## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Nuo Therapeutics, Inc., | Case No. 16-10192_____(__) |
| Debtor. | |

## DECLARATION OF DAVID E. JORDEN IN SUPPORT OF FIRST DAY MOTIONS

**STATE OF MARYLAND** )
                                  )    **SS**
**COUNTY OF MONTGOMERY** )

I, David E. Jorden, hereby state and declare as follows:

1. I am the Acting Chief Executive Officer/Chief Financial Officer of Nuo Therapeutics, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"). I am generally familiar with the day-to-day operations, business and financial affairs and books and records of the Debtor.

2. I have over 25 years of experience in the financial fields, including 4 years in public accounting. I am a graduate of Northwestern University's Kellogg School, MBA, and the University of Texas at Austin, B.B.A. I was previously a Certified Public Accountant and hold the Chartered Financial Analyst designation. My areas of expertise include capital markets, financial management and analysis, and business strategy.

3. On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

4. To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 case on its business, the Debtor has requested various types of relief in a number

of applications and motions (each a "First Day Motion" and collectively the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtor's business operations to preserve value for the Debtor, its stakeholders and parties in interest. Each First Day Motion is crucial to the Debtor's reorganization efforts.

5.      I make this declaration in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. The facts set forth in this declaration are personally known to me, and, if called as a witness, I could and would testify thereto.

6.      Additional information regarding the Debtor is available in the Debtor's filings with the United States Securities and Exchange Commission.

## I.      BACKGROUND

### A.      The Debtor's Business

7.      The Debtor is a biomedical company that pioneers leading-edge biodynamic therapies. The Debtor's flagship product, Aurix™, is a biodynamic hematogel that uses a patient's own platelets and plasma as a catalyst for healing. It is the only therapy of its kind that is FDA-cleared for use on a variety of wound etiologies. The use of autologous (derived from the same individual) biological therapies for tissue repair and regeneration is part of a transformative clinical strategy designed to improve long term recovery in complex chronic conditions with significant unmet medical needs.

8.      The Debtor is a Delaware corporation, organized in 1998. Its principal offices are located at 207A Perry Parkway, Suite 1, Gaithersburg, Maryland 20877. The Debtor was originally organized under the name Informatix Holdings, Inc. In 1999, Autologous Wound Therapy, Inc., or AWT, an Arkansas Corporation, merged with and into Informatix Holdings, Inc., and the name of the surviving corporation was changed to Autologous Wound Therapy, Inc.

ATLANTA 5686785.2

In 2000, AWT changed its name to Cytomedix, Inc., or Cytomedix.  In 2001, Cytomedix, filed for bankruptcy under Chapter 11 of the Bankruptcy Code, after which Cytomedix was authorized to continue to conduct its business as a debtor and debtor-in-possession.  Cytomedix emerged from bankruptcy in 2002 under a plan of reorganization.  At that time, all of Cytomedix's securities or other claims against or equity interests in Cytomedix were canceled and of no further force or effect.  Holders of certain securities, other claims or equity interests were entitled to receive new securities from Cytomedix in exchange for their securities, other claims or equity interests prior to the bankruptcy.

9.      In September 2007, Cytomedix received clearance from the U.S. Food and Drug Administration (the "FDA") for the Aurix$^{TM}$ System ("Aurix").  Aurix was formerly known as the AutoloGel$^{TM}$ System.  In April 2010, Cytomedix acquired the Angel® Whole Blood Separation System ("Angel" or the "Angel® Business") from Sorin Group USA, Inc.  In February 2012, Cytomedix acquired Aldagen, Inc. ("Aldagen"), a privately held cell-therapy company located in Durham, North Carolina.  In 2014, Cytomedix changed its name to Nuo Therapeutics, Inc.  Aldagen is a wholly-owned subsidiary of the Debtor.

10.      The Debtor's current commercial offerings consist of point of care technologies for the safe and efficient separation of autologous blood and bone marrow to produce platelet based therapies or cell concentrates.  Today, the Debtor has two distinct platelet rich plasma ("PRP") devices, (i) the Aurix System for wound care, and (ii) the Angel cPRP system for orthopedics markets. The Debtor's product sales are predominantly (approximately 84%) in the U.S., where it sells products through direct sales representatives and under a License Agreement between the Debtor and Arthrex that generates royalty payments.  Growth drivers in the U.S. include the treatment of chronic wounds with Aurix in the Veterans Affairs healthcare system

ATLANTA 5686785.2

and the Medicare population under a National Coverage Determination ("NCD") when registry data is collected under Center for Medicare & Medicaid Services' ("CMS")' Coverage with Evidence Development ("CED") program, and a worldwide distribution and licensing agreement that allows Arthrex as a partner to promote the Angel system for uses other than wound care.

11.    On January 4, 2016, the Debtor and RestorixHealth, Inc. ("Restorix") entered into a non-binding statement of intent with regard to a business partnership whereby, under CMS' CED program, the Debtor and Restorix will work in collaboration with up to 30 Restorix partner hospitals to initially enroll up to 1,600 patients over an initial 13 month period in three separate and distinct established protocols for the treatment of diabetic foot ulcers, venous leg ulcers, and pressure ulcers.    A final draft agreement has been provided to Restorix and comments are expected to the agreement the week of January 25, 2016.    The Debtor and Restorix have begun joint planning of the initiation of the collaboration with a target initiation of March 1, 2016.

**B.    Existing Debt**

**Senior Secured Debt – Deerfield Facility Agreement**

12.    On or about March 31, 2014, the Debtor entered into that certain Facility Agreement (the "Deerfield Facility Agreement"), under which the Debtor obtained a $35 million five-year senior secured convertible credit facility by and between the Debtor and Deerfield Private Design Fund II, L.P.; Deerfield Private Design International II, L.P.; Deerfield Special Situations Fund, L.P.; and Deerfield Special Situations International Master Fund, L.P.    On January 18, 2016, I was informed by counsel to the above-referenced Deerfield entities that, as of January 1, 2015, Deerfield Special Situations International Master Fund, L.P. transferred its assets (including its rights and obligations under the Deerfield Facility Agreement) to Deerfield Special Situations Fund, L.P.    Accordingly, for purposes of this declaration, the following three Deerfield entities: (i) Deerfield Private Design Fund II, L.P.; (ii) Deerfield Private Design

4

International II, L.P.; and (iii) Deerfield Special Situations Fund, L.P. will be referred to collectively as "Deerfield".

13.    The Deerfield Facility Agreement is structured as a purchase of senior secured convertible notes (the "Notes"), which bear interest at a rate of 5.75% per annum, payable quarterly in arrears in cash or, at the Debtor's election, in registered shares of common stock; provided, that during the five quarters ending September 30, 2015, the Debtor had the option of having all or any portion of accrued interest added to the outstanding principal balance.  The Debtor elected to have all portions of accrued interest added to the principal balance until September 30, 2015, beginning with interest due for the third quarter of 2014.  Outstanding amounts under the Deerfield Facility Agreement are due in full on March 31, 2019.

14.    As of September 30, 2015, the total debt outstanding under the Deerfield Facility Agreement was approximately $37.6 million, including accrued interest.  The Deerfield Facility Agreement required the Debtor to maintain a compensating cash balance of $5.0 million in deposit accounts subject to control agreements in favor of Deerfield.  As of September 30, 2015, the Debtor had approximately $4.1 million in cash and cash equivalents and was not in compliance with that covenant.  The terms of the Deerfield Facility Agreement also required the Debtor to pay Deerfield accrued interest in the amount of approximately $2.6 million on October 1, 2015, which the Debtor was unable to do.

15.    On November 11, 2015, the Debtor entered into a letter agreement with Deerfield and certain of its affiliates pursuant to which the Deerfield Facility Agreement was modified to provide that: (i) between November 11, 2015 and December 4, 2015, the amount of cash required to be maintained in a deposit account subject to control agreements in favor of Deerfield was reduced from $5,000,000 to $1,750,000, and (ii) the date for payment of the accrued interest

ATLANTA 5686785.2

amount originally payable on October 1, 2015 was extended to December 4, 2015.

16.     On December 4, 2015, the Debtor entered into a letter agreement with Deerfield and certain of its affiliates pursuant to which the Deerfield Facility Agreement was modified to provide that: (i) between December 4, 2015 and December 17, 2015, the amount of cash required to be maintained in a deposit account subject to control agreements in favor of Deerfield was reduced to $1,375,000, and (ii) the date for payment of the accrued interest amount originally payable on October 1, 2015 was extended to December 17, 2015.

17.     On December 17, 2015, the Debtor entered into a letter agreement with Deerfield and certain of its affiliates pursuant to which the Deerfield Facility Agreement was modified to provide that: (i) between December 18, 2015 and January 7, 2016, the amount of cash required to be maintained in a deposit account subject to control agreements in favor of Deerfield was reduced to $500,000, and (ii) the date for payment of the accrued interest amount originally payable on October 1, 2015 was extended to January 7, 2016.  No further agreement or extension has been reached or granted.

18.     Deerfield has the right to convert the principal amount of the Notes into shares of the Debtor's common stock ("Conversion Shares") at a per share price equal to $0.52. In addition, the Debtor granted to Deerfield the option to require the Debtor to redeem up to 33.33% of the total amount drawn under the facility, together with any accrued and unpaid interest thereon, on each of the second, third, and fourth anniversaries of the closing with the option right triggered upon the Debtor's net revenues falling below certain quarterly milestone amounts.  Revenue for the three month period ended September 30, 2015 was less than the amounts required under the Deerfield Facility Agreement.

19.     Contemporaneously with the Deerfield Facility Agreement, the Debtor entered

6

into a security agreement which provides, among other things, that its obligations under the Notes will be secured by a first priority security interest, subject to customary permitted liens, on all the Debtor's assets. The Debtor also entered into a Registration Rights Agreement pursuant to which it filed a registration statement to register the resale of the Conversion Shares and the shares underlying the stock purchase warrants.

20. In connection with the March 31, 2014 and June 25, 2014 draws under the Deerfield Facility Agreement in the aggregate amount of $35 million, the debtor issued to Deerfield warrants to purchase approximately 96.2 million shares of the Debtor's common stock. Contemporaneously with the Deerfield Facility Agreement, the Debtor also entered into a Registration Rights Agreement pursuant to which it filed a registration statement to register the resale of the Conversion Shares and the shares underlying the stock purchase warrants.

21. As a result of certain non-standard anti-dilution provisions and cash settlement features, the Debtor classified the detachable stock purchase warrants and the conversion option embedded in the Notes as derivative liabilities for financial reporting purposes. For financial reporting purposes under generally accepted accounting principles (GAAP), these derivative liabilities were recorded initially at their estimated then fair value; as a result, the Debtor recognized total debt discount on the convertible notes of $34.8 million. The Debtor is amortizing this discount over the term of the Notes under GAAP using the effective interest method. As of December 31, 2015, approximately $0.7 million of the initial debt discount had been amortized.

22. Deerfield does not agree with the Debtor's treatment of the warrants and conversion option for financial accounting purposes, or the discount on the convertible notes recognized by the Debtor for such purposes.

23.    For U.S. federal income tax purposes, although the Debtor has not conducted a full investigation, the Debtor believes that the Notes were issued with original issue discount ("OID"). The Debtor did not, however, claim a deduction for any OID amortization on its 2014 U.S. federal income tax return. Although it was intended that the Debtor and Deerfield would agree on the amount of OID with which the Notes were issued for U.S. federal income tax purposes, no such agreement exists, and Deerfield does not agree with the tax treatment of the notes described above.

24.    Prior to the Petition date, an ad hoc committee of equity holders advised the Debtor that it believes that the existence of debt discount raises an issue as to whether Deerfield can credit bid on its prepetition claim for any amount that represents unmatured interest.

25.    For credit bid purposes Deerfield has agreed to use the sum of $10.5 million as the prepetition loan portion of its claim.[1]  The Debtor is amenable to this amount for the purpose of Deerfield's credit bid.  This resolution of Deerfield's credit bid amount is without prejudice to Deerfield's contentions regarding the amount of its secured indebtedness and the amount of OID.

### Other Secured Obligations

26.    The Debtor directly or indirectly leases machinery and equipment such as photocopiers under various secured leasing agreements.

### Other Indebtedness and Unsecured Claims Against the Debtor

27.    Two former employees of the Debtor have asserted potential litigation claims against the Debtor in the sum of approximately $350,000, which claims the Debtor disputes.

28.    As of the Petition Date, the Debtor's books and records reflect accounts payable

---

[1] Deerfield's total credit bid will be equal to $15,050,000, in consideration of its proposed debtor-in-possession financing.

ATLANTA 5686785.2

of approximately $2.1 million that are due and payable and other accrued expenses (not including interest accrued under the Deerfield Facility Agreement or taxes).

29.     As of the Petition Date, the Debtor owes approximately $15,000.00 in accrued real property taxes.

## C.     Events Leading to Chapter 11

30.     The Debtor faces a challenging competitive environment as the chronic wound market has many therapies that directly compete with Aurix that have established habitual use patterns and provider contracts to encourage standardized use.  Acceptance of new products, like Aurix, has been slow often due to reimbursement rates and issues.  Also, several suppliers to the chronic wound market have established market shares and significant resources to devote to sales and marketing efforts.  However, I believe that the positive clinical data amassed to date and, most importantly, the recently increased reimbursement rate by CMS for the Aurix product effective January 1, 2016 are positive developments for the company.  More specifically, CMS had previously reimbursed Aurix at a national average of $430 during 2015.  Based on the Debtor's continued interaction with CMS on the issues of resource utilization and clinical intensity associated with Aurix, when CMS announced its final rules for Hospital Outpatient Prospective Payment System rates in late October, the 2016 national average reimbursement rate was increased to $1,411 per treatment.  This significant increase is a potentially transformative development for the Debtor's business as now, for the first time, the positive clinical attributes of the product can be matched with a reimbursement rate that both recognizes the product's value proposition and provides the hospital outpatient wound care clinic the financial motivation to utilize Aurix.

31.     In light of the prior challenging reimbursement and competitive environment in which the Debtor's primary product competes, the Debtor's revenues have been insufficient to cover operating expenses, which consist primarily of employee compensation, professional fees,

ATLANTA 5686785.2

consulting expenses, clinical trial costs, and other general business expenses such as insurance, travel related expenses, and sales and marketing related items.

32.    On August 11, 2015, the Debtor's Board of Directors approved a realignment plan (the "Realignment Plan") with the goal of preserving and maximizing the value of the Debtor's existing assets. The Realignment Plan eliminated approximately 30% of the Debtor's workforce and was aimed at the preservation of cash and cash equivalents to finance the Debtor's future operations and support the Debtor's revised business objectives. In connection, with the Realignment Plan, Martin P. Rosendale stepped down as Chief Executive officer effective August 14, 2015. Mr. Rosendale has continued to serve as a consultant on an as-needed, but limited basis. Effective August 15, 2015, Dean Tozer was appointed as the Debtor's President and Chief Executive Officer. Immediately prior to such appointment, Mr. Tozer served as the Debtor's Chief Commercial Officer. The Debtor recognized severance costs totaling approximately $0.80 million to executives and non-executives in connection with the Realignment Plan. Certain modest severance expenses are not expected to be paid until the first quarter of 2016.

33.    On January 8, 2016, the board of directors of the Debtor provided written notice to terminate, without cause, the employment relationship between the Debtor and Mr. Tozer. In accordance with the terms of Mr. Tozer's employment agreement, the termination will be effective thirty days from the date of the notice. Also on January 8, 2016, the board appointed me as the Debtor's Acting Chief Executive Officer, effective immediately. Effective January 12, 2016, Dean Tozer resigned from the board of directors of the Debtor as a result of his earlier termination.

34.    The Debtor has continued to experience losses following implementation of the Realignment Plan, and faces severe liquidity pressures that have created difficulty in servicing its

existing debt, difficulty in obtaining additional or replacement financing, and challenges in funding its ongoing operations.  The Debtor's deteriorating financial condition has left the Debtor with no choice but to seek relief under chapter 11 of the Bankruptcy Code by filing the Petition.

35.     As set forth in the Debtor's Form 10-Q for period ending September 30, 2015, filed with the U.S. Securities and Exchange Commission, the Debtor's financial statements reflect assets of $19,151,928 as of September 30, 2015, liabilities of $13,119,282 as of September 30, 2015, and $9,901,562 in revenue for the nine months ending September 30, 2015.

## Chapter 11 Initiatives

36.     The Board of Directors of the Debtor, after a thorough and deliberative process, has authorized the Debtor to commence this bankruptcy case for the purpose of preserving and maximizing the value of the Debtor's assets for the benefit of the Debtor's stakeholders and parties in interest.

### Sale Process

37.     The Debtor anticipates that this chapter 11 case will involve a sale of substantially all of the Debtor's significant assets pursuant to Section 363 of the Bankruptcy Code, through an auction process approved by the Bankruptcy Court.

38.     Before filing this chapter 11 case, the Debtor—with the aid of Gordian Group, LLC, its financial advisor and investment banker—initiated a focused marketing process to explore a range of strategic financing and sale options for the Debtor's various business units. After careful evaluation and further negotiation with the Debtor's stakeholders, it was determined that an expedited free-and-clear sale of the Debtor's business through a chapter 11 proceeding would preserve the underlying value of its operations and maximize the value of the Debtor's assets for the benefit of the Debtor's creditors and stakeholders.

11

39.     Under the requirements of the Debtor's debtor-in-possession financing, further described below, the Debtor is required to file a sale procedures motion within one day after the Petition Date.  The Debtor is in the process of finalizing that motion, and anticipates that it will include a draft asset purchase agreement with Deerfield, pursuant to which the Debtor expects that Deerfield will make a stalking horse bid subject to higher or better offers.

40.     As will be further detailed in the sale motion, the Debtor's proposed debtor-in-possession financing sets forth certain milestones for the sale process, as follows:

| | |
|---|---|
| **March 4, 2016** | **Deadline for contract counterparties to object to assumption and assignment of executory contracts.** |
| **March 7, 2016** | **Bid Deadline.** |
| **March 9, 2016** | **Auction.** |
| **March 10, 2016** | **Sale Objection Deadline.** |
| **March 11, 2016** | **Sale Hearing.** |

41.     While the Debtor understands that the timeline for the marketing and sale of its assets is aggressive, the Debtor believes that it reflects the constraints of the case and is appropriate under the circumstances.  The Debtor, in its business judgment, believes that the marketing and sale of its assets pursuant to the proposed sale process presents the best opportunity to maximize the value of its assets for all interested parties.

**Debtor-in-Possession Financing**

42.     The Debtor has secured additional debtor-in-possession financing from Deerfield in connection with its bankruptcy filing.  Without such additional financing, the Debtor believes that its operations will cease in the near term, resulting in significant loss of value to all of its stakeholders and parties in interest.  With such additional financing in place, however, the Debtor believes that it can continue operations through the contemplated sale process. Consistent with these plans, the Debtor has presented a nine-week budget cash projection to

ATLANTA 5686785.2

Deerfield.

43.     During the sale process, the Debtor intends to continue normal operations as it completes its operational and financial restructuring for the benefit of its creditors, stakeholders and all other parties in interest.

## II.     FIRST DAY MOTIONS AND APPLICATIONS

44.     Concurrently with the filing of its Chapter 11 petition, the Debtor is filing certain applications, motions, and proposed orders.  The Debtor requests that the relief described below be granted, as each request constitutes a critical element in achieving the successful rehabilitation and restructuring of the Debtor for the benefit of all parties in interest.

45.     Concurrently with the filing of this Chapter 11 case, the Debtor filed the First Day Motions, which request various forms of relief.  Generally, the First Day Motions have been designed to meet the Debtor's goals of:  (a) continuing its operations in Chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of its employees, vendors, suppliers and service providers during the Debtor's reorganization process; (c) establishing procedures for the smooth and efficient administration of this Chapter 11 case; and (d) obtaining the necessary financing through cash collateral usage and a debtor in possession loan to finance the Debtor's operations during this Chapter 11 case.

46.     I have reviewed and discussed with Debtor's counsel each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference any factual statements set forth in the First Day Motions.  It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the goals of this Chapter 11 case.

47.     It is my further belief that, with respect to those First Day Motions requesting the

ATLANTA 5686785.2

authority to honor prepetition obligations, the relief requested is essential to the Debtor's chapter 11 initiatives and necessary to avoid immediate and irreparable harm to the Debtor. Any diminution in the Debtor's ability to maintain its operations in the ordinary course will have an immediate and irreparable harmful effect on the going concern value of the Debtor's estate to the detriment of all of the Debtor's constituencies.[2]

### A.    Motion to Approve Debtor in Possession Financing ("DIP Motion")

48.    By the DIP Motion, the Debtor seeks the entry of interim and final orders (i) authorizing the Debtor to obtain postpetition financing (the "DIP Financing") pursuant to that certain *Senior Secured, Superpriority Debtor-In-Possession Credit Agreement* (as it may be amended from time to time, the "DIP Agreement") and the related DIP Budget; (ii) authorizing the Debtor to use Cash Collateral; (iii) granting liens and providing superpriority administrative expense status to the DIP Lenders; (iv) granting adequate protection to the Prepetition Secured Parties; (v) modifying the automatic stay; (vi) scheduling a final hearing on the relief requested herein; and (vii) granting related relief.

49.    As set forth in the DIP Motion, the Debtor, in its reasonable business judgment, seeks $9,000,000 in post-petition financing, consisting of (a) a roll-up loan in the aggregate principal amount of $4,500,000, and (b) certain other loans in the aggregate principal amount of $4,500,000 to finance operations and the costs of chapter 11. The financing sought on an interim basis will be used to provide $1,500,000 in new money, and $4,500,000 to fund the roll-up loan to refinance a portion of the indebtedness under the Deerfield Facility Agreement.

50.    Upon entry of the Final Order, the Debtor will draw additional funds available

---

[2]    Unless otherwise defined herein, any capitalized term used herein shall have the meaning ascribed thereto in the particular motion described below.

under the DIP Financing in accordance with the terms of the DIP Agreement, in order to fund the Debtor's operations during this chapter 11 case.

51.     The Debtor is cash-strapped and has an immediate need to access the funds available under the DIP Financing.  Without the DIP Financing the Debtor would be unable to pay costs and expenses, including but not limited to, wages, salaries, professional fees, and other general administrative expenses and costs that will arise in connection with the administration of a chapter 11 case and in the ordinary course of the Debtor's business.  The Debtor has no other credit available, and without the additional liquidity provided under the DIP Financing the Debtor will run out of cash before the end of January 2016 and cease operations.

52.     Despite the Debtor's extraordinary circumstances, it made a good faith effort to explore all available financing options.  However, the Debtor's obligations owed to the Prepetition Secured Parties, including Deerfield, under its Existing Facility Agreement are secured, in whole or in part, by all of the Debtor's assets, and therefore, (i) the liens of Deerfield would have to be primed to obtain postpetition financing, (ii) the Debtor would have to find a postpetition lender willing to extend credit that would be junior to the liens of Deerfield or (iii) postpetition financing would have to be extended on an unsecured basis.  The Debtor recognizes that few other DIP lenders, if any, would be willing to lend under the circumstances.

53.     After extensive negotiations, the Prepetition Secured Parties have consented to the priming of their liens in accordance with the terms described in the DIP Motion and DIP Agreement.  Consequently, the Debtor was able to obtain the DIP Financing from the DIP Lenders on a senior secured, superpriority basis under section 364 of the Bankruptcy Code as set forth in the DIP Agreement, and only on such terms.  The Debtor and its professionals believe that the DIP Financing is comparable to postpetition financings obtained by companies similar in

ATLANTA 5686785.2

size to the Debtor, particularly with respect to pricing and fees. The terms and conditions set forth in the DIP Agreement were extensively negotiated—in good faith and at arms' length—by the Debtor and its professionals on the one hand, and the DIP Lenders and their professionals on the other hand.

54.     The success of the Debtor's chapter 11 case depends in large part on maintaining and/or restoring marketplace and employee confidence and maintaining the operation of its business. As a result, the Debtor needs immediate access to the DIP Financing in order to, among other things, permit the orderly operation of its business by timely procuring and paying vendors, employees and other operational costs. In addition, the DIP Financing will give the Debtor's counterparties confidence that it will continue to meet its obligations in the ordinary course of business. Accordingly, the Debtor believes that such financing, coupled with the use of cash collateral, will enable it to stabilize operations during this chapter 11 case.

55.     Moreover, given the lack of any alternative capital and funding, the Debtor submits that it will face immediate and irreparable harm in the absence of the relief requested in the DIP Motion. Indeed, without the liquidity provided under the DIP Financing the Debtor will be forced to immediately shut down operations. The Debtor believes that the DIP Financing, made available pursuant to both the interim and final orders, will provide sufficient capital and liquidity to fund its operations during this chapter 11 case. Further, under the circumstances, the Debtor believes that the terms of the DIP Financing are fair and reasonable and represent the best—and perhaps the only—financing available to the Debtor.

56.     I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this chapter 11 case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf

ATLANTA 5686785.2

of the Debtor, I respectfully submit that the DIP Motion should be granted.

**B.**     **Motion for Authorization to Continue Using Existing Centralized Cash Management System and Maintain Existing Bank Accounts ("Cash Management Motion")**

57.     By the Cash Management Motion, the Debtor seeks entry of an order (i) authorizing (a) the continued maintenance of existing bank accounts, (b) the continued use of the Debtor's existing cash management system, (c) the continued use of existing business forms, and (d) the opening and closure of bank accounts as deemed necessary and appropriate in the Debtor's business judgment, and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code.

58.     As of the Petition Date, the Debtor used straightforward, independent cash management systems to collect, transfer, and disburse funds generated by its operations and to accurately record all such transactions (collectively, the "Cash Management System") in the ordinary course of business.  The Debtor's Cash Management System involves an integrated network of separate accounts to manage and control receipts and disbursements.  The Cash Management System is centralized at the Debtor's corporate offices and allows the Debtor, through the use of accounting software, to track its cash balances on a daily basis.  The Debtor's Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and scope.  The Debtor's Cash Management System enables the Debtor's management to quickly and accurately create reports on the status, location and availability of funds and helps to facilitate the movement of such funds.  Accordingly, the Debtor believes that its Cash Management System—though critical to the successful operation of its business—is straightforward and can be easily monitored by the Debtor, its professionals, and the U.S. Trustee during this chapter 11 case.

59.     Specifically, in the ordinary course of business, the Debtor maintains two (2)

17

primary bank accounts with Capital One Bank, consisting of a Business Money Market Account and a Business Checking Account. The Debtor also maintains a certificate of deposit approximately in the sum of $53,450.00 at Capital One in connection with requirements of the Maryland Board of Pharmacy. The Debtor also maintains an investment account with Wilmington Trust and a cash reserves account with Fidelity, both of which had balances of $0.00 as of the Petition Date. The Debtor believes that each of its Bank Accounts is maintained at a stable financial institution.

60.     As part of its Cash Management System, the Debtor uses a variety of checks and other pre-printed business forms. Because of the nature and scope of the Debtor's business operations and the number of suppliers of goods and services with whom the Debtor transacts on a regular basis, it is important that the Debtor be permitted to continue to use its Business Forms without alteration or change. To avoid disruption of its Cash Management System and unnecessary expense, the Debtor requests that it be authorized to continue to use its Business Forms substantially in the forms existing before the Petition Date, without reference to its status as a debtor-in-possession; provided, however, that once the Debtor's existing checks have been used the Debtor will reorder checks with the designation "Debtor-in-Possession and the corresponding bankruptcy case number on all such checks. In the absence of such relief, the estate will be required to bear a potentially significant administrative burden and expense.

61.     In sum, the Debtor's Cash Management System allows for (i) overall corporate control of funds, (ii) cash availability when and where needed by the Debtor, and (iii) the reduction of administrative costs through a method of coordinating funds collection and movement. Further, the Cash Management System will enable the Debtor to continue to maintain detailed records reflecting all transfers, receipts, and disbursements. The Debtor's

ATLANTA 5686785.2

smooth transition into, and through, chapter 11 depends on its ability to use its Cash Management System, maintain its Bank Accounts, and use its existing Business Forms without interruption. Indeed, the Cash Management System is essential to the efficient execution and achievement of the Debtor's business objectives and ultimately, to maximizing the value of the Debtor's estate. In light of the foregoing, the Debtor believes that requiring it to adopt a new, segmented cash management system at this early and critical stage of this chapter 11 case would be an unnecessary financial and administrative burden, detrimental to the Debtor's estate and creditors.

62.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this chapter 11 case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

## C. **Motion for Entry of Interim and Final Orders (i) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor and (ii) Determining that the Utility Companies are Adequately Assured of Postpetition Payment ("Utilities Motion")**

63.    By the Utilities Motion, the Debtor seeks entry of interim and final orders: (i) prohibiting Utility Companies from altering, refusing or discontinuing services to, or discriminating against, the Debtor as a result of the commencement of this case or on account of prepetition invoices, (ii) approving the Debtor's proposed form of adequate assurance, and (iii) establishing procedures for resolving adequate assurance objections by Utility Companies.

64.    In the ordinary course of its business, the Debtor incurs expenses in connection with certain Utility Services including gas, electric, and other similar services. On average, the Debtor pays approximately $2,000 each month to Utility Companies.

65.    The Utility Services are essential to the Debtor's business; any service

interruption would severely disrupt the Debtor's operations and could harm customer relationships, revenues, profits, and ultimately its ability to maximize stakeholder recoveries in this chapter 11 case. It is therefore critical that all Utility Services continue to be provided on an uninterrupted basis to the Debtor.  Consequently, the Debtor intends to pay all postpetition obligations owed to the Utility Companies in a timely manner using operating revenue and in accordance with the DIP Budget.

66.     However, due to the timing of the filing of this chapter 11 case in relationship to the Utility Companies' billing cycles, and the Debtor's financial situation leading to the filing of this chapter 11 case, the Debtor has been invoiced, but has not yet paid, for certain prepetition Utility Services.  In addition, the Debtor may have incurred utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtor.  The Utilities Motion seeks to preserve the protections that the Utility Companies have under section 366 of the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate adequate assurances without facing the threat of immediate termination of its Utility Services.  In particular, the Debtor requests approval of certain procedures that balance the protections afforded Utility Companies and the Debtor's need for uninterrupted Utility Services.

67.     Further, the Debtor respectfully submits that none of the Utility Companies requires a deposit for the provision of Utility Services to the Debtor during the postpetition period of this case given the modest cost of the Utility Services and the availability of funds pursuant to the DIP Agreement and Budget.  Nevertheless, the Debtor proposes to pay an adequate assurance deposit to each Utility Company in an amount equal to the two-week average charge for Utility Services provided by each Utility Company.  The Debtor submits that the foregoing constitutes adequate assurance of future payment to the Utility Companies to satisfy

the requirements of Section 366 of the Bankruptcy Code; however, the Utilities Motion provides a mechanism through which Utility Companies may request additional adequate assurance.

68.    Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this chapter 11 case, and is critical to the Debtor's reorganization efforts.  Accordingly, on behalf of the Debtor, I respectfully request that the Court grant the relief requested in the Utilities Motion.

**D.    Motion for Authorization to Pay Pre-Petition Wages, Compensation, and Employee Benefits ("Wages Motion")**

69.    By the Wages Motion, the Debtor seeks interim and final orders (i) authorizing, but not directing, the Debtor to pay the prepetition wages, salaries, and benefits of its employees; (ii) authorizing, but not directing, the Debtor to continue employee benefit programs in the ordinary course of business; and (iii) authorizing and directing all banks to honor prepetition checks for payment of prepetition wage, salary and benefit obligations.

70.    As of the Petition Date, the Debtor employs approximately 21 full-time employees (the "Employees").    The average gross semi-monthly payroll historically is approximately $280,000.  The next scheduled payroll date is on or around January 31, 2016.  All Employees are paid through a payroll service.  The Debtor estimates that the aggregate amount of the Employees' prepetition accrued, unpaid wages and commissions as of the Petition Date will not exceed $130,000 (the "Prepetition Wages Cap").  Pursuant to the Wages Motion, the Debtor will not make payments to the Employees for prepetition accrued, unpaid wages and commissions in excess of the Prepetition Wages Cap.  Moreover, the Debtor does not believe payments of wages to any individual employee will exceed the $12,475 cap under section 507(a) of the Bankruptcy Code.

ATLANTA 5686785.2

71.    In addition to the wages discussed above, the Debtor's Employees also generally are entitled to receive other forms of compensation, including health benefits, vacation pay, paid holidays, paid sick time, and other earned time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs").  The Employee Benefit Programs include, but are not limited to: (i) paid time off benefits, (ii) expense reimbursement for certain employment-related activities, (iii) 401(k) and similar retirement investment plans, (iv) a healthcare program, including dental and vision coverage as well as several insurance options, and (v) workers' compensation insurance.  Certain of these Employee Benefit Programs are funded by the Employees themselves through payroll deductions or a combination payroll deductions and contributions from the Debtor.  Further, as set forth in the Wages Motion, the Debtor proposes that all payments to Employees in connection with the Employee Benefit Programs be made subject to both the DIP Budget and any applicable payment cap.

72.    The Debtor believes that many, if not most, of its Employees rely exclusively on their compensation to pay their daily living expenses.  Also, the Employee Benefit Programs are a critical component of the Employees' total compensation package.  Absent the relief requested in the Wages Motion, the Employees could face significant financial difficulties.  Furthermore, if the Debtor is not permitted to make the payments proposed in the Wages Motion, the Employees' morale will suffer, and worse, certain Employees may seek alternative employment. Any loss in workforce at this time could hinder the Debtor's chapter 11 case and jeopardize the Debtor's going-concern value.  Accordingly, as set forth in the Wages Motion, the Debtor requests authority to continue paying the Employees and administering the Employee Benefit Programs and any obligations related to the foregoing (subject to the DIP Budget and any applicable payment caps) in the ordinary course of business.

ATLANTA 5686785.2

73.     At this critical stage, the Debtor simply cannot risk the substantial disruption that would attend any decline in workforce morale or composition attributable to Debtor's failure to pay the Employee Obligations in the ordinary course of business.

74.     I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this chapter 11 case, and is critical to the Debtor's reorganization efforts.  Accordingly, on behalf of the Debtor, I respectfully submit that the Wages Motion should be granted.

**E.**     **Motion for Authorization to (A) Continue Workers' Compensation, Liability, Property, and Other Insurance Programs, (B) Pay All Obligations in Respect Thereof and (C) Enter Into Premium Financing Agreements in the Ordinary Course of Business ("Insurance Motion")**

75.     Pursuant to the Insurance Motion, the Debtor seeks entry of an order authorizing (i) the Debtor (a) to continue its workers' compensation, liability, property, and other insurance programs, (b) to pay all obligations in respect thereof, and (c) to enter into premium financing agreements in the ordinary course of business, and (ii) financial institutions to honor and process checks and transfers related to such obligations.

76.     In the ordinary course of its business, the Debtor maintains a number of insurance polices that are administered by various third-party insurance carries.  These policies provide coverage for, among other things, workers' compensation, automobile losses and liability, directors' and officers' liability, fiduciary liability, general liability, employee health, employee dental, employee disability, and employee life insurance benefits.  The Debtor is required to pay, either directly or through the Debtor's insurance brokers, premiums for coverage under these Insurance Programs.  The Insurance Premiums are based upon a fixed rate established and billed by each Insurance Carrier.  The premiums for most of the Insurance Programs are determined annually and are paid at the inception of each policy.

23

77.     Because it is not always economically advantageous for the Debtor to pay the Insurance Premiums on all of the Insurance Policies on a lump-sum basis, in the ordinary course of the Debtor's business, the Debtor finances the premiums on certain of its Insurance Policies pursuant to premium financing agreements with third-party lenders.  In exchange for the financing, the Debtor agrees to pay monthly installments in accordance with a pre-set payment schedule and further grants the lender a security interest in "unearned premiums" to secure the payment obligations.  As of the Petition Date, the Debtor believes that approximately $79,834.44 remains outstanding with respect to the current insurance premium financing agreements.

78.     The continuation of the Debtor's Insurance Policies and premium-financing agreements, as well as having the ability to renew or enter into new Insurance Policies and premium-financing agreements, is essential to the preservation of the value of the Debtor's business, properties, and assets.  Moreover, in certain cases, coverage provided by the Insurance Policies is required by law, regulation, or contract.

79.     I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 case, and is critical to the Debtor's reorganization efforts.  Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be granted.

**F.      Applications for Orders Authorizing Retention and Employment of Epiq Bankruptcy Solutions, LLC ("Epiq") (i) as Claims, Balloting, and Noticing Agent, *Nunc Pro Tunc* to the Petition Date and (ii) Administrative Advisor *Nunc Pro Tunc* to the Petition Date (together, "Epiq Retention Applications")**

80.     Pursuant to the Epiq Retention Applications, the Debtor seeks entry of two orders: the first, approving the services agreement between the Debtor and Epiq and the Debtor's appointment and retention of Epiq as claims and noticing agent for the Debtor in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware, effective as of the

ATLANTA 5686785.2

Petition Date, and the second, approving a separate services agreement between the Debtor and Epiq and the Debtor's retention of Epiq as its administrative advisor (with respect to those services that exceed the scope of a Claims Agent) in this chapter 11 case.  Accordingly, Epiq's engagement is an effective and efficient manner of providing notice to the hundreds of creditors and parties in interest of the filing of, and developments in, the Debtor's chapter 11 case.  Additionally, Epiq will significantly reduce the administrative burden on the Clerk's office in connection with, among other things, the claims administration and plan confirmation processes.  Further, retaining Epiq as Administrative Advisor to perform the Administrative Services will allow the Debtor and its professionals to focus on key aspects of the Debtor's restructuring efforts.  It is the Debtor's understanding that Epiq is fully equipped and capable of performing the Administrative Services in addition to processing proofs of claim and handling the volume of mailing involved in properly sending the required notices to creditors and other interested parties in this chapter 11 case.

81.     I believe that the relief requested in the Epiq Retention Applications is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this chapter 11 case, and is critical to the Debtor's reorganization efforts.  Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Epiq Retention Applications should be granted.

### G.     Motion for Entry of Order Authorizing the Payment of Prepetition Trust Fund Taxes in the Ordinary Course of Business ("Taxes Motion")

82.     In the ordinary course of business, the Debtor collects sales, use and other trust fund type taxes (however denominated) (the "Trust Fund Taxes"), and subsequently remits such taxes to the appropriate federal, state and local taxing authorities (each, a "Taxing Authority").  The Debtor may also be responsible for remitting use taxes to the appropriate Taxing Authorities

on personal property and certain related services.  Accordingly, by the Taxes Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor to remit and pay certain prepetition Trust Fund Taxes owed to the appropriate Taxing Authorities in the ordinary course of business, as such payments become due and payable in an aggregate amount not to exceed $90,0000, subject to the availability of funds sufficient to make such payment the terms and conditions of any orders entered by the Court in connection with the Debtor's postpetition financing.

83.     There is often a lag-time between the time when the Debtor incurs an obligation to pay the Trust Fund Taxes and the date when payment of such taxes is due.  Various governmental units may therefore have claims against the Debtor for Trust Fund Taxes that have accrued, but are unpaid and not yet due, as of the Petition Date.  The relevant Taxing Authority may also make retrospective adjustments to determine any payment deficiency or surplus for a particular period resulting in a demand for further payment from or refund to the taxpayer. While the Debtor is making its best efforts to calculate the amounts with respect to the Trust Fund Taxes owed as of the Petition Date, the calculation of such amount is difficult to determine with complete certainty because the Debtor's books have not yet been closed for the most recent month.  Accordingly, the amounts required to be paid pursuant to the Taxes Motion are subject to change.

84.     Because the Trust Fund Taxes do not constitute estate property, their payment will not adversely affect the Debtor or its creditors.  Moreover, many Taxing Authorities impose personal liability on the officers and directors of corporations to the extent such taxes are collected but not remitted.  The Debtor's officers and directors may be subject to civil or even criminal liability as a result of such non-payment.  The prosecution of such actions during the

26

pendency of this case would be a significant distraction, and therefore, be detrimental to the Debtor's reorganization efforts.

85.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 case, and is critical to the Debtor's reorganization efforts.   Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Taxes Motion should be granted.

**H.      Motion for Entry of an Order Establishing (i) Notice and Objection Procedures for Transfers of Equity Securities and (ii) a Record Date for Notice and Sell-Down Procedures for Trading in Claims ("Equity Trading Motion")**

86.     By the Equity Trading Motion, the Debtor seeks the entry of an order (i) establishing notice and objection procedures regarding certain transfers of beneficial interests in equity securities in the Debtor; (ii) establishing a record date for notice and potential sell-down procedures for trading in claims against the Debtor; and (iii) granting certain related relief.   The narrowly tailor equity-trading procedures set forth in the Equity Trading Motion are intended to give the Debtor the ability to monitor and object to proposed transfers of Equity Securities an Claims against the Debtor, as the unrestricted transfer of such claims and interests could jeopardize the estate's use of certain tax attributes, including but not limited to, the Debtor's net operating losses ("NOLs").

87.     The Debtor has experienced years of losses from the operation of its business. The Debtor does not know the current value of its federal income tax NOLs, but reasonably believes that the value of the NOLs may be significant. These NOLs could translate into future reductions of the Debtor's federal income tax liabilities, and could substantially enhance the Debtor's cash position for the benefit of parties in interest, contributing to the Debtor's efforts to maximize value for the benefit of its estate and creditors.

ATLANTA 5686785.2

88.      As described in the Equity Trading Motion, the Debtor may lose the ability to use its NOLs if it experiences an "ownership change" for federal income tax purposes. To prevent this potential loss of property of the Debtor's estate, the Debtor requests approval of certain procedures governing the transfer of Equity Securities during the pendency of this chapter 11 case. In addition, the Debtor may ultimately need to seek a Sell-Down Order with respect to trading in Claims to protect and preserve the value of the NOLs in connection with a plan of reorganization or a qualifying asset sale.

89.      In the absence of the relief requested in the Equity Trading Motion, transfers of Equity Securities during the pendency of this chapter 11 case could severely limit—or even eliminate—the Debtor's ability to use its NOLs, and could have significant negative consequences for the Debtor, its estate and its efforts to maximize value for creditors and parties in interest.  Although the Debtor is currently investigating the value of its NOLs, same are a key estate asset and that the loss of the NOLs would cause immediate and irreparable harm.  Through the proposed equity-trading procedures, the Debtor will be able to monitor and object to certain transfers of Equity Securities in order to ensure that the NOLs are preserved for the benefit of the Debtor's stakeholders.

90.      I believe that the relief requested in the Equity Trading Motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this chapter 11 case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Equity Trading Motion should be granted.

I.      **Motion for an Order Authorizing, But Not Directing, Payment of Prepetition Claims of Certain Critical Vendors ("Critical Vendor Motion")**

91.      By the Critical Vendor Motion, the Debtor seeks the entry of an order (i)

authorizing, but not directing, the Debtor to pay, in its reasonable business judgment, the Critical

Vendor Claims in an aggregate amount not to exceed (a) $450,000 on an interim basis and (b)

$650,000 on a final basis;  (ii) authorizing, but not directing, the Debtor to enter into Postpetition

Trade Agreements as it deems appropriate in its business judgment; (iii) authorizing all banks

and other financial institutions to receive, process, honor, and pay any and all checks presented

for payment and electronic transfers with respect to payments authorized by this Motion, whether

presented before or after the Petition Date, upon receipt by each bank and financial institution of

notice of such authorization, provided that sufficient funds are on deposit in the applicable

accounts; and (iv) granting such further and related relief as the Court deems just and proper.

92.     As set forth in the Critical Vendor Motion, in the ordinary course of the Debtor's

business it depends on a number of suppliers, service providers, contract manufacturers, and

other third parties to assist with, among other things, product development, manufacturing,

distribution, and commercialization.  In particular, the Aurix and Angel Systems are complex

healthcare products that require the Debtor to obtain materials, supplies, and other components

from a number of unique suppliers and sources.  The Debtor's reliance on third-party suppliers

and contractors makes their continued cooperation critical to the Debtor's ability to preserve the

value of its estate and pursue its goals in this chapter 11 case.

93.     Each of the Critical Vendors provides materials, components, or services that are

vital to the Debtor's continued operations and ability to generate revenue.  In determining the

amount of the Final Cap and whether a given vendor was a Critical Vendor, the Debtor consulted

the appropriate members of its management team to identify those vendors essential to the

Debtor's operations.  The Debtor believes that, in some cases, other vendors cannot supply the

required goods or services in sufficient quantity, quality, or reliability, or on a cost-efficient or

ATLANTA 5686785.2

timely basis.  Further, in certain other cases, the process of transitioning to a replacement vendor would take precious time and resources and could significantly disrupt the Debtor's operations. Under the circumstances, the Debtor believes that it does not have viable alternatives to obtain substitute goods or services from other sources.  Consequently, to ensure the uninterrupted operation of its business, the Debtor seeks authority to pay all or a portion of the Critical Vendor Claims to the extent that the Debtor determines, in the exercise of its business judgment, that payment of such Critical Vendor Claims is necessary and appropriate to preserve its business.

94.    I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this chapter 11 case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Critical Vendor Motion should be granted.

[*signature follows*]

ATLANTA 5686785.2

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Respectfully submitted this 26th day of January, 2016.

Name: David E. Jorden
Title:  Acting Chief Executive Officer and acting
Chief Financial Officer of the Debtor