**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nuo Therapeutics, Inc., | Case No. 16-10192 (MFW) |
| Debtor. | |

**MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION**
**FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO**
**SECTIONS 105, 361, 362, 363(c), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),**
**364(e), AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES**
**2002, 4001, 6003, 6004, AND 9014 (I) AUTHORIZING THE DEBTOR TO**
**OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTOR**
**TO USE CASH COLLATERAL AND (III) GRANTING ADEQUATE PROTECTION**
**TO PREPETITION SECURED PARTIES**

The above-captioned debtor and debtor in possession (the "Debtor"), by its undersigned

counsel, hereby submits this motion (the "Motion"), pursuant to sections 105(a), 361, 362, 363,

364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), for entry of an order, substantially in the proposed form attached hereto as **Exhibit A**,

(the "Interim Order") and, after the final hearing, a final order (the "Final Order"): (i) authorizing

the Debtor to obtain postpetition financing (the "DIP Financing") pursuant to that certain *Senior*

*Secured, Superpriority Debtor-In-Possession Credit Agreement*,  (as it may be amended from

time to time, the "DIP Agreement") and the budget attached hereto as **Exhibit B** (the "Budget");[1]

(ii) authorizing the Debtor to use Cash Collateral (defined herein); (iii) granting liens and

providing superpriority administrative expense status to the DIP Lenders (defined herein);

---

[1]  Capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to such terms in the
    DIP Agreement.

(iv) granting adequate protection to the Prepetition Secured Parties (defined herein); (v) modifying the automatic stay; (vi) scheduling a final hearing on the relief requested herein; and (vii) granting related relief.  In support of this Motion, the Debtor incorporates the statements set forth in the Declaration of David E. Jorden in Support of First Day Motions (the "Jorden Declaration") filed contemporaneously herewith and further respectfully states as follows:

## Jurisdiction, Venue, and Predicates for Relief

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are (i) sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014; and (iii) Local Rule 4001-2.

3.      Further, pursuant to Local Rule 9013-1(f), the Debtor hereby consents to the entry of a final judgment or order in connection with this Motion if it is determined that this Court cannot—absent the consent of the parties—enter such final judgment or order consistent with Article III of the United States Constitution.

## Background

### A.      Background

4.      On the date hereof (the "Petition Date"), the Debtor filed with the Court its voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 case. The Debtor continues to operate its business and manage its

property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.       No creditors' committee has been appointed in this case. No trustee or examiner has been appointed.

6.       The Debtor and its non-debtor affiliate companies (collectively, "Nuo") operate a biomedical company that pioneers leading-edge biodynamic therapies.  The Debtor's flagship product—the Aurix™ System ("Aurix" or the "Aurix System")—is a biodynamic hematogel that uses a patient's own platelets and plasma as a catalyst for healing.  It is the only therapy of its kind cleared by the U.S. Food and Drug Administration (the "FDA") for use on ulcers and a variety of wound etiologies.  The use of autologous biological therapies for tissue repair and regeneration is part of a transformative clinical strategy designed to improve long-term recovery in complex chronic conditions with significant unmet medical needs.  In September 2007, the Debtor (then known as Cytomedix, Inc.) received clearance from the FDA for Aurix, which was formerly known as the AutoloGel™ System.  In April 2010, the Debtor acquired the Angel® Whole Blood Separation System ("Angel" or the "Angel System") from Sorin Group USA, Inc. In February 2012, the Debtor acquired Aldagen, Inc. ("Aldagen"), a privately held cell-therapy company located in Durham, North Carolina.

7.       The Debtor's current commercial offerings consist of point-of-care technologies for the safe and efficient separation of autologous blood and bone marrow to produce platelet-based therapies or cell concentrates.  Today, the Debtor has two distinct platelet-rich plasma devices, (i) the Aurix System for wound care and (ii) the Angel System for orthopedic markets. The Debtor's product sales are predominantly in the U.S. (approximately 84%), where it sells products through direct-sales representatives and the Angel cPRP system under a licensing

agreement between the Debtor and Arthrex. Growth drivers in the U.S. include the treatment of chronic wounds with Aurix in the Veterans Affairs healthcare system and the Medicare population under a National Coverage Determination when registry data is collected under Centers for Medicare & Medicaid Service's Coverage with Evidence Development program, and the licensing agreement that allows Arthrex as a partner to promote the Angel System for uses other than wound care.

8.      However, in recent years the Debtor has faced an increasingly competitive environment; indeed, the Aurix System is one of many therapies in the chronic-wound market. Consequently, the market has been slow to accept new products like Aurix. Because of this intense competition, the Debtor's revenues have been insufficient to cover operating expenses. In August 2015, the Debtor attempted to implement a realignment plan (the "Realignment Plan") with the goal of preserving and maximizing the value of the Debtor's existing assets. The Realignment Plan, among other things, eliminated approximately 30% of the Debtor's workforce and otherwise to preserve cash and cash equivalents to finance the Debtor's future operations and support the Debtor's revised business objectives.

9.      Unfortunately, however, the Debtor has continued to experience losses following the implementation of the Realignment Plan and now faces severe liquidity pressures that have created difficulty in servicing its existing debt, obtaining additional or replacement financing, and funding its ongoing operations. The Debtor's deteriorating financial condition has left the Debtor with no choice but to seek relief under chapter 11 of the Bankruptcy Code.

10.     After careful evaluation and further negotiation with Nuo's stakeholders, including Deerfield Management Company, L.P. ("Deerfield"), affiliates of which are Nuo's secured lenders under its Existing Facility Agreement (defined herein), it was determined that the

structure and financial support obtained through securing debtor-in-possession financing provided by an affiliate of Deerfield as the DIP Agent (the "DIP Agent") on behalf of Deerfield Private Design Fund II, L.P., Deerfield Private Design International II, L.P., and Deerfield Special Situations Fund, L.P. (collectively, in such capacities, the "DIP Lenders"), as well as the ability of the Debtor to conduct an auction under the supervision of this Court and subsequently consummate a sale transaction, presented the best option for the Debtor's stakeholders.  In furtherance of these efforts, the Debtor will, within one day of the Petition Date as required under the proposed debtor-in-possession financing, file a motion to, among other things, approve certain bid procedures in connection with the Debtor's proposed sale under section 363 of the Bankruptcy Code of substantially all of its assets to an affiliate of Deerfield, which has agreed to serve as the stalking-horse purchaser, subject to higher and better bids.  An expedited sale of the Debtor's assets is essential to not only preserve the underlying value of its operations, but also to maximize the value of the Debtor's assets for the benefit of the Debtor's creditors and other stakeholders.

### B.    The Debtor's Prepetition Financing

11.    The Debtor is party to that certain Facility Agreement dated as of March 31, 2014 (as amended, modified, and supplemented from time to time, the "Existing Facility Agreement") with Deerfield Private Design Fund II, L.P., Deerfield Private Design International II, L.P., Deerfield Special Situations Fund, L.P., and Deerfield Special Situations International Master Fund, L.P., the lender parties thereto (collectively, in such capacities, the "Prepetition Secured Parties"), together with the documents and agreements related thereto or entered into in connection therewith (collectively, with the Existing Facility Agreement, the "Prepetition Secured Agreements").  On January 18, 2016, the Debtor was informed by Deerfield's counsel

that, as of January 1, 2015, Deerfield Special Situations International Master Fund, L.P. transferred its assets (including its rights and obligations under the Existing Facility Agreement) to Deerfield Special Situations Fund, L.P.

12.     Among the covenants contained in the Existing Facility Agreement was the requirement that the Debtor maintain cash on deposit in an amount not less than $5 million at all times after all funds were disbursed to the Debtor under the Existing Facility Agreement (the "Cash Balance Covenant").  In addition, under the Existing Facility Agreement, the Debtor was required to pay an accrued interest amount totaling approximately $2.6M on October 1, 2015. With the increasing pressures on the business and liquidity, as described above and as further described in the Jorden Declaration, the Debtor was unable to meet this covenant and subsequently entered into letter agreements (collectively, the "Consent Letters") with the Prepetition Secured Parties on both November 11, 2015 and December 5, 2015, which (i) decreased the Cash Balance Covenant to $1.75 million and $1.375 million, respectively, and (ii) extended the due date for the accrued-interest payment to December 4, 2015 and December 17, 2015, respectively.  However, the Debtor has continued to struggle, and on December 17, 2015, entered another Consent Letter that (i) further reduced the Cash Balance Covenant to $500,000 for the period between December 18, 2015 and January 7, 2016, and (ii) further extended the due date for the accrued-interest payment to January 7, 2016.  No further agreement or extension has been reached or granted.

13.     After careful evaluation and further negotiation with the Debtor's stakeholders, including Deerfield, it was determined that the structure of and the financial support provided by the DIP Agreement, as well as Deerfield's ability to consummate a transaction within the limited

time available for at least certain of the Debtor's assets, presented the best option for the Debtor and its stakeholders.

14.    As of the Petition Date, the Debtor was indebted to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $38.3 million in respect of the disbursements made under the Prepetition Secured Agreements, plus accrued and unpaid interest thereon and all fees accrued thereunder and all other fees and expenses (including fees and expenses of attorneys and advisors) as provided in the Existing Facility Agreement and documents related thereto (collectively, the "Prepetition Secured Obligations").

15.    To secure the Prepetition Secured Obligations, the Debtor and its affiliates— Aldagen and Cytomedix Acquisition Company, LLC (together, the "Guarantors")—granted security interests and liens (the "Prepetition Liens") to the Prepetition Secured Parties, including liens on and security interests in the personal-property and real-property interests constituting "Collateral" under, and as defined in, that certain Guaranty and Security Agreement dated as of March 31, 2014 (together with the Cash Collateral, which is defined below, the "Prepetition Collateral").

16.    As of the Petition Date, the Debtor believes that (i) the Prepetition Liens are valid, binding, perfected, enforceable first-priority liens (subject to permitted exceptions under the Existing Facility Agreement) and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (ii) the Prepetition Secured Obligations constitute legal, valid, and binding obligations, enforceable in accordance with the terms of the Prepetition Secured Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or

Case 16-10192-MFW    Doc 7    Filed 01/26/16    Page 8 of 112

counterclaims to any of the Prepetition Secured Obligations exist and no portion of the Prepetition Secured Obligations are subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (iii) the Prepetition Secured Obligations constitute allowable secured claims.

17.     The Prepetition Secured Parties have a security interest in the Cash Collateral (defined herein), including all amounts on deposit in the Debtor's banking, checking, or other deposit accounts and all proceeds of Prepetition Collateral realized prepetition or postpetition, to secure the Prepetition Secured Obligations and, respectively, to the same extent and order of priority as that which was held by such party prepetition.

## **Relief Requested**

18.     By this Motion, the Debtor seeks, among other things:

(a)     authorization for the Debtor to obtain up to $9,000,000 in post-petition financing, consisting of (a) a roll-up loan in the aggregate principal amount of $4,500,000, and (b) certain other loans in the aggregate principal amount of $4,500,000 to finance operations and the costs of this chapter 11 case (collectively, the "DIP Loans" or the "Loans"), which shall have the liens and priorities set forth herein (such loans, the "Priority Loans"; together with the DIP Term Loan, the "DIP Loans" and the DIP Lenders on the terms and conditions set forth in the interim order (the "Interim Order"), in the form attached hereto as **Exhibit A**, and the DIP Documents, among the Debtor, the DIP Agent, and each lender from time to time party to the DIP Agreement, including, but not limited to the DIP Lenders. The financing sought on an interim basis will be used to provide $1,500,000 in new money, and $4,500,000 to fund the roll-up loan to refinance a portion of the indebtedness under the Existing Facility Agreement;

(b)     authorization for the Debtor to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)     authorization for the Debtor to (i) use the Cash Collateral (defined herein) pursuant to section 363 of the Bankruptcy Code, and all other Prepetition Collateral, and (ii) provide adequate protection to the Prepetition Secured Parties under the Prepetition Secured Agreements;

(d)     subject to the provisions of the Interim Order and any Final Order, authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP

Documents upon the occurrence and during the continuance of an Event of Default;

(e)    subject to entry of the Final Order, authorization to grant liens to the DIP Lenders and the Prepetition Secured Parties on the proceeds of the Debtor's claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>");

(f)    subject to entry of the Final Order, the waiver by the Debtor of any right to seek to surcharge against the DIP Collateral (defined herein) or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(g)    at an interim hearing (the "<u>Interim Hearing</u>") on this Motion, pursuant to Bankruptcy Rule 4001, entry of an Interim Order (a) authorizing the Debtor to borrow and be obligated under the DIP Agreement in an aggregate principal amount not to exceed $1,500,000 plus any fees and expenses of the advisors to the DIP Agent and the DIP Lenders prior to the entry of the Final Order, in accordance with the Budget (b) authorizing the Debtor to use the Cash Collateral and the other Prepetition Collateral, and (c) granting adequate protection to the Prepetition Secured Parties; and

(h)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "<u>Final Hearing</u>") for this Court to consider entry of a final order in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders (the "<u>Final Order</u>") authorizing and approving on a final basis the relief requested in the Motion, including without limitation, for the Debtor on a final basis to use and be obligated for all amounts under the DIP Documents, including without limitation, with respect to the Priority Loans, and for the Debtor to continue to use the Cash Collateral and the other Prepetition Collateral subject to the terms of the DIP Documents and the Final Order.

### DIP Financing and Cash Collateral

19.    As mentioned above, the Debtor's Prepetition Secured Obligations are secured by first-priority liens and security interests in substantially all of the Debtor's and the Guarantors' assets.  Those assets, and the proceeds thereof now owned or hereafter acquired by the Debtor, constitute the Prepetition Collateral.  Substantially all of the Debtor's cash, including, without limitation, all cash and other amounts on deposit or maintained by the Debtor in any bank accounts, as well as any cash proceeds derived from the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, are cash collateral of the

Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

20.     The Debtor intends to finance its business operations through the continued use of Cash Collateral and postpetition financing incurred pursuant to sections 363, 364(c), and 364(d) of the Bankruptcy Code, up to the principal amount of $1,500,000, plus fees, and subject to entry of the Final Order, $9,000,000 of postpetition financing, consisting of (i) a Roll-Up Loan in the aggregate principal amount of $4,500,000; and (ii) certain Loans in the aggregate principal amount of $4,500,000.  The DIP Loans shall be secured by first-priority, valid, priming, perfected, and enforceable liens (as defined in section 101(37) of the Bankruptcy Code) on property of the Debtor's estate pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained in the Interim Order and the Final Order.

21.     The Debtor believes that this arrangement will meet the Debtor's financing needs during this chapter 11 case.  Specifically, the DIP Financing will provide the Debtor with much-needed liquidity, in order to permit, among other things, the continuation of the operation of the Debtor's business, as well as the consummation of the sale of substantially all of the Debtor's assets.

<u>**Concise Statement and Highlighted Provisions**</u>

22.     Consistent with Bankruptcy Rule 4001(c)(1) and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms for the Debtor's request for the use of Cash Collateral and the DIP Financing.[2]  As discussed herein, the Debtor

---

[2]     The complete statement of the terms of the use of Cash Collateral and DIP Financing is set forth in the DIP Agreement and this summary is qualified by reference to the DIP Agreement.

ATLANTA 5687016.1                                    -10-

believes these provisions are reasonable in light of the facts and circumstances of this chapter 11 case and respectfully submits that same should be approved.

## Concise Statement

**DIP Agent:**  Deerfield Mgmt, L.P., as administrative agent and collateral agent.

**DIP Lenders:**  Each lender from time to time party to the DIP Agreement, including, but not limited to Deerfield Private Design Fund II, L.P., Deerfield Private Design International II, L.P., and Deerfield Special Situations Fund, L.P.

**DIP Secured Parties:**  The DIP Agent, the DIP Lenders and the successors and assigns of each of the foregoing (collectively, the "DIP Secured Parties").

**Borrowers:**  Nuo Therapeutics, Inc.

**DIP Loans:**  $9,000,000 of postpetition financing, consisting of (i) a Roll-Up Loan in the aggregate principal amount of $4,500,000, and (ii) certain Loans in the aggregate principal amount of $4,500,000 (collectively, the "DIP Loans"); and (b) fees in an amount equal to 1.5% of the Commitment minus the amount of the Roll Up Loan.  ***DIP Agreement Preamble; Sections 2.1, 2.2 & 2.9.***

Each Lender's Commitment shall be reduced by the amount of DIP Loans made by such Lender. ***DIP Agreement Section 2.2.***

**Maturity Date:**  Means the earliest of:  (i) the stated maturity date, which shall be March 31, 2016; (ii) the date on which the sale of the Debtor's assets shall have been consummated (or any portion thereof); (iii) the date that is twenty (20) days after the entry of the Interim Order, unless on or before such day the Bankruptcy Court shall have entered the Final Order; and (iv) the acceleration of the Loans or termination of the Commitment under this Agreement, including, without limitation, as a result of the occurrence of an Event of Default.  ***DIP Agreement Section 1.1.***

**Use of Proceeds:**  The proceeds of the Loans shall be used to (i) provide for the ongoing working capital and general corporate and operating purposes of the Debtor during the pendency of the Chapter 11 Case in accordance with, and subject to, the Budget, (ii) pay fees, interest and expenses associated with the Loans and the Existing Credit Agreement, (iii) pay the Carve-Out, including without limitation the payment of the fees of the U.S. Trustee's office, in each case, in accordance with the Budget, and (iv) to the extent of $4,500,000 to refinance a like amount of the Existing Loans under the Existing Credit Agreement -- the Roll Up Loan.  ***DIP Agreement Section 2.1.***

**DIP Budget:**  Not later than two (2) business days prior to the first Monday of each calendar month commencing on March 3, 2016, the Debtor shall deliver to the DIP Agent for its approval an updated rolling nine week Budget for the period commencing on the first Monday of such calendar month.  Such Budgets shall set forth on a line-item basis the Debtor's anticipated cash receipts and cash disbursements on a weekly basis which the Debtor expects to incur during each

week included in such Budget.  The Debtor shall promptly deliver to the DIP Agent any supplemental information or updates applicable to any Budget.  Until such time as the DIP Agent and the Lenders have approved in writing any proposed Budget (which approval shall not be unreasonably withheld or delayed), the Budget last approved by the DIP Agent and the Lenders shall control. ***DIP Agreement Section 5.1(f).***

**Interest Rates:**  The outstanding principal amount of the Loans shall bear interest from the date of disbursement of such Loan at twelve percent (12%) (calculated on the basis of the actual number of days elapsed). ***DIP Agreement Sections 1.1, 2.7.***

**Interest on Late Payments:**  If an Event of Default has occurred and is continuing, the Debtor shall pay, in respect of principal and interest on the Loans outstanding under this Agreement, at the rate per annum equal to the Interest Rate applicable thereto plus ten percent (10%) for so long as such Event of Default is continuing. ***DIP Agreement Section 2.8***.

**Security:**  All Obligations hereunder and under the other Transaction Documents shall:  (i) constitute an allowed superpriority administrative expense claim against the Debtor with priority in the Chapter 11 Case over any and all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506, 507(a), 507(b), 546(c), 546(d), 726(b), 1113 or 1114 respectively, of the Bankruptcy Code, subject in each case only to the Carve-Out, amounts expended under the Budget, and Prior Liens, and (ii) be secured by Liens on the Collateral (except for Permitted Liens and subject to the Carve-Out) with the priority set forth in the Financing Orders. ***DIP Agreement Section 2.10; Interim Order ¶ 13***.

As security for the DIP Obligations, effective and perfected upon the date of the DIP Orders, the following security interests and liens are granted by the Debtor to the DIP Agent, for itself and the benefit of the DIP Lenders (all property of the Debtor identified below being collectively referred to as the "DIP Collateral"), subject and subordinate only to the Carve-Out (all such liens and security interests granted to the DIP Agent pursuant to the DIP Orders, the "DIP Liens"): ***DIP Agreement Section 2.10; Interim Order ¶ 12.***

- a valid, binding, continuing, enforceable, fully perfected first-priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtor, that is not subject to either (a) valid, perfected and non-avoidable liens in existence at the time of the commencement of the chapter 11 case (the "Prior Liens) or (b) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (together with the Prior Liens, the "Unencumbered Property"); provided that such Unencumbered Property shall not include Avoidance Actions, but subject to entry of the Final Order, such Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions. ***Interim Order ¶ 12(b)(i)***.

- a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtor,

that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Non-Primed Liens"), which security interests and liens in favor of the DIP Agent, for itself and the benefit of the DIP Lenders, shall be junior to the Non-Primed Liens.  *Interim Order ¶ 12(b)(ii)*.

- a valid, binding, continuing, enforceable, fully perfected first-priority, senior priming lien on, and security interest in, all of the Debtor's Prepetition Collateral and a valid, binding, fully-perfected senior lien upon all Prepetition Collateral that is subject to any other Lien or obligation on a junior basis to the Prepetition Liens, but junior to any Non-Primed Liens on the Collateral.  The DIP Liens on the Debtor's Prepetition Collateral shall be senior in all respects to the Prepetition Liens on the Debtor's Prepetition Collateral, but shall be junior to any Non-Primed Liens on the Debtor's Prepetition Collateral.  *Interim Order ¶ 12(b)(iii)*.

- The DIP Liens and the Adequate Protection Liens (as defined below) shall not be (a) subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date, or (iii) any lien of the Debtor securing the Prepetition Secured Obligations or (b) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.  *Interim Order ¶ 18*.

**Adequate Protection:**  The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral (such diminution in value, the "**Adequate Protection Obligations**").   As adequate protection, the Prepetition Secured Parties are granted the following:

- Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, (effective upon the date of the Interim Order) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Non-Primed Liens.  *Interim Order ¶ 16*.

- Section 507(b) Claims.   The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to (a) the Carve-Out and (b) the Superpriority Claims granted to the DIP Agent and the DIP Lenders in respect of the DIP Obligations.  Except to the extent expressly set forth in the DIP Orders, the Prepetition Secured Parties shall not receive or retain any payments, property in respect of the 507(b) Claims until all DIP Obligations shall have indefeasibly been paid in full.  *Interim Order ¶ 16(b)*.

- **Information and Other Covenants.**  The Debtor shall comply with the reporting requirements set forth in the DIP Agreement, together with such additional information as the DIP Agent and the Initial Lenders may reasonably request from time to time.  ***DIP Agreement Section 5.1(o).***

- **Credit Bidding.**  No plan of reorganization or liquidation, nor any order entered in connection with a sale of assets under section 363 of the Bankruptcy Code or otherwise, shall limit or otherwise restrict the right of the DIP Agent or any DIP Lender, or any Prepetition Secured Party to submit a credit bid for all or any part of the DIP Collateral (including a joint credit bid by one or more of the Prepetition Secured Parties, DIP Agent, and/or DIP Lenders).  Failure of the Bankruptcy Court to permit the Lenders to credit bid the then outstanding Existing Loans in an amount of $10,550,000 and the then outstanding Loans, for a total credit bid equal to $15,050,000, in connection with the purchase of Debtor's assets pursuant to the Asset Purchase Agreement shall constitute an Event of Default.  ***DIP Agreement Section 6.1(xxiv), Interim Order ¶ 18(c).***

**Expenses:**  From time to time upon demand, the Debtor shall reimburse the Lenders for their costs and expenses, including reasonable attorneys' fees in connection with the negotiation, preparation, execution, administration and enforcement of the Transaction Documents.  The Debtor will pay to the Initial Lenders in full in cash on the Agreement Date a fee in an amount equal to one and a half percent (1.5%) of the amount equal to the Commitment minus the amount of the Roll Up Loan.  The Closing Fee will be fully earned and due and payable on the Agreement Date and will be non-refundable once paid.  ***DIP Agreement Section 2.9.***

**Carve-Out:**  The "Carve-Out" shall mean: (i) Professional Expenses incurred by Professional Persons at any time, whether or not then allowed or paid (but subject to ultimate allowance), whether by this Interim Order, procedural order, or otherwise, but only to the extent all such Professional Expenses set forth in this clause do not exceed the amount permitted through such time for such expenses in the Budget as then applicable; provided, however, that upon the occurrence of an Event of Default, the Professional Expenses incurred by Professional Persons thereafter may not exceed $50,000; (ii) U.S. Trustee fees, pursuant to 28 U.S.C. § 1930; and (iii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $25,000 out of the DIP Collateral; provided, however, that nothing herein shall be construed to impair the ability of any interested party to object to any Professional Expenses sought by any Professional Person.  ***Interim Order ¶ 17(b).***

**Events of Default:**  Failure of the Court to permit the Lenders to credit bid the Existing Loans and the Loans in connection with the purchase of Debtor's assets, failure to employ an acceptable chief restructuring officer, failure to meet the Case Milestones,  and other customary events of default, including, among other things, failure to make required payments, default under other debt agreements, and breach of covenants, representations and warranties.  ***DIP Agreement Section 6.1.***

**Remedies on Default:**  If any Event of Default occurs and is continuing, the DIP Lenders may (i) declare the principal of, and accrued and unpaid interest on, the Loans or any part of any of them (together with any other amounts accrued or payable under the Transaction Documents) to

be, and the same shall thereupon become, immediately due and payable and (ii) terminate all Commitments, in each case, without any further notice and without any presentment, demand, or protest of any kind, all of which are expressly waived by the Debtor and the Guarantors, and take any further action available at law or in equity, including, without limitation, the sale of the Loans and all other rights acquired in connection with the Loans. ***DIP Agreement Section 6.1***.

**Automatic Stay:**  The automatic stay under section 362 of the Bankruptcy Code will be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon an Event of Default, all rights and remedies under the DIP Documents, other than those rights and remedies against DIP Collateral, provided that the DIP Agent shall provide (i) five (5) days' notice to the Debtor (with a copy to counsel to the Committee, if any, and the U.S. Trustee) prior to the termination of the Debtor's right to use Cash Collateral, and (ii) seven (7) days' notice to the Debtor (with a copy to counsel to the Committee, if any, and the U.S. Trustee) prior to the enforcement of the DIP Liens or exercise of any other rights or remedies against the DIP Collateral. ***Interim Order ¶ 22(b)***.

**Indemnification:**  The Debtor shall, at all times, indemnify and hold harmless (the "Indemnity") each of the Lenders and each Lender's directors, partners, officers, employees, agents, counsel and advisors (each, an "Indemnified Person") from any losses, claims (including the cost of defending against such claims), damages, liabilities, penalties, or other expenses (each a "Loss") which an Indemnified Person may incur or to which an Indemnified Person may become subject to the extent such Loss arises out of a breach of any representation, warranty or covenant of the Debtor in any of the Transaction Documents, or the extension of credit hereunder or the Loan or the use or intended use of the Loan.  The Indemnity shall not apply with respect to any Indemnified Person to the extent that a court or arbitral tribunal with jurisdiction over the subject matter of the Loss, such Indemnified Person and over the Debtor determines (after such Indemnified Person that had an adequate opportunity to defend its interests), that such Loss resulted from the willful misconduct of such Indemnified Person, which determination results in a final, non-appealable judgment or decision of a court or tribunal of competent jurisdiction.  The Indemnity is independent of and in addition to any other agreement of any Party under any Transaction Document to pay any amount to the Lenders or the Debtor, as applicable, and any exclusion of any obligation to pay any amount under this subsection shall not affect the requirement to pay such amount under any other section hereof or under any other agreement. ***DIP Agreement Section 7.11***.

## Highlighted Provisions

23.      Pursuant to Local Rule 4001-2, the Debtor is required to highlight certain provisions included in the DIP Agreement and the DIP Orders.  As discussed herein, the Debtor believes these provisions are reasonable in light of the facts and circumstances of this chapter 11 case.  Indeed, the circumstances of the chapter 11 case virtually precluded any other lender from providing financing that would have alleviated the need for these provisions.  The provisions

under Rule 4001-2(a)(i) of the Local Rules included in the DIP Orders and DIP Agreement are as

follows:

> Local Rule 4001-2(a)(i)(B).  The Debtor is agreeing to the validity, amount, enforceability, unavoidability and perfection of the Prepetition Liens.  The Interim Order provides for a challenge period, including to the extent that a committee were to obtain standing, a committee could challenge the prepetition claims and liens.  ***Interim Order ¶ 24***.

> Local Rule 4001-2(a)(i)(C).  Subject to entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the chapter 11 case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.  ***Interim Order ¶ 13(b)***.

> Local Rule 4001-2(a)(i)(D).  Upon entry of the Final Order, to the extent approved by the Bankruptcy Court, the DIP Liens shall attach to any proceeds of claims and causes of action brought under sections 502(d), 544, 545, 547, 548 and 553 of the Bankruptcy Code.  ***Interim Order ¶ 12(a)***.

> Local Rule 4001-2(a)(i)(E).  Subject to entry of the Final Order, $4,500,000 of the aggregate principal amount of loans outstanding under the Existing Facility Agreement are receiving liens and priority granted under the DIP Agreement.  ***DIP Agreement Section 2.1***.

> Local Rule 4001-2(a)(i)(F).  The Carve-Out provides equal treatment for the fees and expenses incurred by Professional Persons employed by the official committee of unsecured creditors, if any, appointed in this case.  ***Interim Order ¶ 17(a)***.

> Local Rule 4001-2(a)(i)(H).  Subject to entry of the Final Order, no costs or expenses of administration be imposed upon the DIP Agent, any DIP Lender under the equities of the case provisions of Section 552(b) of the Bankruptcy Code.  ***Interim Order ¶ 13(b)***.

## **Basis for Relief Requested**

## I.    **The DIP Financing Should Be Approved**

24.    The DIP Agreement was negotiated in good faith and at arms' length by and

among the Debtor, the DIP Lenders, and their respective professionals.  The Debtor submits that

the terms thereof, the use of Cash Collateral, and all other financial accommodations provided

under the DIP Agreement and the DIP Orders are fair and reasonable and reflect the exercise of

the Debtor's prudent business judgment consistent with its fiduciary duties.  The Debtor has, in its business judgment, determined that entering into the DIP Agreement will give the Debtor the financing needed to operate its business with minimum interruption or disruption to its operations and thus preserve the going-concern value of the Debtor's estate.  In addition, the Debtor has, in its business judgment, determined that the DIP Financing provides the Debtor with the greatest degree of flexibility to implement its chapter 11 strategy.

25.     As described above, the Debtor's chapter 11 efforts hinge upon use of Cash Collateral and obtaining access to postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (i) obtaining unsecured credit in the ordinary course of business, (ii) obtaining unsecured credit outside the ordinary course of business, and (iii) obtaining credit with specialized priority or on a secured basis.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c), the court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status and/or secured by a senior lien on unencumbered property, a junior lien on encumbered property or a combination of the foregoing.  In addition, pursuant to section 364(d), absent consent from affected secured parties, a court may authorize postpetition credit secured by a senior or equal lien on encumbered property (*i.e.*, a "priming" lien) when a debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.

**A.     Incurrence of Secured Superpriority Debt Under Bankruptcy Code Sections 364(c) and 364(d)**

26.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that debtors in possession cannot "obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense." *See Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized

where debtor could not obtain credit as an administrative expense); *In re Klein Sleep Prods., Inc.*, 173 B.R. 296, 297-98 (S.D.N.Y. 1994) (same); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b)).

27.     As described above, as a condition to making the DIP Facility available to the Debtor the DIP Lenders have required that $4,500,000 of the Prepetition Obligations be "rolled up" as part of into the DIP Financing.  This treatment of the Prepetition Obligations is an essential element of the overall DIP Financing and should be approved because the DIP Lenders would not have agreed to provide the DIP Financing without such a provision.  Further, the Debtor was not able to locate debtor-in-possession financing from another party on more favorable terms, let alone terms that did not include a roll-up of the Debtor's obligations under the Existing Facility Agreement.   This Court has previously approved similar debtor-in-possession financing agreements where the debtor was not able to obtain debtor-in-possession financing under other conditions.[3]  *See, e.g., In re Cal Dive International, Inc.*, Case No. 15-10458 (Bankr. D. Del. April 20, 2015); *In re Digital Domain Media Group, Inc.*, Case No. 12-12568 (BLS) (Bankr. D. Del. Nov. 7, 2012); *In re Real Mex Restaurants, Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011); *In re Landsource Communities Development LLC*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 21, 2008).

---

[3]     The referenced orders are voluminous in nature and are not attached to this Motion; however, in light of the requirements of Local Rule 7007-2(a)(vii), undersigned counsel has retained copies of each order, and will make them available to the Court or to any party that requests them.

28.    In addition, section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A)    the trustee is unable to obtain credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. 364(d)(1).

29.    A debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d).  *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (citing *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986)).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Ames*, 115 B.R. at 40 (holding that debtor made reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

30.    The Debtor selected the DIP Financing provided by the DIP Lenders only after carefully examining all available options.  In the end, it was not feasible for the Debtor to obtain a loan on equal to or better terms that afforded the Debtor sufficient liquidity to operate its business without the consent of the Prepetition Secured Parties, which would result in increased costs and risks to the Debtor such that the proposed financing was considered far favorable to the

potential restructuring.  In addition, the Debtor was unable to obtain financing on an unsecured basis or obtain an equity investment from any potential strategic partner.

31.     In the end, the DIP Lenders provided the only viable source of funding. Accordingly, the Debtor commenced arm's length and good-faith negotiations with the DIP Lenders for the DIP Financing.

32.     After fully considering its financing options, and whether other more advantageous financing alternatives would be available to the Debtor, the Debtor exercised its sound business judgment and accepted the DIP Financing with the DIP Lenders.  The DIP Financing provides significant advantages and favorable terms that the Debtor believes would be unavailable through other lenders.  Further, the Debtor notes that the Prepetition Secured Parties that will be primed by the liens granted to the DIP Lenders have consented to the relief requested herein (subject to the adequate protection described above).

**B.     Adequate Protection Under Bankruptcy Code Sections 364(d) and 361**

33.     In connection with the DIP Financing, the Debtor proposes providing the Prepetition Secured Parties with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code.[4]  To that end, the Debtor and the Prepetition Secured Parties have negotiated, and the Debtor requests that the Court approve as of the Petition Date, the adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral described below.

34.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or without court approval. Section 363(e) provides that, upon request of an entity that has an interest in property to be used

---

[4]     Bankruptcy Code section 364(d) requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor-in-possession financing facility.  *See* 11 U.S.C. § 364(d).

by a debtor, the court shall prohibit or condition such use as necessary to provide adequate protection of such interest. Under section 364(d), a debtor may obtain credit secured by a senior or equal lien if an existing secured creditor's interest in the collateral security is adequately protected.

35.    What constitutes adequate protection is decided on a case-by-case basis. *See Mosello*, 195 B.R. at 289; *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 56 (3d Cir. 1994); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). By adequate protection, the Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). When priming of liens is sought pursuant to section 364(d) of the Bankruptcy Code, courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens. *Beker*, 58 B.R. at 737. Because all of these tests are satisfied here and the Debtor has met all of its obligations under section 364 of the Bankruptcy Code, the Motion should be granted and the DIP Agreement should be approved.

36.    Sections 361(2) and (3) of the Bankruptcy Code expressly describe replacement liens and administrative-claim status as appropriate forms of adequate protection. Thus, the provision of these forms of adequate protection is appropriate. Further, payment of reasonable and documented out-of-pocket fees, costs and expenses often serves as a form of adequate protection for secured creditors. Agreeing to pay the reasonable and documented out-of-pocket fees, costs and expenses offers meaningful additional protection to any diminution in the value of

the Prepetition Collateral. Accordingly, the Debtor believes that the adequate protection described above is fair, reasonable, and sufficient to protect any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the period their collateral is used by the Debtor.

### C. The DIP Financing is Necessary to Preserve the Assets of the Debtor's Estate

37. The Debtor must immediately instill the Debtor's employees, vendors, service providers, customers, and potential bidders with confidence that this chapter 11 case will not erode the Debtor's overall value. The Debtor believes that it must provide its various constituents with confidence in its ability to seamlessly transition its business into chapter 11, operate its business normally in that environment and ultimately sell its business in a successful and expedient manner. The DIP Financing will provide the working capital necessary to allow the Debtor to, among other things, continue operating the business in the ordinary course of business, which in turn will help maintain value for the benefit of all creditors and parties in interest.

38. The success of this chapter 11 case at the outset depends on the confidence of the Debtor's constituents, which in turn depends upon the Debtor's ability to minimize the disruption of the bankruptcy filings. Approval and implementation of the DIP Financing will assure continued functioning of the Debtor and preserve the going concern value of its estate.

### D. The Terms of the DIP Financing are Fair, Reasonable, and Appropriate

39. After appropriate investigation and analysis, the Debtor's management has concluded that the DIP Financing presents the best available option under the circumstances. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See Ames*, 115 B.R. at 40 (courts should approve borrowings pursuant to 364(c) and

(d) if the debtors was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58-59 (Bankr. N.D.N.Y. 2005) (same); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment...[was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *cf. Group of Institutional Investors v. Chicago, Mil., St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); *In re Simasko Prods. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

40.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arms' length. In the reasonable exercise of the Debtor's business judgment, the DIP Financing is the best financing option available under the present circumstances. As discussed above, the Debtor, with the assistance of its advisors, assessed its financing needs and the DIP Financing proposal. After fully considering all of the Debtor's realistic options, and whether other more advantageous financing alternatives were available to the Debtor, the Debtor decided to accept the DIP Financing from the DIP Lenders.

41.     Further, the proposed DIP Financing subjects the security interests and administrative-expense claims of the DIP Lenders to the Carve-Out, as described above, thereby ensuring that in the event of a default under the DIP Agreement, the Debtor's estate or other

parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in this case.  In *Ames Dept. Stores*, the court found such carve-outs for professional fees not only reasonable but necessary to ensure that official committees and debtors' estates could retain assistance from counsel.  *See Ames*, 115 B.R. at 38, 40 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

## II.   Interim Approval Should Be Granted

42.   The Debtor respectfully requests entry of the Interim Order on an expedited basis in order to avoid the immediate and irreparable harm that would be suffered by the Debtor's estate if the Debtor did not obtain the financing needed to sustain the Debtor's business as a going concern pending the Final Hearing.   The Debtor has an immediate need to obtain the DIP Financing and use Cash Collateral to permit them, in addition to financing the administration of this chapter 11 case, to (i) operate the Debtor's business; (ii) maintain business relationships with vendors, suppliers, and customers; (iii) pay employee wages in the ordinary course; (iv) make necessary capital expenditures; (v) satisfy other working capital and operational needs; and (vi) finance the sale process, all of which are necessary to preserve the Debtor's going-concern value.

43.   Without the use of Cash Collateral and the additional liquidity, the Debtor would not be able to meet its day-to-day operational needs.  If unable to meet the day-to-day operational needs, the Debtor would have to halt its operations which would drastically erode its overall value.  Further, the Debtor must demonstrate to its customers and vendors that the Debtor has sufficient capital to ensure ongoing operations in the ordinary course, thereby assuaging any potential fears among the constituents of the Debtor that this chapter 11 case will negatively affect the Debtor's operations.  Therefore, the Debtor requests approval of the DIP Financing on

an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtor's estate if the Debtor is unable to obtain the financing needed to sustain its business.

44.     Rule 4001(c) of the Bankruptcy Rules permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." In examining requests under this rule, courts apply the same business-judgment standard as is applicable to other business decisions. *See, e.g., Ames*, 115 B.R. at 38.  After the 14-day period, the rule does not limit the request to those amounts necessary to avoid immediate and irreparable harm, and a debtor can borrow those amounts it views as prudent to the operation of its business.  *Id*. at 36.

45.     The Debtor requests that the Court conduct an expedited interim  hearing on the Motion and authorize the Debtor from and after the entry of the Interim Order until the Final Hearing to obtain credit under the DIP Agreement, which the Debtor shall use in accordance with the Budget to, among other things, provide working capital for the Debtor and pay expenses for its chapter 11 case.  This authority will allow the Debtor to maintain its operations and avoid immediate and irreparable harm and prejudice to its estate, and all parties-in-interest, pending the conclusion of the Final Hearing.

### III.     Request for Final Hearing

46.     Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable but in no event later than twenty-one (21) days following the entry of the Interim Order, subject to the Court's availability.   At the Final Hearing, the Debtor will request Court authority to obtain credit under the DIP Agreement on a final basis.

47.     The Debtor requests authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties (defined herein).  The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

## Modification of the Automatic Stay

48.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Financing Agreement requires a modification of the automatic stay to implement the terms of the DIP Financing Agreement.

49.     Stay modification provisions of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances.  As noted above, the Debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.  Nor has the Debtor been able to obtain debtor-in-possession financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of the automatic stay described above, are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arms' length.  In these circumstances, and importantly, in light of the material benefits afforded to the Debtor by the DIP Financing, the modification of the automatic stay is warranted.

## Request for Waiver of Stay

50.     The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

entry of the order, unless the court orders otherwise." As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### Notice

51.     The Debtor will provide notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to Deerfield Management Company, L.P.; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (e) any such other party entitled to notice pursuant to Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtor will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

52.     No prior Motion for the relief requested herein has been made to this Court or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtor respectfully requests entry of the Interim Order attached hereto as **Exhibit A**, and a Final Order, granting the relief requested herein, and granting such other and further relief as is just and proper.

Dated: January 26, 2016
      Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

By:    */s/ Karen B. Skomorucha Owens*
      William P. Bowden (No. 2553)
      Karen B. Skomorucha Owens (No. 4759)
      Stacy L. Newman (No. 5044)
      500 Delaware Avenue, P.O. Box 1150
      Wilmington, DE  19899-1150
      Phone: 302.654.1888
      Fax: 302.654.2067
      Email:  wbowden@ashby-geddes.com
            kowens@ashby-geddes.com
            snewman@ashby-geddes.com

      -and-

**DENTONS US LLP**
Sam J. Alberts (pro hac vice pending)
1301 K Street, NW
Suite 600. East Tower
Washington, D.C. 20005
Tel:  202.408.7004
Fax:  202.408.6399
Email: sam.alberts@dentons.com

Bryan E. Bates (pro hac vice pending)
303 Peachtree Street, NE
Suite 5300
Atlanta, Georgia 30308
Tel.: 404.527.4073
Fax: 404.527.4198
Email: bryan.bates@dentons.com

*Proposed Attorneys for Debtor*
*and Debtor-in-Possession*

## Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------------- x

In re:                                                  :        Chapter 11
                                                        :
Nuo Therapeutics, Inc.                                  :        Case No. 16-10192 (MFW)
                                                        :
                        Debtor.                         :        **Related to Docket Nos. _____**
                                                        :
-------------------------------------------------------------------- x

**INTERIM ORDER UNDER SECTIONS 105, 361, 362, 363(c), 363(e),
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), AND 507 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001
AND 9014 (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION
FINANCING; (II) AUTHORIZING DEBTOR TO USE CASH
COLLATERAL; (III) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES; (IV) SCHEDULING A
FINAL HEARING AND (V) GRANTING RELATED RELIEF**

Upon the motion, dated January 26, 2016 (the "**Motion**"), of Nuo Therapeutics, Inc., a

Delaware corporation (the "**Debtor**") in the above-captioned case (the "**Case**") commenced on

January 26, 2016 (the "**Petition Date**"), for interim and final orders under sections 105, 361,

362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), and Rules

2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

"**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local

Rules**"), seeking:

(i)        the authority for the Debtor to enter into that certain Senior Secured, Superpriority

Debtor-in-Possession Credit Agreement dated as of January __, 2016 (as amended, restated,

supplemented or otherwise modified from time to time, the "**DIP Agreement**"), substantially in

the form attached hereto as **Exhibit A**, together with the other agreements delivered or executed

from time to time in connection therewith (as hereafter amended, restated, supplemented or otherwise modified from time to time, together with the DIP Agreement, the "**DIP Documents**"), pursuant to which the Debtor shall (a) obtain up to $9,000,000 in aggregate postpetition senior secured super-priority debtor-in-possession financing ("**DIP Loan Facility**") and other extensions of credit from the lenders from time to time party thereto (initially, on the closing date, the "**Initial DIP Lenders**", and together with any other lenders from time to time party thereto, the "**DIP Lenders**") and Deerfield Mgmt, L.P., as the administrative and collateral agent (the "**DIP Agent**") and (b) grant security interests and liens and accord superpriority claim status in favor of the DIP Agent and the DIP Lenders pursuant to sections 361, 364(c) and 364(d)(1) of the Bankruptcy Code in accordance with the DIP Documents;[1]

(ii)      authorization for the Debtor to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(iii)     authorization for the Debtor to use Cash Collateral (as defined in paragraph 4(i) below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined in paragraph 4(a) below);

(iv)      to grant adequate protection with respect to the use of Cash Collateral and any diminution in the value of the Prepetition Collateral (as defined below) securing the Debtor' Prepetition Secured Obligations (as defined below) under that certain Facility Agreement dated as of March 31, 2014 (as otherwise amended, restated, supplemented or modified from time to time, the "**Existing Facility Agreement**"), by and among the Debtor, on the one hand, and the lenders from time to time party thereto, on the other hand, together with the documents and

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Documents.

agreements related thereto or entered into in connection therewith (collectively, with the Existing Facility Agreement, the "**Prepetition Secured Agreements**");

(v)      at an interim hearing (the "**Interim Hearing**") on the Motion before this Court, pursuant to Bankruptcy Rule 4001, entry of this interim order (the "**Interim Order**"): (a) authorizing the Debtor, on an interim basis, to borrow under the DIP Agreement an aggregate principal amount not to exceed $9,000,000 (inclusive of the Roll-Up Loan of $4,500,000, plus fees, interest and other amounts in accordance with the terms of the DIP Documents) at any time outstanding prior to the entry of the Final Order (as defined below); (b) authorizing the Debtor, on an interim basis, to use Cash Collateral and the other Prepetition Collateral; and (c) granting, on an interim basis, adequate protection to the Prepetition Secured Parties;

(vi)      scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "**Final Hearing**") for this Court to consider entry of a final order (the "**Final Order**"), authorizing and approving on a final basis the relief requested in the Motion, including without limitation, the Debtor' ability on a final basis to utilize the DIP Loan Facility and the Debtor' ability to continue to use Cash Collateral and the other Prepetition Collateral, subject to the terms of the DIP Documents and the Final Order; and

(vii) granting other related relief as described in the Motion;

and the Court having held and concluded the Interim Hearing on January __, 2016, and upon the record made by the Debtor at the Interim Hearing, including, without limitation, the admission into evidence of the **Declaration of David E. Jorden in Support of First Day Motions** [D.I. __], the declaration of Shaun Martin (as financial advisor and CRO to the Debtor) in support of the Motion [D.I. __], and the declaration of Peter S. Kaufman (as investment banker and financial advisor to the Debtor) in support of the Motion [D.I. __], each of which was

filed with the Court, and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing, and notice of the Interim Hearing having been given in accordance with the Bankruptcy Rules; and all objections to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtor, its estate, its creditors, and other parties in interest, and is essential for the continued operation of the Debtor's business; and it further appearing that the Debtor was unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and adequate protection being provided on account of the interests of certain holders of liens on the property of the estate on which liens are to be granted; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, as applicable, on an interim basis, that:

1.      <u>Grant of Motion</u>.  The Motion is hereby GRANTED on an interim basis as hereinafter set forth.  Any and all objections to the relief requested in the Motion, to the extent not withdrawn with prejudice, waived or resolved by consent at or before the Interim Hearing, are hereby OVERRULED and DENIED.

2.      <u>Jurisdiction/Venue</u>.  This Court has core jurisdiction over the Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. The Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      <u>Notice</u>.  The Interim Hearing was held pursuant to the authorization of Bankruptcy Rules 2002, 4001(b), (c), and (d) and Rule 9014, and the Local Rules.  Notice of the

Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor, to certain parties in interest, including:  (a) the Office of the United States Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to Deerfield Management Company, L.P.; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (e) any such other party entitled to notice pursuant to Rule 9013-1(m) of the Local Rules.   Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion complies with Bankruptcy Rules 2002 and Local Rule 4001-2.

4.      <u>Debtors' Stipulations and Releases</u>.  Without prejudice to the rights of any other party (but which rights are subject to the limitations thereon contained in paragraph 24 of this Interim Order), the Debtor admits, stipulates and agrees that:

(a)      as of the Petition Date, the Debtor, without defense, counterclaim, recoupment or offset of any kind, is indebted and liable to the Prepetition Secured Parties in the aggregate principal amount of $35,000,000 of outstanding borrowings under the Prepetition Secured Agreements, plus accrued interest asserted in the amount of $3,288,421.67, plus all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Prepetition Secured Obligations**"), which Prepetition Secured Obligations are secured by (i) first-priority security interests in and liens on substantially all of the Debtor's assets, including accounts, inventory, contract rights, instruments, documents, chattel paper, drafts and acceptances, general intangibles and all other forms of obligations owing to the Debtor (and the proceeds, product and offspring therefrom, collectively, the "**Prepetition Collateral**") all as more fully described in the Prepetition Secured Agreements;

(b)     the Prepetition Secured Obligations constitute the legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

(c)     the liens granted to the Prepetition Secured Parties on the Prepetition Collateral pursuant to and in connection with the Prepetition Secured Agreements (collectively, the "**Prepetition Liens**"), including, without limitation, all security agreements, pledge agreements and other security documents executed by any of the Debtor for the benefit of the Prepetition Secured Parties, are (i) valid, binding, perfected and enforceable liens and security interests in the property described in the Existing Credit Facility Agreement, (ii) not, pursuant to the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attack, offset, recoupment, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind, and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below) to which the DIP Liens are subject and (C) valid, perfected and unavoidable liens and security interests permitted under the Existing Facility Agreement and existing as of the Petition Date;

(d)     no portion of the Prepetition Secured Obligations or any payments made to the Prepetition Secured Parties or applied to the Prepetition Secured Obligations prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law;

(e)     subject to entry of the Final Order, the Debtor hereby forever waives and releases any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses and setoff rights against the Prepetition Secured Parties, in their capacities as such, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law; provided, however, that nothing herein or in any of the DIP Documents shall operate as a release or waiver of any claims or causes of action held by any party against the Debtor, any "affiliate" (as such term is defined in the Bankruptcy Code) of the Debtor or any officer, director or direct or indirect equity owner (or affiliate thereof) of the Debtor; and

(f)     substantially all cash, securities or other property (and the proceeds therefrom) as of the Petition Date, including without limitation, all cash, securities or other property (and the proceeds, product and offspring therefrom) and other amounts on deposit or maintained by the Debtor in accounts pursuant to the Prepetition Secured Agreements were subject to rights of setoff and valid, perfected, enforceable, first priority liens under the Existing Facility Agreement and the other Prepetition Secured Agreements, and applicable law, for the benefit of the Prepetition Secured Parties.   All proceeds of the Prepetition Collateral are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (collectively, the "**Cash Collateral**").

5.      <u>Need for Financing and Cash Collateral Use</u>.

(a)      The Debtor has an immediate need to obtain the DIP Loan Facility and to use the Prepetition Collateral, including any cash that constitutes Prepetition Collateral, in order to, among other things, permit the orderly continuation of the operation of their businesses, preserve the going concern value of the Debtor, pay the costs of administration of its estate and for the other purposes set forth in the DIP Documents.   The Debtor's use of the Prepetition Collateral (including the Cash Collateral) and the DIP Loan Facility on the terms described herein is necessary to prevent immediate and irreparable harm to the Debtor's estate.

(b)      The Debtor is unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtor granting to the DIP Agent for the benefit of itself and the DIP Lenders, subject to the Carve-Out (as defined in paragraph 17 below), (i) the DIP Liens (as defined in paragraph 12(a) below), including the priming DIP Liens and (ii) the Superpriority DIP Claims (as defined in paragraph 13(a) below), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents.   No party or parties other than the DIP Lenders would provide postpetition financing to the Debtor absent the Debtor granting such parties priming liens on the Debtor's assets pursuant to section 364(d)(1) of the Bankruptcy Code or other impracticable conditions, and the

Debtor was unable to satisfy the requirements of section 364(d)(1) of the Bankruptcy Code.

6.     <u>Proposed DIP Loan Facility</u>.  The Debtor has requested the DIP Agent and DIP Lenders to establish the DIP Loan Facility pursuant to which the Debtor may from time to time obtain loans ("**DIP Loans**") in an aggregate principal amount of up to $9,000,000 outstanding at any time pursuant to the terms of the DIP Documents.  The DIP Agent and each DIP Lender is willing to establish the DIP Loan Facility, upon the terms and conditions set forth herein and in the DIP Documents.

7.     <u>Certain Conditions to DIP Loan Facility</u>.  The DIP Agent's and DIP Lenders' willingness to establish the DIP Loan Facility is conditioned upon, among other things: (a) the Debtor obtaining Court approval of the DIP Agreement (and all extensions of credit thereunder), as well as all of the other DIP Documents; (b) the Debtor's provision of adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code of the interests of Prepetition Secured Parties with respect to the Prepetition Liens; (c) the DIP Agent and each DIP Lender receiving, as security for the payment of the DIP Obligations (as defined below), security interests in and liens upon the DIP Collateral (as defined below) and the DIP Documents; and (d) the Debtor's satisfaction of all conditions precedent in the DIP Agreement and DIP Documents, unless waived in writing by the Initial DIP Lenders in their sole discretion.

8.     <u>Finding of Cause</u>.  Good cause has been shown for the entry of this Interim Order and authorization for the Debtor to use Cash Collateral and to obtain extensions of credit under the DIP Loan Facility (the "**DIP Credit Extensions**") pursuant to the terms of the DIP Documents.  The Debtor's need for use of Cash Collateral and financing of the type afforded by the DIP Agreement is ongoing, immediate and critical.  Entry of this Interim Order

will minimize disruption of the Debtor's businesses and operations, will preserve the assets of the Debtor's estate and their value and is in the best interests of the Debtor, its creditors and its estate.  The terms of the proposed financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

9.    <u>Finding of Good Faith</u>.  Based upon the record presented at the Interim Hearing, the Court finds that the DIP Agreement and the other DIP Documents, as well as the terms of this Interim Order, have been negotiated in good faith and at arm's length between the Debtor, on the one hand, and the DIP Agent and DIP Lenders, on the other hand.  Therefore, all DIP Credit Extensions heretofore and hereafter made to the Debtor pursuant to the DIP Documents shall be deemed to have been extended and made in good faith within the meaning of section 364(e) of the Bankruptcy Code.

10.    <u>Authorization of Interim Financing; Budget</u>.

(a)    The Court hereby authorizes (i) the execution, delivery and performance by Debtor of and under the DIP Agreement and other DIP Documents, as applicable, in substantially the form annexed to the Motion (with such changes, if any, as were addressed to the Court at the Interim Hearing or are authorized to be made as amendments to the DIP Agreement and other DIP Documents in accordance with this Interim Order) and all other instruments, security agreements, assignments, pledges, and other documents referred to therein or required by the DIP Agreement to be executed by the Debtor; (ii) the Debtor to obtain DIP Loans and other DIP Credit Extensions in accordance with the DIP Documents from time to time up to an aggregate principal amount outstanding at any time of $6,000,000 inclusive for the

interim DIP Loan of (A) $4,500,000 to be used solely to refinance $4,500,000 under the Existing Facility Agreement) (the "**Roll-Up**"), inclusive of interest, fees and other charges payable in connection with the foregoing; plus (B) up to $1,500,000 to be used by the Debtor in accordance with the DIP Documents and the Budget (as defined below), and (iii) the Debtor to satisfy all conditions precedent and perform of all obligations hereunder and under the DIP Documents in accordance with the terms hereof and thereof; provided, however, that the authorization to use proceeds of DIP Loans shall be limited solely to the purposes specified and authorized in this Interim Order or the DIP Documents (collectively, the "**Permitted Uses**"); and provided, further, that until the entry of the Final Order, the Debtor may obtain DIP Credit Extensions only to the extent necessary to avoid immediate and irreparable harm to the Debtor, which, for purposes hereof, shall include, without limitation, obligations and expenses specified in the Budget, the funding of DIP Loans used to pay the fees and expenses due and other amounts owing by Debtor at any time to the DIP Agent and DIP Lenders under the DIP Documents, and other expenses and obligations of the Debtor to the DIP Agent and DIP Lenders that are required to be paid prior to the Final Hearing under the DIP Documents, this Interim Order or any other order of the Court.

(b)      The DIP Agent and DIP Lenders shall not have any obligation or responsibility to monitor the Debtor's use of any DIP Loans, and may rely upon the Debtor's representations that the amount of the DIP Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order and the DIP Documents.

(c)     The Debtor shall deliver to the DIP Agent, on a periodic basis as required under the DIP Loan Facility from and after the closing of the DIP Loan Facility, updates to the "Budget" (as defined in the DIP Agreement), acceptable to the DIP Agent and Initial DIP Lenders as and to the extent required by the DIP Agreement (such Budget, together with any updated Budgets acceptable to the DIP Agent and the Initial DIP Lenders, the "**Budget**").

11.     <u>Execution, Delivery and Performance of DIP Documents</u>.  The Debtor is authorized to execute, deliver and perform under all the terms and conditions of each and every DIP Document.  The DIP Documents may be executed and delivered on behalf of the Debtor by any officer, director or agent of the Debtor who represents himself or herself to be duly authorized and empowered to execute the DIP Documents for and on behalf of the Debtor, and the DIP Agent and DIP Lenders may rely upon any of such person's execution and delivery of any of the DIP Documents as having done so with all requisite power and authority to do so.  Upon the entry of this Interim Order, the DIP Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.  In furtherance of the provisions of this Interim Order, the Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, if applicable, the execution of the DIP Agreement, security agreements, pledge agreements, control agreements, mortgages, deeds of trust, deeds to secure debt, financing statements and intellectual property filings), and to pay all filing and recording fees as may be necessary or, in the opinion of the DIP Agent or any DIP Lender, are desirable to give effect to any of the terms and conditions of the DIP Documents or as otherwise required or contemplated by the DIP Documents.

12.    <u>DIP Collateral and DIP Liens</u>.

(a)    All "Obligations" under (and as defined in) the DIP Agreement, including, without limitation, all DIP Credit Extensions and all amounts owing (then existing, contingent or otherwise, all of the foregoing being collectively called the "**DIP Obligations**") shall be, and hereby are, secured, subject and subordinate only to the Carve-Out (as defined in paragraph 17 below), by perfected, first priority liens (collectively, the "**DIP Liens**") in favor of the DIP Agent and each DIP Lender on and in all of the Prepetition Collateral and all other assets of the Debtor in existence or created prior to, on or after the Petition Date, and subject to the entry of the Final Order, any proceeds or property recovered in connection with the successful prosecution or settlement of any claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code (collectively, the "**DIP Collateral**").

(b)    The DIP Liens with respect to the DIP Collateral shall have the following priorities:

i    <u>Unencumbered Collateral</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all DIP Collateral (including, without limitation, all real property) that is not subject to a valid and perfected lien existing on the Petition Date other than the DIP Collateral on which there are liens and security interests as described in clause (iii) below;

ii    <u>Encumbered Collateral</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, a lien on and security interests in all DIP Collateral (including, without limitation, all real property) that is subject to a valid, perfected and unavoidable lien existing on the Petition Date to the extent such lien was senior to the Prepetition Liens on the Petition Date;

iii    <u>Extent of Priming DIP Lien</u>. Pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien on

and security interest in all Prepetition Collateral that is or was intended or required to be subject to valid and perfected liens existing on the Petition Date in favor of the Prepetition Secured Parties; and

iv    Carve-Out.  The DIP Liens shall be subject and subordinate in all respects to the Carve-Out in accordance with paragraph 17 of this Interim Order.

13.    Superiority DIP Claim; Surcharge.

(a)    Scope of Superpriority DIP Claim.  Subject to the Carve-Out in accordance with paragraph 17 of this Interim Order, and in addition to being secured as provided in this Interim Order and any Final Order, all DIP Obligations shall constitute an allowed administrative expense claim under section 503(b) of the Bankruptcy Code and shall constitute an allowed superpriority claim (the "**Superpriority DIP Claim**") pursuant to section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in the Debtor's case of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the Final Order), 507(a), 507(b), 546(c), 726 or 1114 of the Bankruptcy Code. Without limiting the generality of the foregoing, the Superpriority DIP Claim shall be superior to any and all administrative priority claims arising out of transactions, if any, arising between the Debtor and any subsidiary of a Debtor, and all such intercompany claims shall be subordinate to the Superpriority DIP Claim.

(b)    No Surcharge.  Subject to the Carve-Out in accordance with paragraph 17 of this Interim Order, it shall be an Event of Default under (and as defined in) the DIP Agreement for any costs or administrative expenses that have been or may be incurred in this chapter 11 case, in any matters or proceedings related hereto or in any superseding chapter 7 case, to be prior to or on a parity with the

Superpriority DIP Claim of the DIP Agent and DIP Lenders for the DIP Obligations. Subject to entry of the Final Order, in no event shall any costs or expenses of administration be imposed upon the DIP Agent, any DIP Lender or any of the DIP Collateral pursuant to sections 105, 506(c) or 552(b) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent and all DIP Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Agent or any DIP Lender; and, subject to the entry of the Final Order, in no event shall any costs or expenses of administration be imposed upon the Prepetition Secured Parties or any Prepetition Collateral, whether pursuant to sections 105, 506(c) or 552(b) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, and no such consent shall be implied from any action, inaction or acquiescence by the Prepetition Secured Parties.

14.     <u>Debtor Reimbursement Claims</u>.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Documents and as provided herein, without offset, counterclaim, deduction or other claim of avoidance of any nature or type.  In no event shall the Debtor be authorized to offset, deduct, avoid or recoup any amounts owed, or alleged to be owed, by the DIP Agent, any DIP Lender or any Prepetition Secured Party to the Debtor against any of the DIP Obligations (including, without limitation, any such obligations owing under the Prepetition Secured Agreements), unless and to the extent expressly otherwise agreed to in writing by each of the DIP Agent, DIP Lenders and Prepetition Secured Parties, as applicable.

15.     <u>Cash Collateral; Other Matters</u>.  Subject to the terms of this Interim Order and the DIP Documents, the Debtor is authorized to use Cash Collateral that is secured by the

DIP Liens or the Prepetition Liens in accordance with this Interim Order and the DIP Documents.  The Debtor shall cause the Cash Collateral to be promptly deposited in one or more accounts as required by the DIP Documents, which shall be subject to the DIP Liens.  Prior to the deposit of such Cash Collateral, the Debtor shall be deemed to hold all such proceeds in trust for the benefit of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, as applicable.  The DIP Agent and DIP Lenders may, subject to the provisions of the DIP Documents, apply (and reapply) any or all Cash Collateral at any time or times in its possession or control to the payment of any of the DIP Obligations, in such order of application as the DIP Agent or any DIP Lender may designate or elect, and may use all or part of the Cash Collateral to collateralize any contingent DIP Obligations.  If after the repayment in full in cash ("**Full Payment**") of the DIP Obligations, any Challenge (as defined below), claim or cause of action is asserted against the DIP Agent or any DIP Lender or any Prepetition Secured Parties, then such parties shall be entitled to payment from the Debtor to the extent of all costs, expenses, liabilities or damages incurred by it or them (including, without limitation, reasonable attorneys' fees), as secured creditors pursuant to the terms of the DIP Documents and Existing Facility Agreement, all as more fully set forth in the Final Order.

    16. <u>Adequate Protection of Prepetition Secured Parties</u>. As adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code for the Debtor's use, consumption, sale, collection or other disposition of any of the Prepetition Collateral, the Prepetition Secured Parties shall receive the following as adequate protection:

    (a) to the extent there is a diminution in the value of the interests of the Prepetition Secured Parties in the Prepetition Collateral (whether the reason for such diminution is as a result of or from, arises from, or is attributable to, the imposition of

the automatic stay, the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral), the Prepetition Secured Parties are granted replacement liens on the Prepetition Collateral (the "**Replacement Liens**"), which liens are valid, binding, enforceable and fully perfected as of the date hereof, but are subject to the Carve-Out;

(b)      an allowed administrative claim (the "**Credit Facility Administrative Claim**") against the Debtor's estate under section 507(b) of the Bankruptcy Code to the extent that the Replacement Liens do not adequately protect the diminution in the value of the Prepetition Collateral, which Credit Facility Administrative Claim, if any, shall be junior and subordinate to the Carve-Out and the Superpriority DIP Claim; and

(c)      payment of fees and expenses of the Prepetition Secured Parties' to the extent incurred prior to, on or after the Petition Date.

17.    Payment of Certain Fees and Expenses.

(a)      Payment of Professional Expenses.  Subject to the Budget, the Debtor is authorized to use proceeds of DIP Loans solely for the uses permitted under the DIP Agreement, including, without limitation, (i) to pay any fees required to be paid to the Clerk of the Court; and (ii) to pay the fees of the U.S. Trustee pursuant to 28 U.S.C. § 1930 and payment of interest, if any, pursuant to 31 U.S.C. § 3717.  For so long as no Event of Default under (and as defined in) the DIP Agreement shall have occurred and be continuing, the Debtor is also authorized to use the proceeds of the DIP Loans, without limitation, (i) to pay the fees and disbursements incurred by a

chapter 7 trustee (if any) under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000 out of the DIP Collateral; and (ii) to pay fees, compensation, costs, expenses and disbursements (collectively, "**Professional Expenses**") of professionals (including, without limitation, attorneys, accountants, appraisers, consultants and investment bankers) retained by the Debtor (the "**Debtor Professionals**") or an official committee of unsecured creditors, if any, appointed in this chapter 11 case (any such official committee being referred to as a "**Committee**"), and the professionals retained by such Committee, all in accordance with and subject to the Budget; provided, however, that, except as provided in the final sentence of this paragraph no proceeds of DIP Loans or any Cash Collateral of the DIP Agent or Prepetition Secured Parties shall be used to pay Professional Expenses of the Debtor Professionals or Committees (collectively, the "**Professional Persons**") or any other costs incurred in connection with (i) commencing or continuing any claims, causes of actions, adversary proceedings or contested matters against any Prepetition Secured Party, the DIP Agent or any DIP Lender with respect to any loan, repayment or other transaction, act or inaction under or in connection with the Prepetition Secured Agreements or DIP Documents (as the case may be), including, without limitation, discovery proceedings subsequent to the commencement of any such claims or causes of action; (ii) preventing, hindering or delaying performance or enforcement by any Prepetition Secured Party, the DIP Agent or any DIP Lender of its rights or remedies under this Interim Order or any of the DIP Documents (except to contest whether an Event of Default has occurred and exists under the DIP Agreement); (iii) challenging any liens granted in connection

with the Prepetition Secured Agreements, the DIP Liens or the Superpriority DIP Claim; (iv) challenging the DIP Obligations or the Prepetition Secured Obligations; or (v) that would otherwise be expenses not permitted pursuant to the Budget. Notwithstanding the foregoing limitations up to $10,000 may be used by the Committee solely to investigate claims, causes of action or adversary proceedings against the Prepetition Secured Parties with respect to the Prepetition Liens granted to such persons on Prepetition Collateral.

(b)     Carve-Out.  For the purposes of this Interim Order, the "**Carve-Out**" shall mean:  (i) Professional Expenses incurred by Professional Persons at any time, whether or not then allowed or paid (but subject to ultimate allowance), whether by this Interim Order, procedural order, or otherwise, but only to the extent all such Professional Expenses set forth in this clause do not exceed the amount permitted through such time for such expenses in the Budget as then applicable; provided, however, that upon the occurrence of an Event of Default, the Professional Expenses incurred by Professional Persons thereafter may not exceed $50,000; (ii) U.S. Trustee fees, pursuant to 28 U.S.C. § 1930 (the "**U.S. Trustee Fees**"); and (iii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $25,000 out of the DIP Collateral; provided, however, that nothing herein shall be construed to impair the ability of any interested party to object to any Professional Expenses sought by any Professional Person.

18.     Preservation of Rights Granted Under this Interim Order.

(a)    <u>Protection From Subsequent Financing Order</u>.  It shall constitute an Event of Default under (and as defined in) the DIP Agreement if the Debtor seeks, or if there is entered in this chapter 11 case, or in any successor case, any order that authorizes the obtaining of credit or the incurrence of indebtedness by the Debtor (or any trustee or examiner) that (i) is secured by a security, mortgage, collateral interest or lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens or Credit Facility Replacement Liens, except as expressly authorized by the DIP Agreement, or (ii) has priority administrative status that is equal or senior to the Superpriority DIP Claim; <u>provided</u>, <u>however</u>, that nothing herein shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of the DIP Obligations and Prepetition Secured Obligations must be fully paid from the proceeds of such credit or indebtedness, and all contingent obligations owed to any DIP Lender or any Prepetition Secured Party fully cash collateralized as provided in the DIP Documents or Prepetition Secured Agreements (as applicable).

(b)    <u>Rights Upon Dismissal, Conversion or Consolidation</u>.  If the Case is dismissed, converted to a case under chapter 7 of the Bankruptcy Code or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of the Case shall affect the rights or remedies of the DIP Agent and DIP Lenders under the DIP Documents or the rights or remedies of Prepetition Secured Parties or the DIP Agent or DIP Lenders under this Interim Order, and all of the respective rights and remedies hereunder and thereunder of Prepetition Secured Parties, the DIP Agent and DIP

Lenders shall remain in full force and effect as if the Case had not been dismissed, converted, or substantively consolidated.  It shall constitute an Event of Default if the Debtor seeks, or if there is entered, any order dismissing the Case.  Notwithstanding any order that may be entered in the future dismissing the Case (i) all of the liens and claims granted hereunder shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such liens and claims shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing all the liens and claims of the Prepetition Secured Parties, the DIP Agent and the DIP Lenders to the greatest extent permitted by applicable law.

(c)     No Discharge; Credit Bid Rights.  Unless and until Full Payment of the DIP Obligations shall occur or are otherwise satisfied with the consent of the DIP Lenders in their sole discretion, all such obligations shall not be discharged by the entry of any order confirming a plan of reorganization in the Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived such discharge. Subject to entry of the Final Order, no plan of reorganization or liquidation, nor any order entered in connection with a sale of assets under section 363 of the Bankruptcy Code or otherwise, shall limit or otherwise restrict the right of the DIP Agent or any DIP Lender, or any Prepetition Secured Party to submit a credit bid for all or any part of the DIP Collateral (including a joint credit bid by one or more the Prepetition Secured Parties, DIP Agent and/or DIP Lenders).

(d)     No Marshaling.  The Debtor agrees not to assert rights pursuant to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP

Collateral at any time securing any of the DIP Obligations, and, subject to entry of the Final Order, in no event shall any DIP Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of the Debtor's estate pursuant to section 551 of the Bankruptcy Code.

(e)    <u>No Requirement to File Proof of Claim</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar order establishing a deadline for the filing of proofs of claims entitled to administrative expense treatment under section 503(b) of the Bankruptcy Code, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be required to file any proof of claim with respect to any of the DIP Obligations or the Prepetition Secured Obligations, all of which shall be due and payable in accordance with the DIP Documents and the Prepetition Secured Agreements, as applicable, without the necessity of filing any such proof of claim, and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Documents or the Existing Facility Agreement, as applicable, or prejudice or otherwise adversely affect the DIP Agent's, any DIP Lender's or any Prepetition Secured Parties' rights, remedies, powers or privileges under the DIP Documents, the Existing Facility Agreement or this Interim Order.

(f)    <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Interim Order are in addition to, and without prejudice to the rights of, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to pursue any and all rights and remedies available to them under the Bankruptcy Code, the Existing Facility Agreement and the DIP Documents, or any other applicable agreement or law

including, without limitation, the right to seek adequate protection and/or additional or differing adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or the granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professional Persons, or other parties seeking compensation in the chapter 11 case.

19.    <u>Automatic Perfection of Liens</u>.  The DIP Liens and Replacement Liens (collectively, the "**DIP Order Liens**") shall, as of the Petition Date, be deemed valid, binding, enforceable and perfected with respect to all of the DIP Collateral or Prepetition Collateral, as applicable, upon entry of this Interim Order.  The DIP Agent, DIP Lenders, and the Prepetition Secured Parties, shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including, without limitation, possession of any of the DIP Collateral or any other property of the Debtor or the obtaining of any consent of any third party including, without limitation, any third party to a control or similar agreement under the Existing Facility Agreement) in order to validate the perfection of any DIP Order Liens.  If the DIP Agent, any DIP Lender, or any Prepetition Secured Party chooses to file or record any such mortgages, deeds of trust, security deeds, notices of lien or UCC-1 financing statements, or take any other action to validate the perfection of any DIP Order Liens, the Debtor and its officers are authorized to execute any documents or instruments as the DIP Agent, any DIP Lender or the Prepetition Secured Parties, shall reasonably request, and the Debtor shall pay or reimburse the DIP Agent, each DIP Lender, and each of the Prepetition Secured Parties (as applicable) for the payment of any cost, fees or

expenses (including, without limitation, recording taxes) payable in connection with the filing or recordation of any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or other instruments or agreements.  The DIP Agent, each DIP Lender and Prepetition Secured Parties, may, in its or their discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which the Debtor is organized or has or maintains any DIP Collateral or an office, and each filing office is authorized to accept such certified copy of this Interim Order for filing and recording.

20.     <u>Reimbursement of Expenses</u>.  All reasonable and documented costs and expenses incurred by the DIP Agent and any DIP Lenders for which the Debtor is obligated under the DIP Documents, shall form a part of the DIP Obligations and shall be paid by the Debtor (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the DIP Documents; provided that no written objection is received by counsel for the DIP Lenders from the U.S. Trustee or the Committee within ten (10) days (the "**Review Period**") after receipt by the U.S. Trustee and counsel to the Committee of invoices thereof (subject in all respects to applicable privilege and work product doctrines) and such objector files a motion with the Court within three (3) business days thereafter seeking a hearing on such objection on the first omnibus hearing date on which such hearing can be held. If an objection is received as to any portion of such invoice and motion seeking a hearing thereon is timely filed, the Debtor shall promptly pay after the Review Period the portion of such invoice not subject to objection and the Bankruptcy Court shall decide any such objection upon Motion of the DIP Agent and DIP Lenders unless otherwise resolved.

21.     <u>Amendments to DIP Documents</u>.  The Debtor and the DIP Agent and DIP Lenders are hereby authorized to execute, deliver and implement, in accordance with the terms

of the DIP Documents and without further order of the Court, any amendments to and modifications of any of the DIP Documents on the following conditions:  (a) the amendment or modification must not constitute a material change to the terms of the DIP Documents, (b) copies of the amendment or modification must be served upon counsel for the Committee, if any, the U.S. Trustee and other interested parties specifically requesting such notice, and (c) notice of the amendment is filed with the Court.  Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court.  For purposes hereof, a "material change" shall mean a change that operates to shorten the maturity date of the DIP Loan Facility, increase the aggregate amount of the commitment for DIP Loans under the DIP Loan Facility, increase the rate of interest other than as provided in or contemplated by the DIP Documents, add additional specific events of default, or enlarge the nature and extent of default remedies available to the DIP Agent or any DIP Lender following an Event of Default under (and as defined in) the DIP Agreement.  Without limiting the foregoing, any other change that does not materially and adversely affect the rights of the Debtor under the DIP Loan Facility shall not constitute a material change to the terms of the DIP Documents and may be affected by the Debtor and the DIP Lenders without the need for further approval of the Court.

22.     Events of Default; Remedies.

(a)     Events of Default and Remedies.   An Event of Default shall be deemed to have occurred and exist for purposes of this Interim Order upon the occurrence of an "Event of Default" under (and as defined in) the DIP Agreement, including, without limitation, any breach or failure of compliance by the Debtor with respect to any of the provisions of this Interim Order.

(b)     Enforcement of Remedies.   Upon or after the occurrence of any Event of Default, the DIP Agent and, as applicable, each DIP Lender shall be fully authorized, in its sole discretion, to exercise all remedies available to it under the DIP Documents and applicable law, provided that the DIP Agent shall provide (i) five (5) days' notice to the Debtor's counsel (with a copy to counsel to the Committee, if any, and the U.S. Trustee) prior to the termination of the Debtor' right to use Cash Collateral, and (ii) seven (7) days' notice to the Debtor's counsel (with a copy to counsel to the Committee, if any, and the U.S. Trustee) prior to the enforcement of the DIP Liens or exercise of any other rights or remedies against the DIP Collateral. The foregoing notices shall be served via electronic mail or facsimile on the Debtors' counsel, counsel to the Committee and the Office of the U.S. Trustee.  The foregoing notice provisions are without prejudice to the rights of the DIP Agent and the DIP Lenders, as applicable, to seek earlier relief from this Court upon appropriate notice and hearing pursuant to the Bankruptcy Code and Bankruptcy Rules.  In any hearing regarding the exercise of remedies, unless otherwise ordered by the Court, the sole and exclusive issue shall be whether or not an Event of Default has occurred and is continuing under any of the DIP Documents.  Upon or after the occurrence of an

Event of Default, and notwithstanding the notice periods referred to above, none of the DIP Agent or any DIP Lender shall be obligated to make any DIP Credit Extensions to any of the Debtor.  The automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement the provisions of this paragraph.  Additionally, injunctive or other similar provisions contained in any plan of reorganization or any order confirming any such plan or plans of reorganization, shall not preclude the Prepetition Secured Parties, the DIP Agent or any DIP Lender from exercising the rights and remedies provided to it pursuant to and in accordance with this Interim Order, the Final Order and the DIP Documents.

(c)    <u>Application of DIP Collateral Proceeds</u>.  Notwithstanding any contrary provision contained in this Interim Order, if the DIP Agent or any DIP Lender, or Prepetition Secured Parties shall proceed to enforce the DIP Liens or any other liens or claims granted to them in respect of any DIP Collateral, then the DIP Agent or any DIP Lender or Prepetition Secured Party may, in its discretion, elect to apply all proceeds of the DIP Collateral or Prepetition Collateral, as applicable, to the payment or cash collateralization of the DIP Obligations or the Prepetition Secured Obligations, as the case may be, then outstanding, if any, in such order of application as the DIP Agent or Prepetition Secured Party, as applicable, may elect in its discretion, and any application to the Prepetition Secured Obligations shall not be deemed to reduce the amount of the DIP Obligations.

(d)    <u>Rights Cumulative</u>.  The rights, remedies, powers and privileges conferred upon the Prepetition Secured Parties, the DIP Agent and the DIP Lenders

pursuant to this Interim Order shall be in addition to, and cumulative with, those contained in the DIP Documents and Existing Facility Agreement, as applicable.

23.    <u>Modification of Automatic Stay</u>.    The automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement the provisions of this Interim Order and the DIP Documents, thereby permitting (a) the DIP Agent and the DIP Lenders, *inter alia*, to receive collections of DIP Collateral for application to the DIP Obligations as provided herein, (b) the DIP Agent to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens and (c) the DIP Agent and any DIP Lender, as applicable, to enforce the DIP Liens and exercise any of its or their rights and remedies as set forth in paragraph 22 of this Interim Order and the DIP Documents, all without further order modifying or terminating the automatic stay of section 362 of the Bankruptcy Code.

24.    <u>Deadline for Challenge to Prepetition Secured Obligations</u>.    In consideration of the DIP Agent's and the DIP Lenders' agreement to provide DIP Credit Extensions pursuant to the DIP Documents, and the Prepetition Secured Parties' consent to the use of Cash Collateral and to the DIP Liens, the Debtor has voluntarily made the stipulations and releases contained in paragraph 4 above (the "**Debtor's Stipulations**").    The Debtor's Stipulations shall be binding on the Debtor, but shall be subject only to the right of a party-in-interest, including the Committee and any chapter 11 trustee or chapter 7 trustee that is appointed prior to the expiration of the Challenge Deadline (as defined below), to the extent that such party has or is otherwise granted standing to do so, to commence an appropriate adversary proceeding (a "**Challenge**") objecting to the validity, priority, amount or allowance of any Prepetition Secured Obligations, or the extent, validity, priority, perfection or avoidability of any

liens granted to the Prepetition Secured Parties on the Prepetition Collateral, or seeking disgorgement of, recharacterization or subordination of, or offset or recoupment, against all or part of the payment of Prepetition Secured Obligations by a Debtor, the Roll-Up, or asserting any claim under contract, tort or other theory (including, without limitation, lender liability), including, without limitation, theories of recovery or pursuant to section 105 or chapter 5 of the Bankruptcy Code, which adversary proceeding or contested matter must be filed no later than the earlier to occur of (a) seventy-five (75) days from the entry of this Interim Order and (b) sixty (60) days from the date of the formation of any creditors' committee (the "**Challenge Deadline**"); provided, however, that if a chapter 7 trustee or chapter 11 trustee is appointed prior to the Challenge Deadline, the Challenge Deadline applicable to such trustee shall extend until the later of (i) sixty (60) days from such appointment and (ii) the existing Challenge Deadline.  If the party-in-interest has not obtained an order from the Court granting such party standing to pursue any such Challenge, then such party shall be required promptly to seek such an order as a condition to its further prosecution of such Challenge, subject to any objection by the Debtor, the Prepetition Secured Parties, or any other interested party, and a party's authority to prosecute such Challenge shall be contingent upon its obtaining such an order granting standing.  In no event shall the filing of any such Challenge affect any of the rights, privileges, powers or remedies of the Debtor, the Prepetition Secured Parties, the DIP Agent or any DIP Lender under this Interim Order, the DIP Documents, or the Prepetition Secured Agreements.  If such Challenge is not timely filed (or, if filed, is denied or overruled), or if standing in connection with any such Challenge is not granted, (i) with respect to any Prepetition Secured Obligations, all of such Prepetition Secured Obligations shall be deemed a legal, valid, binding and enforceable claim that is allowed in full as a secured claim, and not subject to subordination or

recharacterization in this Case, including any superseding chapter 7 case, or in any other proceedings; (ii) with respect to any liens granted to secure the Prepetition Secured Obligations, such Prepetition Liens shall be deemed to be legal, valid, binding, enforceable, perfected (having the priority set forth in this Interim Order) and unavoidable in this Case, including any superseding chapter 7 case, and in any other proceedings; and (iii) all claims and other causes of action (including, without limitation, "lender liability" theories) and causes of action or theories of recovery pursuant to section 105 or chapter 5 of the Bankruptcy Code) against Prepetition Secured Parties shall be forever waived and barred.  For the avoidance of doubt, any chapter 7 trustee or chapter 11 trustee appointed or elected prior to the Challenge Deadline, or during the pendency of any adversary proceeding or contested matter commenced by the Committee or any other party in interest to this paragraph 24, shall be deemed to be a party other than the Debtor and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations, stipulations and waivers of the Debtor in this Order.  If this Case is converted to a case under chapter 7 of the Bankruptcy Code, the trustee shall be permitted to continue prosecution of any pending adversary proceeding or contested matter theretofore commenced pursuant to this paragraph 24 on behalf of Debtor's estate.

25.   Service of Order.  Promptly after the entry of this Interim Order, the Debtor shall mail, by January __, 2016, a copy of this Interim Order, to:  (a) the Office of the U.S. Trustee; (b) counsel Deerfield Management Company, L.P.; (c) each of the Debtor's twenty (20) largest unsecured creditors; (d) any known holders of prepetition liens on the Prepetition Collateral; and (e) all parties (if any) who have filed requests for notices under Rule 2002 of the Bankruptcy Rules as of the date hereof, and (f) any such other party entitled to notice pursuant to

Rule 9013-1(m) of the Local Rules, and shall file a certificate of service regarding same with the Clerk of the Court. Such service shall constitute good and sufficient notice of the Final Hearing.

26.     <u>No Deemed Control</u>.  Subject to entry of the Final Order, by consenting to this Interim Order, making DIP Credit Extensions to the Debtor and administering the financing relationship with the Debtor pursuant to the DIP Documents, neither the DIP Agent nor any DIP Lender shall, solely by reason thereof, be deemed to be in control of the Debtor or the Debtor's operations, or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar state or federal statute) with respect to the operations or management of the Debtor.

27.     <u>Binding Effect; Successors and Assigns</u>.  Immediately upon entry of this Interim Order by the Court (notwithstanding any applicable law or rule to the contrary), the provisions of this Interim Order shall be binding upon and inure to the benefit of all parties in interest in this Case, including, without limitation, the DIP Agent, each DIP Lender, the Prepetition Secured Parties, the Debtor, and their respective successors and assigns (including, without limitation, any chapter 11 trustee hereafter appointed or elected for the estate the Debtor, or any chapter 7 trustee appointed in any superseding chapter 7 case); provided, however that neither the DIP Agent nor any DIP Lender shall have any obligation to make DIP Credit Extensions to, or consent to the use of Cash Collateral by, any chapter 7 or chapter 11 trustee appointed or elected for the estate of the Debtor.

28.     <u>Order Controls</u>.  In the event of any irreconcilable inconsistency between the terms of the DIP Documents and this Interim Order, the provisions of this Interim Order shall govern and control.

29.  <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held at

_____ __.m., on _____, 2016, _____ Floor at Courtroom __, before Judge

_____, at the United States Bankruptcy Court for the District of Delaware.  If any or all

of the provisions of this Interim Order are modified, vacated or stayed as the result of any

objection timely filed and asserted at the Final Hearing, then, without limiting the provisions of

paragraph 31 hereof, any DIP Obligations incurred prior to the effective date of such

modification, vacatur or stay shall be governed in all respects by the original provisions of this

Interim Order, and the DIP Agent and each DIP Lender shall be entitled to the protections

afforded under section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges,

and benefits, including, without limitation, the DIP Liens and Superpriority DIP Claim granted

herein and with respect to all such DIP Obligations.

30.  <u>Objection Deadline</u>.  If any party in interest shall have an objection to any

of the provisions of this Interim Order, such party shall be authorized to assert such objection at

the Final Hearing, provided that a written statement setting forth the basis for such objection is

filed with the Court, and concurrently served upon:  (a) the Office of the United States Trustee,

844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19899-0035; (b) counsel for

the Debtor, Dentons US LLP, 1301 K Street, NW, Suite 600, East Tower, Washington, DC

20005-3364, Attention: Sam J. Alberts, Esq.; and (c) counsel for the DIP Agent, DIP Lenders

and Prepetition Secured Parties, Katten Muchin Rosenman LLP, 575 Madison Avenue, New

York, New York 10022, Attention:  Jeff J. Friedman, Esq. and Connolly Gallagher LLP, The

Brandywine Building, 1000 West Street, Suite 1400, Wilmington, DE 19801, Attention:  Jeffrey

C. Wisler, Esq.; so that such objections and responses are filed on or before 12:00 p.m., Eastern

Standard Time on February __, 2016.  Any objecting party should appear at the Final Hearing to

assert the basis for such objection before the Court or the Court may deem such objection to have been waived and abandoned by such objecting party.

      31.   <u>Effect of Appeal</u>.  Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed on appeal:

      (a)    such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability or DIP Liens granted, created or incurred by the Debtor to the DIP Agent and DIP Lenders prior to the effective date of such stay, modification or vacation, or the validity, enforceability or priority of any DIP Liens, priority or right authorized or created under the original provisions of this Interim Order or pursuant to the DIP Documents; and

      (b)    any indebtedness, obligation or liability incurred by the Debtor to the DIP Agent and the DIP Lenders under the DIP Documents prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits, including, without limitation, the DIP Liens and priorities granted herein and pursuant to the DIP Documents, with respect to any such indebtedness, obligation or liability.  All DIP Credit Extensions under the DIP Documents are made in reliance upon this Interim Order, and, therefore, the indebtedness resulting from such DIP Credit Extensions prior to the effective date of any stay, modification or vacation of this Interim Order cannot (i) be subordinated, (ii) lose the priority of the DIP Liens, or (iii) be deprived of the benefit of the Superpriority DIP Claim granted to the DIP Agent and DIP

Lenders under this Interim Order or the DIP Documents, as a result of any subsequent

order in this Case, or any superseding case, of the Debtor.

32.    <u>Effectiveness</u>.    This Interim Order shall take effect and be enforceable

immediately upon entry hereof notwithstanding any contrary Bankruptcy Rule or Rule of Civil

Procedure and there shall be no stay of execution or effectiveness of this Interim Order.

33.    <u>Retention of Jurisdiction</u>.    The Court has and will retain jurisdiction to

enforce this Interim Order according to its terms.

Wilmington, Delaware
Date:  January __, 2016

_____
    United States Bankruptcy Judge

# Exhibit A

## SENIOR SECURED, SUPERPRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**"), dated as of January ____, 2016, among Nuo Therapeutics, Inc., a Delaware corporation ("**Borrower**"), Deerfield Mgmt., L.P., as administrative agent and collateral agent (in such capacities, the "**DIP Agent**") and the lenders set forth on the signature page of this Agreement (such persons and each person which from time to time becomes a party hereto as a lender, the "**Lenders**", and together with the DIP Agent and the Borrower, the "**Parties**").

### W I T N E S S E T H :

WHEREAS, on January ____, 2016 (the "**Petition Date**") the Borrower, as a debtor and debtor in possession, filed a voluntary petition for relief under the Bankruptcy Code (such term and other capitalized terms used herein shall have the meanings set forth in Article I of this Agreement) with the United States Bankruptcy Court for the for the District of Delaware (the "**Bankruptcy Court**") (such proceedings being jointly administered under Case No. _____ are hereinafter referred to collectively as the "**Chapter 11 Case**"). The Borrower continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide a senior secured, super-priority debtor-in-possession credit facility in an aggregate principal amount of Nine Million Dollars ($9,000,000), inclusive of the Roll Up Loan (hereinafter defined), in the amount of Four Million Five Hundred Thousand $4,500,000, all on a post-petition basis and on the terms and conditions set forth herein; and

WHEREAS, the Lenders are willing to provide such financing only if, among other things, (a) all of the Obligations hereunder and under the other Transaction Documents (i) constitute an allowed super-priority, administrative expense claim in the Chapter 11 Case pursuant to section 365(c)(1) of the Bankruptcy Code, as more particularly set forth herein and in the Financing Orders; and (ii) are secured by valid, perfected Liens on the Collateral to the extent set forth herein and in the Financing Orders; and (b) the financing and the Transaction Documents are authorized and approved by the Financing Orders to be entered by the Bankruptcy Court, and such Financing Orders are acceptable in form and substance to the DIP Agent and the Lenders in their sole discretion.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS

**Section 1.1    General Definitions**.  Wherever used in this Agreement, including the recitals hereto, the Exhibits or the Schedules attached hereto, unless the context otherwise requires, the following terms have the following meanings:

"**Accountant's Report**" has the meaning given to it in Section 5.1(e)(i).

"**Affiliate**" means, with respect to any Person, any other Person:

      (a)    that owns, directly or indirectly, in the aggregate more than 10% of the beneficial ownership interest of such Person;

      (b)    that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person; or

      (c)    that directly or indirectly is a general partner, controlling shareholder, or managing member of such Person.

"**Agreement**" has the meaning given in the introductory paragraph hereto.

"**Agreement Date**" means the date of this Agreement.

"**Applicable Laws**" means all statutes, rules and regulations of any Governmental Authorities in the United States or elsewhere relating to Borrower or its Subsidiaries or the conduct of their respective businesses.

"**Approved Cash Management Arrangements**" means cash management arrangements satisfactory to the DIP Agent and the Initial Lenders in their sole discretion.

"**Approved Cash Management Order**" means a cash management order satisfactory to the DIP Agent and the Initial Lenders in their sole discretion approving the Approved Cash Management Arrangements and directing the Borrower to comply therewith.

"**Asset Purchase Agreement**" means that certain Asset Purchase Agreement, dated on or about the date of this Agreement by and among the Borrower and the buyer identified therein (the "**Buyer**").

"**Authorizations**" has the meaning given to it in Section 3.1(o).

"**Bankruptcy Code**" means title 11 of the United States Code, as now and hereafter in effect, or any successor statutes.

"**Bankruptcy Court**" has the meaning given to it in the Recitals hereto.

"**Borrower**" has the meaning given to it in the introductory paragraph hereto.

"**Borrower Indemnified Party**" has the meaning given to it in Section 7.11.

"**Budget**" means the forecast of cash receipts, expenses and disbursements, loan balances, and anticipated total drawing amounts and uses of Loans for the immediately following 9-week period, in form and substance acceptable to the DIP Agent and the Initial Lenders, as updated and approved in accordance with Section 5.1(f), Section 5.1(g) and the Financing Orders.

"**Business Day**" means a day on which banks are open for business in the City of New York.

"**Carve-Out**" has the meaning given to it in the Financing Orders, as applicable.

"**Case Milestones**" means each of the following deadlines:  (a) entry of the Interim Order and the Approved Cash Management Order, each in form and substance satisfactory to the DIP Agent and the Initial Lenders, by the third Business Day following the Petition Date; (b) entry of the Final Order in form and substance satisfactory to the DIP Agent and the Initial Lenders within twenty (20) days after the date of entry of the Interim Order; (c) filing of the Stalking Horse Motion, in form and substance satisfactory to the DIP Agent and the Initial Lenders, by the first Business Day following the Petition Date; (d) entry of an order approving the Stalking Horse Motion and related bidding and sale procedures, in each case, in form and substance satisfactory to the DIP Agent and the Initial Lenders by the earlier of (i) twenty (20) days following the formation of a Committee and (ii) twenty five (25) days after the Petition Date; (e) holding of an auction for the sale of the Borrower' assets by March 13, 2016; (f) entry of an order approving such sale(s) by March 14, 2016; and (g) closing of such sales by March 25, 2016.

"**Cash and Cash Equivalents**" means, with respect to any date of determination, cash, cash equivalents, and marketable securities as set forth on Borrower's balance sheet as of such date.

"**CFC**" has the meaning given to it in Section 3.1(m).

"**Chapter 11 Case**" has the meaning given to it in the Recitals hereto.

"**Chapter 11 Plan**" means a plan of reorganization or a chapter 11 plan of the Borrower, in form and substance satisfactory to the Existing Lenders and the Initial Lenders, in their sole discretion.

"**Closing Fee**" has the meaning given to it in Section 2.9(b).

"**Code**" has the meaning given to it in Section 3.1(l).

"**Collateral**" means any and all "Collateral" or "DIP Collateral" referred to in the Financing Orders.

"**Commitment**" means the commitment of Lenders to provide Loans in accordance with Section 2.2 in an aggregate principal amount of $9,000,000.

"**Committee**" means any official committee of unsecured creditors appointed by the U.S. Trustee or approved by the Bankruptcy Court in the Chapter 11 Cases.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other domestic or foreign liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, arrangement (including under any relevant incorporating statute), rearrangement, receivership, insolvency, reorganization, judicial management, administration or relief of debtors or similar

debtor relief laws of the United States or other applicable jurisdiction from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event which, at the giving of notice, lapse of time or fulfillment of any other condition (or any combination of the foregoing), would constitute an Event of Default.

"**DIP Agent**" has the meaning given to it in the introductory paragraph hereto.

"**DIP Superpriority Claim**" means the superpriority administrative expense claim granted by the Bankruptcy Court in the Financing Orders in respect of the Obligations, as described in and subject to Section 2.10.

"**Dollars**" and the "**$**" sign mean the lawful currency of the United States of America.

"**Event of Default**" has the meaning given to it in Section 6.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, including the rules and regulations thereunder.

"**Existing Credit Agreement**" means that certain Facility Agreement, dated as of March 31, 2014 (as amended, restated, supplemented, waived or otherwise modified on or before the Petition Date), by and among Borrower and the Existing Lenders.

"**Existing Lenders**" means the lenders from time to time party to the Existing Credit Agreement as of the date hereof.

"**Existing Loans**" means the loans by Existing Lenders under the Existing Credit Agreement.

"**FDA**" means the U.S. Food and Drug Administration.

"**Final Order**" means the final order entered by the Bankruptcy Court approving this Agreement.

"**Financing Orders**" means:  the Interim Order and, the Final Order, as applicable at such time.

"**First Day Orders**" means those orders entered by the Bankruptcy Court on or about the Petition Date, in each case as previously provided to the DIP Agent and the Initial Lenders and acceptable to them in form and substance.

"**GAAP**" means generally accepted accounting principles consistently applied as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession).

US\116406964v3_333285-00104 1/26/2016 3:50 PM

"**Government Authority**" means any government, quasi-governmental agency, governmental department, ministry, cabinet, commission, board, bureau, agency, court, tribunal, regulatory authority, instrumentality, judicial, legislative, fiscal, or administrative body or entity, whether domestic or foreign, federal, state, provincial or local, having jurisdiction over the matter or matters and Person or Persons in question.

"**Hedging Obligations**" means all liabilities under take-or-pay or similar arrangements or under any interest rate swaps, caps, floors, collars and other interest hedge or protection agreements, treasury locks, equity forward contracts, currency agreements or commodity purchase or option agreements or other interest or exchange rate or commodity price hedging agreements and any other derivative instruments, in each case, whether the Borrower and its Subsidiaries are liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which liabilities the Borrower or its Subsidiaries otherwise assures a creditor against loss.

"**Indebtedness**" means the following:

      (a)      all indebtedness for borrowed money;

      (b)      the deferred purchase price of assets or services (other than trade payables and other liabilities to employees and officers arising in the ordinary course of business and not related to any financing) which in accordance with GAAP would be shown to be a liability (or on the liability side of a balance sheet);

      (c)      all guarantees of Indebtedness;

      (d)      the maximum amount of all letters of credit issued or acceptance facilities established for the account of Borrower and any of its Subsidiaries, including without duplication, all drafts drawn thereunder (other than letters of credit or acceptance facilities supporting other indebtedness of Borrower and any of its Subsidiaries which are otherwise permitted hereunder);

      (e)      all capitalized lease obligations;

      (f)      all indebtedness of another Person secured by any Lien on any property of Borrower or its Subsidiaries, whether or not such indebtedness has been assumed or is recourse (with the amount thereof, in the case of any such indebtedness that has not been assumed by Borrower or its Subsidiaries, being measured as the lower of (x) the fair market value of such property and (y) the amount of the indebtedness secured);

      (g)      all Hedging Obligations; and

      (h)      indebtedness created or arising under any conditional sale or title retention agreement.

"**Indemnity**" has the meaning given to it in Section 7.11.

"**Initial Lenders**" means the Lenders signatory to this Agreement on the Agreement Date.

"**Initial Loan**" means the initial Loan by Lenders hereunder.

"**Interest Payment Date**" has the meaning given to it in Section 2.7.

"**Interest Rate**" means twelve percent (12%) simple interest per annum.

"**Interim Order**" means the interim order entered by the Bankruptcy Court approving this Agreement.

"**IP**" and "**Intellectual Property**" have the meanings given to such terms in Section 3.1(k).

"**Lenders**" means the Initial Lenders and any other Person who becomes party to this Agreement from time to time as a Lender.

"**Lien**" means any lien, pledge, preferential arrangement, mortgage, security interest, deed of trust, charge, assignment, hypothecation, title retention, privilege or other encumbrance on or with respect to property or interest in property having the practical effect of constituting a security interest, in each case with respect to the payment of any obligation with or from the proceeds of, any asset or revenue of any kind.

"**Loans**" means loans and advances hereunder.

"**Loss**" has the meaning given to it in Section 7.11.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, condition (financial or otherwise) or assets of Borrower or its Subsidiaries, taken as a whole, other than as a result of those events that customarily would occur leading up to the commencement of the Chapter 11 Case, (b) the validity or enforceability of any provision of any Transaction Document, (c) the ability of the Borrower to fully and timely perform the Obligations or (d) the rights and remedies of the Lenders under any Transaction Document.

"**Maturity Date**" means the earliest of:  (i) the stated maturity date, which shall be March 31, 2016; (ii) the date on which the sale of the Borrower's assets shall have been consummated (or any portion thereof); (iii) the date that is twenty (20) days after the entry of the Interim Order, unless on or before such day the Bankruptcy Court shall have entered the Final Order; and (iv) the acceleration of the Loans or termination of the Commitment under this Agreement, including, without limitation, as a result of the occurrence of an Event of Default.

"**Maximum Available Amount**" means the maximum amount of the Loans available at any time in accordance with the Budget (less the amount of any such Loans then outstanding), such amount not to exceed the lesser of (a) the unfunded portion of the Commitment at any time and (b) the total permitted amount of Loans set forth in the Financing Orders.

"**Necessary Documents**" has the meaning given to it in Section 3.1(i).

US_ACTIVE 406964v3_333285-00104 1/26/2016 3:50 PM

"**Notice of Borrowing**" means a notice requesting the borrowing of a Loan duly executed by the chief financial officer or acting chief financial officer of the Borrower and substantially in the form of Exhibit A hereto.

"**Obligations**" means all obligations (monetary or otherwise) of the Borrower arising under or in connection with the Transaction Documents including each of the Loans and all and any obligations related to the foregoing.

"**Organizational Documents**" means the articles of incorporation and by-laws, each as amended to date, of Borrower.

"**Other Taxes**" means any and all present or future stamp or documentary taxes or any other excise or property taxes, duties, other similar charges or similar levies, and all liabilities with respect thereto, together with any interest, fees, additions to tax or penalties applicable thereto (including by reason of any delay in payment), arising from any payment made hereunder or from the execution, delivery, registration or enforcement of, or otherwise with respect to, any Transaction Document (excluding, for greater certainty, any taxes on the general income of the Lenders.)

"**Party**" and "**Parties**" have the respective meanings given in the introductory paragraph hereto.

"**Permitted Indebtedness**" means the following Indebtedness:

(a)    the Obligations;

(b)    Indebtedness evidenced by capital leases or secured by purchase money Liens approved in writing by the Required Lenders; and

(c)    Indebtedness existing as of the Agreement Date and set forth on Exhibit A and paid only pursuant to the provisions of the agreements evidencing such Indebtedness set forth on such Exhibit.

"**Permitted Liens**" means:

(a)    Liens existing on the Agreement Date and set forth on Exhibit B attached hereto, and any renewals or extensions thereof, provided that the property covered thereby is not increased;

(b)    Liens in favor of the Lenders and the Existing Lenders;

(c)    statutory Liens created by operation of applicable law;

(d)    Liens arising in the ordinary course of business, consistent with past practice and securing obligations that are not overdue or are being contested in good faith by appropriate proceedings;

(e)      Liens for taxes, assessments or governmental charges or levies not overdue and payable or that are being contested in good faith by appropriate proceedings;

(f)      Liens arising from judgments, decrees or attachments in existence prior to Petition Date;

(g)      Liens in favor of financial institutions arising in connection with accounts maintained in the ordinary course of Borrower's and its Subsidiaries' business and consistent with past practice held at such institutions to secure standard fees for services charged by, but not financing made available by, such institutions;

(h)      Liens securing Indebtedness permitted pursuant to clause (b) of the definition of Permitted Indebtedness;

(i)      pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(j)      deposits to secure (i) the performance of tenders, bids, trade contracts, licenses and leases, statutory obligations, surety bonds, performance bonds, bank guaranties and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice, or (ii) indemnification obligations relating to any disposition;

(k)      easements, rights of way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially interfere with the conduct of the business of the applicable Person;

(l)      leases, licenses or subleases granted to others in the ordinary course of business and not interfering in any material respect with the business of Borrower and its Subsidiaries;

(m)      Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or equivalent in foreign jurisdictions) on items in the course of collection; and

(n)      licenses of intellectual property granted by Borrower or any of its Subsidiaries required in connection with the sale of Borrower's products in the ordinary course of business and not interfering in any material respect with the conduct of business of Borrower and its Subsidiaries.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**Petition Date**" has the meaning given to it in the Recitals hereto.

8

"**PFIC**" has the meaning given to it in Section 3.1(l).

"**Prior Liens**" means any valid, duly perfected, non-avoidable Liens, only to the extent permitted to be in existence pursuant to the Existing Credit Agreement, in existence as of the Petition Date (or valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted but section 546(b) of the Bankruptcy Code, and, to the extent applicable, section 362(b)(18) of the Bankruptcy Code) including, without limitation, valid, duly perfected, non-avoidable pre-Petition Date Liens referred to on any schedule to any lender or owner title insurance policy of any of the property of the Borrower.

"**Register**" has the meaning given to it in Section 1.4(b).

"**Required Lenders**" means Lenders that, taken together, hold more than 50% of the aggregate outstanding principal amount of the Commitment and the Loans extended thereunder; provided, that in the event that there is no Commitment then in effect, then more than 50% of the Loans then outstanding.

"**Roll Up Loan**" has the meaning given to it in Section 2.1(a).

"**SEC**" means the United States Securities and Exchange Commission.

"**SEC Reports**" means the annual and other reports filed or furnished by Borrower with or to the SEC under the Exchange Act.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"**Security Agreement**" shall have the meaning provided therefor in the Existing Credit Agreement.

"**Stalking Horse Motion**" means the motion of the Borrower, in form and substance satisfactory to the Initial Lenders and the Buyers, filed on or about the Petition Date, seeking approval of the terms of sale procedures, bid protections and related relief in connection with the Asset Purchase Agreement.

"**Subsidiary or Subsidiaries**" means, as to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such Person.

"**Tax Affiliate**" means (a) Borrower and its Subsidiaries and (b) any Affiliate of any Borrower with which such Borrower files or is required to file consolidated, combined or unitary tax returns.

"**Taxes**" means all present or future taxes, levies, imposts, stamp or other duties, fees, assessments, deductions, withholdings, and other charges imposed by any Government

Authority, and all liabilities with respect thereto, together with any interest, fees, additions to tax or penalties applicable thereto (including by reason of any delay in payment).

"**Tax Returns**" has the meaning given to it in Section 3.1(l).

"**Test Period**" means each successive one calendar week period (a Monday through the following Sunday) commencing on February 1, 2016.

"**Transaction Documents**" means this Agreement, the Financing Orders, the Approved Cash Management Order and any other order, document or instrument delivered in connection with any of the foregoing and dated the Agreement Date or subsequent thereto, whether or not specifically mentioned herein or therein, in each case as amended, amended and restated, supplemented, waived or otherwise modified at any time and from time to time.

"**U.S. Trustee**" means the office of the United States Trustee for the District of Delaware.

"**Variance Report**" mean, for any Test Period, a report setting forth the variances (as a percentage) between actual results and the corresponding anticipated amounts set forth in the Budget for such period, as set forth in Section 5.1(g).

**Section 1.2    Interpretation**.  In this Agreement, unless the context otherwise requires, all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun; the division of this Agreement into Articles and Sections and the use of headings and captions is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions; the words "herein," "hereof," "hereunder," "hereinafter" and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or Section hereof; the words "include," "including," and derivations thereof shall be deemed to have the phrase "without limitation" attached thereto unless otherwise expressly stated; references to a specified Article, Exhibit, Section or Schedule shall be construed as a reference to that specified Article, Exhibit, Section or Schedule of this Agreement; and any reference to any of the Transaction Documents means such document as the same shall be amended, supplemented or modified and from time to time in effect.   In the event of a conflict between this Agreement and any Financing Order, the applicable Financing Order shall govern.

**Section 1.3    Business Day Adjustment**.  If the day by which a payment is due to be made is not a Business Day, that payment shall be made by the next succeeding Business Day unless that next succeeding Business Day falls in a different calendar month, in which case that payment shall be made by the Business Day immediately preceding the day by which such payment is due to be made.

**Section 1.4    Register**.

(a)    Borrower shall record on its books and records the amount of the Loans, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.

(b)     Borrower shall establish and maintain at its address referred to in Section 7.1:  (i) a record of ownership (the "**Register**") in which Borrower agrees to register by book entry the interests (including any rights to receive payment of principal and interest hereunder) of each Lender having a Commitment, and the amount of Loans extended by such Lenders under such Commitment, and any assignment of any such interest; and (ii) accounts in the Register in accordance with its usual practice in which it shall record (A) the names and addresses of the Lenders (and any change thereto pursuant to this Agreement), (B) the amount of any principal or interest due and payable or paid and (C) any other payment received by the Lenders from the Borrower and its application to the Loans.

**Section 1.5     Definition of "Knowledge."**  For purposes of the Transaction Documents, whenever a representation or warranty is made to Borrower's knowledge or awareness, to the "best of Borrower's knowledge, or with a similar qualification, knowledge or awareness means such knowledge of such fact or other matter as would have been discovered after a reasonable inquiry of any of the officers, directors, employees and consultants of Borrower as of the applicable date who would be expected to have knowledge or awareness of such fact or matter under the circumstances.

### ARTICLE 2
### AGREEMENT FOR THE LOAN

**Section 2.1     Use of Proceeds**.

(a)     The proceeds of the Loans shall be used to (i) provide for the ongoing working capital and general corporate and operating purposes of the Borrower during the pendency of the Chapter 11 Case in accordance with, and subject to, the Budget, (ii) pay fees, interest and expenses associated with the Loans and the Existing Credit Agreement, (iii) pay the Carve-Out, including without limitation the payment of the fees of the U.S. Trustee's office, in each case, in accordance with the Budget, and (iv) to the extent of $4,500,000 to refinance a like amount of the Existing Loans under the Existing Credit Agreement ("Roll Up Loan").

**Section 2.2     Disbursement**.

(a)     Subject to the satisfaction of the conditions set forth in Section 4.1, each Lender severally agrees to make an initial Loan in the total amount set forth in the initial Notice of Borrowing (i) equal to the Roll Up Loan to be used for the purpose in Section 2.1(a)(iv), plus (ii) up to $1,500,000 to be used to pay the Closing Fee and for any other purpose in accordance with Section 2.1(a), no later than one (1) Business Day after receiving such Notice of Borrowing.

(b)     Subject to satisfaction of each of the conditions set forth in Section 4.2, each Lender severally agrees to make Loans to the Borrower after the initial Loan in amounts not to exceed the Maximum Available Amount, no later than two (2) Business Days after receiving a Notice of Borrowing.  Such Loans may be made no more frequently than once per week and in the aggregate not to exceed the lesser of the unfunded portion of the Commitment or the Budget and shall be subject to the foregoing

limitation.  Each Lender's share of such Loans shall be determined by its pro rata share of the Commitment as such share is set forth on Schedule 2 hereto.

Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 5 p.m. New York City time, to the account of the Borrower most recently designated by it for such purpose by notice to the Lenders; provided that such account and all sums on deposit shall be subject to a perfected first priority Lien in favor of the Lenders.

**Section 2.3    Payment**.

(a)    The Borrower shall pay to the Lenders the outstanding principal amount of the Loans and all accrued and unpaid interest and fees in respect of the Loans on the earlier of (i) the Maturity Date and (ii) the date the principal amount of the Loans becomes due and payable following an acceleration under Section 6.1 for an Event of Default.

(b)    Once repaid, Loans may not be reborrowed.

(c)    Within two (2) Business Days after cash receipt of any payments on account of accounts receivable (except for advance deposits remitted by customers, but including such deposits following ordinary course billing for goods or services and recognition by the Borrower that such funds constitute payments on account of such goods or services sold) otherwise due to Borrower, (i) if an Event of Default has occurred and is continuing, the Borrower shall deposit such amount  into a deposit account subject to a blocked account agreement in favor of the DIP Agent on behalf of the Lenders and shall not expend such funds, or (ii) if no Default or Event of Default is continuing, to the extent such cash receipts have been deposited into a deposit account subject to a blocked account agreement in accordance with clause (i) above, the Borrower shall use such funds and all other cash receipts in accordance with the Budget.

(d)    Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Lender and reasonably acceptable to Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(e)    The Borrower shall have the right at any time and from time to time to prepay any Loans in whole or in part, without premium or penalty (other than interest that is accrued and outstanding at the time of such prepayment).

(f)    Notwithstanding the requirements of  Article 4, if the Maturity Date occurs as a result of a sale of the Borrower's Assets and no Event of Default exists, Borrower may, by delivery of Notice of Borrowing, request a draw down on, and the

Lenders shall advance on, such date an amount not to exceed the lesser of (i) any unfunded portion of the Commitment, and (ii) the remaining accrued and unpaid items on the Budget.

**Section 2.4    Time and Place**.  Payments of any amounts due to the Lenders under this Agreement shall be made in Dollars in immediately available funds prior to 11:00 a.m. New York City time on such date that any such payment is due, at such bank or places as the Lenders shall from time to time designate in writing prior to the date such payment is due.  The Borrower shall pay all and any costs (administrative or otherwise) imposed by banks, clearing houses, or any other financial institution, in connection with making any payments under any of the Transaction Documents, except for any costs imposed by the Lenders' banking institutions.

**Section 2.5    Taxes, Duties and Fees**.

(a)    Any and all payments under any Transaction Document shall be made, in accordance with this Section 2.5, free and clear of and without deduction for any withholding Taxes except as required by applicable law.  If any Taxes are required by law to be withheld from any amounts payable under a Transaction Document, (i) the amount payable shall be increased by as much as shall be necessary so that, after making all required withholdings (including withholdings on the additional amounts), the payee shall receive an amount equal to the sum it would have received had no such withholdings been made (any and all such additional amounts payable shall hereafter be referred to as the "**Additional Amounts**"), (ii) the payor shall make such withholdings, and (iii) the payor shall pay the full amount withheld to the relevant taxing or other authority in accordance with applicable law.  Within thirty (30) days after the date of any payment of such Taxes, the payor shall furnish to the applicable payee the original or a certified copy of a receipt evidencing payment thereof or other evidence of such payment reasonably satisfactory to such payee.

(b)    In addition, Borrower agrees to pay, and authorizes the applicable payee to pay in its name (but without duplication), all Other Taxes.  Within thirty (30) days after the date of any payment of Other Taxes, Borrower shall furnish to the applicable payee the original or a certified copy of a receipt evidencing payment thereof or other evidence of such payment reasonably satisfactory to such payee.

(c)    Borrower shall reimburse and indemnify, within ten (10) days after receipt of demand therefor, each payee for all withholding Taxes and Other Taxes to which this Section 2.5 applies, whether or not such Taxes were correctly or legally imposed or asserted.  A certificate of the applicable payee(s) setting forth the amounts to be paid thereunder and delivered to Borrower shall be conclusive, binding and final for all purposes, absent manifest error.

(d)    If any Lender determines in good faith that it has received a refund from a Government Authority relating to Taxes in respect of which Borrower paid Additional Amounts or made a payment pursuant to Section 2.5(c), such Lender shall promptly pay such refund to Borrower, net of all out-of-pocket expenses (including any Taxes imposed thereon) of such Lender incurred in obtaining such refund, and without interest (other

13

than interest paid by the relevant Governmental Authority with respect to such refund); provided that Borrower, upon the request of such Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender if such Lender is required to repay such refund to such Governmental Authority.  Nothing in this Section shall require any Lender to disclose any information it deems confidential (including, without limitation, its tax returns) to any Person, including Borrower.

**Section 2.6    Costs, Expenses and Losses**.  If, as a result of any failure by Borrower to pay any sums due under this Agreement on the due date therefor (after the expiration of any applicable grace periods), the Lenders shall incur commercially reasonable costs, expenses and/or losses, by reason of the liquidation or redeployment of deposits from third parties or in connection with obtaining funds to maintain any Loans, the Borrower shall pay to the Lenders upon request by the Lenders, the amount of such costs, expenses and/or losses within five (5) Business Days after receipt by the Borrower of a certificate from the Lenders setting forth in reasonable detail such costs, expenses and/or losses, along with supporting documentation.  For the purposes of the preceding sentence, "costs, expenses and/or losses" shall include, without limitation, any interest paid or payable to carry any unpaid amount and any loss, premium, penalty or expense which may be incurred in obtaining, liquidating or employing deposits of or borrowings from third parties in order to make, maintain or fund the Loans or any portion thereof.

**Section 2.7    Interest**.

(a)    The outstanding principal amount of (a) the Loans shall bear interest from the date of disbursement of such Loan at the Interest Rate (calculated on the basis of the actual number of days elapsed).  Accrued interest shall be paid in cash monthly, in arrears, on the first Business Day of each month (each, an "**Interest Payment Date**"). Accrued interest will be paid in Dollars.

**Section 2.8    Interest on Late Payments**.  Without limiting the remedies available to the Lenders under the Transaction Documents or otherwise, to the maximum extent permitted by applicable law, if an Event of Default has occurred and is continuing, the Borrower shall pay, in respect of principal and interest on the Loans outstanding under this Agreement, at the rate per annum equal to the Interest Rate applicable thereto plus ten percent (10%) for so long as such Event of Default is continuing.  Such interest shall be payable on demand.

**Section 2.9    Fee and Costs**.

(a)    From time to time upon demand, the Borrower shall reimburse the Lenders for their costs and expenses, including reasonable attorneys' fees in connection with the negotiation, preparation, execution, administration and enforcement of the Transaction Documents.

(b)    The Borrower will pay to the Initial Lenders in full in cash on the Agreement Date a fee (the "**Closing Fee**") in an amount equal to one and a half percent (1.5%) of the amount equal to the Commitment minus the amount of the Roll Up Loan.

The Closing Fee will be fully earned and due and payable on the Agreement Date and will be non-refundable once paid.

**Section 2.10   Superpriority Nature of Obligations**.   Subject to the terms of the Financing Orders, as applicable, all Obligations hereunder and under the other Transaction Documents shall:  (i) constitute an allowed superpriority administrative expense claim against the Borrower with priority in the Chapter 11 Case over any and all administrative expense claims and unsecured claims against the Borrower and its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506, 507(a), 507(b), 546(c), 546(d), 726(b), 1113 or 1114 respectively, of the Bankruptcy Code, subject in each case only to the Carve-Out and Prior Liens, and (ii) be secured by Liens on the Collateral (except for Permitted Liens and subject to the Carve-Out) with the priority set forth in the Financing Orders.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**Section 3.1    Representations and Warranties of the Borrower**.   The Borrower represents and warrants as of the Agreement Date and on each day on which the Borrower request or receive any Loan, that:

(a)    Borrower is conducting its business in compliance with its Organizational Documents, which are in full force and effect with no material defaults outstanding thereunder;

(b)    no Default or Event of Default (or any other material default or event of default, however described) has occurred under any of the Transaction Documents;

(c)    **[Reserved]**;

(d)    the obligation of the Borrower to make any payment under this Agreement (together with all charges in connection therewith) is absolute and unconditional, and there exists no right of setoff or recoupment, counterclaim, cross-claim or defense of any nature whatsoever to any such payment;

(e)    no Indebtedness of Borrower exists other than Permitted Indebtedness;

(f)    Borrower validly exists as a corporation, in good standing under the laws of the jurisdiction of its organization.  Borrower has full power and authority to own its properties and conduct its business, and is duly qualified to do business as a foreign entity and is in good standing (or equivalent concept) in each jurisdiction in which the conduct of its business makes such qualification necessary and in which the failure to so qualify would have a Material Adverse Effect;

(g)    other than the Chapter 11 Case, there is not pending, or, to the knowledge of Borrower, threatened, any action, suit or other proceeding before any Government Authority (i) to which Borrower is a party or (ii) which has as the subject thereof any

assets owned by Borrower.  There are no current, or, to the knowledge of Borrower, pending, legal, governmental or regulatory enforcement actions, suits or other proceedings to which Borrower or any of its assets is subject;

(h)      subject to the entry of the Financing Orders, the Transaction Documents have been duly authorized, executed and delivered by Borrower, as applicable, and constitute the valid, legal and binding obligation of Borrower enforceable in accordance with their terms, except as such enforceability may be limited by applicable insolvency, bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally and applicable equitable principles (whether considered in a proceeding at law or in equity).  The execution, delivery and performance of the Transaction Documents by the Borrower and the consummation of the transactions therein contemplated will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, other than Liens in favor of the Lenders, upon any assets of Borrower pursuant to, any agreement to which Borrower is a party or by which Borrower is bound or to which any of the assets of Borrower are subject, (ii) result in any violation of or conflict with the provisions of the Borrower's Organizational Documents or (iii) result in the violation of any law or any judgment, order, rule, regulation or decree of any Government Authority.  Subject to the entry of the Financing Orders, no consent, approval, authorization or order of, or registration or filing with any Government Authority is required for the execution, delivery and performance of any of the Transaction Documents or for the consummation by the Borrower of the transactions contemplated hereby except for such registrations and filings in connection with the entry into the Transaction Documents that are necessary to comply with applicable federal, state or provincial securities laws and filings contemplated by the Financing Orders and Borrower has the power and authority to enter into the Transaction Documents and to consummate the transactions contemplated under the Transaction Documents;

(i)      subject to the entry of the Financing Orders, Borrower holds, and is operating in compliance in all material respects with, all franchises, grants, authorizations, licenses, permits, easements, consents, certificates and orders of any Government Authority (collectively, "**Necessary Documents**") required for the conduct of its business and all Necessary Documents are valid and in full force and effect; and Borrower has not received written notice of any revocation or modification of any Necessary Document, and Borrower has no reason to believe that any Necessary Document will not be renewed in the ordinary course; and Borrower is in compliance in all material respects with all applicable federal, state, provincial, local and foreign laws, regulations, orders and decrees applicable to the conduct of its business;

(j)      Borrower has good and marketable title to all of its assets free and clear of all Liens except Permitted Liens and Prior Liens and subject to the Carve-Out.  The property held under lease by Borrower is held under valid, subsisting and enforceable leases with only such exceptions with respect to any particular lease as do not interfere in any material respect with the conduct of the business of Borrower;

16

(k)     Borrower owns or has the right to use pursuant to a valid and enforceable written license, implied license or other legally enforceable right, all of the Intellectual Property (as defined below) that is necessary for the conduct of its business as currently conducted (the "**IP**").  The IP (excluding third-party IP that Borrower has a right to use pursuant to a valid and enforceable written license, implied license or other legally enforceable right) that is registered with or issued by a Government Authority is valid and enforceable; there is no outstanding, pending, or, to the knowledge of Borrower, threatened action, suit, other proceeding or claim by any third person challenging or contesting the validity, scope, use, ownership, enforceability, or other rights of Borrower in or to any IP (except for any rejections or objections that may have been issued by the applicable patent, trademark or intellectual property office in the ordinary course of prosecution of applications for registrations for IP) and Borrower has not received any written notice regarding any such action, suit, or other proceeding.  Borrower has not infringed or misappropriated any material rights of others.  There is no pending or, to the knowledge of Borrower, threatened action, suit, other proceeding or claim that Borrower infringes upon, violates or uses the Intellectual Property rights of others without authorization, and Borrower has not received any written notice regarding any such action, suit, other proceeding or claim.  Except for non-exclusive rights granted by the Borrower to its customers, distributors, resellers and technology collaborators in respect to their products and technologies in the course of licensing, selling and developing such products and technologies, Borrower is not a party to or bound by any option, license or agreement with respect to IP.  The term "**Intellectual Property**" as used herein means (i) all patents, patent applications, patent disclosures and inventions (whether patentable or unpatentable and whether or not reduced to practice), (ii) all trademarks, service marks, trade dress, trade names, slogans, logos, and corporate names and Internet domain names, together with all of the goodwill associated with each of the foregoing, (iii) copyrights, copyrightable works, and licenses, (iv) registrations and applications for registration for any of the foregoing, (v) computer software (including but not limited to source code and object code), data, databases, and documentation thereof, (vi) trade secrets and other confidential information, (vii) other intellectual property, and (viii) copies and tangible embodiments of the foregoing (in whatever form and medium).

(l)     Borrower is not in violation of its Organizational Documents.

(m)     all income and other material Tax returns, reports and statements (collectively, the "**Tax Returns**") required to be filed by any Tax Affiliates have been filed with the appropriate Government Authorities, all such Tax Returns are true and correct in all material respects, and all Taxes, assessments and other governmental charges and impositions reflected therein and all other material Taxes, assessments and other governmental charges otherwise due and payable have been paid prior to the date on which any liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP.  As of the Agreement Date, the Borrower has no knowledge of any tax deficiency with respect to its taxes which, if determined adversely, could reasonably be expected to be materially adverse to the Borrower.  Based on its current expectations, the Borrower will not be a "passive foreign investment company" ("**PFIC**")

within the meaning of Section 1297 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") for the fiscal year ending December 31, 2014 and does not currently expect to be a PFIC in any subsequent fiscal year, and does not own any direct or indirect equity interest (or option to acquire equity interests) in any entity that is expected to be a PFIC in respect of its current or any subsequent fiscal year.  The Borrower is not a "controlled foreign corporation" ("**CFC**") within the meaning of Section 957(a) of the Code, and does not own 10% or more of the voting shares of any entity that is a CFC;

(n)     Except as set forth in Schedule 3.1(n), Borrower has not granted rights to develop, manufacture, produce, assemble, distribute, license, market or sell its products, services or Intellectual Property to any other Person and is not bound by any agreement that affects the exclusive right of Borrower to develop, manufacture, produce, assemble, distribute, license, market or sell its products, services or Intellectual Property other than for (i) such distribution agreements entered into by the Borrower in the ordinary course of business for the distribution of its products; and (ii) such research agreements entered into by the Borrower in the ordinary course of business with hospitals, universities and other educational institutions;

(o)     Borrower:  (i) at all times has complied in all material respects with all Applicable Laws, (ii) has not received any warning letter or other correspondence or notice from the FDA or from any other Government Authority alleging or asserting noncompliance with Applicable Laws; (iii) possesses and complies in all material respects with all licenses, certificates, approvals, clearances, authorizations, permits and supplements or amendments thereto required by any Applicable Laws (together, the "**Authorizations**") which are valid and in full force and effect and has not received any notice from the FDA or any other Government Authority alleging or asserting noncompliance with any Authorizations; (iv) has not received written notice that any Government Authority has taken, is taking, or intends to take action to limit, suspend, modify or revoke any Authorization and the Borrower has no knowledge that any Government Authority is considering such action; and (v) has filed, obtained, maintained or submitted all reports, documents, forms, notices, applications, records, claims, submissions and supplements or amendments as required by any Applicable Laws or Authorizations, except as would not have a Material Adverse Effect.  There is no false or misleading information or significant omission in any of the submissions by Borrower to the FDA or any other Government Authority.  Borrower has fulfilled and performed its obligations under all Authorizations, and no event has occurred or condition or state of facts exists which would constitute a breach or default under, or would cause a revocation or termination of, any Authorization;

(p)     The Form 10-Q of the Borrower filed with the SEC as of November 13, 2015, together with the related notes fairly present the financial condition of Borrower as of the dates indicated and the results of operations and changes in cash flows for the periods therein specified in conformity with GAAP consistently applied throughout the periods involved, subject, in the case of unaudited financial statements, to year-end adjustments; and, except as disclosed in Borrower's public filings, there are no material off-balance sheet arrangements or any other relationships with unconsolidated entities or

18

other persons, that may have a current or future effect on the Borrower's financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenue or expenses;

(q)     Borrower maintains a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for material assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

(r)     to the knowledge of the Borrower, (i) no "prohibited transaction" as defined under Section 406 of ERISA or Section 4975 of the Code, or any individual or class exemption issued and not exempt under ERISA Section 408 and the regulations and published interpretations thereunder has occurred with respect to any Employee Benefit Plan, except as for such transactions that would not have a Material Adverse Effect, (ii) at no time within the last seven (7) years has Borrower or any ERISA Affiliate maintained, sponsored, participated in, contributed to or has or had any liability or obligation in respect of any Employee Benefit Plan subject to Section 302 of ERISA, Title IV of ERISA, or Section 412 of the Code or any "multiemployer plan" as defined in Section 3(37) of ERISA or any multiple employer plan for which Borrower or any ERISA Affiliate has incurred or could incur liability under Section 4063 or 4064 of ERISA, (iii) no Employee Benefit Plan represents any current or future liability for retiree health, life insurance, or other retiree welfare benefits except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or similar state law, (iv) each Employee Benefit Plan is and has been operated in compliance with its terms and all applicable laws, including but not limited to ERISA and the Code, except for such failures to comply that would not have a Material Adverse Effect, (v) no event has occurred (including a "reportable event" as such term is defined in Section 4043 of ERISA) and no condition exists that would subject any Borrower or any ERISA Affiliate to any tax, fine, lien, penalty or liability imposed by ERISA, the Code or other applicable law, except for any such tax, fine, lien, penalty or liability that would not, individually or in the aggregate, have a Material Adverse Effect, (vi) the Borrower does not maintain any Foreign Benefit Plan, and (vii) the Borrower does not have any obligations under any collective bargaining agreement.  As used in this clause (r), "**Employee Benefit Plan**" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA, including, without limitation, all stock purchase, stock option, stock based severance, employment, change in control, medical, disability, fringe benefit, bonus, incentive, deferred compensation, employee loan and all other employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA, under which (A) any current or former employee, director or independent contractor of Borrower or any of its Subsidiaries has any present or future right to benefits and which are contributed to, sponsored by or maintained by Borrower or any of its Subsidiaries or (B) Borrower or any of its Subsidiaries has had or has any present or future obligation or liability; "**ERISA**" means the Employee Retirement Income Security Act of 1974, as

19

amended; "**ERISA Affiliate**" means any member of Borrower's controlled group as defined in Code Section 414 (b), (c), (m) or (o); and "**Foreign Benefit Plan**" means any Employee Benefit Plan established, maintained or contributed to outside of the United States of America or which covers any employee working or residing outside of the United States;

(s)    the Borrower does not, and have not ever, sponsored, administered, participated in or contributed to a retirement or pension arrangement that provides defined benefits to employees or former employees of Borrower;

(t)    all of the issued and outstanding shares of capital stock of Borrower are duly authorized and validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state and foreign securities laws, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities that have not been waived in writing.  There are no preemptive rights or other rights to subscribe for or to purchase, or any restriction upon the voting or transfer of any shares of common stock pursuant to the Organizational Documents or any agreement to which Borrower or any of its Subsidiaries is a party or by which Borrower or any of its Subsidiaries is bound.  All of the issued and outstanding shares of capital stock of each of Borrower's Subsidiaries have been duly and validly authorized and issued and are fully paid and nonassessable, and Borrower owns of record and beneficially, free and clear of any claims, Liens (other than Permitted Liens and Prior Liens) and voting proxies, all of the issued and outstanding shares of such stock;

(u)    all products designed, developed, manufactured, prepared, assembled, packaged, tested, labeled, distributed or marketed by or on behalf of the Borrower that are subject to the jurisdiction of the FDA or a comparable government authority have been and are being designed, developed, tested, manufactured, prepared, assembled, packaged, distributed, labeled and marketed in material compliance with the Federal Food, Drug and Cosmetic Act and the rules and regulations promulgated thereunder and all other Applicable Laws and Authorizations (each a "**Requirement of Law**"), including, without limitation, clinical and non-clinical evaluation, product approval or clearance, good manufacturing practices, labeling, advertising and promotion, record-keeping, establishment registration and device listing, reporting of recalls, and adverse event reporting, and have been and are being tested, investigated, designed, developed, manufactured, prepared, assembled, packaged, labeled, distributed, marketed, and sold in material compliance with each applicable Requirement of Law;

(v)    (i) Borrower is in compliance with the written procedures, record-keeping and reporting requirements required by the FDA or any comparable government authority pertaining to the reporting of adverse events and recalls involving any of its products, including, as the case may be, Medical Device Reporting set forth in 21 C.F.R. Part 803 and Reports of Corrections and Removals set forth in 21 C.F.R. Part 806, (ii) Borrower's products are and have been labeled, promoted, and advertised in accordance with their Permit or within the scope of an exemption from obtaining such Permit, and (iii) Borrower's establishments are registered with the FDA, as applicable, and each product

of Borrower, if any, is listed with the FDA under the applicable FDA registration and listing regulations for medical devices;

(w)    since December 31, 2014, Borrower has filed or furnished when due (including any applicable extensions) all reports, schedules, forms, statements and other documents required to be filed or furnished by it with the SEC pursuant to the reporting requirements of the Exchange Act (all of the foregoing filed or furnished prior to the date hereof and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "**SEC Documents**").  Except to the extent that any SEC Document has been revised or superseded by a later-filed or furnished SEC Document, as of their respective dates: (i) the SEC Documents complied in all material respects with the requirements of the Exchange Act; (ii) none of the SEC Documents, when filed or furnished, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and (iii) the financial statements of Borrower included in the SEC Documents complied in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto as in effect as of the time of filing.  The financial statements of Borrower included in the SEC Documents have been prepared in accordance with U.S. generally accepted accounting principles, consistently applied, during the periods involved (except (x) as may be otherwise indicated in such financial statements or the notes thereto, or (y) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the financial position of Borrower as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments which will not be material, either individually or in the aggregate);

(x)    no statement or information contained in this Agreement and any other Transaction Document, any delivery of financial information or Budget or any certificate furnished to the DIP Agent or the Lenders or any of them, by or on behalf of Borrower for use in connection with the transactions contemplated by this Agreement or the other Transaction Documents when taken as a whole, contained as of the date such statement, information, or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which they were made.  The financial information and Budget are based upon good faith estimates and assumptions believed by management of Borrower to be reasonable at the time made, such assumptions set forth on Exhibit F hereto; and

(y)    subject only to the entry of the order approving the Stalking Horse Motion, the Asset Purchase Agreement constitutes a valid, legal and binding obligation of the Borrower enforceable in accordance with its terms.

**Section 3.2    Borrower's Acknowledgment**.  Borrower acknowledges that it has made the representations and warranties referred to in Section 3.1 with the intention of persuading the

Lenders to enter into the Transaction Documents and fund each of the Loans and that the Lenders have entered into the Transaction Documents and funded the Loans and on the basis of, and in full reliance on, each of such representations and warranties and the representations and warranties shall survive the execution and delivery of this Agreement until the Obligations are repaid in full.

**ARTICLE 4**
**CONDITIONS OF DISBURSEMENT**

**Section 4.1    Conditions to Initial Disbursement**.    The obligation of the Initial Lenders to make the Initial Loan, including the Roll Up Loan, shall be subject to the fulfillment of the following conditions:

(a)    the Chapter 11 Case shall have been commenced in the Bankruptcy Court, and all of the First Day Orders and all related pleadings to be entered in connection with the commencement of the Chapter 11 Case or promptly following the Petition Date shall have been reviewed in advance by the DIP Agent and the Initial Lenders and shall be reasonably satisfactory in form and substance to the DIP Agent and the Initial Lenders;

(b)    the Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the DIP Agent and the Initial Lenders, on such prior notice as may be satisfactory to the DIP Agent and the Initial Lenders, the Interim Order no later than one (1) Business Day after the Petition Date, approving and authorizing this Agreement and the other Transaction Documents, all provisions thereof and the priorities and liens granted under Bankruptcy Code sections 364(c) and (d), as applicable, in form and substance satisfactory to the DIP Agent and the Initial Lenders and such Interim Order shall not have been reversed, modified, amended, stayed (including stay pending appeal) or vacated;

(c)    the Borrower shall be in compliance with the terms of the Interim Order in all respects;

(d)    no trustee or examiner shall have been appointed with respect to the Borrower or their respective properties;

(e)    the Approved Cash Management Order shall be in full force and effect, and the Approved Cash Management Arrangements shall have been implemented, each of which shall be acceptable to the DIP Agent and the Initial Lenders;

(f)    the DIP Agent shall have received an executed Notice of Borrowing from the Borrower at least one (1) Business Day prior to the date of such requested Loan, which shall include the Roll Up Loan and Closing Fee;

(g)    the DIP Agent and the Initial Lenders shall have received the Budget which shall be in form and substance satisfactory to the DIP Agent and the Initial Lenders;

22

(h)      the DIP Agent and the Initial Lenders shall have received copies of all engagement and similar letters for the engagement of Borrower's professionals and management agreements of the Borrower;

(i)      the DIP Agent shall have received:  (i) executed counterparts of each of the Transaction Documents; (ii) customary officer's and secretary's certificates; (iii) evidence of authority, including without limitation resolutions or consents and incumbency certificates; and (iv) any material third party and governmental consents necessary in connection with the Borrower's entry into this Agreement and the other Transaction Documents, the financing thereunder and related transactions;

(j)      all representations and warranties of the Borrower under Section 3.1 hereto shall be true and correct in all material respects; provided that, if a representation and warranty is qualified as to materiality, the materiality qualifier set forth above shall be disregarded with respect to such representation and warranty for purposes of this condition;

(k)      the Borrower shall have appointed a chief restructuring officer acceptable to the DIP Agent and filed a motion seeking Bankruptcy Court approval of such appointment;

(l)      all corporate and judicial proceedings and all instruments and agreements in connection with the transactions contemplated hereunder among the Borrower, the DIP Agent and the Initial Lenders contemplated by this Agreement and the Financing Orders shall be reasonably satisfactory in form and substance to the DIP Agent and the Initial Lenders, and the Initial Lenders shall have received all information and copies of all documents or papers requested by it;

(m)      the Borrower shall have agreed to the draft of Asset Purchase Agreement, which shall be subject only to changes that are acceptable to the DIP Agent and the Initial Lenders;

(n)      the Borrower shall have paid all fees, costs and expenses then payable by the Borrower pursuant to Section 2.9 of this Agreement and the other Transaction Documents;

(o)      no Default or Event of Default has occurred or would result from the Disbursement; and

(p)      the Borrower shall have satisfied such other conditions and delivered such other financial or other information as may be reasonably requested by the DIP Agent and the Initial Lenders.

**Section 4.2      Conditions to each subsequent Loan**.  The obligation of the Lenders to make any Loan subsequent to the Initial Loan shall be subject to the fulfillment of the following conditions:

23

(a)      the Lenders shall have received a fully executed and delivered Notice of Borrowing request at least two (2) Business Days prior to the date of such requested Loan;

(b)      the minimum borrowing request shall be Five Hundred Thousand Dollars ($500,000);

(c)      as of the date of the proposed Loan, the representations and warranties contained herein and in each other Transaction Document, certificate or other writing delivered to the Lenders pursuant hereto or thereto on or prior to the date of the proposed borrowing, shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof; which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of the proposed borrowing, to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date;

(d)      as of the date of such borrowing, no event shall have occurred and be continuing or would result from the funding of such Loan that would constitute an Event of Default or a Default;

(e)      the Borrower shall have paid all fees, costs and expenses then payable by the Borrower pursuant to this Agreement and the other Transaction Documents;

(f)      the making of such Loan shall not contravene any law, rule or regulation applicable to the Lenders;

(g)      the amount of the Loan requested and its intended use is permitted by the Budget;

(h)      if such Loan is requested more than twenty (20) days following the Interim Order, the Final Order shall have been entered by the Bankruptcy Court, in form and substance satisfactory to the DIP Agent and the Lenders, which Final Order shall have been entered on such prior notice to such parties as may be reasonably satisfactory to the DIP Agent and the Initial Lenders, approving and authorizing on a final basis this Agreement, all provisions hereof and the priorities and liens granted under Bankruptcy Code sections 364(c) and (d), as applicable;

(i)      neither the Interim Order nor the Final Order, as applicable, shall have been reversed, modified, amended, stayed (including stay pending appeal) or vacated;

24

(j)     the Borrower shall be in compliance in all respects with the terms of the Interim Order and the Final Order, as applicable;

(k)     no trustee or examiner shall have been appointed with respect to the Borrower or its properties;

(l)     the Approved Cash Management Order shall be in full force and effect, and the Approved Cash Management Arrangements shall be in effect and shall not have been materially changed, in each case without the written consent of the DIP Agent and the Required Lenders;

(m)     the DIP Agent shall have received the required periodic updates to the Budget and the weekly Variance Reports, each in form and substance satisfactory to the DIP Agent and the Lenders, and the Borrower shall be in compliance with Section 5.1(f) and (g); and

(n)     other than the Chapter 11 Case, no action shall be pending or threatened (to the knowledge of the Borrower) against the Borrower.

The DIP Agent or the Lenders shall be entitled, but not obligated, to reasonably request and receive, prior to the making of any Loans, additional documents or information if, in the good faith judgment of the Required Lenders, such request is warranted under the circumstances.

**Section 4.3     Special Loan Advance**.  Notwithstanding the foregoing requirements in this Article 4 and without giving effect to any termination of the Commitment 6.1(a)(ii), upon the occurrence of an Event of Default which is continuing, Borrower may request, by delivery of a Notice of Borrowing, and Lender shall advance, within one (1) Business Day of receipt of such Notice of Borrowing, a Loan to Borrower up to the lesser of (i) the sum of the unfunded potion of the Commitment and (ii) the amount of accrued gross payroll expenses up to the date of such Event of Default covered by the Budget, plus the Carve-Out.

## ARTICLE 5
## AFFIRMATIVE COVENANTS AND EVENTS OF DEFAULT

**Section 5.1     Affirmative Covenants**.  Unless the Required Lenders shall otherwise agree:

(a)     Borrower and its Subsidiaries shall maintain its existence and qualify and remain qualified to do its business as currently conducted, except where the failure to maintain such qualification would not reasonably be expected to have a Material Adverse Effect;

(b)     Borrower and its Subsidiaries shall comply in all material respects with all Applicable Laws, except where the necessity of compliance therewith is contested in good faith by appropriate proceedings;

(c)     Borrower shall obtain and its Subsidiaries shall make and keep in full force and effect all material Authorizations required to conduct their businesses;

(d)     the Borrower shall promptly notify the Lenders of the occurrence of (i) any Default or Event of Default, (ii) any claims, litigation, arbitration, mediation or administrative or regulatory proceedings (individually, a "**Claim**") that are instituted or threatened against Borrower or its Subsidiaries; (iii) any reporting of device recalls, device failures or serious adverse events or deaths in connection with any of the products of Borrower or any of its Subsidiaries, (iv) an event that has had, or reasonably could be expected to have, a Material Adverse Effect on the value of any Intellectual Property and (v) each event which, at the giving of notice, lapse of time, determination of materiality or fulfillment of any other applicable condition (or any combination of the foregoing), would constitute a default or event of default (however described) under any Transaction Document;

(e)     (i) if Borrower is not required to file reports pursuant to Sections 13 or 15(d) of the Exchange Act, Borrower will provide quarterly financial statements for itself and its Subsidiaries within forty-five (45) days after the end of each quarter, and audited annual financial statements within one hundred twenty (120) days after the end of each year prepared in accordance with GAAP in the United States with a report thereon by Borrower's independent certified public accountants (an "**Accountant's Report**"); (ii) Borrower will timely file with the SEC (subject to appropriate extensions made under Rule 12b-25 under the Exchange Act) any annual reports, quarterly reports and other periodic reports required to be filed pursuant to Section 13 or 15(d) of the Exchange Act; and (iii) Borrower will provide to the Lenders copies of all documents, reports, financial data and other information not available on the SEC EDGAR system or the SEDAR system and not containing any material non-public information that the Lenders may reasonably request including amendments to Organizational Documents promptly after their effectiveness, and cause the Lenders to be permitted to visit and inspect any of the properties of Borrower, and to discuss its affairs, finances with its officers during regular business hours and upon reasonable notice;

(f)     not later than two (2) business days prior to the first Monday of each calendar month commencing on March 3, 2016, the Borrower shall deliver to the DIP Agent for its approval an updated rolling nine week Budget for the period commencing on the first Monday of such calendar month.  Such Budgets shall set forth on a line-item basis the Borrower's anticipated cash receipts and cash disbursements on a weekly basis which the Borrower expects to incur during each week included in such Budget.  The Borrower shall promptly deliver to the DIP Agent any supplemental information or updates applicable to any Budget.  Until such time as the DIP Agent and the Lenders have approved in writing any proposed Budget (which approval shall not be unreasonably withheld or delayed), the Budget last approved by the DIP Agent and the Lenders shall control;

(g)     not later than Thursday of each week, commencing on the first week after the Agreement Date, the Borrower shall deliver to the DIP Agent a weekly line-by-line Variance Report for approval in writing by the DIP Agent and the Lenders (such approval not to be unreasonably withheld or delayed) for the preceding weekly period and on a cumulative basis for the period of the applicable Budget, comparing actual cash receipts and disbursements to amounts projected in the then-applicable Budget and showing on a

line-by-line basis any adverse variance to the corresponding line item of the applicable Budget together with a reasonably detailed explanation of any material adverse variances. An approved Variance Report modifies the Budget. No Budget shall be modified without the prior written consent of the DIP Agent and the Lenders;

       (h)     not later than fifteen (15) days after the last day of each month, Borrower shall deliver to the DIP Agent non-GAAP basis monthly financial statements including an unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such preceding monthly period and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a financial officer of Borrower as presenting fairly in all material respects the financial condition as of the end of and for such monthly period and such portion of the fiscal year and results of operations and cash flows of Borrower and its Subsidiaries on a consolidated basis, subject to normal year-end adjustments;

       (i)     `not less than two (2) Business Days prior to the filing thereof; and to the extent reasonably practicable, the Borrower shall deliver to the DIP Agent drafts of all material pleadings, motions, applications, judicial information, financial information and any other material documents to be filed by or on behalf of the Borrower with the Bankruptcy Court or delivered to the U.S. Trustee in the Chapter 11 Case (except in the case of any such documents filed on an expedited basis in connection with an emergency proceeding, which shall be delivered as soon as practicable and in any event prior to the filing thereof);

       (j)     the Borrower will maintain general and professional liability insurance, including products/completed operations liability coverage, and such other insurance coverage in such amounts and with respect to such risks as the Lenders may reasonably request from time to time and in accordance with Section 5.11 of the Security Agreement;

       (k)     the Borrower shall use the proceeds of the Loans in accordance with Section 2.1 and all cash and deposit account proceeds or other cash subject to a Lien in favor of the Lenders in accordance with the Financing Orders;

       (l)     as soon as available, but in any event no later than ten (10) Business Days after the end of each month, Borrower shall deliver to the DIP Agent a certificate of an authorized officer of Borrower setting forth computations in reasonable detail satisfactory to the Lenders demonstrating compliance with the financial covenant set forth in Section 5.3;

       (m)     the Borrower will deliver to the DIP Agent as soon as practicable in advance of filing with the Bankruptcy Court, the proposed Interim Order, the proposed Final Order, as applicable (each which must be in form and substance satisfactory to the DIP Agent and the Lenders), all other proposed orders and pleadings related to this Agreement (which must be in form and substance satisfactory to the DIP Agent and the

27

Lenders), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

(n)    the Borrower will comply with each Case Milestone on a timely basis;

(o)    the Borrower will provide any additional reporting requirements requested by the DIP Agent and the Initial Lenders, including, without limitation, with respect to litigation, contingent liabilities, and ERISA and environmental events; and

(p)    the Borrower will provide periodic access by the DIP Agent, the Lenders and their advisors to information and senior personnel, senior management and other company advisors, including conference calls with such persons upon any request by the DIP Agent or any Lender.

The Borrower shall cause each of its Subsidiaries to comply with each of the agreements set forth in Section 5.1.

**Section 5.2    Negative Covenants**.  Unless the Required Lenders shall otherwise agree:

(a)    Borrower shall not, nor shall Borrower permit any Subsidiary to (i) liquidate or dissolve (unless, prior to such liquidation or dissolution, such Subsidiary ceases to own any operating assets or conduct business), or (ii) directly or indirectly, by operation of law or otherwise amalgamate or merge with, consolidate with, acquire all or substantially all of the assets or stock of, or otherwise combine with or acquire, any Person.  The Borrower shall not establish any Subsidiary without consent of the Required Lenders and unless such Subsidiary executes and delivers to the Lenders a guaranty of the Obligations and security agreement providing for all of its assets to be collateral for the Obligations in form and substance satisfactory to the Lenders;

(b)    Borrower shall not, nor shall Borrower permit any Subsidiary to (i) enter into any partnership, joint venture, syndicate, pool, profit-sharing or royalty agreement or other combination, or engage in any transaction, whereby its income or profits are, or might be, shared with another Person other than a wholly owned U.S. Subsidiary, (ii) enter into any management contract or similar arrangement whereby a substantial part of its business is managed by another Person, or (iii) distribute, or permit the distribution of, any of its assets, including its intangibles, to any shareholder of any Subsidiary or to any Affiliate, including by way of loans or advances or purchase or redemption of equity interests in a Person;

(c)    Borrower shall not, nor shall Borrower permit any Subsidiary to, create, incur or suffer any Lien upon any of its assets, other than Permitted Liens and Prior Liens and subject to the Carve-Out;

(d)    Borrower shall not, nor shall Borrower permit any Subsidiary to, create, incur, assume, guarantee or remain liable with respect to any Indebtedness, other than Permitted Indebtedness;

(e)     Borrower shall not, nor shall Borrower permit any Subsidiary to, acquire any assets (other than assets acquired in the ordinary course of business consistent with past practices), directly or indirectly, in one or more related transactions;

(f)     Borrower shall not, nor shall Borrower permit any Subsidiary to (i) engage in any business other than the businesses in which it is currently engaged or (ii) modify or alter its organizational documents, except as may be required by the Bankruptcy Code in connection with the Chapter 11 Case;

(g)     Borrower shall not, nor shall Borrower permit any Subsidiary to, directly or indirectly, enter into any transaction with any of its Affiliates, except in the ordinary course of business and upon terms that are no less favorable than would be obtained in a comparable arm's length transaction with a Person not an Affiliate;

(h)     the Borrower shall not declare or pay any dividend or other distribution on its common shares without the prior written consent from the Required Lenders;

(i)     **[Reserved]**;

(j)     **[Reserved]**;

(k)     **[Reserved]**;

(l)     Borrower shall not, nor shall Borrower permit any Subsidiary to (i) establish or commence contributing to or otherwise participate in any retirement or pension arrangement that provides defined benefits; or (ii) acquire an interest in any Person if such Person sponsors, administers, participates in, or has any liability in respect of, any retirement or pension arrangement that provides defined benefits;

(m)     Borrower shall not, nor shall Borrower permit any Subsidiary to, use the proceeds of the Loans other than in accordance with Section 2.1 and the Budget.  No proceeds of any Loan may be used to pay any fees or expenses in connection with initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the Existing Lenders or Lenders or (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the Lenders or the Existing Lenders, subject to an aggregate amount not to exceed $10,000 that may be used by the Committee, if any, for purposes of investigating (but not challenging) liens, claims, interests and adequate protection of the Existing Lenders;

(n)     Borrower shall not, nor shall Borrower permit any Subsidiary to, incur, create or assume, suffer to exist or permit any superpriority claim which is pari passu or senior to the claims of the Lenders against the Borrower hereunder, except for the Carve-Out;

29

(o)    Borrower shall not, nor shall Borrower permit any Subsidiary to, dispose any of its assets (including, without limitation, any sale and leaseback transaction) other than in the ordinary course of business;

(p)    Borrower shall not, nor shall Borrower permit any Subsidiary to, enter into any agreement to return any of its inventory outside the ordinary course of business to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under section 546(h) of the Bankruptcy Code;

(q)    Borrower shall not, nor shall Borrower permit any Subsidiary to, make (i) any payments on account of any creditor's claims against any Borrower, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget or otherwise approved by the Lenders in their sole discretion and in writing; and

(r)    Borrower shall not, nor shall it permit any of its Subsidiaries to, obtain, or seek to obtain, any stay on the exercise of the remedies of the Lenders hereunder, under any Transaction Document or Financing Order.

**Section 5.3    Financial Covenant**.  The Borrower shall not permit, for any Testing Period starting as of the date which is (a) two (2) weeks after the Petition Date or (b) if a revised Budget is approved in accordance with Section 5.1(f), two (2) weeks after such approval date, the amount of Actual Cumulative Operating Disbursements for such Testing Period to be higher than the amount of Projected Cumulative Operating Disbursements for such Testing Period by more than, for each of the first eight weekly periods following such date, 15% of such amount of Projected Cumulative Operating Disbursements for such Testing Period. "**Actual Cumulative Operating Disbursements**" shall mean, for any period of determination, the amount of all operating cash disbursements of the Borrower during such period. "**Projected Cumulative Operating Disbursements**" shall mean, for any period of determination, the amount of all operating cash disbursements of the Borrower projected (as of the start of such period) to be paid during such period as set forth in the Budget.

## ARTICLE 6
## EVENTS OF DEFAULT

**Section 6.1    General Acceleration Provision upon Events of Default**.

(a)    If any event specified in Section 6.1(b) shall have occurred and be continuing beyond the applicable cure period or which has not been waived by the Required Lenders (each, an "**Event of Default**"), the Required Lenders may (i) declare the principal of, and accrued and unpaid interest on, the Loans or any part of any of them (together with any other amounts accrued or payable under the Transaction Documents) to be, and the same shall thereupon become, immediately due and payable and (ii)

terminate the Commitment, in each case, without any further notice and without any presentment, demand, or protest of any kind, all of which are hereby expressly waived by the Borrower, and take any further action available at law or in equity, including, without limitation, the sale of the Loans and all other rights acquired in connection with the Loans.

(b)     Each of the following shall constitute an Event of Default:

(i)     Borrower shall have failed to make payment of (A) principal when due on the Loans, or (B) interest and any other amounts due under the Loans within five (5) Business Days of their due date;

(ii)     any representation or warranty made by Borrower in any Transaction Document shall have been incorrect, false or misleading as of the date it was made;

(iii)     Borrower shall have failed to comply with the due observance or performance of Sections 5.1, 5.2 and 5.3;

(iv)     Borrower shall have failed to comply with the due observance or performance of any other covenant, condition or agreement contained in any Transaction Document (other than as described in clauses (i), (ii) and (iii) above), and such failure shall not have been cured by the Borrower within five (5) Business Days;

(v)     other than with respect to the Chapter 11 Case, an involuntary petition shall be filed or an action or proceeding otherwise commenced in respect of a Borrower seeking relief under any Debtor Relief Law or seeking any reorganization, arrangement, consolidation or readjustment of the debts of Borrower under any other bankruptcy or insolvency law and, in respect of any such action under U.S. law, any of the following events occur:  (A) Borrower consents or acquiesces to the institution of such petition or proceeding, (B) the petition commencing such proceeding is not timely controverted, (C) the petition commencing such proceeding is not dismissed within thirty (30) days of the filing date thereof; (D) an interim trustee is appointed to take possession of all or any substantial portion of the property or assets of, or to operate all or any substantial portion of the business of, such Borrower or (E) an order for relief shall have been issued or entered therein; provided that, Lenders shall have no obligation to provide any extension of credit to Borrower during such thirty (30) day calendar period specified in (C) above;

(vi)     a receiver, interim receiver, receiver-manager, assignee, liquidator, sequestrator, custodian, trustee or similar officer shall be appointed for Borrower or for all or any part of its property or a warrant of attachment, execution or similar process shall be issued against any part of the property of Borrower;

(vii)     Borrower shall file a certificate of dissolution or shall be liquidated, dissolved or wound-up or shall commence or have commenced against

31

it any action or proceeding for dissolution, winding-up or liquidation, or shall take any action in furtherance thereof;

(viii)    one or more judgments against Borrower or attachments against any of its property remain(s) unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days from the date of entry of such judgment;

(ix)    any authorization necessary for the execution, delivery or performance of any Transaction Document or for the validity or enforceability of any of the Obligations is not given or is withdrawn or ceases to remain in full force or effect, including without limitation the liens or superpriority claims granted with respect to the Transaction Documents shall not be valid, perfected and enforceable in all respects, or shall be asserted by or on behalf of Borrower not to be valid, perfected and enforceable in all respects, or if any third party files any motion asserting that any pre-Petition Date liens arising under the Existing Facility Agreement are not valid, perfected and enforceable in all respects and a court approves such motion;

(x)    the validity of any Transaction Documents shall be contested by Borrower, or any treaty, law, regulation, communiqué, decree, ordinance or policy of any jurisdiction shall purport to render any material provision of any Transaction Document invalid or unenforceable or shall purport to prevent or materially delay the performance or observance by Borrower of the Obligations;

(xi)    there is a failure to perform in any agreement to which Borrower is a party with a third party or parties resulting in a right by such third party or parties to accelerate the maturity of any indebtedness for borrowed money in an aggregate amount in excess of $50,000;

(xii)    **[Reserved]**;

(xiii)    **[Reserved]**;

(xiv)    any material suspension by Borrower of operation of any its businesses (other than in connection with the Chapter 11 Case);

(xv)    the Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Case and the order appointing such trustee or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof;

(xvi)   an order of the Bankruptcy Court shall be entered granting any superpriority claim (other than the Carve-Out) in the Chapter 11 Case, which is pari passu with or senior to the claims of the DIP Agent and the Lenders against Borrower hereunder or any Lien or security interest that is pari passu with or senior to the Liens and security interest securing the Loans, or Borrower takes any action seeking or supporting the grant of any such claim, Lien or security interest, in each case except as expressly permitted hereunder;

(xvii)   the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower which have a value in excess of $50,000 in the aggregate or permit other actions that would have a Material Adverse Effect on the Borrower or its estate;

(xviii) an order of the Bankruptcy Court shall be entered reversing, staying, vacating or (except as otherwise agreed to in writing by the Lenders in their sole and absolute discretion) otherwise amending, supplementing or modifying the Interim Order or, the Final Order;

(xix)   Borrower shall make any prepetition payment other than (A) as permitted by the Interim Order or, the Final Order, (B) as otherwise permitted by this Agreement, (C) as otherwise ordered by the Bankruptcy Court and agreed in writing by the DIP Agent in its sole discretion or (D) as authorized by the Bankruptcy Court (i) in accordance with the First Day Orders entered on, before or after the Agreement Date or other orders of the Bankruptcy Court entered with the consent of (or non-objection by) the DIP Agent, (ii) in connection with the assumption of executory contracts and unexpired leases with the consent of (or non-objection by) the DIP Agent or (iii) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date;

(xx)   Borrower shall not comply with any terms of the Interim Order, the Final Order;

(xxi)   any stipulation shall be entered into by Borrower or any order shall be entered by the Bankruptcy Court with respect to the provision of adequate protection to any Person or the use of cash collateral by Borrower, in each case that is not satisfactory in form and substance to the DIP Agent in its sole and absolute discretion;

(xxii)   failure at any time to employ a chief restructuring officer for the Borrower acceptable to the DIP Agent and the Required Lenders, it being agreed that Shaun Martin, the current chief restructuring officer, is acceptable to the DIP Agent and the Required Lenders;

(xxiii) entry of a Bankruptcy Court, order authorizing the sale of all or substantially all of the assets of Borrower (or Borrower seeking or supporting

33

such sale), other than in accordance with the Stalking Horse Motion, unless (A) such order contemplates repayment in full in cash of this Agreement upon consummation of the sale or (B) such sale is consummated as part of a plan of reorganization;

(xxiv)  failure of the Bankruptcy Court to permit the Lenders to credit bid the then outstanding Existing Loans in an amount of $10,550,000 and the then outstanding Loans, for a total credit bid equal to $15,050,000, hereunder in connection with the purchase of Borrower's assets pursuant to the Asset Purchase Agreement; and

(xxv)   failure of the Borrower to meet any of the Case Milestones.

**Section 6.2    Recovery of Amounts Due**.  If any amount payable hereunder is not paid as and when due, the Borrower hereby authorizes the Lenders to proceed, to the fullest extent permitted by applicable law, without prior notice, by right of setoff, banker's lien or counterclaim, against any moneys or other assets of the Borrower to the full extent of all amounts payable to the Lenders.

**ARTICLE 7**
**MISCELLANEOUS**

**Section 7.1    Notices**.  Any notice to be given under this Agreement shall be sent by certified or registered mail (return receipt requested) or delivered personally or by courier (including a recognized overnight delivery service) or by facsimile or by electronic mail and shall be effective five (5) days after being placed in the mail, if mailed by regular United States mail, or upon receipt, if delivered personally, by courier, by facsimile or electronic mail in each case addressed to a Party.  A notice to be given to the Borrower under this Agreement shall not be effective unless and until it is given by the Required Lenders.  Any notice given to the Borrower under this Agreement by the Required Lenders shall be binding upon all of the Lenders.  The addresses for such communications shall be:

If to the Borrower:

Nuo Therapeutics, Inc.
207A Perry Parkway, Suite 1
Gaithersburg, MD 20877
Fax:  1-240-499-2690
Email:  DJorden@nuot.com
Attention:  David Jorden
          Acting Chief Financial Officer

US 3406964v3_333285-00104 1/26/2016 3:50 PM

With copy to:

>Dentons US LLP
>1301 K Street, NW
>Suite 600, East Tower
>Washington, DC 20005-3364
>Fax:  1-202-408-6399
>Email:  sam.alberts@dentons.com
>Attention:  Sam J. Alberts

If to the DIP Agent or the Lenders:

>Deerfield Mgmt., L.P.
>c/o Deerfield Management Company, L.P.
>780 Third Avenue, 37th Floor
>New York, NY 10017
>Fax:  212-599-3075
>Email:  dclark@deerfield.com
>Attn:  David J. Clark

With a copy to:

>Katten Muchin Rosenman LLP
>525 West Monroe Street
>Chicago, Illinois  60661
>Fax:  (312) 577-4676
>Attention:  Jeffrey L. Elegant, Esq.

**Section 7.2     Waiver of Notice**.  Whenever any notice is required to be given to the Lenders or Borrower under any Transaction Document, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 7.3     Reimbursement of Legal and Other Expenses**.  If any amount owing to the Lenders under any Transaction Document shall be collected through enforcement of this Agreement, any Transaction Document or restructuring of the Loans or Commitment, in the nature of a workout, settlement, negotiation, or any process of law, or shall be placed in the hands of third Persons for collection, the Borrower shall pay (in addition to all monies then due in respect of the Loan or otherwise payable under any Transaction Document) attorneys' and other fees and expenses incurred in respect of such collection.

**Section 7.4     Governing Law**.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed in such State.  Each Party hereby irrevocably waives personal service of process

35

Case 16-10192-MFW    Doc 7    Filed 01/26/16    Page 100 of 112

and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such Party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  The Parties hereby waive all rights to a trial by jury.

Section 7.5    **Successors and Assigns**.  This Agreement shall bind and inure to the respective successors and assigns of the Parties, except that Borrower may not assign or otherwise transfer all or any part of its rights under the Transaction Documents without the prior written consent of the Required Lenders.  Each Lender may sell or otherwise transfer the Loans and related Commitments, provided that such Lender shall have provided notice of the transfer to Borrower for recordation in the Register pursuant to Section 1.4.  Upon receipt of a notice of a transfer of an interest in a Loan, Borrower shall record the identity of the transferee and other relevant information in the Register and the transferee shall (to the extent of the interests transferred to such transferee) have all the rights and obligations of, and shall be deemed, a Lender hereunder.

Section 7.6    **Entire Agreement**.  The Transaction Documents contain the entire understanding of the Parties with respect to the matters covered thereby and supersede any and all other written and oral communications, negotiations, commitments and writings with respect thereto.  The provisions of this Agreement may be waived, modified, supplemented or amended only by an instrument in writing signed by the authorized officer of each Party.

Section 7.7    **Severability**.  If any provision of this Agreement shall be invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  The Parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

Section 7.8    **Counterparts**.  This Agreement may be executed by each Party on separate counterparts, each of which and any facsimile copies thereof shall be deemed an original, but all of which together shall constitute one and the same agreement.

Section 7.9    **Survival**.  The obligations of Borrower under Section 1.4 and the obligations of the Borrower and the Lenders under this Article 7 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, or the termination of the Commitment or this Agreement or any provision hereof.

Section 7.10    **Waiver**.  Neither the failure of, nor any delay on the part of, any Party in exercising any right, power or privilege hereunder, or under any agreement, document or instrument mentioned herein, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder, or under any agreement, document or instrument mentioned herein, preclude other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver of any right, power, privilege or default hereunder, or under any agreement, document or instrument mentioned herein, constitute a

36

waiver of any other right, power, privilege or default or constitute a waiver of any default of the same or of any other term or provision.  No course of dealing and no delay in exercising, or omission to exercise, any right, power or remedy accruing to the Lenders upon any default under this Agreement or any other agreement shall impair any such right, power or remedy or be construed to be a waiver thereof or an acquiescence therein; nor shall the action of the Lenders in respect of any such default, or any acquiescence by it therein, affect or impair any right, power or remedy of the Lenders in respect of any other default.  All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.

**Section 7.11   Indemnity**.

(a)    The Borrower shall, at all times, indemnify and hold harmless (the "**Indemnity**") each of the Lenders and each Lender's directors, partners, officers, employees, agents, counsel and advisors (each, an "**Indemnified Person**") from any losses, claims (including the cost of defending against such claims), damages, liabilities, penalties, or other expenses (each a "**Loss**") which an Indemnified Person may incur or to which an Indemnified Person may become subject to the extent such Loss arises out of a breach of any representation, warranty or covenant of the Borrower in any of the Transaction Documents, or the extension of credit hereunder or the Loan or the use or intended use of the Loan.  The Indemnity shall not apply with respect to any Indemnified Person to the extent that a court or arbitral tribunal with jurisdiction over the subject matter of the Loss, such Indemnified Person and over the Borrower determines (after such Indemnified Person that had an adequate opportunity to defend its interests), that such Loss resulted from the willful misconduct of such Indemnified Person, which determination results in a final, non-appealable judgment or decision of a court or tribunal of competent jurisdiction.  The Indemnity is independent of and in addition to any other agreement of any Party under any Transaction Document to pay any amount to the Lenders or the Borrower, as applicable, and any exclusion of any obligation to pay any amount under this subsection shall not affect the requirement to pay such amount under any other section hereof or under any other agreement.

(b)    Promptly after receipt by an Indemnified Person under this Section 7.11 of notice of the commencement of any action (including any governmental action), such Indemnified Person shall deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person.

(c)    An Indemnified Person shall have the right to retain its own counsel with the reasonable fees and expenses to be paid by the indemnifying party, if, in the reasonable opinion of counsel for the indemnifying party, the representation by such counsel of the Indemnified Person and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person and any other party represented by such counsel in such proceeding.  The indemnifying party shall pay for only one separate legal counsel for the Indemnified Persons, and such legal counsel shall be approved by the indemnifying party.  The failure to deliver written

US\_ACTIVE\\06964v3\_333285-00104 1/26/2016 3:50 PM

notice to the indemnifying party within a reasonable time of the commencement of any such legal action shall not relieve the indemnifying party of any liability to the Indemnified Person under this Section 7.11, except to the extent that the indemnifying party is actually prejudiced in its ability to defend such action.  The indemnification required by this Section 7.11 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as such expense, loss, damage or liability is incurred and is due and payable.

(d)     Without prejudice to the survival of any other agreement of any of the Parties hereunder, the agreements and the obligations of the Borrower contained in this Section 7.11 shall survive the termination of each other provision hereof and the payment of all amounts payable to the Lenders hereunder.

**Section 7.12   Interest Limitations**.  The Transaction Documents are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the amount paid or agreed to be paid to the Lenders for the Loan exceed the maximum amount permissible under applicable law.   If from any circumstance whatsoever fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance the Lenders shall ever receive anything which might be deemed interest under applicable law, that would exceed the highest lawful rate, such amount that would be deemed excessive interest shall be applied to the reduction of the principal amount owing on account of the Loan, or if such deemed excessive interest exceeds the unpaid balance of principal of the Loan, such deemed excess shall be refunded to the Borrower.  All sums paid or agreed to be paid to the Lenders for the Loan shall, to the extent permitted by applicable law, be deemed to be amortized, prorated, allocated and spread throughout the full term of the Loan until payment in full so that the deemed rate of interest on account of the Loan is uniform throughout the term thereof.  The terms and provisions of this Section shall control and supersede every other provision of this Agreement.

**Section 7.13   Further Assurances**.  Froth time to time, the Borrower shall perform any and all acts and execute and deliver to the Lenders such additional documents as may be necessary or as requested by the Lenders to carry out the purposes of any Transaction Document or any or to preserve and protect the Lenders' rights as contemplated therein.

**Section 7.14   Independent Transaction Documents**.   Each Transaction Document constitutes an independent agreement between the parties thereto (the "**Transaction Parties**") and no Transaction Document shall be construed so as to affect the rights of the Transaction Parties to their rights and remedies under another Transaction Document.

### [SIGNATURE PAGE FOLLOWS]

38

IN WITNESS WHEREOF, the Lenders and the Borrower have caused this Agreement to be duly executed.

**BORROWER:**

**NUO THERAPEUTICS, INC.**

By: _____
Name:
Title:

**DIP AGENT:**

**DEERFIELD MGMT., L.P.**

By: _____
Name:
Title:

**LENDERS:**

**DEERFIELD PRIVATE DESIGN FUND II, L.P.**

By:  Deerfield Mgmt., L.P., its General Partner
By:  J.E. Flynn Capital, LLC, its General Partner

By: _____
Name: _____
Title: _____

[Signature Page to Facility Agreement]

**DEERFIELD PRIVATE DESIGN INTERNATIONAL II, L.P.**

By:   Deerfield Mgmt., L.P., its General Partner
By:   J.E. Flynn Capital, LLC, its General Partner

By: _____
Name: _____
Title: _____


**DEERFIELD SPECIAL SITUATIONS FUND, L.P.**

By:   Deerfield Mgmt., L.P., its General Partner
By:   J.E. Flynn Capital, LLC, its General Partner

By: _____
Name: _____
Title: _____

[Signature Page to Facility Agreement]

<u>**EXHIBIT A**</u>

**Form of Notice of Borrowing**

NOTICE OF BORROWING

DATE: [_____]

Deerfield Mgmt., L.P., as DIP Agent
780 Third Avenue, 37th Floor
New York NY 10017
Fax: 212-59903075
Email: dclark@deerfield.com
Attn: David J. Clark

RE:  Request for disbursement of Loan

Ladies and Gentlemen:

1.  We refer to the Senior Secured, Superpriority Debtor-in–Possession Credit Agreement, dated as of January ____, 2016, between Nuo Therapeutics, Inc. ("Borrower") and Deerfield Management Company, L.P., as DIP Agent, and the Lenders (as defined therein) from time to time party thereto (as amended, restated, supplemented or modified from time to time, the "Credit Agreement").

2.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Credit Agreement.

3.  The Borrower hereby requests that the Lenders advance a Loan on [_____] in the principal amount of $[_____] in accordance with Section 2.2 of the Credit Agreement.  The Lenders are requested to disburse the proceeds of such Loan to the parties listed on Annex 1 attached hereto by wire transfer in the corresponding amounts set forth in such Annex 1.

4.  The Borrower hereby certifies that (a) the representations and warranties in Article 3 of the Credit Agreement are true in all material respects on the date hereof with the same effect as though such representations and warranties had been made on today's date, (b) no Event of Default or Default has occurred and is continuing, and (c) the relevant conditions to the making of such Loan set forth in Article 4 of the Credit Agreement have been fulfilled.

Very truly yours,

NUO THERAPEUTICS, INC.


By: _____
Name:
Title:

ANNEX 1 to NOTICE OF BORROWING

**Wire Transfer Instructions for Disbursement of Loan:**

**<u>EXHIBIT B</u>**
**Permitted Liens**

None

**SCHEDULE 1**
**Budget**

(attached)

## SCHEDULE 2
## Pro Rata Shares

| | |
|---|---|
| Deerfield Private Design Fund II, L.P. | 30.7560% |
| Deerfield Private Design International II, L.P. | 35.2440% |
| Deerfield Special Situations Fund, L.P. | 34.00% |

US_116406964v3_333285-00104 1/26/2016 3:50 PM

**Exhibit B**

{01081911;v1 }
ATLANTA 5687016.1

WEEKLY CASH-FLOW FORECAST
CONSOLIDATED

**NUO THERAPEUTICS, INC.**
**Weekly Cash-Flow Projection**

*All figures in thousands of U.S. dollars*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Accrued and | 1 - 9 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| *Week number* | 1/31 | 2/7 | 2/14 | 2/21 | 2/28 | 3/6 | 3/13 | 3/20 | 3/27 | unpaid | TOTAL |
| *Week-ending date* | Post | Post | Post | Post | Post | Post | Post | Post | Post | 3/27 | Post |
| *Pre/Post-petition week* | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | |
| Aurix CED | 14 | 15 | 15 | 15 | 15 | 17 | 17 | 17 | 17 | - | 143 |
| Aurix VA | 14 | 15 | 15 | 15 | 15 | 17 | 17 | 17 | 17 | - | 143 |
| Angel | 39 | 33 | 33 | 286 | 33 | 44 | 46 | 269 | 31 | - | 816 |
| All other revenue | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | - | 35 |
| **TOTAL REVENUE** | **71** | **68** | **68** | **321** | **68** | **81** | **84** | **307** | **69** | **-** | **1,137** |
| | | | | | | | | | | | |
| **Beginning operating cash balance** | 17 | 927 | 575 | 516 | 228 | 449 | 230 | 415 | 645 | **2,050** | **17** |
| **Collections** | | | | | | | | | | | |
| Aurix CED | 59 | 80 | 66 | 64 | 18 | 18 | 18 | 15 | 19 | - | 356 |
| Aurix VA | 20 | 20 | 18 | 14 | 14 | 14 | 14 | 15 | 15 | - | 145 |
| Angel | 48 | 240 | 110 | 61 | 22 | 183 | 17 | 114 | 25 | - | 820 |
| All other collections | - | - | - | - | - | 50 | - | - | - | - | 50 |
| **Total collections** | **127** | **340** | **194** | **139** | **53** | **265** | **49** | **144** | **59** | **-** | **1,371** |
| | | | | | | | | | | | |
| **Operating disbursements** | | | | | | | | | | | |
| Payroll and payroll taxes | 102 | - | 133 | - | 133 | - | - | 135 | - | 121 | 625 |
| Bonuses and sales commissions | 25 | - | - | - | 50 | - | - | - | - | 50 | 125 |
| Employee benefits | 13 | 13 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 44 | 148 |
| Employee travel and entertainment | 9 | 9 | 11 | 11 | 11 | 11 | 10 | 10 | 10 | 20 | 111 |
| Research and development services | - | - | - | - | 12 | 8 | 8 | 8 | 8 | 34 | 79 |
| Inventory purchases | - | - | - | - | 10 | 297 | 9 | 6 | 25 | 77 | 423 |
| Outside services | - | - | - | - | - | 13 | 6 | 6 | 3 | 12 | 27 |
| Marketing expense | - | - | - | - | 13 | 6 | 6 | 6 | 6 | 25 | 64 |
| Reimbursement expense | - | - | - | 7 | 12 | 12 | 12 | 12 | 12 | 48 | 102 |
| Investor relations | - | - | - | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 6 |
| Insurances | - | 48 | 300 | - | 15 | - | - | - | - | (150) | 212 |
| Information technology | - | - | - | 1 | 5 | 5 | 5 | 5 | 5 | 19 | 40 |
| Supplies | - | - | - | 4 | 4 | 4 | 4 | 4 | 4 | 18 | 39 |
| Utilities | - | - | - | - | - | 1 | 1 | 1 | 1 | - | 2 |
| Licensing fees | - | - | - | 0 | 1 | 1 | 1 | 1 | 1 | 2 | 4 |
| Quality assurance | - | - | - | - | - | - | - | - | - | - | - |
| Professional fees, ordinary course | - | - | - | - | - | - | 16 | 13 | 13 | 42 | 84 |
| Board of Directors fees | - | - | - | - | 3 | 3 | 3 | 3 | 3 | 12 | 27 |
| Excise taxes | - | - | - | - | - | 7 | - | 7 | - | 14 | 42 |
| All other operating disbursements | - | 14 | 14 | 14 | 14 | 12 | 11 | 11 | 11 | 45 | 148 |
| **Total operating disbursements** | **150** | **91** | **470** | **44** | **291** | **380** | **100** | **236** | **114** | **434** | **2,309** |
| **OPERATING CASH FLOW** | **$ (23)** | **$ 249** | **$ (276)** | **$ 95** | **$ (237)** | **$ (115)** | **$ (50)** | **$ (92)** | **$ (55)** | **$ (434)** | **$ (938)** |
| | | | | | | | | | | | |
| **Non-operating disbursements** | | | | | | | | | | | |
| Bank fees | - | 5 | - | - | - | 5 | - | - | - | 5 | 15 |
| Income and business taxes | - | 3 | 90 | - | - | 3 | - | - | - | 3 | 99 |
| **Total non-operating disbursements** | **-** | **8** | **90** | **-** | **-** | **8** | **-** | **-** | **-** | **8** | **114** |
| | | | | | | | | | | | |
| **Bankruptcy-related disbursements** | | | | | | | | | | | |
| Interest, DIP loan new money | - | 2 | - | - | - | 12 | - | - | - | 19 | 33 |
| Interest, DIP loan pre-petition roll-up | - | 10 | - | - | - | 43 | - | - | - | 30 | 83 |
| Fees, DIP loan | 68 | - | - | - | - | - | - | - | - | - | 68 |
| Professional fees, restructuring | - | - | 194 | 163 | 41 | 41 | 264 | 178 | 41 | 1,170 | 2,092 |
| Transaction fees | - | - | - | - | - | - | - | - | - | 100 | 100 |
| Vendor deposits | - | - | 150 | - | - | - | - | - | - | (150) | - |
| Critical-vendor payments | - | 430 | - | 220 | - | - | - | - | - | - | 650 |
| Priority claims {TBD} ----> | - | - | - | - | - | - | - | - | - | 100 | 100 |
| KEIP/KERP {TBD} ----> | - | - | - | - | - | - | - | - | - | 325 | 325 |
| All other (sources) / uses {TBD} ----> | - | - | - | - | - | - | - | - | - | - | - |
| **Total bankruptcy-related disbursements** | **68** | **593** | **194** | **383** | **41** | **96** | **264** | **178** | **41** | **1,594** | **3,451** |
| **TOTAL DISBURSEMENTS** | **217** | **692** | **754** | **426** | **332** | **485** | **364** | **414** | **155** | **2,036** | **5,875** |
| **NET CASH FLOW** | **$ (90)** | **$ (352)** | **$ (560)** | **$ (288)** | **$ (278)** | **$ (219)** | **$ (315)** | **$ (270)** | **$ (96)** | **$ (2,036)** | **$ (4,503)** |
| | | | | | | | | | | | |
| **DIP loan, new money** | | | | | | | | | | | |
| Period | Interim | Interim | Interim | Final | Final | Final | Final | Final | Final | Final | Final |
| Beginning balance | - | 1,000 | 1,000 | 1,500 | 1,500 | 2,000 | 2,000 | 2,500 | 3,000 | 4,500 | - |
| Add: Advances | 1,000 | - | 500 | - | 500 | - | 500 | 500 | 1,500 | - | 4,500 |
| Subtract: Repayments | - | - | - | - | - | - | - | - | - | - | - |
| Ending balance, line of credit | **$ 1,000** | **$ 1,000** | **$ 1,500** | **$ 1,500** | **$ 2,000** | **$ 2,000** | **$ 2,500** | **$ 3,000** | **$ 4,500** | **$ 4,500** | **$ 4,500** |
| **ENDING OPERATING CASH BALANCE** | **$ 927** | **$ 575** | **$ 516** | **$ 228** | **$ 449** | **$ 230** | **$ 415** | **$ 645** | **$ 2,050** | **$ 14** | **$ 14** |
| | | | | | | | | | | | |
| **Working-capital balances** | | | | | | | | | | | |
| Accounts receivable | 924 | 651 | 525 | 707 | 722 | 538 | 572 | 735 | 745 | 745 | 745 |
| Inventory | 490 | 396 | 396 | 246 | 203 | 409 | 407 | 398 | 398 | 398 | 398 |
| Accounts payable | 145 | 243 | 311 | 371 | 400 | 364 | 364 | 363 | 359 | 359 | 359 |
| DIP loan, new money | 1,000 | 1,000 | 1,500 | 1,500 | 2,000 | 2,000 | 2,500 | 3,000 | 4,500 | 4,500 | 4,500 |
| DIP loan, pre-petition roll-up | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |

**NUO THERAPEUTICS, INC.**
**Accrual and payment of professional fees and expenses**

*All figures in thousands of U.S. dollars*

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Accrued and unpaid | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | 1/31 | 2/7 | 2/14 | 2/21 | 2/28 | 3/6 | 3/13 | 3/20 | 3/27 | | |
| **Beginning balance** | - | 578 | 849 | 899 | 941 | 1,153 | 1,312 | 1,262 | 1,293 | 1,480 | - |
| Add: Accruals for Debtor professionals | | | | | | | | | | | |
| Debtor lead counsel | 129 | 129 | 101 | 76 | 76 | 76 | 76 | 78 | 81 | - | 822 |
| Debtor local counsel | 21 | 15 | 15 | 15 | 15 | 16 | 21 | 15 | 15 | - | 148 |
| CRO and additional personnel | 51 | 51 | 41 | 41 | 41 | 41 | 42 | 41 | 41 | - | 390 |
| Investment banker | 55 | - | - | - | 55 | - | - | - | - | - | 110 |
| Claims agent | 20 | 15 | 15 | 15 | 13 | 13 | 13 | 13 | 11 | - | 127 |
| U.S. Trustee | - | - | - | - | - | - | - | - | 13 | - | 13 |
| Subtotal accruals for Debtor professionals | 276 | 210 | 172 | 147 | 200 | 146 | 152 | 147 | 161 | - | 1,610 |
| Add: Accruals for DIP-lender professionals | | | | | | | | | | | |
| DIP lender lead counsel [1] | 264 | 26 | 26 | 21 | 21 | 23 | 31 | 31 | 31 | - | 474 |
| DIP lender local counsel [2] | 38 | 10 | 10 | 11 | 11 | 10 | 10 | 10 | 10 | - | 120 |
| Subtotal accruals for DIP-lender professionals | 302 | 36 | 36 | 32 | 32 | 33 | 41 | 41 | 41 | - | 594 |
| Add: Accruals for UCC professionals | | | | | | | | | | | |
| UCC lead counsel | - | 21 | 26 | 16 | 16 | 16 | 16 | 16 | 21 | - | 144 |
| UCC financial advisor | - | 6 | 11 | 11 | 6 | 6 | 6 | 6 | 6 | - | 54 |
| Subtotal accruals for UCC professionals | - | 26 | 36 | 26 | 21 | 21 | 21 | 21 | 26 | - | 198 |
| **Total accruals** | 578 | 272 | 244 | 205 | 253 | 200 | 214 | 209 | 228 | - | 2,402 |
| Subtract: Payments to Debtor professionals | | | | | | | | | | | |
| Debtor lead counsel | - | - | - | - | - | - | (104) | - | - | (518) | (622) |
| Debtor local counsel | - | - | - | - | - | - | (17) | - | - | (91) | (108) |
| CRO and additional personnel | - | - | (143) | (41) | (41) | - | (41) | (42) | (41) | 9 | (340) |
| Investment banker | - | - | - | - | - | - | (45) | - | - | (65) | (110) |
| Claims agent | - | - | - | (20) | - | - | (57) | - | - | (30) | (107) |
| U.S. Trustee | - | - | - | - | - | - | - | - | - | (13) | (13) |
| Subtotal accruals for Debtor professionals | - | - | - | (163) | (41) | (41) | (264) | (42) | (41) | (708) | (1,300) |
| Subtract: Payments to DIP-lender professionals | | | | | | | | | | | |
| DIP lender lead counsel | - | - | (156) | - | - | - | - | (94) | - | (224) | (474) |
| DIP lender local counsel | - | - | (38) | - | - | - | - | (42) | - | (40) | (120) |
| Subtotal accruals for DIP-lender professionals | - | - | (194) | - | - | - | - | (136) | - | (264) | (594) |
| Subtract: Payments to UCC professionals | | | | | | | | | | | |
| UCC lead counsel | - | - | - | - | - | - | - | - | - | (144) | (144) |
| UCC financial advisor | - | - | - | - | - | - | - | - | - | (54) | (54) |
| Subtotal accruals for UCC professionals | - | - | - | - | - | - | - | - | - | (198) | (198) |
| Subtract: Retainers applied to Debtor-professional accruals | | | | | | | | | | | |
| Debtor lead counsel | - | - | - | - | - | - | - | - | - | (200) | (200) |
| Debtor local counsel | - | - | - | - | - | - | - | - | - | (40) | (40) |
| CRO and additional personnel | - | - | - | - | - | - | - | - | - | (50) | (50) |
| Investment banker | - | - | - | - | - | - | - | - | - | - | - |
| Claims agent | - | - | - | - | - | - | - | - | - | (20) | (20) |
| U.S. Trustee | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal accruals for Debtor professionals | - | - | - | - | - | - | - | - | - | (310) | (310) |
| **Total payments** | - | - | (194) | (163) | (41) | (41) | (264) | (178) | (41) | (1,480) | (2,402) |
| **ENDING BALANCE** | 578 | 849 | 899 | 941 | 1,153 | 1,312 | 1,262 | 1,293 | 1,480 | 0 | - |

Notes
1. Includes $213K of pre-petition fees and expenses carried forward to w/e 1/31 and paid in post-petition period
2. Includes $22K of pre-petition fees and expenses carried forward to w/e 1/31 and paid in post-petition period