**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nuo Therapeutics, Inc., | Case No. 16-10192 (MFW) |
| Debtor. | |

**PLAN SUPPLEMENT TO THE FIRST AMENDED PLAN OF
REORGANIZATION OF NUO THERAPEUTICS, INC.**

**PLEASE TAKE NOTICE** that Nuo Therapeutics, Inc. (the "Debtor") hereby files this plan supplement (the "Plan Supplement") in support of the First Amended Plan of Reorganization of Nuo Therapeutics, Inc., as modified [Docket No. 247] (the "Plan")[1] and the Disclosure Statement for the First Amended Plan of Reorganization of Nuo Therapeutics, Inc., as modified [Docket No. 248] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement includes current drafts of the following documents (which are currently in draft form and subject to change), as may be modified, amended or supplemented from time to time in accordance with the Plan:

| | |
|---|---|
| Attachment 1 | Modified list of the Executory Contracts, and the Cure Amount relating to each Executory Contract identified. |
| Attachment 2 | Feasibility analysis for Scenario B. |
| Attachment 3 | Reorganized Debtor's certain corporate documents attendant to Scenario A: Second Amended And Restated Certificate Of Incorporation Of Nuo Therapeutics, Inc.; Amended And Restated By-Laws Of Nuo Therapeutics, Inc.; and Certificate Of Designation Of Series A Preferred Stock Of Nuo Therapeutics, Inc. |
| Attachment 4 | Reorganized Debtor's certain corporate documents attendant to Scenario B:  Second Amended And Restated Certificate Of Incorporation Of Nuo Therapeutics, Inc.; and Second Amended And Restated Bylaws Of Nuo |

---

[1] All capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Plan.

| | |
|---|---|
| | Therapeutics, Inc. |
| Attachment 5 | Identities of the proposed members of the Reorganized Debtor's board and the proposed executive officers of the Reorganized Debtor, under Scenario A. |
| Attachment 6 | Identities of the proposed members of the Reorganized Debtor's board and the proposed executive officers of the Reorganized Debtor, under Scenario B. |
| Attachment 7 | Identity of any insider who will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider, under Scenario A. |
| Attachment 8 | Identity of any insider who will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider, under Scenario B. |
| Attachment 9 | 9.A. -- Scenario A, certain New Common Stock documents:  Registration Rights Agreement, and Securities Purchase Agreement. 9.B. -- Scenario B, certain New Common Stock document:  Registration Rights Agreement. |
| Attachment 10 | Scenario B Secured Exit Financing Facility certain documents:  Credit Agreement, and Guaranty and Security Agreement. |
| Attachment 11 | Percentage of the Scenario A Allocated New Common Stock allocated from the New Investors to existing holders of Common Stock Equity Interests in the Debtor as of the Record Date who execute and timely deliver a Release Document, in the event of a Successful Capital Raise. |
| Attachment 12 | Form of the Arthrex TSA (transition services agreement). |
| Attachment 13 | "Class 4 Escrow" information. |

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Debtor reserves the right to alter, amend, modify, or supplement any document in this Plan Supplement in accordance with the

Plan, *provided, that,* if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Confirmation Hearing, the Debtors will file a blackline of such document with the Bankruptcy Court.

     **PLEASE TAKE FURTHER NOTICE** that the Debtor will seek confirmation of the Plan at the Confirmation Hearing scheduled for **April 25, 2016 at 10:30 a.m. (prevailing Eastern Time)** before the Honorable Mary Walrath in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware 19801, at which time and at which place you may appear if you so desire.

     **PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Plan Supplement and any other related documents are available upon request to Epiq Bankruptcy Solutions, LLC either by email request – with reference to "Nuo Therapeutics, Inc." in the subject line – to tabulation@epiqsystems.com or by telephone at (646) 282-2400.  Copies of these documents and all filings in the case are also available online free of charge at http://dm.epiq11.com/NUO. Copies of all documents filed in this case are also on file with the Clerk of the Bankruptcy Court for the District of Delaware, and may be reviewed during the regular hours of the Bankruptcy Court or online, for a fee, through the Bankruptcy Court's internet website at http://www.deb.uscourts.gov.

*[signatures follow]*

This 15th day of April, 2016.

*/s/ Stacy L. Newman*
_____
ASHBY & GEDDES, P.A.
William P. Bowden (No. 2553)
Karen B. Skomorucha Owens (No. 4759)
Stacy L. Newman (No. 5044)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE  19899-1150
Phone: 302.654.1888
Fax: 302.654.2067
Email:   wbowden@ashby-geddes.com
            kowens@ashby-geddes.com
            snewman@ashby-geddes.com

DENTONS US LLP
Sam J. Alberts (admitted *pro hac vice*)
1301 K Street, NW
Suite 600. East Tower
Washington, D.C. 20005
Tel:  202.408.7004
Fax:  202.408.6399
Email: sam.alberts@dentons.com

-and-

Bryan E. Bates (admitted *pro hac vice*)
303 Peachtree Street, NE
Suite 5300
Atlanta, Georgia 30308
Tel.: 404.527.4073
Fax: 404.527.4198
Email: bryan.bates@dentons.com

CO-COUNSEL TO DEBTOR-IN-POSSESSION     CO-COUNSEL TO DEBTOR-IN-POSSESSION

**<u>Attachment 1</u>**


**Modified list of the Executory Contracts, and the Cure Amount relating to each Executory Contract identified**

**MODIFIED LIST OF EXECUTORY CONTRACTS TO BE ASSUMED OR ASSUMED AND ASSIGNED, WITH CORRESPONDING CURE AMOUNTS**

| Contract Party | Description / Type of Contract | Estimated Cure Cost |
|---|---|---|
| ACE American Insurance Company | Accident and sickness insurance for debtor | $ - |
| AIG | Employee practices liability insurance for debtor | $ - |
| AIG | Excess insurance on XL Specialty Insurance for debtor | $ - |
| AIG | Fiduciary liability insurance for debtor | $ - |
| Allianz Global Corporate & Specialty | Transport and cargo insurance for debtor | $ - |
| Amarex Clinical Research LLC | Consulting rate agreement for advisory services as needed by debtor | $ 29,448.70 |
| AREP Meridian I LLC (To be rejected in Scenario B) | Lease agreement for Aldagen offices where debtor is the lessee | $ 20,778.22 |
| Arizona Heart Hospital | CED site agreement to perform for debtor | $ - |
| Arizona Heart Hospital | Consignment agreement to provide centrifuge by debtor | $ - |
| Arthrex, Inc. | Distribution agreement to facilitate sales on behalf of debtor | $ - |
| Arthrex, Inc. | Agreement to establish quality standards on the debtor | $ - |
| Arthrex, Inc. | Manufacturing agreement where Arthrex will manufacture the product and obtain licensing rights to no longer pay a transfer price under the distribution agreement | $ - |
| Arthur Gallagher Risk Management (f/k/a William Gallagher Associates) | Insurance policies for debtor | $ 6.84 |
| Asheville Specialty Hospital | Consignment agreement to provide centrifuge by debtor | $ - |
| Augustin Training & Consulting UG | Agreement for debtor to use results from health questionnaire | $ 17,696.73 |
| Aventura Hospital & Medical Center | CED site agreement to perform for debtor | $ 2,500.00 |
| Beazley Group | Cyber insurance for debtor | $ - |
| Beiersdorf | Trademark coexistence agreement with debtor | $ - |
| Berkley Life Sciences | Workers compensation insurance for debtor | $ - |
| Berkley Life Sciences | Property and auto insurance for debtor | $ - |
| Bioprod Biomedicinski produkti d.o.o. | Assignment of manufacturing agreement from Bioprod to Arthrex | $ - |
| Bioprod Biomedicinski produkti d.o.o. | Manufacturing and supplier agreement for debtor products | $ - |

| | | |
|---|---|---|
| Bioprod Biomedicinski produkti d.o.o. | Agreement to establish quality standards, logistics, and warehousing, for manufacturer | $ - |
| Bioprod Biomedicinski produkti d.o.o. | Bailment agreement where debtor is bailor | $ - |
| Blanchard Valley Regional Health Center | CED site agreement to perform for debtor | $ - |
| BSI Group | Certification assistance agreement for debtor | $ - |
| Byers Peak, Inc. | Manufacturing and supplier agreement for debtor products | $ - |
| Byers Peak, Inc. | Agreement to establish quality standards for manufacturer | $ - |
| Catalent Pharma Solutions | Amendment to agreement with supplier for debtor | $ - |
| Catholic Health | CED site agreement to perform for debtor (additionally covering Mercy Hospital of Buffalo & Sisters of Charity) | $ 2,500.00 |
| Charles E. Worden Sr. | Release of security interest in patents to debtor, including royalty agreements | $ - |
| Charles E. Worden Sr. | Substitute agreement for patent use by debtor | $ - |
| Cigna | Administrative Services Contract (Level Funding) and Stop Loss Policy between Nuo Therapeutics, Inc. and Cigna Health Life Insurance Co. (Effective Date June 1, 2015) | $ - |
| CNA | Product liability insurance for debtor | $ - |
| Commonwealth Economics | Debtor is sub-lessee for Nashville, TN offices | $ 3,182.28 |
| Concur Technologies | Business service agreement providing business travel and expense management services to debtor | $ 1,234.16 |
| Covance Market Access Services Inc. | Agreement for access to personnel for medical reimbursement strategies as needed by debtor | $ 53,234.32 |
| FedEx Corporation | FedEx pricing agreement for transportation services | $ 29,431.82 |
| Fidelity Investments | 401k and profit sharing plan for debtor employees | $ 6,990.74 |
| Fidelity Investments | Service agreement for payroll services | $ - |
| Foley & Lardner | Legal services agreement to be provided as needed to debtor | $ 27,037.62 |
| Fort HealthCare | CED site agreement to perform for debtor | $ 1,500.00 |
| G3 Medical Inc. | Pricing agreement for medical packaging suppliers for debtor | $ 13,782.88 |
| G3 Medical Inc. | Assignment of manufacturing agreement from G3 Medical to Relion Manufacturing | $ - |
| Gilero LLC | Master services agreement for services provided to debtor | $ 20,236.75 |

| | | | |
|---|---|---|---|
| Health Management Systems Inc. | Employee Assistance Program (EAP) and Work Life services for debtor | $ | - |
| HealthSouth | Consignment agreement to provide centrifuge by debtor | $ | - |
| Hyperbaric Medicine & Wound | Consignment agreement to provide centrifuge by debtor | $ | - |
| Kaweah Delta Hospital Foundation | Business associate agreement to protect privacy based on data gathered in CED site | $ | - |
| Kaweah Delta Hospital Foundation | CED site agreement to perform for debtor | $ | - |
| Kindred Hospital – Flamingo Las Vegas | Centrifuge lease agreement where debtor is lessor | $ | - |
| Kindred Hospital Boston North Shore | Cytomedix consignment program agreement for customer inventory access | $ | - |
| Kindred Hospital Pittsburgh | Cytomedix consignment program agreement for customer inventory access | $ | - |
| Kindred Hospital Pittsburgh North Shore | Consignment agreement to provide centrifuge by debtor | $ | - |
| Manx LLC | Master services agreement in the event consulting services are needed by debtor | $ | 3,420.00 |
| McGuff Pharmaceuticals, Inc. | Ascorbic acid supplier agreement for debtor | $ | - |
| Mercy Hospital of Buffalo | CED site agreement to perform for debtor | $ | - |
| Metropolitan Life Insurance Company | Dental insurance for debtor | $ | - |
| Net Health Systems, Inc. | Service agreement and license for software to be used by debtor | $ | - |
| NetSuite | Accounting software for debtor | $ | - |
| North Georgia Foot And Ankle Specialists | Consignment agreement to provide centrifuge by debtor | $ | - |
| Northwest Hospital, LLC d/b/a Northwest Medical Center | Clinical research agreement | $ | - |
| Olean General Hospital | Consignment agreement to provide centrifuge by debtor | $ | - |
| Orange Regional Medical Center | CED site agreement to perform for debtor | $ | 2,500.00 |
| Pfizer Inc. | Thrombin supplier agreement for debtor | $ | 42,203.00 |
| Pfizer Inc. | Thrombin supplier extension agreement for debtor | $ | - |
| Piedmont Healthcare, Inc. | CED site agreement to perform for debtor | $ | 10,120.00 |
| Reliance Standard Life Insurance Company | Life insurance for debtor | $ | - |
| Rochester General Hospital | Consignment agreement to provide centrifuge by debtor | $ | - |
| ROHTO Pharmaceutical Co., LTD | Distribution agreement to facilitate sales on behalf of debtor | $ | - |

| R-Squared | Consulting rate agreement for advisory services as needed by debtor | $ | - |
| Sarstedt Group | Resale certificate agreement for debtor | $ | 197.40 |
| Sarstedt Group | Agreement to establish quality standards for manufacturer | $ | - |
| Saul Holdings Limited Partnership | Agreement for debtor to lease Gaithersburg, MD offices | $ | 19,390.71 |
| Saul Holdings Limited Partnership | First amendment to agreement for debtor to extend lease Gaithersburg, MD offices | $ | - |
| Saul Holdings Limited Partnership | Second amendment to agreement for debtor to extend lease Gaithersburg, MD offices | $ | - |
| Sherman Oaks Hospital, Amputation Prevention Center | Consignment agreement to provide centrifuge by debtor | $ | - |
| Sisters of Charity Hospital | CED site agreement to perform for debtor | $ | - |
| Sparton Corporation | Manufacturing and supplier agreement for debtor products | $ | 70,486.66 |
| St. Luke's Regional Medical Center, Ltd., | CED site agreement to perform for debtor | $ | 2,500.00 |
| Swedish Covenant Hospital Wound Care Center | Consignment agreement to provide centrifuge by debtor | $ | - |
| SyncBASE | Terms and conditions for the use of OPTRACK for debtor employee options tracking software | $ | 1,704.92 |
| Syncroness | Master services agreement for services provided to debtor | $ | - |
| Taylor Regional Hospital | Consignment agreement to provide centrifuge by debtor | $ | - |
| The Vested Group | Installation, implementation, and technical support for NetSuite software | $ | 6,750.00 |
| United Regional Wound Care Center | CED site agreement to perform for debtor | $ | 2,500.00 |
| Valley Presbyterian Hospital | Business associate agreement to protect privacy based on data gathered in CED site | $ | - |
| Valley Presbyterian Hospital | CED site agreement to perform for debtor | $ | - |
| Valley Wound Healing Center | CED site agreement to perform for debtor | $ | - |
| Vorteil | Consignment agreement to provide centrifuge by debtor | $ | - |
| Western Maryland Health System | CED site agreement to perform for debtor | $ | - |
| XL Specialty Insurance | Executive and corporate securities liability insurance | $ | - |
| Zak Weis | Consignment agreement to provide centrifuge by debtor | $ | - |

**<u>Attachment 2</u>**

**Feasibility analysis for Scenario B**

**Nuo Therapeutics, Inc**
Financial Projections for Plan B Confirmation
(Dollars in Thousands)

| | 8 Mos. 2016 | Full Year '17 | Full Year '18 | Full Year '19 | Full Year '20 | Full Year '21 | Full Year '22 |
|---|---|---|---|---|---|---|---|
| Revenue (1) | | | | | | | |
| Aurix Sales | $ 3,300 | $ 7,000 | $ 10,750 | $ 15,373 | $ 21,522 | $ 29,054 | $ 37,770 |
| Aldagen Royalties | 134 | 200 | 200 | 200 | 200 | 200 | 200 |
| Total Revenue | 3,434 | 7,200 | 10,950 | 15,573 | 21,722 | 29,254 | 37,970 |
| *Growth rate yoy* | | *110%* | *52%* | *42%* | *39%* | *35%* | *30%* |
| | | | | | | | |
| Cost of goods sold (2) | 703 | 1,400 | 2,190 | 3,115 | 5,430 | 8,776 | 13,290 |
| | | | | | | | |
| Gross profit | 2,731 | 5,800 | 8,760 | 12,458 | 16,291 | 20,478 | 24,681 |
| *Gross margin* | *80%* | *81%* | *80%* | *80%* | *75%* | *70%* | *65%* |
| | | | | | | | |
| Sales & Marketing | 1,640 | 2,181 | 3,500 | 4,500 | 6,500 | 9,000 | 11,250 |
| R&D (clinical; CED) | 1,713 | 2,056 | 2,467 | 1,500 | 1,500 | 1,750 | 2,000 |
| G&A | 2,394 | 2,873 | 3,447 | 3,964 | 4,361 | 4,579 | 4,808 |
| Total operating expenses | 5,747 | 7,110 | 9,414 | 9,964 | 12,361 | 15,329 | 18,058 |
| | | | | | | | |
| EBITDA | (3,016) | (1,310) | (654) | 2,494 | 3,930 | 5,149 | 6,623 |
| *EBITDA Margin* | *-88%* | *-18%* | *-6%* | *16%* | *18%* | *18%* | *17%* |
| | | | | | | | |
| | | | | | | | |
| EBITDA | (3,016) | (1,310) | (654) | 2,494 | 3,930 | 5,149 | 6,623 |
| Working Capital Changes | 475 | (838) | (830) | (1,770) | (826) | (720) | (605) |
| Purchases of Property, Plant & Equipment | 60 | 120 | 120 | 200 | 300 | 500 | 500 |
| Cash from Operations | (2,481) | (2,028) | (1,364) | 924 | 3,404 | 4,929 | 6,518 |
| | | | | | | | |
| Beginning Cash | - | 257 | 723 | 1,146 | 1,263 | 1,936 | 2,118 |
| Cash From Operations | (2,481) | (2,028) | (1,364) | 924 | 3,404 | 4,929 | 6,518 |
| Debt Financing (3) (4) | 3,000 | 3,000 | 2,500 | | (2,000) | (4,250) | (4,500) |
| Interest Expense (5) | (263) | (506) | (713) | (806) | (731) | (497) | (328) |
| Ending Cash | $ 257 | $ 723 | $ 1,146 | $ 1,263 | $ 1,936 | $ 2,118 | $ 3,808 |

(1) Assumes CED study is positive and commercial sales are achieved
(2) Assumes CMS lowers pricing as of 4th Full Year impacting Gross Margins
(3) Excludes $2.25mm of Debt provided to pay claims at confirmation.
(4) Total Senior Debt Repayment of $10.75mm is completed by YE of the 5th Full Year
(5) 7.5% Interest Rate Paid Quarterly

**Attachment 3**

**Reorganized Debtor's certain corporate documents attendant to Scenario A: Second Amended And Restated Certificate Of Incorporation Of Nuo Therapeutics, Inc.; Amended And Restated By-Laws Of Nuo Therapeutics, Inc.; and Certificate Of Designation Of Series A Preferred Stock Of Nuo Therapeutics, Inc.**

**SECOND AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**NUO THERAPEUTICS, INC.**

Nuo Therapeutics, Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Corporation*"), DOES HEREBY CERTIFY AS FOLLOWS:

1.    The name of the Corporation is "Nuo Therapeutics, Inc." The Corporation was originally incorporated under the name "Informatix Holdings, Inc.", and the original certificate of incorporation was filed with the Secretary of State of the State of Delaware on April 29, 1998. Informatix Holdings, Inc. changed its name to Autologous Wound Therapy, Inc. and later changed that name to Cytomedix, Inc.

2.    The Corporation filed its First Amended Plan of Reorganization under chapter 11 of title 11 of the United States Code on March 28, 2016 (the "*Plan*"). The Plan was confirmed on April [__], 2016 by the United States Bankruptcy Court for the District of Delaware.

3.    This Second Amended and Restated Certificate of Incorporation ("*Certificate*") has been deemed approved without the need for Board of Directors ("*Board*") or stockholder approval pursuant to Section 303 of the General Corporation Law of the State of Delaware (the "DGCL") because it is adopted pursuant to the Plan, as confirmed by the United States Bankruptcy Court for the District of Delaware.

4.    Pursuant to the provisions of Sections 242(a), 245 and 303 of the DGCL, the undersigned Corporation does hereby certify that the text of the Certificate is hereby amended and restated to read as follows:

ARTICLE I
NAME

The name of the corporation is Nuo Therapeutics, Inc. (the "*Corporation*").

ARTICLE II
PURPOSE

The purpose for which the Corporation is organized is to engage in, carry on and conduct any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "*DGCL*").

ARTICLE III
REGISTERED AGENT

The name and address of the Corporation's registered agent and office in the State of Delaware is National Corporate Research, Ltd., 850 New Burton Road, Suite 201, Dover,

Delaware 19904.  Either the registered office or the registered agent may be changed in the manner provided by law.

ARTICLE IV
CAPITALIZATION

Section 4.1.        Authorized Capital Stock.

The total number of shares of all classes of capital stock that the Corporation is authorized to issue is [26,000,000] shares, consisting of [25,000,000] shares of common stock, par value $0.0001 per share (the "**Common Stock**"), and [1,000,000] shares of preferred stock, par value $0.0001 per share (the "**Preferred Stock**").  Notwithstanding any other provisions contained herein to the contrary, the Corporation shall not issue nonvoting equity securities.  The prohibition on issuance of nonvoting equity securities is included in this Certificate in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. §1123(a)(6)).

Section 4.2.        Preferred Stock.

(a)        The Preferred Stock may be issued from time to time in one or more series.  The Board of Directors (the "**Board**") is hereby expressly authorized to provide for the issuance of shares of Preferred Stock in one or more series and to establish from time to time the number of shares to be included in each such series and to fix the voting powers, if any, designations, powers, preferences and relative, participating, optional and other special rights, if any, of each such series and the qualifications, limitations and restrictions thereof, as shall be stated in the resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designations (a "**Preferred Stock Designation**") filed pursuant to the DGCL.

(b)        The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding and such additional shares as are necessary to satisfy the payment of dividends in kind on any Preferred Stock) by the affirmative vote of the holders of a majority of the outstanding shares of Common Stock, without a vote of the holders of the Preferred Stock, or any series thereof, unless a vote of any such holders of Preferred Stock is required pursuant to another provision of this Second Amended and Restated Certificate of Incorporation (this "**Certificate**") (including any Preferred Stock Designation.)

Section 4.3.        Common Stock.

(a)        The holders of shares of Common Stock shall be entitled to one vote for each such share on each matter properly submitted to the stockholders on which the holders of Common Stock are entitled to vote.  Except as otherwise required by law or this Certificate (including any Preferred Stock Designation), at any annual or special meeting of the stockholders the Common Stock shall have the exclusive right to vote for the election of directors and on all other matters properly submitted to a vote of the stockholders.  Notwithstanding the foregoing and subject to Section 4.2(b), except as otherwise required by law or this Certificate (including a Preferred Stock Designation), holders of Common Stock shall not be entitled to vote on any amendment to this Certificate (including any amendment to any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders

2

of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate (including any Preferred Stock Designation).

(b)    Subject to the rights of the holders of Preferred Stock, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.

(c)    In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, and subject to the rights of the holders of Preferred Stock in respect thereof, the holders of shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

ARTICLE V
BOARD OF DIRECTORS

Section 5.1.        <u>Board Powers</u>.

The business and affairs of the Corporation shall be managed by, or under the direction of, the Board.  In addition to the powers and authority expressly conferred upon the Board by statute, this Certificate or the By-Laws of the Corporation (the "*By-Laws*"), the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, in all cases, to the provisions of the DGCL, this Certificate and any By-Laws adopted by the Corporation; provided, however, that no amendments to this Certificate or the By-Laws hereafter adopted by the Corporation shall invalidate any prior act of the Board that would have been valid if such amendments to this Certificate or the By-Laws had not been adopted.

Section 5.2.        <u>Number, Election and Term</u>.

(a)    The number of directors of the Corporation shall initially be five and shall be fixed from time to time exclusively by the Board pursuant to a resolution adopted by the Board.

(b)    Directors shall be elected each year at the annual meeting of stockholders of the Corporation and shall hold office until the next annual meeting of stockholders of the Corporation and until their successors have been elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.

(c)    Unless and except to the extent that the By-Laws shall so require, the election of directors need not be by written ballot.

3

Section 5.3.        Newly Created Directorships and Vacancies.

Newly created directorships resulting from an increase in the number of directors and any vacancies on the Board resulting from death, resignation, retirement, disqualification, removal or other cause may be filled solely by a majority vote of the directors then in office, even if less than a quorum, or by a sole remaining director (and not by stockholders), and any director so chosen shall hold office until the next annual meeting of stockholders of the Corporation and until his or her successor has been elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.

Section 5.4.        Removal.

Any or all of the directors may be removed from office at any time, with or without cause by the affirmative vote of holders of a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

Section 5.5.        Preferred Stock – Directors.

Notwithstanding any other provision of this Article V, and except as otherwise required by law, whenever the holders of one or more series of Preferred Stock shall have the right, voting separately by class or series, to elect one or more directors, the term of office, the filling of vacancies, the removal from office and other features of such directorships shall be governed by the terms of such series of Preferred Stock as set forth in this Certificate (including any Preferred Stock Designation) and such directors shall not be included in any of the classes created pursuant to this Article V unless expressly provided by such terms.

ARTICLE VI
BY-LAWS

In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power to adopt, amend, alter or repeal the By-Laws.  The affirmative vote of a majority of the Board shall be required to adopt, amend, alter or repeal the By-Laws.  The By-Laws also may be adopted, amended, altered or repealed by the stockholders to the extent permissible under the DGCL; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by law or by this Certificate (including any Preferred Stock Designation), the affirmative vote of the holders of at least a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders to adopt, amend, alter or repeal the By-Laws.

ARTICLE VII
MEETINGS OF STOCKHOLDERS

Section 7.1.        No Action by Written Consent.

Except as otherwise expressly provided by the terms of any series of Preferred Stock permitting the holders of such series of Preferred Stock to act by written consent, any action

4

required or permitted to be taken by stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation, unless the taking of such action by means of written consent of the stockholders of the Corporation is approved in advance by a resolution adopted by the Board.

Section 7.2.　　　<u>Meetings</u>.

Except as otherwise required by law or the terms of any one or more series of Preferred Stock, special meetings of stockholders of the Corporation (i) may be called by the Chairman of the Board, the Chief Executive Officer or any member of the Board pursuant to a resolution adopted by a majority of the Board and (ii) shall be called by the Secretary at the written request (a "***Special Meeting Request***") of holders of record of at least 20% of the voting power of the outstanding stock of the Corporation entitled to vote on the matter or matters to be brought before the proposed special meeting.  Such request shall state the purpose or purposes of the proposed meeting.  Within 15 days of the Corporation's receipt of a Special Meeting Request that complies with this <u>Section 7.2</u>, the Corporation shall send a notice of the meeting to stockholders as set forth in the By-Laws.  Special meetings of stockholders shall be held at such place and time and on such date as shall be determined by the Corporation and stated in the Corporation's notice of meeting, provided that a special meeting of stockholders called pursuant to a Special Meeting Request shall be held no later than 30 days after the date the Corporation receives the Special Meeting Request, unless the stockholders submitting such Special Meeting Request shall request a date no later than 60 days after the date the Corporation receives the Special Meeting Request.  Any special meeting of stockholders called pursuant to a Special Meeting Request and as to which notice has been given may be postponed, and any such special meeting as to which notice has been given may be cancelled, by the Secretary upon public announcement given before the date previously scheduled for such meeting or any adjournment thereof, in each case only if the stockholders submitting such Special Meeting Request shall request such postponement or cancellation in writing.

Section 7.3.　　　<u>Advance Notice</u>.

Subject to <u>Section 7.2</u>, advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the By-Laws.

ARTICLE VIII
SECTION 203 OF THE DGCL

The Corporation hereby elects not to be governed by Section 203 of the DGCL.

ARTICLE IX
LIMITED LIABILITY; INDEMNIFICATION

Section 9.1.　　　<u>Limitation of Personal Liability</u>.

No person who is or was a director of the Corporation shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted

5

by the DGCL as the same exists or hereafter may be amended.  If the DGCL is hereafter amended to authorize corporate action further limiting or eliminating the liability of directors, then the liability of a director to the Corporation or its stockholders shall be limited or eliminated to the fullest extent permitted by the DGCL, as so amended.  Any repeal or amendment of this Section 9.1 by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Certificate inconsistent with this Section 9.1 will, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to further limit or eliminate the liability of directors) and shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or amendment or adoption of such inconsistent provision with respect to acts or omissions occurring prior to such repeal or amendment or adoption of such inconsistent provision.

Section 9.2.        Indemnification.

(a)        Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "*proceeding*"), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter a "*Covered Person*"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized or permitted by applicable law, as the same exists or may hereafter be amended, against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by such Covered Person in connection with such proceeding, and such right to indemnification shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of this or her heirs, executors and administrators; and such right to indemnification shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators; provided, however, that, except for proceedings to enforce rights to indemnification, the Corporation shall indemnify a Covered Person in connection with a proceeding (or part thereof) initiated by such Covered Person only if such proceeding (or part thereof) is authorized by the Board (whether before, during or after the pendency of such proceeding).  The right to indemnification conferred by this Section 9.2 shall be a contract right that shall fully vest at the time the Covered Person first assumes his or her position as a director or officer of the Corporation and shall include the right to be paid by the Corporation the expenses incurred in defending or otherwise participating in any such proceeding in advance of its final disposition.

(b)        The rights provided to Covered Persons pursuant to this Section 9.2 shall not be exclusive of any other right that any Covered Person may have or hereafter acquire under applicable law, this Certificate, the By-Laws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

6

(c)     Any repeal or amendment of this <u>Section 9.2</u> by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Certificate inconsistent with this <u>Section 9.2</u>, will, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

(d)     This <u>Section 9.2</u> shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than Covered Persons.

ARTICLE X
COMPETITIVE OPPORTUNITY

If any stockholder, any Affiliate of any stockholder or any of such stockholder's or its Affiliate's partners, members, stockholders, directors, officers or Affiliates (collectively, "***Representatives***"), acquires knowledge of a potential transaction or matter which may be an investment or business opportunity or prospective economic or competitive advantage in which the Corporation could have an interest or expectancy (a "***Competitive Opportunity***") or otherwise is then exploiting any Competitive Opportunity, the Corporation will have no interest in, and no expectation that, such Competitive Opportunity be offered to it.  Any such interest or expectation is hereby renounced so that such stockholder and its Representatives (including any Representative serving as an officer or director of the Corporation) shall (a) have no duty to communicate or present such Competitive Opportunity to the Corporation and (b) have the right to either hold any such Competitive Opportunity for such stockholder's (and its agents', partners' or Affiliates') own account and benefit or to recommend, assign or otherwise transfer such Competitive Opportunity to persons other than the Corporation or any Affiliate of the Corporation.  For purposes of this Certificate, "***Affiliate***" shall mean, with respect to any person, any other person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first person.  This <u>Article X</u> shall not apply and shall not have any force or effect in the event that the Competitive Opportunity is presented to, acquired, or otherwise obtained by, a Representative as a result of such Representative's capacity as a director of the Corporation.

ARTICLE XI
AMENDMENT OF CERTIFICATE OF INCORPORATION

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate (including any Preferred Stock Designation), in the manner now or hereafter prescribed by this Certificate and the DGCL; and, except as set forth in <u>Article IX</u>, all rights, preferences and privileges herein conferred upon stockholders, directors or any other persons by and pursuant to this Certificate in its present form or as hereafter amended are granted subject to the right reserved in this <u>Article XI</u>; provided, however, that, notwithstanding any other provision of this Certificate, and in addition to any other vote that may be required by law or any Preferred Stock Designation, the affirmative vote of the holders of at least 66 2/3% of the

7

voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend, alter or repeal, or adopt any provision of this Certificate inconsistent with the purpose and intent of, Article V, Article VI, Article VII or this Article XI.

(SIGNATURE PAGE FOLLOWS)

8

IN WITNESS WHEREOF, Nuo Therapeutics, Inc. has caused this Certificate to be duly executed in its name and on its behalf by its Secretary this [_]th day of April, 2016.

NUO THERAPEUTICS, INC.


By: _____

Name:

Title:

9

**AMENDED AND RESTATED**

**BY-LAWS**

**OF**

**NUO THERAPEUTICS, INC.,**

a Delaware corporation

(the "Corporation")

(Adopted as of April [__], 2016)

**AMENDED AND RESTATED**

**BY-LAWS**

**OF**

**NUO THERAPEUTICS, INC.**

ARTICLE I
OFFICES

Section 1.1    <u>Registered Office</u>.  The registered office of the Corporation within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

Section 1.2    <u>Additional Offices</u>.  The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "Board") may from time to time determine or as the business and affairs of the Corporation may require.

ARTICLE II
STOCKHOLDERS MEETINGS

Section 2.1    <u>Annual Meetings</u>.  The annual meeting of stockholders shall be held at such place and time and on such date as shall be determined by the Board and stated in the notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to <u>Section 9.5(a)</u>.  At each annual meeting, the stockholders shall elect the directors of the Corporation and may transact any other business as may properly be brought before the meeting.

Section 2.2    <u>Special Meetings</u>.  Except as otherwise required by applicable law, special meetings of stockholders, for any purpose or purposes, may be called only as provided in the Corporation's Second Amended and Restated Certificate of Incorporation, as the same may be amended or restated from time to time (the "***Certificate of Incorporation***").  The Board may in its sole discretion determine that a special meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to <u>Section 9.5(a)</u>.

Section 2.3    <u>Notices</u>.  Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting. Unless otherwise provided by applicable law or the Certificate of Incorporation, such notice shall be given by the Corporation not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting in the manner permitted by <u>Section 9.3</u>.  If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the

purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto), and, if applicable, the Special Meeting Request or as otherwise permitted pursuant to Section 2.7 or Section 3.2.   Other than a special meeting of stockholders called pursuant to a Special Meeting Request in accordance with the Certificate of Incorporation, any meeting of stockholders as to which notice has been given may be postponed, and any special meeting of stockholders as to which notice has been given may be cancelled, by a resolution adopted by a majority of the Board upon public announcement given before the date previously scheduled for such meeting or any adjournment thereof.

Section 2.4    Quorum.  Except as otherwise provided by applicable law, the Certificate of Incorporation or these By-Laws, the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock of the Corporation representing a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business.   If a quorum shall not be present or represented by proxy at any meeting of the stockholders, the chairman of the meeting may adjourn the meeting from time to time in the manner provided in Section 2.6 until a quorum shall attend.   The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.   Shares of its own stock belonging to the Corporation or to another corporation (if a majority of the voting power of the shares entitled to vote in the election of directors belonging to such other corporation is held, directly or indirectly, by the Corporation) shall neither be entitled to vote nor, for quorum purposes, be counted in (a) the number shares present, in person or by proxy, at a stockholders meeting or (b) the number of shares of outstanding capital stock of the Corporation entitled to vote at a stockholders meeting; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

Section 2.5    Voting of Shares.

(a)    Voting Lists.  The Secretary shall prepare, or shall cause the officer or agent who has charge of the stock ledger of the Corporation to prepare, at least 10 days before every meeting of stockholders, a complete list of the stockholders of record entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order for each class of stock and showing the address and the number of shares registered in the name of each stockholder. Nothing contained in this Section 2.5(a) shall require the Corporation to include the telephone number or other electronic contact information for electronic transmission to any stockholder on such list.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  If the Corporation

determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be examined by any stockholder who is present.  If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 9.5(a), then such list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 2.5(a) or to vote in person or by proxy at any meeting of stockholders.

(b)   Manner of Voting.  At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy.  If authorized by the Board, the voting by stockholders or proxyholders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission, provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxyholder.  The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(c)   Proxies.  Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  Proxies need not be filed with the Secretary of the Corporation until the meeting is called to order, but shall be filed with the Secretary before being voted.  Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority.

(i)   A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy.  Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(ii)   A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

(iii)   Any copy, electronic transmission or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and

all purposes for which the original writing or transmission could be used; provided that such copy, electronic transmission or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(d)    <u>Required Vote</u>.  Subject to the rights of the holders of one or more series of preferred stock of the Corporation ("***Preferred Stock***"), voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon.  All other matters shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation, these By-Laws or applicable stock exchange rules, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e)    <u>Inspectors of Election</u>.  The Board may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof.  The Board may appoint one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspectors of election or alternates are appointed by the Board, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall ascertain and report the number of outstanding shares and the voting power of each; determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots; count all votes and ballots and report the results; determine the disposition of any challenges and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  No person who is a candidate for an office at an election may serve as an inspector at such election.  Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting.  If there is more than one inspector, the report of a majority shall be the report of the inspectors.

Section 2.6    <u>Adjournments</u>.  Any annual or special meeting of stockholders may be adjourned by the chairman of the meeting, from time to time, whether or not there is a quorum, to reconvene at the same or some other place, provided that a special meeting of stockholders called pursuant to a Special Meeting Request may not be adjourned without the written consent of the stockholders that submitted such Special Meeting Request.  Notice need not be given of any such adjourned meeting if the date, time and place or the means of remote communication by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting, as applicable, are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the stockholders, or the holders of any class or series of stock entitled to vote separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting.  If the adjournment is for more than 30 days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the

meeting.  If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with <u>Section 2.3</u>, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 2.7    <u>Advance Notice for Business</u>.

(a)    Annual Meetings of Stockholders.  No business may be transacted at an annual meeting of stockholders, other than business that is either (I) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board, (II) otherwise properly brought before the annual meeting by or at the direction of the Board or (III) otherwise properly brought before the annual meeting by any stockholder of the Corporation (x) who is a stockholder on the date of the giving of the notice provided for in this <u>Section 2.7(a)</u> and who is entitled to vote at such annual meeting and (y) who complies with the notice procedures set forth in this <u>Section 2.7(a)</u>.  Except for proposals properly made in accordance with Rule 14a-8 (or any successor thereof) under the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), and included in the notice of meeting given by or at the direction of the Board, the foregoing clause (III) shall be the exclusive means for a stockholder to propose business to be brought before an annual meeting of stockholders.  Stockholders seeking to nominate persons for election to the Board must comply with <u>Section 3.2</u>, and this <u>Section 2.7</u> shall not be applicable to nominations.

(i)    In addition to any other applicable requirements, for business (other than nominations) to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation and such business must otherwise be a proper matter for stockholder action.  Subject to <u>Section 2.7(a)(iv)</u>, a stockholder's notice to the Secretary with respect to such business, to be timely, must comply with the provisions of this <u>Section 2.7(a)(i)</u>.  A stockholder's notice must be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that if the annual meeting is called for a date that is more than 30 days earlier or more than 60 days later than such anniversary date, notice by the stockholder to be timely must be so received not earlier than the opening of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation.  The public announcement of an adjournment or postponement of an annual meeting shall not commence a new time period for the giving of a stockholder's notice as described in this <u>Section 2.7(a)</u>.

(ii)    To be in proper written form, a stockholder's notice to the Secretary with respect to any business (other than director nominations which are the subject of <u>Section 3.2</u>) must set forth:

(A)    as to each such matter such stockholder proposes to bring before the annual meeting (1) a brief description of the business desired to be brought

before the annual meeting and any material interest in such business of such stockholder and any Stockholder Associated Person (as defined below), individually or in the aggregate, (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and if such business includes a proposal to amend these By-Laws, the text of the proposed amendment) and (3) the reasons for conducting such business at the annual meeting;

(B)      the name and address of the stockholder proposing such business, as they appear on the Corporation's books;

(C)      the class or series and number of shares of capital stock of the Corporation that are owned of record or are directly or indirectly owned beneficially by such stockholder and by any Stockholder Associated Person;

(D)      any proxy (other than a revocable proxy given in response to a solicitation made pursuant to Section 14(a) (or any successor thereof) of the Exchange Act by way of a solicitation statement filed on Schedule 14A), contract, arrangement, understanding or relationship pursuant to which such stockholder or any Stockholder Associated Person has a right to vote any shares of the Corporation;

(E)      any Derivative Position held by such Stockholder and by any Stockholder Associated Person;

(F)      a description of all agreements, arrangements or understandings (written or oral) between or among such stockholder, any Stockholder Associated Person or any other person or persons (including their names) in connection with the proposal of such business by such stockholder;

(G)      any other information relating to such stockholder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitation of proxies for election of directors (even if an election contest is not involved), or would be otherwise required, in each case pursuant to Section 14 (or any successor thereof) of the Exchange Act and the rules and regulations promulgated thereunder;

(H)      a representation that such stockholder intends to appear in person or by proxy at the annual meeting to bring such business before the meeting; and

(I)      a statement of whether such stockholder or any Stockholder Associated Person intends, or is part of a group that intends, to solicit proxies in connection with the proposal.

(iii)      The foregoing notice requirements of this Section 2.7(a) shall be deemed satisfied by a stockholder as to any proposal made pursuant to Rule 14a-8 (or any successor thereof) of the Exchange Act if the stockholder has notified the Corporation of such

stockholder's intention to present such proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) of the Exchange Act.  No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this <u>Section 2.7(a)</u>, provided, however, that once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this <u>Section 2.7(a)</u> shall be deemed to preclude discussion by any stockholder of any such business conducted in accordance with the rules for such meeting as set forth in <u>Section 2.8</u>.  If the Board or the chairman of the annual meeting determines that any stockholder proposal was not made in accordance with the provisions of this <u>Section 2.7(a)</u> or that the information provided in a stockholder's notice does not satisfy the information requirements of this <u>Section 2.7(a)</u>, such proposal shall not be presented for action at the annual meeting.  Notwithstanding the foregoing provisions of this <u>Section 2.7(a)</u>, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present the proposed business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

(iv)    In addition to the provisions of this <u>Section 2.7(a)</u>, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein.  Nothing in this <u>Section 2.7(a)</u> shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor thereof) under the Exchange Act.

(b)    <u>Special Meetings of Stockholders</u>.  Any business may be transacted at a special meeting of stockholders, provided that with respect to each special meeting of stockholders, only such business shall be conducted as is permitted by <u>Section 2.3</u>.  Nominations of persons for election to the Board may be made at a special meeting of stockholders pursuant to <u>Section 3.2</u>.  Notwithstanding any provision contained herein, in the case of a special meeting of stockholders called pursuant to a Special Meeting Request, to be timely, a stockholder's notice to the Secretary must be received by the Secretary at the principal executive offices of the Corporation not later than 15 days prior to such meeting.

Section 2.8    <u>Conduct of Meetings</u>.  The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or such other person as shall be appointed by the Board.  The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the chairman of the meeting.  The Board may adopt or, in the absence thereof, the chairman of the meeting may prescribe, such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with these By-Laws or such rules and regulations, the chairman of any meeting of stockholders shall have the right and authority to convene, adjourn and close the meeting, and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and procedures for maintaining order at the meeting and the safety of those present; (c) limitations on attendance at

or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (e) limitations on the time allotted (to individuals and in the aggregate) to questions or comments by participants.  Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 2.9    No Action by Consent of Stockholders in Lieu of Meeting.  Except as otherwise expressly provided by the terms of any series of Preferred Stock permitting the holders of such series of Preferred Stock to act by written consent, any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of the stockholders of the Corporation, unless a majority of the Board approves in advance the taking of such action by means of written consent of stockholders, in which case such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation to its registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary of the Corporation. Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the date the earliest dated consent is delivered to the Corporation, a written consent or consents signed by a sufficient number of holders to take such action are delivered to the Corporation by delivery to the Corporation's registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  An electronic transmission consenting to the action to be taken and transmitted by a stockholder, proxyholder or a person or persons authorized to act for a stockholder or proxyholder shall be deemed to be written, signed and dated for purposes hereof if such electronic transmission sets forth or is delivered with information from which the Corporation can determine that such transmission was transmitted by a stockholder or proxyholder (or by a person authorized to act for a stockholder or proxyholder) and the date on which such stockholder, proxyholder or authorized person transmitted such transmission.    The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  No consent given by electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and delivered to the Corporation by delivery either to the Corporation's registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary of the Corporation.  Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the limitations on delivery in the previous sentence, consents given by electronic transmission may be otherwise delivered to the Corporation's principal place of business or to the Secretary if, to the extent, and in the manner provided by resolution of a majority of the Board.  Any copy, electronic transmission or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all

purposes for which the original writing could be used; provided that such copy, electronic transmission or other reproduction shall be a complete reproduction of the entire original writing. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders were delivered to the Corporation as provided in this <u>Section 2.9</u>.

ARTICLE III<br>DIRECTORS

Section 3.1    <u>Powers</u>.  The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders.  Directors need not be stockholders or residents of the State of Delaware.

Section 3.2    <u>Advance Notice for Nomination of Directors</u>.

(a)    Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors by the stockholders of the Corporation, except as may be otherwise provided by the terms of one or more series of Preferred Stock with respect to the rights of holders of one or more series of Preferred Stock to elect directors. Nominations of persons for election to the Board at any annual meeting of stockholders, or at any special meeting of stockholders called for the purpose of electing directors as set forth in the Corporation's notice of such special meeting, may be made (i) by or at the direction of the Board or (ii) by any stockholder of the Corporation (x) who is a stockholder of record on the date of the giving of the notice provided for in this <u>Section 3.2</u> and who is entitled to vote in the election of directors at such meeting and (y) who complies with the notice procedures set forth in this <u>Section 3.2</u>.

(b)    In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.  To be timely, a stockholder's notice to the Secretary must comply with the provisions of this <u>Section 3.2(b)</u>.  A stockholder's notice must be received by the Secretary at the principal executive offices of the Corporation: (i) in the case of an annual meeting, not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that if the annual meeting is called for a date that is more than 30 days earlier or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so received not earlier than the opening of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation; (ii) except as specified in clause (iii), in the case of a special meeting of stockholders called for the purpose of electing directors, not earlier than the opening of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the

meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the special meeting is first made by the Corporation; and (iii) in the case of a special meeting of stockholders called pursuant to a Special Meeting Request for the purpose of electing directors, not later than 15 days prior to such meeting.  The public announcement of an adjournment or postponement of an annual meeting or special meeting shall not commence a new time period for the giving of a stockholder's notice as described in this Section 3.2.

(c)    Notwithstanding anything in paragraph (b) to the contrary, if the number of directors to be elected to the Board at an annual meeting is greater than the number of nominees of the Corporation and there is no public announcement by the Corporation specifying a decrease in the size of the Board at the time the notice of such meeting is given to stockholders, a stockholder's notice required by this Section 3.2 shall be considered timely, but only with respect to the directorships for which the Corporation has failed to provide nominees, if it shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the date on which such notice was given by the Corporation.

(d)    To be in proper written form, a stockholder's notice to the Secretary must set forth:

(i)    as to each person whom the stockholder proposes to nominate for election as a director:

(A)    the name, age, business address and residence address of the person,

(B)    the principal occupation or employment of the person,

(C)    the class or series and number of shares of capital stock of the Corporation that are owned of record or are directly or indirectly owned beneficially by the person,

(D)    any Derivative Instrument directly or indirectly owned beneficially by such nominee, and

(E)    any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 (or any successor thereof) of the Exchange Act and the rules and regulations promulgated thereunder; and

(ii)    as to the stockholder giving the notice:

(A)    the name and address of such stockholder as they appear on the Corporation's books,

(B)    the class or series and number of shares of capital stock of the Corporation that are owned of record or directly or indirectly owned beneficially by such Stockholder and any Stockholder Associated Person,

(C)    any proxy (other than a revocable proxy given in response to a solicitation made pursuant to Section 14(a) (or any successor thereof) of the Exchange Act by way of a solicitation statement filed on Schedule 14A), contract, arrangement, understanding or relationship pursuant to which such stockholder or any Stockholder Associated Person has a right to vote any shares of the Corporation,

(D)    any Derivative Position held by such Stockholder and by an Stockholder Associated Person,

(E)    a description of all agreements, arrangements or understandings (written or oral) between or among such stockholder, any Stockholder Associated Person, any proposed nominee or any other person or persons (including their names) pursuant to which the nomination or nominations are to be made by such stockholder,

(F)    a representation that such stockholder intends to appear in person or by proxy at the meeting to nominate the persons named in its notice,

(G)    any other information relating to such stockholder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 (or any successor thereof) of the Exchange Act and the rules and regulations promulgated thereunder,

(H)    a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among such stockholder or any Stockholder Associated Person, or others acting in concert therewith, on the one hand, and each proposed nominee, and his or her respective affiliates and associates, or others acting in concert therewith, on the other hand, including, without limitation all information that would be required to be disclosed pursuant to Rule 404 promulgated under Regulation S-K if the stockholder making the nomination and any Stockholder Associated Person, or any person acting in concert therewith, was the "registrant" for purposes of such rule and the nominee was a director or executive officer of such registrant, and

(I)    a statement of whether such stockholder or any Stockholder Associated Person intends, or is part of a group that intends, to solicit proxies for the election of the proposed nominee.  Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

(e)    If the Board or the chairman of the meeting of stockholders determines that any nomination was not made in accordance with the provisions of this <u>Section 3.2</u>, then such nomination shall not be considered at the meeting in question.  Notwithstanding the foregoing provisions of this <u>Section 3.2</u>, if the stockholder (or a qualified representative of the stockholder) does not appear at the meeting of stockholders of the Corporation to present the nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Corporation.

(f)    In addition to the provisions of this <u>Section 3.2</u>, a stockholder shall also comply with all of the applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein.  Nothing in this <u>Section 3.2</u> shall be deemed to affect any rights of the holders of Preferred Stock to elect directors pursuant to the Certificate of Incorporation or the right of the Board to fill newly created directorships and vacancies on the Board pursuant to the Certificate of Incorporation.

Section 3.3    <u>Compensation</u>.    Unless otherwise restricted by the Certificate of Incorporation or these By-Laws, the Board shall have the authority to fix the compensation of directors.  The directors may be reimbursed their expenses, if any, of attendance at each meeting of the Board and may be paid either a fixed sum for attendance at each meeting of the Board or other compensation as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Members of committees of the Board may be allowed like compensation and reimbursement of expenses for service on the committee.

ARTICLE IV
BOARD MEETINGS

Section 4.1    <u>Annual Meetings</u>.  The Board shall meet as soon as practicable after the close of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board.  No notice to the directors shall be necessary to legally convene this meeting, except as provided in this <u>Section 4.1</u>.

Section 4.2    <u>Regular Meetings</u>.  Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places as shall from time to time be determined by the Board.

Section 4.3    <u>Special Meetings</u>.  Special meetings of the Board (a) may be called by the Chairman of the Board or the Chief Executive Officer and (b) shall be called by the Chairman of the Board, the Chief Executive Officer or Secretary on the written request of at least a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request.  Notice of each special meeting of the Board shall be given, as provided in <u>Section 9.3</u>, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery; (ii) at least two days before the meeting if such notice is sent by a nationally recognized

overnight delivery service; and (iii) at least five days before the meeting if such notice is sent through the United States mail. If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting. Any and all business that may be transacted at a regular meeting of the Board may be transacted at a special meeting. Except as may be otherwise expressly provided by applicable law, the Certificate of Incorporation, or these By-Laws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting. A special meeting may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 9.4.

Section 4.4    Quorum; Required Vote. A majority of the Board shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these By-Laws. If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

Section 4.5    Consent In Lieu of Meeting. Unless otherwise restricted by the Certificate of Incorporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 4.6    Organization. The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, a chairman elected from the directors present. The Secretary shall act as secretary of all meetings of the Board. In the absence (or inability or refusal to act) of the Secretary, the chairman of the meeting may appoint any person to act as secretary of the meeting.

ARTICLE V
COMMITTEES OF DIRECTORS

Section 5.1    Establishment. The Board may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board when required. The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.

Section 5.2    Available Powers. Any committee established pursuant to Section 5.1 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and may exercise all of the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

Section 5.3    Alternate Members.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

Section 5.4    Procedures.  Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee.  Notice of each committee meeting shall be given, as provided in Section 9.3, to each committee member (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery; (ii) at least two days before the meeting if such notice is sent by a nationally recognized overnight delivery service; and (iii) at least five days before the meeting if such notice is sent through the United States mail.  At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business.  The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these By-Laws or the Board.  If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  Unless the Board otherwise provides and except as provided in these By-Laws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business.  In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article III and Article IV of these By-Laws.

ARTICLE VI
OFFICERS

Section 6.1    Officers.  The officers of the Corporation elected by the Board shall be a Chairman of the Board, a Chief Executive Officer, and such other officers as the Board from time to time may determine.  Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this Article VI.  Such officers shall also have such powers and duties as from time to time may be conferred by the Board.  The Chairman of the Board or the Chief Executive Officer may also appoint such other officers (including, without limitation, a Treasurer, Secretary, Controller and one or more Vice Presidents) as may be necessary or desirable for the conduct of the business of the Corporation.  Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these By-Laws or as may be prescribed by the Board or, if such officer has been appointed by the Chairman of the Board or the Chief Executive Officer, as may be prescribed by the appointing officer.

(a)    Chairman of the Board.  The Chairman of the Board shall preside when present at all meetings of the stockholders and the Board.  The Chairman of the Board shall advise and counsel the Chief Executive Officer and other officers and shall exercise such powers and perform such duties as shall be assigned to or required of the Chairman of the Board from time to time by the Board or these By-Laws.

(b)    <u>Chief Executive Officer</u>.  The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board.

(c)    <u>Secretary</u>.

(i)    The Secretary shall attend all meetings of the stockholders, the Board and committees of the Board (at the request of the Board or such committee) and shall record the proceedings of such meetings in books to be kept for that purpose.  The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board or the Chief Executive Officer.  The Secretary shall have custody of the corporate seal of the Corporation and the Secretary shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature.  The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(ii)    The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

(d)    <u>Treasurer</u>.  The Treasurer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the Corporation which from time to time may come into the Treasurer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board or the Chief Executive Officer may authorize).

Section 6.2    <u>Term of Office; Removal; Vacancies</u>.  The Chairman of the Board shall be elected annually by the Board at its first meeting held after each annual meeting of stockholders, and he or she shall hold office until the next annual meeting of the Board and until their successors are duly elected and qualified or until their earlier death, resignation, retirement, disqualification, or removal from office.  Any officer, whether elected by the Board or appointed by the Chairman of the Board or the Chief Executive Officer, may be removed, with or without cause, at any time by the Board.  Any officer appointed by the Chairman of the Board or the Chief Executive Officer may also be removed, with or without cause, by the Chairman of the Board or the Chief Executive Officer, as the case may be, unless the Board otherwise provides.  Any vacancy occurring in any elected office of the Corporation may be filled by the Board.  Any vacancy occurring in any office appointed by the Chairman of the Board or the Chief Executive Officer may be filled by the Chairman of the Board or the Chief Executive Officer as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

Section 6.3    Other Officers.  The Board may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

Section 6.4    Multiple Officeholders; Stockholder and Director Officers.  Any number of offices may be held by the same person unless the Certificate of Incorporation or these By-Laws otherwise provide.  Officers need not be stockholders or residents of the State of Delaware.

ARTICLE VII
SHARES

Section 7.1    Certificated and Uncertificated Shares.  The shares of the Corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares.  Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.  Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed in accordance with Section 7.3 representing the number of shares registered in certificate form.  The Corporation shall not have power to issue a certificate representing shares in bearer form.

Section 7.2    Multiple Classes of Stock.  If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the Corporation shall (a) cause the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; provided, however, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

Section 7.3    Signatures.  Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by (a) the Secretary and (b) any other authorized officer of the Corporation.  Any or all the signatures on the certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

Section 7.4    Consideration and Payment for Shares.

(a)      Subject to applicable law and the Certificate of Incorporation, shares of stock may be issued for such consideration, having in the case of shares with par value a value not less than the par value thereof, and to such persons, as determined from time to time by the Board.  The consideration may consist of any tangible or intangible property or benefit to the Corporation including cash, promissory notes, services performed, contracts for services to be performed or other securities.

(b)      Subject to applicable law and the Certificate of Incorporation, shares may not be issued until the full amount of the consideration has been paid, unless upon the face or back of each certificate issued to represent any partly paid shares of capital stock or upon the books and records of the Corporation in the case of partly paid uncertificated shares, there shall have been set forth the total amount of the consideration to be paid therefor and the amount paid thereon up to and including the time said certificate representing certificated shares or said uncertificated shares are issued.

Section 7.5      Lost, Destroyed or Wrongfully Taken Certificates.

(a)      If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate representing such shares or such shares in uncertificated form if the owner: (i) requests such a new certificate before the Corporation has notice that the certificate representing such shares has been acquired by a protected purchaser; (ii) if requested by the Corporation, delivers to the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(b)      If a certificate representing shares has been lost, destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

Section 7.6      Transfer of Stock.

(a)      If a certificate representing shares of the Corporation is presented to the Corporation with a stock power or other endorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(i)      in the case of certificated shares, the certificate representing such shares has been surrendered;

(ii)      (A) with respect to certificated shares, the endorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the endorsement or instruction is made by

any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(iii)    the Corporation has received a guarantee of signature of the person signing such endorsement or instruction or such other reasonable assurance that the endorsement or instruction is genuine and authorized as the Corporation may request;

(iv)    the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.8(a); and

(v)    such other conditions for such transfer as shall be provided for under applicable law have been satisfied.

(b)    Whenever any transfer of shares shall be made for collateral security and not absolutely, the Corporation shall only record such fact in the entry of transfer if, when the certificate for such shares is presented to the Corporation for transfer or, if such shares are uncertificated, when the instruction for registration of transfer thereof is presented to the Corporation, both the transferor and transferee request the Corporation to do so.

Section 7.7    Registered Stockholders.    Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting registration of transfer of uncertificated shares, the Corporation may treat the registered owner as the person exclusively entitled to inspect for any proper purpose the stock ledger and the other books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

Section 7.8    Effect of the Corporation's Restriction on Transfer.

(a)    A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b)    A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares.

Section 7.9    Regulations.  The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares.  The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

ARTICLE VIII
INDEMNIFICATION

Section 8.1    Right to Indemnification.  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "***proceeding***"), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter a "***Covered Person***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized or permitted by applicable law, as the same exists or may hereafter be amended, against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by such Covered Person in connection with such proceeding; provided, however, that, except as provided in Section 8.3 with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify a Covered Person in connection with a proceeding (or part thereof) initiated by such Covered Person only if such proceeding (or part thereof) is authorized by the Board (whether before, during or after the pendency of such proceeding).

Section 8.2    Right to Advancement of Expenses.    In addition to the right to indemnification conferred in Section 8.1, a Covered Person shall also have the right to be paid by the Corporation the expenses (including, without limitation, attorneys' fees) incurred in defending, testifying, or otherwise participating in any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law ("***DGCL***") requires, an advancement of expenses incurred by a Covered Person in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such Covered Person, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such Covered Person, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such Covered Person is not entitled to be indemnified for such expenses under this Article VIII or otherwise.

Section 8.3    Right of Indemnitee to Bring Suit.  If a claim under Section 8.1 or Section 8.2 is not paid in full by the Corporation within 60 days after a written claim therefor has been

received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Covered Person may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Covered Person shall also be entitled to be paid the expense of prosecuting or defending such suit.  In (a) any suit brought by the Covered Person to enforce a right to indemnification hereunder (but not in a suit brought by a Covered Person to enforce a right to an advancement of expenses) it shall be a defense that, and (b) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the Covered Person has not met any applicable standard for indemnification set forth in the DGCL.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Covered Person is proper in the circumstances because the Covered Person has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Covered Person has not met such applicable standard of conduct, shall create a presumption that the Covered Person has not met the applicable standard of conduct or, in the case of such a suit brought by the Covered Person, shall be a defense to such suit.  In any suit brought by the Covered Person to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Covered Person is not entitled to be indemnified, or to such advancement of expenses, under this <u>Article VIII</u> or otherwise shall be on the Corporation.

Section 8.4    <u>Non-Exclusivity of Rights</u>.    The rights provided to Covered Persons pursuant to this <u>Article VIII</u> shall not be exclusive of any other right that any Covered Person may have or hereafter acquire under applicable law, the Certificate of Incorporation, these By-Laws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

Section 8.5    <u>Insurance</u>.    The Corporation may maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Section 8.6    <u>Indemnification of Other Persons</u>.    This <u>Article VIII</u> shall not limit the right of the Corporation to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than Covered Persons.  Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, to the fullest

extent of the provisions of this <u>Article VIII</u> with respect to the indemnification and advancement of expenses of Covered Persons under this <u>Article VIII</u>.

Section 8.7    <u>Third Party Indemnitors</u>.    The Corporation hereby acknowledges that certain Covered Persons have certain rights to indemnification, advancement of expenses and/or insurance provided by third parties, including stockholders of the Corporation (collectively, the "<u>Third Party Indemnitors</u>").    The Corporation hereby agrees:

(a)    that it is the indemnitor of first resort (i.e., its obligations to any such Covered Person are primary and any obligation of the Third Party Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by any such Covered Person are secondary);

(b)    that it shall be required to advance the full amount of expenses incurred by any such Covered Person and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of the Certificate of Incorporation or these By-Laws (or any agreement between the Corporation and any such Covered Person), without regard to any rights any such Covered Person may have against the Third Party Indemnitors; and

(c)    that it irrevocably waives, relinquishes and releases the Third Party Indemnitors from any and all claims against the Third Party Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.

The Corporation further agrees that no advancement or payment by the Third Party Indemnitors on behalf of any such Covered Person with respect to any claim for which any such Covered Person has sought indemnification from the Corporation shall affect the foregoing and the Third Party Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Corporation. The Corporation agrees that the Third Party Indemnitors are express third party beneficiaries of the terms of this <u>Section 8.7</u>.

Section 8.8    <u>Amendments</u>.    Any repeal or amendment of this <u>Article VIII</u> by the Board or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these By-Laws inconsistent with this <u>Article VIII</u>, shall, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Covered Persons on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

Section 8.9    <u>Certain Definitions</u>.    For purposes of this <u>Article VIII</u>, (a) references to "other enterprise" shall include any employee benefit plan; (b) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (c) references to "serving at the request of the Corporation" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably

believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" for purposes of Section 145 of the DGCL.

Section 8.10    Contract Rights.  The rights provided to Covered Persons pursuant to this Article VIII: (a) shall be contract rights based upon good and valuable consideration, pursuant to which a Covered Person may bring suit as if the provisions of this Article VIII were set forth in a separate written contract between the Covered Person and the Corporation, (b) shall fully vest at the time the Covered Person first assumes his or her position as a director or officer of the Corporation, (c) are intended to be retroactive and shall be available with respect to any act or omission occurring prior to the adoption of this Article VIII, (d) shall continue as to a Covered Person who has ceased to be a director or officer of the Corporation, and (e) shall inure to the benefit of the Covered Person's heirs, executors and administrators.

Section 8.11    Severability.  If any provision or provisions of this Article VIII shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Article VIII shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VIII (including, without limitation, each such portion of this Article VIII containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

ARTICLE IX
MISCELLANEOUS

Section 9.1    Place of Meetings.  If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these By-Laws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 9.5 hereof, then such meeting shall not be held at any place.

Section 9.2    Fixing Record Dates.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board so fixes a record date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the business day preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that

the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this <u>Section 9.2(a)</u> at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(c)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is otherwise required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or the Secretary of the Corporation.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board and prior action by the Board is otherwise required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

Section 9.3    <u>Means of Giving Notice</u>.

(a)    <u>Notice to Directors</u>.  Whenever under applicable law, the Certificate of Incorporation or these By-Laws notice is required to be given to any director, such notice shall be given either (i) in writing and sent by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, (ii) by means of electronic transmission, or (iii) by oral notice given personally or by telephone.  A notice to a director will be deemed given as follows: (A) if given by hand delivery, orally, or by telephone, when actually received by the director, (B) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (C) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (D) if sent by facsimile telecommunication, when sent to the facsimile number for such director appearing on the records of the Corporation, (E) if sent by email, when sent to the email address for such director appearing on the records of the Corporation, or (F) if sent by any

other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(b)     Notice to Stockholders.  Whenever under applicable law, the Certificate of Incorporation or these By-Laws notice is required to be given to any stockholder, such notice may be given (1) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (2) by means of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in Section 232 of the DGCL.  A notice to a stockholder shall be deemed given as follows:

(i)     if given by hand delivery, when actually received by the stockholder,

(ii)     if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation,

(iii)     if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, and

(iv)     if given by a form of electronic transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above,

(A)     if by email, when directed to an email address at which the stockholder has consented to receive notice,

(B)     if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and

(C)     if by any other form of electronic transmission, when directed to the stockholder.

A stockholder may revoke such stockholder's consent to receiving notice by means of electronic communication by giving written notice of such revocation to the Corporation.  Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(c)     Notice to Stockholders Sharing Same Address.  Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these By-Laws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to

whom such notice is given.  A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation.  Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(d)    Exceptions to Notice Requirements.  Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these By-Laws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person.  Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.  If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.  Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these By-Laws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings or of the taking of action by written consent of stockholders without a meeting to such stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required.  Any action or meeting that shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given.  If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then-current address, the requirement that notice be given to such stockholder shall be reinstated.  If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230(b) of the DGCL.  The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

Section 9.4    Waiver of Notice.  Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these By-Laws, a written waiver of such notice, signed before or after the date of such meeting by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, shall be deemed equivalent to such required notice.  All such waivers shall be kept with the books of the Corporation.  Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 9.5    Meeting Attendance via Remote Communication Equipment.

(a)     <u>Stockholder Meetings</u>.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)     participate in a meeting of stockholders; and

(ii)     be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)     <u>Board Meetings</u>.  Unless otherwise restricted by applicable law, the Certificate of Incorporation or these By-Laws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 9.6     <u>Dividends</u>.  The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

Section 9.7     <u>Reserves</u>.  The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

Section 9.8     <u>Contracts and Negotiable Instruments</u>.  Except as otherwise provided by applicable law, the Certificate of Incorporation or these By-Laws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize.  Such authority may be general or confined to specific instances as the Board may determine. The Chairman of the Board, the Chief Executive Officer, the President or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation.  Subject to any restrictions imposed by the Board, the Chairman of the Board or the Chief Executive Officer may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other

instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

Section 9.9     <u>Fiscal Year</u>.   The fiscal year of the Corporation shall be fixed by the Board.

Section 9.10    <u>Seal</u>.   The Board may adopt a corporate seal, which shall be in such form as the Board determines.   The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 9.11    <u>Books and Records</u>.   The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

Section 9.12    <u>Resignation</u>.   Any director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman of the Board, the Chief Executive Officer or the Secretary.   The resignation shall take effect at the time specified therein, or at the time of receipt of such notice if no time is specified or the specified time is earlier than the time of such receipt.   Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 9.13    <u>Surety Bonds</u>.   Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, the Chief Executive Officer or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, the Chief Executive Officer or the Board may determine.   The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

Section 9.14    <u>Securities of Other Corporations</u>.   Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board or the Chief Executive Officer.   Any such officer, may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed.   The Board may from time to time confer like powers upon any other person or persons.

Section 9.15   <u>Amendments</u>.  In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power to adopt, amend, alter or repeal the By-Laws. The affirmative vote of a majority of the Board shall be required to adopt, amend, alter or repeal the By-Laws.  The By-Laws also may be adopted, amended, altered or repealed by the stockholders to the extent permissible under the DGCL; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by applicable law or the Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders to adopt, amend, alter or repeal the By-Laws.

Section 9.16   <u>Certain Definitions</u>.  For purposes of these By-Laws:

(a)     "***Derivative Instrument***" shall mean any option, warrant, convertible security, stock appreciation right, swap or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of the Corporation, whether or not such instrument or right is subject to settlement in the underlying class or series of shares of the Corporation or otherwise.

(b)     "***Derivative Position***" shall mean (i) any Derivative Instrument directly or indirectly owned beneficially by a stockholder or by any Stockholder Associated Person and any other direct or indirect opportunity of a stockholder or any Stockholder Associated Person to profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation, (ii) any short interest in any security of the Corporation held by a stockholder or any Stockholder Associated Person (for purposes of <u>Section 2.7</u> and <u>Section 3.2</u> a person shall be deemed to have a short interest in a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security), (iii) any rights beneficially owned, directly or indirectly, by a stockholder or Stockholder Associated Person to dividends on the shares of the Corporation that are separated or separable from the underlying shares of the Corporation, (iv) any proportionate interest in shares of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership in which a stockholder or any Stockholder Associated Person is a general partner or, directly or indirectly, beneficially owns an interest in a general partner or (v) any performance-related fees (other than an asset-based fee) that a stockholder or any Stockholder Associated Person is entitled to based on any increase or decrease in the value of shares of the Corporation or Derivative Instruments, if any, including without limitation any such interests held by members of a stockholder's or any Stockholder Associated Person's immediate family sharing the same household.

(c)     "***electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by facsimile transmission, email, telex, telegram and cablegram.

(d)        "***public announcement***" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) (or any successor provisions thereof) of the Exchange Act.

(e)        "***Stockholder Associated Person***" shall mean for any stockholder that is a beneficial owner of shares of stock of the Corporation (i) any person controlling, directly or indirectly, or acting as a group (within the meaning of Rule 13-d under the Securities Exchange Act of 1934, as amended) with respect to the shares of stock of the Corporation with, such stockholder and (ii) any beneficial owner of shares of stock of the Corporation owned of record or beneficially by such stockholder.

# CERTIFICATE OF DESIGNATION

## OF

## SERIES A PREFERRED STOCK

## OF

## NUO THERAPEUTICS, INC.

_____

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

_____

NUO THERAPEUTICS, INC., a Delaware corporation (the "**Corporation**"), does hereby certify that pursuant to the authority conferred upon the Corporation's board of directors (together with any duly authorized committee thereof, the "**Board of Directors**") by the provisions of the Corporation's Certificate of Incorporation, which authorize the issuance of up to [29,400] shares of preferred stock, par value $0.0001 per share, the following resolutions were duly adopted by the Board of Directors on April [__], 2016:

RESOLVED, that the issue of a class of preferred stock, par value $0.0001 per share, of the Corporation is hereby authorized and the designation, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof are hereby fixed as follows:

Series A Preferred Stock.

1.      Designation; Number of Shares; Rank.

(a)      There shall be a series of Preferred Stock to be designated as "Series A Preferred Stock," par value of $0.0001 per share (the "**Series A Preferred Stock**"), and the authorized number of shares constituting such series shall be 29,400.[1]

(b)      The Series A Preferred Stock shall rank, with respect to rights on liquidation, winding up and dissolution, (i) senior to the Common Stock and each other class of capital stock or series of preferred stock (collectively referred to as "**Junior Securities**"), except for Parity Securities and Senior Securities, (ii) on parity and each other class of capital stock or series of preferred stock which expressly provides that it ranks on parity with the Series A Preferred Stock as to rights on liquidation, winding up

---

[1] Restrictions upon transfer of Series A Preferred Stock and Common Stock to be added on mutually acceptable terms if the parties determine that such restrictions can be implemented to prevent loss of use existing NOLs.

and dissolution (collectively referred to as "**Parity Securities**") and (iii) junior to each other class of capital stock or series of preferred stock which expressly provides that it ranks senior to the Series A Preferred Stock as to rights on liquidation, winding up and dissolution (collectively referred to as "**Senior Securities**").

2.     Liquidation Preference.

(a)     Preference.

(i)     In the event of any liquidation, dissolution or winding up of the Corporation, either voluntarily or involuntarily (a "**Liquidation**"), the holders of the Series A Preferred Stock (the "**Series A Holders**") shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Junior Securities (the "**Junior Holders**"), an amount equal to $1,000 for each share of Series A Preferred Stock (the "**Series A Liquidation Preference**").

(ii)     If, upon the Liquidation, the assets of the Corporation are insufficient to provide for the payment in full of the Series A Liquidation Preference to the Series A Holders for each share of Series A Preferred Stock, those assets legally available for distribution shall be paid ratably to the Series A Holders in proportion to the amount of Series A Preferred Stock held by each holder.

(iii)     Except as provided in this paragraph, after the payment in full of the Series A Liquidation Preference to the Series A Holders for each outstanding share of Series A Preferred Stock, each share of Junior Securities shall receive the remaining assets of the Corporation.

(iv)     The Corporation shall give written notice to the Series A Holders of the time and place of payment of amounts due pursuant to this Section 2(a) at least 20 days prior to the payment thereof.

(b)     Definition.  For purposes of this Section 2, each of the following events shall be considered a Liquidation unless waived in writing by the holders of not less than two-thirds of the shares of the outstanding Series A Preferred Stock (a "**Super-Majority of the Series A Stock**"):

(i)     (A) the sale, transfer or exclusive license or other disposition, in one transaction or series of related transactions by the Corporation or any subsidiary of the Corporation, of all or substantially all of the assets of the Corporation and its wholly-owned subsidiaries, taken as a whole; and (B) the sale or disposition (whether by merger, consolidation or otherwise) of one or more wholly-owned subsidiaries of the Corporation if substantially all of the assets of the Corporation and its wholly-owned subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly-owned subsidiary of the Corporation; and

(ii)     a consolidation or merger of the Corporation with or into any other corporation or other entity or person, or any other corporate reorganization, in which the

stockholders of the Corporation immediately prior to such consolidation, merger or reorganization, own less than 50% of the Corporation's voting power immediately after such consolidation, merger or reorganization; or

(iii)    any transaction or series of related transactions to which the Corporation is a party in which in excess of fifty percent (50%) of the Corporation's voting power is transferred unless such transaction or series of related transactions are effected primarily for the purpose of financing the operations of the Corporation (as determined by the Board of Directors acting in good faith).

(c)    Any securities to be delivered to the Series A Holders and the holders of Junior Securities upon a Liquidation shall be valued as follows:

(i)    If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on that exchange over the 30-day period ending three business days prior to the closing;

(ii)    If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid prices over the 30-day period ending three business days prior to the closing; and

(iii)    If there is no active public market, the value shall be the fair market value thereof, as mutually determined by the Corporation and a Super-Majority of the Series A Stock, provided that if the Corporation and the holders of a Super-Majority of the Series A Stock are unable to reach an agreement as to the fair market value, then by independent appraisal by an experienced investment banker with a nationally recognized investment banking firm or appraisal expert who is a member of a recognized professional association of business appraisals (an "**Appraiser**"), hired and paid by the Corporation, and reasonably approved by  a Super-Majority of the Series A Stock.

(c)    Noncash Distributions.  If any of the assets of the Corporation are to be distributed other than in cash or securities pursuant to Section 2, then the Board of Directors shall promptly engage an Appraiser that is reasonably approved by a Super-Majority of the Series A Stock, to determine the value of the assets to be distributed to the Series A Holders or the holders of the Junior Securities.  The Corporation shall, upon receipt of the Appraiser's valuation, give prompt written notice to each of the Series A Holders and the holders of the Junior Securities of the Appraiser's valuation.

(d)    Authorization.  The Corporation shall not have the power to effect a Liquidation referred to in Section 2(b)(ii) unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the stockholders of the Corporation shall be allocated among the holders of capital stock of the Corporation in accordance with Section 2(a) and Section 2(b).

(e)    Allocation of Escrow and Contingent Consideration. In the event of a Liquidation pursuant to Section 2(b)(1) or Section 2(b)(ii), if any portion of the

consideration payable to the stockholders of the Corporation is placed into escrow, retained as holdback or is payable to the stockholders of the Corporation only upon satisfaction of contingencies (the "**Additional Consideration**"), the Corporation shall cause the Merger Agreement or other similar agreement to provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial Consideration**") shall be allocated among the holders of capital stock of the Corporation in accordance with <u>Section 2(a)</u> and <u>Section 2(b)</u> as if the Initial Consideration were the only consideration payable in connection with such Liquidation and (b) any Additional Consideration which becomes payable to the stockholders of the Corporation upon satisfaction of such contingencies shall be allocated among the holders of capital stock of the Corporation in accordance with <u>Section 2(a)</u> and <u>Section 2(b)</u>, and treating the previous payment of the Initial Consideration (and any prior payment of Additional Consideration) as part of the same transaction with such distribution of Additional Consideration. For the purposes of this <u>Section 2(e)</u>, consideration placed into escrow or retained as holdback to be available for satisfaction of indemnification or similar obligations in connection with such Liquidation shall be deemed to be Additional Consideration.

3.    <u>Voting Rights; Board of Directors</u>

(a)    Each Series A Holder shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws, and, except as expressly provided by this Certificate or as provided by law, shall be entitled to vote together with holders of Common Stock (all voting together as a single class) on all matters upon which holders of Common Stock have the right to vote.  In respect of all such matters, the Series A Holders shall have the right to five (5) votes for each share of Series A Preferred Stock.

(b)    So long as any shares of Series A Preferred Stock are outstanding, the Board of Directors of the Corporation shall consist of five directors, to be elected as follows:

(i)    The Series A Holders, voting as a separate class, shall be entitled to elect one (1) member of the Board of Directors at each meeting or pursuant to each consent of the Corporation's stockholders for the election of directors, and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors.

(ii)    The holders of Common Stock and any other class of stock which generally votes together with the Common Stock, all voting together as a single class on an as converted to Common Stock basis, shall be entitled to elect four (4) members of the Board of Directors at each meeting or pursuant to each consent of the Corporation's stockholders for the election of directors, and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors.

4.    <u>Protective Provisions</u>.    The Corporation shall not, either directly or indirectly (whether by amendment, corporate action, by contract, by merger or otherwise) without the vote or written consent of the holders of a Super-Majority of the Series A

Preferred Stock, in each case given in writing or by vote at a meeting, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

(a)    amend, modify, or repeal any provision of this Certificate or the Bylaws in a manner that  adversely affect the preferences, rights or powers of, or any restrictions provided for the benefit of, the Series A Preferred Stock, except for ministerial changes to correct clerical or typographical mistakes;

(b)    create, authorize or designate (by reclassification, merger or otherwise), issue or obligate itself to issue, any Senior Securities or Parity Securities (including any security convertible into or exchangeable for any Senior Securities or Parity Securities);

(c)    make, pay, redeem or set aside funds for the payment of any dividend, distribution or payment with respect to any equity security of the Corporation, except for (x) dividends or other distributions payable on the Common Stock solely in the form of additional shares of Common Stock or (y) dividends or other distributions payable upon a Liquidation;

(d)    take any action to change the authorized number of members of the Board of Directors to a number other than five;

(e)    incur indebtedness or borrowed money, except indebtedness for working capital purposes not in excess of the sum of $3,000,000 at any time outstanding;

(f)    consummate or consent to any Liquidation (including a Liquidation pursuant to Section 2(b)(1), Section 2(b)(ii) or Section 2(b)(iii)) in which the holders of Series A Preferred Stock do not receive in cash at the closing of any such event or occurrence the Series A Liquidation Preference for each outstanding share of Series A Preferred Stock; or

(g)    issue any Junior Securities that (i) would require the Corporation to obtain Junior Holders' consent, voting as a single class, for the consummation of any Liquidation, including a Liquidation pursuant to Section 2(b)(1), Section 2(b)(ii) or Section 2(b)(iii); or (ii) provide for a liquidation preference amount in excess of one times the original issue price of all such Junior Securities.

5.    Certain Definitions.  As used in this Certificate, the following terms shall have the meanings defined in this Section 5.

"***Bylaws***" means the by-laws of the Corporation, as they may be amended from time to time.

"***Certificate***" means this Certificate of Designations.

"***Common Stock***" means the Corporation's common stock, par value $0.0001 per share.

117847137_1

6

96204153\V-6

IN WITNESS WHEREOF, Nuo Therapeutics, Inc. has caused this Certificate of Designations to be signed and attested by the undersigned this [__] day of April, 2016.

NUO THERAPEUTICS, INC.


By: _____
Name:
Title:

**<u>Attachment 4</u>**

**Reorganized Debtor's certain corporate documents attendant to Scenario B:  Second Amended And Restated Certificate Of Incorporation Of Nuo Therapeutics, Inc.; and Second Amended And Restated Bylaws Of Nuo Therapeutics, Inc.**

## SECOND AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION
## OF
## NUO THERAPEUTICS, INC.

The Certificate of Incorporation of Nuo Therapeutics, Inc. (the "Corporation") was originally filed with the Secretary of State of the State of Delaware on April 29, 1998 under the name "Informatix Holdings, Inc." (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Original Certificate of Incorporation"). The Corporation is filing this Second Amended and Restated Certificate of Incorporation of the Corporation (this "Second Amended and Restated Certificate of Incorporation"), which has been duly adopted by all necessary action of the board of directors of the Corporation (the "Board of Directors") and the stockholders of the Corporation, pursuant to Section 242 and Section 245 of the General Corporation Law of the State of Delaware (as the same may be amended from time to time, the "DGCL") to amend and restate the Original Certificate of Incorporation in its entirety to read as follows:

## ARTICLE I

### Name

The name of the Corporation is Nuo Therapeutics, Inc.

## ARTICLE II

### Duration

The Corporation shall continue in existence perpetually unless sooner dissolved according to law.

## ARTICLE III

### Purposes

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

### Capitalization

The Corporation shall have authority to issue an aggregate of [_____] shares of stock, of which (i) [_____] shares shall be common stock, par value $.0001 per share (the "Common Stock"), and (ii) [_____] shares shall be preferred stock, par value $.0001 per share (the "Preferred Stock"). The Preferred Stock may be issued in one or more series as may be determined from time to time by the Board of Directors. Notwithstanding any other provisions contained herein to the contrary, the Corporation shall not issue nonvoting equity securities. The

prohibition on issuance of nonvoting equity securities is included in this Certificate in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. §1123(a)(6)).

Except as may be agreed in writing from time to time by the Corporation, no holder of shares of any class of the Corporation's capital stock or of any security or obligation convertible into, or of any warrant, option, or right to purchase, subscribe for, or otherwise acquire shares of any class of the Corporation's capital stock, whether now or hereafter authorized, shall, as such holder, have any preemptive right whatsoever to purchase, subscribe for, or otherwise acquire shares of any class of the Corporation, whether now or hereafter authorized.

Dividends may be declared and paid on the Common Stock from funds lawfully available therefor as and when determined by the Board of Directors and subject to any preferential dividend rights of any then outstanding Preferred Stock. Except as otherwise provided by the DGCL or this Second Amended and Restated Certificate of Incorporation, the holders of record of shares of Common Stock shall share ratably in all dividends payable in cash, stock or otherwise and other distributions, whether in respect of liquidation or dissolution (voluntary or involuntary) or otherwise.

## ARTICLE V

### Limitation of Liability

The personal liability of the directors of the Corporation is hereby eliminated to the fullest extent permitted in Section 102(b)(7) of the DGCL, as the same may be amended and supplemented, except for any liability of the directors to the Corporation or its securityholders that any such director would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties as director  Any repeal or modification of this Article V shall not adversely affect any right or protection of a director of the Corporation existing immediately prior to such repeal or modification.

## ARTICLE VI

### Indemnification

The Corporation shall, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, indemnify any and all officers and directors of the Corporation against any and all of the expenses, liabilities or other matters referred to in or covered by Section 145 of the DGCL, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any Bylaw, agreement, vote of the stockholders of the Corporation or the disinterested directors or otherwise, both as to actions or omissions in such officer's or director's official capacity and as to actions or omissions in another capacity while holding such office, and shall continue as to an officer or director who has ceased to be an officer or director and shall inure to the benefit of the heirs, executors and administrators of such person; provided, however, that this Article VI shall only apply to officers and directors serving in such capacities on or after the date this Second Amended and Restated Certificate of Incorporation is filed with the Secretary of State of the State of Delaware with respect to actions taken or omitted to be taken after such date.  Any

repeal or modification of this Article VI shall not adversely affect any right or protection existing hereunder immediately prior to such repeal or modification.

## ARTICLE VII

### Registered Office and Registered Agent

The name and address of the Corporation's registered agent and office in the State of Delaware is National Corporate Research, Ltd., 850 New Burton Road, Suite 201, Dover, Delaware 19904. Either the registered office or the registered agent may be changed in the manner provided by law.

## ARTICLE VIII

### Amendment

The Corporation reserves the right to amend, alter, change, or repeal all or any portion of the provisions contained in its Certificate of Incorporation from time to time in accordance with the laws of the state of Delaware, and all rights conferred on stockholders of the Corporation herein are granted subject to this reservation.

## ARTICLE IX

### Business Combinations with Interested Stockholders

The Corporation elects not to be governed by the provisions of Section 203 of the DGCL regarding business combinations with interested shareholders.

## ARTICLE X

### Bylaws

The Bylaws may contain any provisions for the regulation or management of the affairs of the Corporation not inconsistent with the laws of the State of Delaware now or hereafter existing.

## ARTICLE XI

### Directors

The total number of directors constituting the Board of Directors shall be determined from time to time exclusively by resolution adopted by the Board of Directors. Except as otherwise provided in this Certificate of Incorporation, vacancies in the Board of Directors, whether by reason of death, resignation, disqualification, an increase in the number of directors comprising the Board of Directors or otherwise, shall only be filled by the stockholders of the Corporation entitled to vote generally in the election of directors at a special meeting called for such purpose or by written consent in lieu of such special meeting. Except as otherwise provided in this Certificate of Incorporation or by applicable law, any director may be removed, with or

without cause, by the stockholders of the Corporation entitled to vote generally in the election of directors at a special meeting called for such purpose or by written consent in lieu of such special meeting.

## ARTICLE XII

## Renouncement of Corporate Opportunity

The provisions of this Article XII are set forth to define, to the extent permitted by applicable law, the duties of Exempted Persons (as defined below) to the Corporation with respect to certain classes or categories of business opportunities. "Exempted Persons" means Deerfield Mgmt, L.P., Deerfield Management Company, L.P., Deerfield Special Situations Fund, L.P., Deerfield Private Design Fund II, L.P., Deerfield Private Design International II, L.P. and all of their respective partners (limited or general), principals, directors, officers, members, managers, investment advisers, investment managers, employees, successors and/or affiliates, including any of the foregoing who serve as officers or directors of the Corporation.

The Exempted Persons shall not have any fiduciary duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Corporation or any of its subsidiaries. To the fullest extent permitted by applicable law, the Corporation, on behalf of itself and its subsidiaries, renounces any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to the Exempted Persons, even if the opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and each such Exempted Person shall have no duty to communicate or offer such business opportunity to the Corporation and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or any of its subsidiaries for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such Exempted Person pursues or acquires such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or its subsidiaries.

In addition to and notwithstanding the foregoing provisions of this Article XII, a corporate opportunity shall not be deemed to belong to the Corporation if it is a business opportunity that the Corporation is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's business or is of no practical advantage to it or that is one in which the Corporation has no interest or reasonable expectancy.

No amendment or repeal of this Article XII in accordance with the provisions of Article VIII shall apply to or have any effect on the liability or alleged liability of any Exempted Person for or with respect to any activities or opportunities of which such Exempted Person becomes aware prior to such amendment or repeal. This Article XII shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Second Amended and Restated Certificate of Incorporation, the Bylaws or applicable law.

## ARTICLE XIII

### Exclusive Jurisdiction for Certain Actions

The Court of Chancery of the State of Delaware shall, to the fullest extent permitted by applicable law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation arising pursuant to any provision of the DGCL, this Second Amended and Restated Certificate of Incorporation or the Bylaws or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine, in each case excluding actions in which the Court of Chancery of the State of Delaware concludes that an indispensable party is not subject to the jurisdiction of the Delaware courts and can be subject to the jurisdiction of another court within the United States. Any person or entity purchasing or otherwise acquiring any interest in the shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XIII.

## ARTICLE XIV

### Severability

If any provision or provisions of this Second Amended and Restated Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Second Amended and Restated Certificate of Incorporation (including, without limitation, each portion of any paragraph of this Second Amended and Restated Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (ii) to the fullest extent possible, the provisions of this Second Amended and Restated Certificate of Incorporation (including, without limitation, each such portion of any paragraph of this Second Amended and Restated Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by law.

*[Signature Page Follows]*

I, THE UNDERSIGNED, being an authorized officer of the Corporation, have signed this Second Amended and Restated Certificate of Incorporation on this _____ day of _____, 2016.

**NUO THERAPEUTICS, INC.**

By: _____

    Name:

    Title:

**SECOND AMENDED AND RESTATED BYLAWS**

**of**

**NUO THERAPEUTICS, INC.**

## ARTICLE I

**Offices**

1.    *Registered Offices*.    The registered office of Nuo Therapeutics, Inc. (the "Corporation") shall be as set forth in the Second Amended and Restated Certificate of Incorporation of the Corporation (as the same may be amended and restated from time to time, the "Certificate of Incorporation").

2.    *Other Offices*.    The Corporation may have offices at such places within or outside the State of Delaware as the Board of Directors of the Corporation (the "Board of Directors") may from time to time determine by resolution.

## ARTICLE II

**Meetings of Stockholders**

1.    *Place of Meetings*.    All meetings of stockholders shall be held at such place within or outside the State of Delaware as the Board of Directors may from time to time determine.  In the absence of any such designation, the meetings of stockholders shall be held at the principal executive office of the Corporation.

2.    *Annual Meeting of Stockholders*.    The annual meeting of the stockholders shall be held at such date, time and place in or outside the State of Delaware, as may be designated by the Board of Directors from time to time. At each annual meeting, directors shall be elected and any other business that is properly brought before the meeting may be transacted.

3.    *Special Meetings of Stockholders*.

(a)    Special meetings of stockholders may be called at any time by, and only by, (i) the Board of Directors or (ii) solely to the extent required by Article II, Section 3(b), the Secretary of the Corporation. Each special meeting shall be held at such date, time and place either within or without the State of Delaware as may be stated in the notice of the meeting.

(b) A special meeting of the stockholders shall be called by the Secretary upon the written request of the holders of record of at least [25]% of the voting power of the outstanding shares of capital stock of the Corporation entitled to vote on the action proposed to be taken (the "Requisite Percent"), subject to the following:

(1) In order for a special meeting upon stockholder request (a "Stockholder Requested Special Meeting") to be called by the Secretary, one or more written requests for a special meeting (each, a "Special Meeting Request," and collectively, the "Special Meeting Requests")

stating the purpose of the special meeting and the matters proposed to be acted upon thereat must be signed and dated by the Requisite Percent of the capital stock of the Corporation (or their duly authorized agents), must be delivered to the Secretary at the principal executive offices of the Corporation and must set forth:

(i) in the case of any director nominations proposed to be presented at such Stockholder Requested Special Meeting, the information required by the third paragraph of Article II, Section 12(b);

(ii) in the case of any matter (other than a director nomination) proposed to be conducted at such Stockholder Requested Special Meeting, the information required by the fourth paragraph of Article II, Section 12(b); and

(iii) an agreement by the requesting stockholder(s) to notify the Corporation immediately in the case of any disposition prior to the record date for the Stockholder Requested Special Meeting of shares of voting stock of the Corporation owned of record and an acknowledgement that any such disposition shall be deemed a revocation of such Special Meeting Request to the extent of such disposition, such that the number of shares disposed of shall not be included in determining whether the Requisite Percent has been reached.

The Corporation will provide the requesting stockholder(s) with notice of the record date for the determination of stockholders entitled to vote at the Stockholder Requested Special Meeting. Each requesting stockholder is required to update the notice delivered pursuant to this Article II, Section 3 not later than ten (10) business days after such record date to provide any material changes in the foregoing information as of such record date.

In determining whether a special meeting of stockholders has been requested by the record holders of shares representing in the aggregate at least the Requisite Percent, multiple Special Meeting Requests delivered to the Secretary will be considered together only if each such Special Meeting Request (x) identifies substantially the same purpose or purposes of the special meeting and substantially the same matters proposed to be acted on at the special meeting (in each case as determined in good faith by the Board of Directors), and (y) has been dated and delivered to the Secretary within sixty (60) days of the earliest date of such Special Meeting Requests. If the record holder is not the signatory to the Special Meeting Request, such Special Meeting Request will not be valid unless documentary evidence is supplied to the Secretary at the time of delivery of such Special Meeting Request (or within ten (10) business days thereafter) of such signatory's authority to execute the Special Meeting Request on behalf of the record holder. Any requesting stockholder may revoke his, her or its Special Meeting Request at any time by written revocation delivered to the Secretary at the principal executive offices of the Corporation; provided, however, that if following such revocation (or any deemed revocation pursuant to clause (iii) above), the unrevoked valid Special Meeting Requests represent in the aggregate less than the Requisite Percent, there shall be no requirement to hold a special meeting. The first date on which unrevoked valid Special Meeting Requests constituting not less than the Requisite Percent shall have been delivered to the Corporation is referred to herein as the "Request Receipt Date."

(2) A Special Meeting Request shall not be valid if:

NY\1779794.11

(i) the Special Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law;

(ii) the Request Receipt Date is during the period commencing ninety (90) days prior to the first anniversary of the date of the immediately preceding annual meeting and ending on the date of the next annual meeting;

(iii) the purpose specified in the Special Meeting Request is not the election of directors and an identical or substantially similar item (as determined in good faith by the Board of Directors, a "Similar Item") was presented at any meeting of stockholders held within the twelve months prior to the Request Receipt Date; or

(iv) a Similar Item is included in the Corporation's notice as an item of business to be brought before a stockholder meeting that has been called but not yet held or that is called for a date within ninety (90) days of the Request Receipt Date.

(3) A Stockholder Requested Special Meeting shall be held at such date and time as may be fixed by the Board of Directors; provided, however, that the Stockholder Requested Special Meeting shall be called for a date not more than ninety (90) days after the Request Receipt Date.

(4) Business transacted at any Stockholder Requested Special Meeting shall be limited to (i) the purpose(s) stated in the valid Special Meeting Request(s) received from the Requisite Percent of record holders and (ii) any additional matters that the Board of Directors determines to include in the Corporation's notice of the meeting. If none of the stockholders who submitted the Special Meeting Request appears or sends a qualified representative to present the matters to be presented for consideration that were specified in the Stockholder Meeting Request, the Corporation need not present such matters for a vote at such meeting, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

4.  *Notice of Meetings*.  Written or printed notice, stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called, shall be prepared and delivered by the Corporation not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, to each stockholder of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail with postage thereon prepaid, addressed to the stockholder at his address as it appears on the stock transfer books of the Corporation.

5.  *Quorum at Meetings of Stockholders*.  Except as otherwise provided by law or the Certificate of Incorporation, at any meeting of the stockholders, the presence in person or by proxy of the holders of a majority in voting power of the outstanding shares of capital stock entitled to vote at the meeting shall be necessary and sufficient to constitute a quorum. Such a quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum, and the votes present may continue to transact business until adjournment. In the absence of a quorum, the stockholders so present may, by a majority in voting power thereof, adjourn the meeting from time to time in the manner provided in Article II, Section 6 of these Bylaws until a quorum shall attend.

NY\1779794.11

6.  *Adjournments.*  Any meeting of stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or if after the adjournment, a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting.

7.  *Voting at Meetings of Stockholders.*  Except as otherwise provided by or pursuant to the provisions of the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share held by such stockholder of capital stock which has voting power upon the matter in question.  Shares of its own capital stock belonging to the Corporation shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any subsidiary of the Corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.  Voting at meetings of stockholders need not be by written ballot.  At all meetings of stockholders for the election of directors at which a quorum is present, a plurality of the votes cast shall be sufficient to elect.  All other elections and questions presented to the stockholders at a meeting at which a quorum is present shall, unless otherwise provided by the Certificate of Incorporation, these Bylaws, the rules or regulations of any stock exchange applicable to the Corporation, applicable law or pursuant to any regulation applicable to the Corporation or its securities, be decided by the affirmative vote of the holders of a majority in voting power of the shares of capital stock of the Corporation which are present in person or by proxy and entitled to vote thereon.

8.  *Proxies.*  Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after 3 years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or a new proxy bearing a later date.

9.  *Fixing Date for Determination of Stockholders of Record.*

(a)  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof (but excluding any determination of stockholders entitled to express consent to corporate action in writing without a meeting, which is discussed in Article II, Section 11(b) below), entitled to call special meetings, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date: (1) in the case of determination of stockholders entitled to vote at any meeting of stockholders or adjournment thereof, shall, unless

4

otherwise required by law, not be more than 60 nor less than 10 days before the date of such meeting; and (2) in the case of any other action (excluding any determination of stockholders entitled to express consent to corporate action in writing without a meeting), shall not be more than 60 days prior to such other action.  If no record date is fixed: (1) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; and (2) the record date for determining stockholders for any other purpose (excluding any determination of stockholders entitled to express consent to corporate action in writing without a meeting) shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(b)      (i) The record date for determining stockholders entitled to express consent in writing without a meeting, when (A) no prior action of the Board of Directors is required by law and (B) when the stockholder of record seeking to take action by such written consent does not need to solicit other stockholders pursuant to, or in accordance with, Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), in order to have not less than the minimum number of votes that would be necessary to authorize or take any action by written consent, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law.

(ii)      If prior action by the Board of Directors is required by law, the Board of Directors may fix a record date for determining stockholders entitled to express consent in writing without a meeting, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required under the Delaware General Corporation Law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(iii)      If the stockholder of record seeks to solicit other stockholders pursuant to, and in accordance with, Section 14(a) of the Exchange Act, to authorize or take any action by written consent, the record date for determining stockholders entitled to express consent in writing without a meeting shall be the record date determined in accordance with Article II, Section 11(b).

(c)      A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

10.      *List of Stockholders Entitled to Vote*.  At least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder, shall be prepared by the Secretary.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period

NY\1779794.11

of at least 10 days prior to the meeting, on a reasonably accessible electronic network; provided, that, the information required to gain access to such list is provided with the notice of the meeting, or, during ordinary business hours at the principal place of business of the Corporation. Such list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present.  Except as otherwise required by law, the original or duplicate stock ledger shall be the only evidence as to who are the stockholders entitled to examine such list or to vote in person or by proxy at such meeting.

11.     *Action By Written Consent of Stockholders.*

(a)     Any action required or permitted to be taken at an annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, (i) shall be signed by holders of record on the record date of outstanding shares of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and (ii) shall be delivered to the Secretary at the principal executive offices of the Corporation or otherwise delivered to the Corporation in accordance with applicable law. Every written consent shall bear the date of the signature of each stockholder who signs the consent, and no written consent shall be effective to take corporate action unless, within sixty (60) days of the earliest dated valid consent delivered in the manner described in this Article II, Section 11, written consents signed by the requisite percentage of stockholders entitled to exercise such consent are delivered to the Corporation in the manner described in this Article II, Section 11.  Only stockholders of record on the record date shall be entitled to consent to corporate action in writing without a meeting.

(b)     As promptly as practicable after any written consents of stockholders of the Corporation are received by the Corporation, the Secretary shall review and, if the Secretary has determined that the Corporation has received a consent or consents in writing signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take the action described in such consents, certify the results.

(c)     The Corporation shall give prompt written notice to the stockholders of the Corporation of the taking of corporate action without a meeting by less than unanimous written consent.

12.     *Advance Notice of Stockholder Nominees for Director and Other Stockholder Proposals.*

(a)     The matters to be considered and brought before any annual or special meeting of stockholders of the Corporation (other than a Stockholder Requested Special Meeting) shall be limited to only such matters, including the nomination and election of directors, as shall be brought properly before such meeting in compliance with the procedures set forth in this Article II, Section 12.

(b)     For any matter to be properly brought before any annual meeting of stockholders, the matter must be (i) specified in the notice of annual meeting given by or at the direction of the Board of Directors, (ii) otherwise brought before the annual meeting by or at the

direction of the Board of Directors or (iii) brought before the annual meeting in the manner specified in this <u>Article II, Section 12(b)</u> (x) by a stockholder that holds of record stock of the Corporation entitled to vote at the annual meeting on such matter (including any election of a director) or (y) by a person (a "<u>Nominee Holder</u>") that holds such stock through a nominee or "street name" holder of record of such stock and can demonstrate to the Corporation such indirect ownership of, and such Nominee Holder's entitlement to vote, such stock on such matter.

In addition to any other requirements under applicable law, the Certificate of Incorporation and these Bylaws, persons nominated by stockholders for election as directors of the Corporation and any other proposals by stockholders shall be properly brought before an annual meeting of stockholders only if notice of any such matter to be presented by a stockholder at such meeting (a "<u>Stockholder Notice</u>") shall be delivered to the Secretary at the principal executive office of the Corporation not less than ninety (90) nor more than one hundred and twenty (120) days prior to the first anniversary date of the annual meeting for the preceding year; <u>provided</u>, <u>however</u>, that if and only if the annual meeting is not scheduled to be held within a period that commences thirty (30) days before and ends thirty (30) days after such anniversary date (an annual meeting date outside such period being referred to herein as an "<u>Other Meeting Date</u>"), such Stockholder Notice shall be given in the manner provided herein by the later of (i) the close of business on the date ninety (90) days prior to such Other Meeting Date or (ii) the close of business on the tenth (10th) day following the date on which such Other Meeting Date is first publicly announced or disclosed.

Any stockholder desiring to nominate any person or persons (as the case may be) for election as a director or directors of the Corporation at an annual meeting of stockholders shall deliver, as part of such Stockholder Notice, a statement in writing setting forth the name of the person or persons to be nominated, the number and class of all shares of each class of stock of the Corporation owned of record and beneficially by each such person, as reported to such stockholder by such person, all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case, pursuant to Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder, each such person's signed consent to serve as a director of the Corporation if elected, such stockholder's name and address, the number and class of all shares of each class of stock of the Corporation owned of record and beneficially by such stockholder and, in the case of a Nominee Holder, evidence establishing such Nominee Holder's indirect ownership of stock and entitlement to vote such stock for the election of directors at the annual meeting. The Corporation may require any proposed director nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as an independent director of the Corporation and to comply with applicable law. If a stockholder is entitled to vote only for a specific class or category of directors at a meeting (annual or special), such stockholder's right to nominate one or more individuals for election as a director at the meeting shall be limited to such class or category of directors.

Any stockholder who gives a Stockholder Notice of any matter (other than a nomination for director) proposed to be brought before an annual meeting of stockholders shall deliver, as part of such Stockholder Notice, the text of the proposal to be presented and a brief written statement of the reasons why such stockholder favors the proposal and setting forth such

7

stockholder's name and address, the number and class of all shares of each class of stock of the Corporation owned of record and beneficially by such stockholder, any material interest of such stockholder in the matter proposed (other than as a stockholder), if applicable, and, in the case of a Nominee Holder, evidence establishing such Nominee Holder's indirect ownership of stock and entitlement to vote such stock on the matter proposed at the annual meeting.

As used in these Bylaws, shares owned "beneficially" shall mean all shares which such person is deemed to beneficially own pursuant to Rules 13d-3 and 13d-5 under the Exchange Act.

Notwithstanding any provision of this Article II, Section 12 to the contrary, in the event that the number of directors to be elected to the Board of Directors at the next annual meeting of stockholders is increased by virtue of an increase in the size of the Board of Directors and either all of the nominees for director at the next annual meeting of stockholders or the size of the increased Board of Directors is not publicly announced or disclosed by the Corporation at least one hundred (100) days prior to the first anniversary of the preceding year's annual meeting, a Stockholder Notice shall also be considered timely hereunder, but only with respect to nominees to stand for election at the next annual meeting as the result of any new positions created by such increase, if it shall be delivered to a Secretary at the principal executive office of the Corporation not later than the close of business on the tenth day following the first day on which all such nominees or the size of the increased Board of Directors shall have been publicly announced or disclosed.

(c) For any matter to be properly brought before a special meeting of stockholders, the matter must be set forth in the Corporation's notice of such meeting given by or at the direction of the Board of Directors or by the Secretary pursuant to Article II, Section 4. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, any stockholder entitled to vote for the election of such director(s) at such meeting may nominate a person or persons (as the case may be) for election to such position(s) as are specified in the Corporation's notice of such meeting, but only if a Stockholder Notice containing the information required by the third paragraph of Article II, Section 12(b) hereof shall be delivered to the Secretary at the principal executive office of the Corporation not later than the close of business on the tenth (10th) day following the first day on which the date of the special meeting and either the names of all nominees proposed by the Board of Directors to be elected at such meeting or the number of directors to be elected shall have been publicly announced or disclosed.

(d) For purposes of this Article II, Section 12, a matter shall be deemed to have been "publicly announced or disclosed" if such matter is disclosed in a press release reported by the Dow Jones News Service, the Associated Press or a comparable national news service, or in a document publicly filed by the Corporation with the Securities and Exchange Commission.

(e) In no event shall the postponement or adjournment of an annual meeting already publicly noticed or a special meeting, or any announcement thereof, commence a new period for the giving of notice as provided in this Article II, Section 12. This Article II, Section 12 shall not apply to any stockholder proposal made pursuant to Rule 14a-8 under the Exchange Act.

8

(f) The chairman of any meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall have the power and duty to determine whether notice of nominees and other matters proposed to be brought before a meeting has been duly given in the manner provided in this Article II, Section 12 or Article II, Section 3, as applicable and, if not so given, shall direct and declare at the meeting that such nominees and other matters shall not be considered.

(g) Notwithstanding any provision of this Article II, Section 12 to the contrary, a nomination by a stockholder of persons for election to the Board of Directors may be submitted for inclusion in the Corporation's proxy materials to the extent required by rules adopted by the Securities and Exchange Commission providing for such nominations and inclusion and interpretations thereof ("Proxy Access Rules"), and, if such nomination is submitted under the Proxy Access Rules, such submission:

(i) in order to be timely, must be delivered to, or be mailed and received by, the Secretary at the principal executive offices of the Corporation no later than one hundred and twenty (120) calendar days before the date that the Corporation mailed (or otherwise disseminated) its proxy materials for the prior year's annual meeting (or such other date as may be set forth in the Proxy Access Rules for companies without advance notice bylaws);

(ii) in all other respects, must be made pursuant to, and in accordance with, the terms of the Proxy Access Rules, as in effect at the time of the nomination, or any successor rules or regulations of the Securities and Exchange Commission then in effect; and

(iii) must provide the Corporation with any other information required by this Article II, Section 12, by applicable binding law, the Certificate of Incorporation or a resolution of the Board of Directors for nominations not made under the Proxy Access Rules, except to the extent that requiring such information to be furnished is prohibited by the Proxy Access Rules. The provisions of this paragraph of this Article II, Section 12 do not provide stockholders of the Corporation with any rights, nor impose upon the Corporation any obligations, other than the rights and obligations set forth in the Proxy Access Rules.

## ARTICLE III

### Board of Directors

1.    *Number and Qualification*.  The Board of Directors shall consist, subject to the Certificate of Incorporation, of such number of directors as shall from time to time be fixed exclusively by resolution adopted by the Board of Directors. The stockholders shall elect directors at each annual meeting of stockholders.  Each of the directors shall hold office until the annual meeting next after his election and until his successor shall be elected and shall qualify, or until his death in office or his earlier resignation or removal.  Directors need not be stockholders.

2.    *Powers of Directors*.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which may exercise all the powers possessed by the Corporation itself and do all such lawful acts and things as are not inconsistent with the laws of the State of Delaware, the Certificate of Incorporation, or these Bylaws.  The

Board of Directors shall have authority from time to time to set apart out of any assets of the Corporation otherwise available for dividends a reserve or reserves of working capital, or for any such proper purpose or purposes, and to abolish or add to any such reserve or reserves from time to time as the Board of Directors may deem to be in the interests of the Corporation; and the Board of Directors shall likewise have power, subject to the provisions of the Certificate of Incorporation, to determine in its discretion what part of the earned surplus and/or net assets of the Corporation in excess of such reserve or reserves shall be declared in dividends and paid to the stockholders of the Corporation.

3.    *Compensation of Directors*.  The Board of Directors may from time to time by resolution authorize the payment of fees or compensation, to the directors for services as such to the Corporation, including, but not limited to, fees and traveling expenses for attendance at all meetings of the Board of Directors or of the committees, and determine the amount of such fees and compensation.  Nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

4.    *Directors' Meetings*.  Meetings of the Board of Directors may be held either within or outside the State of Delaware.

(a)    *Regular meetings*.  The Board of Directors may from time to time provide for the holding of regular meetings, with or without notice, and may fix the times and places at which such meetings are to be held.

(b)    *Special Meetings*.  Meetings other than regular meetings may be called at any time by (i) the Chairman or, (ii) if the Board of Directors then includes a director affiliated with investment funds affiliated with Deerfield Mgmt, L.P., Deerfield Management Company, L.P., Deerfield Special Situations Fund, L.P., Deerfield Private Design Fund II, L.P., Deerfield Private Design International II, L.P. or any of their respective partners (limited or general), principals, directors, officers, members, managers, investment advisers, investment managers, employees, successors and/or affiliates (collectively, the "Sponsor Holders"), by such director, and must be called by the Secretary upon the written request of a majority of the directors then in office.

(c)    *Notice*.  Notice of all meetings shall state the time and place of such meeting, but need not state the purposes thereof unless otherwise required by law, the Certificate of Incorporation, these Bylaws, or the Board of Directors. Notice of each meeting, other than regular meetings (unless otherwise required by the Board of Directors), shall be given to each director by mailing the same to each director at his residence or business address at least two days before the meeting or by delivering the same to him personally or by telephone or means of electronic transmission to him at least one day before the meeting unless, in case of exigency, the President or Secretary shall prescribe a shorter notice to be given personally or by telephone, facsimile transmission, or other means of electronic transmission to all or any one or more of the directors at their respective residences or places of business.

5.    *Telephonic Meetings Permitted*.  Members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting thereof by means of telephone conference or other communications equipment by means of which all persons

NY\1779794.11

participating in the meeting can hear each other, and participation in a meeting pursuant to this Bylaw shall constitute presence in person at such meeting.

6.      *Quorum; Manner of Acting*.  At all meetings of the Board of Directors, a quorum shall be a majority of directors then in office; <u>provided</u>, <u>that</u>, so long as the Sponsor Holders beneficially own (directly or indirectly) a majority of the shares of voting stock of the Corporation, it shall be necessary to constitute a quorum, in addition to a majority of the total number of directors then in office, that a director affiliated with the Sponsor Holders be present (other than attendance for the sole purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened). Except as herein otherwise provided, and except as otherwise provided by applicable law or the Certificate of Incorporation, a vote of a majority of the directors present at a meeting in which a quorum is present (including a director affiliated with the Sponsor Holders) shall constitute the act of the Board of Directors. For the avoidance of doubt, so long as the Sponsor Holders collectively beneficially own (directly or indirectly) a majority of the shares of voting stock of the Corporation, if directors that constitute a quorum (including a director affiliated with the Sponsor Holders) are not present at the time that the vote on any action is taken, a quorum shall not be constituted with respect to such action, and any vote taken with respect to such action shall not be a valid action of the Board of Directors, notwithstanding that a quorum of the Board of Directors may have been present at the commencement of such meeting. If a quorum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another place, if applicable, date or time, without further notice or waiver thereof.

7.      *Action by Unanimous Consent of Directors*.  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee in accordance with applicable law.

8.      *Committees*.  The Board of Directors by resolution may provide for such standing or special committees as it deems desirable and may discontinue the same at its pleasure. Subject to any applicable law, each committee shall consist of one or more of the directors of the Corporation as determined by the Board of Directors.   Each such committee shall have the powers and perform such duties, not inconsistent with law, as may be assigned to it by the Board of Directors.

9.      *Committee Rules*.  Unless the Board of Directors otherwise provides, each committee designated by the Board of Directors may make, alter and repeal rules for the conduct of its business.  In the absence of such rules each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to <u>Article III</u> of these Bylaws.

NY\1779794.11

## ARTICLE IV

### Officers

1.      *Titles; Election*.  The Board of Directors shall elect a President, one or more Vice Presidents, a Secretary, a Treasurer, and such other officers as the Board of Directors may from time to time deem advisable, all of whom shall hold office at the pleasure of the Board of Directors and shall have such authority and shall perform such duties as set forth in these Bylaws or as the Board of Directors shall prescribe from time to time.  Any officer may be, but is not required to be, a director of the Corporation.  Any two or more offices may be held by the same person.

2.      *Duties*.  The Board of Directors may require any officer, agent or employee to give bond for the faithful performance of this duties in such form and with such sureties as the Board of Directors may require.  Subject to such extension, limitations, and other provisions as the Board of Directors, the Certificate of Incorporation or these Bylaws may from time to time prescribe, the following officers shall have the following powers and duties.

(a)      *President*.  The President shall be the Chief Executive Officer of the Corporation and shall have the general supervision of the business, affairs and property of the Corporation and over its officers subject to the control of the Board of Directors.  In the absence or inability to act of the Chairman, the President shall preside at all meetings of the stockholders and the Board of Directors and shall have and perform all the powers and duties of the Chairman, subject to the control of the Board of Directors.  In general, the President shall exercise the powers and authority and perform all of the duties commonly incident to the office of President and shall have such other powers and perform such other duties as may be assigned to him from time to time by the Board of Directors.  The same individual may be elected or appointed Chairman of the Board of Directors and President.

(b)      *Vice President*.  The Vice President or Vice Presidents shall perform such duties as may be assigned to them by the Board of Directors and, in the absence or disability of the President, the Vice Presidents in order of seniority shall exercise all powers and duties pertaining to the office of the President.

(c)      *Secretary*.  The Secretary shall keep the minutes of all meetings of stockholders and of the Board of Directors, give and serve all notices, attend to such correspondence as may be assigned to him, keep in safe custody the seal of the Corporation, and affix such seal to all such instruments properly executed as may require it, and shall have such other duties and powers as the Board of Directors shall prescribe from time to time.

(d)      *Treasurer*.  The Treasurer, in all cases subject to the direction of the Board of Directors, shall have the care and custody of the monies, funds, valuable papers and documents of the Corporation (other than his own bond, if any, which shall be in the custody of the President), and shall have and exercise, under the supervision of the Board of Directors, all the powers and duties commonly incident to his office.  The Treasurer shall deposit all funds of the Corporation in such bank or banks, trust company or trust companies, or with such firm or firms doing a banking business as the Board of Directors shall designate.  The Treasurer may endorse

NY\1779794.11

for deposit of collection all checks, notes, etc. payable to the Corporation or to its order. The Treasurer shall keep accurate books of account of the Corporation's transactions, which shall be the property of the Corporation, and, together with all its property in his possession, shall be subject at all times to the inspection and control of the Board of Directors. The Treasurer shall do and perform such other duties as may from time to time be assigned to him by the Board of Directors. The Treasurer shall be subject in every way to the order of the Board of Directors and/or the President and whenever the Board of Directors or President may require it, shall prepare an account of all his transactions and of the financial condition of the Corporation.

(e)     *Chairman of the Board of Directors*. The Chairman of the Board of Directors (the "<u>Chairman</u>") if appointed by the Board of Directors, when present shall preside at all meetings of the stockholders and the Board of Directors. The Chairman shall perform such other duties as the Board of Directors may prescribe from time to time.

3.     *Delegation of Authority*. The Board of Directors may at any time delegate the powers and duties of any officer for the time being to any other officer, director or employee.

4.     *Salaries*. The salaries of all officers shall be fixed by the Board of Directors or a committee thereof.

## ARTICLE V

### Resignation, Removals and Vacancies

1.     *Resignation*. Any director, officer, or agent may resign at any time by giving written notice thereof to the Board of Directors, the President, or the Secretary. Any such resignation shall take effect at the time specified therein or, if the time be not specified, upon receipt thereof; and unless otherwise specified therein, the acceptance of any resignation shall not be necessary to make it effective.

2.     *Removals*. At a special meeting called for such purpose or by written consent in lieu thereof, the stockholders of the Corporation may by vote of the majority of the issued and outstanding shares of the capital stock entitled to vote generally in the election of directors, remove from office, with or without cause, any director elected by such holders, and elect his or her successor, unless otherwise provided by law or the Certificate of Incorporation; <u>provided</u>, <u>that</u>, directors who are elected solely by the holders of a class or multiple classes of preferred stock, par value $0.0001 per share, of the Corporation (the "<u>Preferred Stock</u>"), may only be removed from such office by vote of the majority of the issued and outstanding shares of such class or classes of Preferred Stock  The Board of Directors may remove from office any officer of the Corporation with or without cause. The Board of Directors from time to time may delegate to any other officer or to any director the powers and duties of any other officer.

3.     *Vacancies*. Unless otherwise provided by law or the Certificate of Incorporation, any newly created directorship or any vacancy occurring in the Board of Directors for any cause shall only be filled by the stockholders of the Corporation at a special meeting of the stockholders called for such purpose or by written consent in lieu of such a special meeting; <u>provided</u>, <u>that</u>, vacancies to any directorships created by the death, resignation, removal or

otherwise of any director who was elected only by the holders of a class or multiple classes of Preferred Stock may only be filled by the holders of such class or classes of Preferred Stock. Each director elected as provided in the prior sentence shall hold office until the expiration of the term of office of the director whom he or she has replaced or until his or her successor is elected and qualified.  Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board of Directors at any regular or special meeting.

## ARTICLE VI

### Capital Stock

1.      *Certificates of Stock*.  The shares of the Corporation shall be represented by certificates; provided, that, the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of stock shall be uncertificated shares.  Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.  Any such certificates shall be signed by the President or a Vice President and by the Treasurer or an Assistant Treasurer or by the Secretary or an Assistant Secretary.  Any of such signatures may be in facsimile. In case any officer who has signed, or whose facsimile signature has been used on a certificate has ceased to be an officer before the certificate has been delivered, such certificate may nevertheless be adopted and issued and delivered by the Corporation, or its transfer agent, as though the officer who signed such certificate or certificates, or whose facsimile signature or signatures shall have been used thereon, had not ceased to be such officer of the Corporation.

2.      *Lost Certificates*.  In case of loss or mutilation or theft or destruction of a certificate of capital stock of this Corporation, a duplicate certificate may be issued upon such terms as the Board of Directors may determine.

## ARTICLE VII

### Fiscal Year, Bank Deposits, Checks, etc.

1.      *Fiscal Year*.  The fiscal year of the Corporation will commence on such date as the Board of Directors may by resolution designate.

2.      *Bank Deposits, Checks, Etc.*  The funds of the Corporation shall be deposited in the name of the Corporation in such banks or trust companies as the Board of Directors may from time to time designate. All checks, drafts, notes, or other obligations for the payment of money shall be signed by such persons as the Board of Directors from time to time by resolution may direct or authorize.

## ARTICLE VIII

### Books and Records

1.      *Place of Keeping Books*.  Unless otherwise expressly required by the laws of Delaware, the books and records of this Corporation may be kept outside of the State of

NY\1779794.11

Delaware at such place or places as may be designated from time to time by the Board of Directors.

2.     *Examination of Books*.   Except as otherwise provided by law, the Certificate of Incorporation or in these Bylaws, the Board of Directors shall have the power to determine from time to time whether and to what extent and at what times and places and under what conditions and regulations the accounts, records and books of this Corporation, or any of them, shall be open to the inspection of the stockholders, and no stockholder shall have any right to inspect any account or book or document of this Corporation except as prescribed by statute or authorized by express resolution of the stockholders or of the Board of Directors.

## ARTICLE IX

### Notices

1.     *Requirements of Notice*.   Whenever notice is required to be given by law or these Bylaws, it shall not mean personal notice unless so specified, but such notice may be given in writing by depositing the same in a post office or letter box, postpaid and addressed to the person to whom such notice is directed at the address of such person on the records of the Corporation, and such notice shall be deemed given at the time when the same shall be thus mailed.

2.     *Waivers*.   Any waiver of notice, given by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.   Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.   Neither the business to be transacted at nor the purpose of any regular or special meeting of the stockholders, directors, or members of a committee of directors need be specified in a waiver of notice.

## ARTICLE X

### Seal

The Board of Directors may provide a suitable seal containing the name of the Corporation. In lieu of the corporate seal, when so authorized by the Board of Directors or a duly empowered committee thereof, a facsimile thereof may be impressed or affixed or reproduced.

## ARTICLE XI

### Powers of Attorney

The Board of Directors may authorize one or more of the officers of the Corporation to execute powers of attorney delegating to named representatives or agents power to represent or act on behalf of the Corporation, with or without power of substitution.

NY\1779794.11

## ARTICLE XII

## Indemnification of Directors and Officers

1.    *Indemnification granted.*  The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that, on or after the date of adoption of these Second Amended and Restated Bylaws, he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans (any such entity, an "Other Entity"), against all liability and loss suffered and expenses (including, but not limited to, attorneys' fees and expenses), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Covered Person with respect to actions taken or omitted to be taken, or events or circumstances occurring, on or after the date of adoption of these Second Amended and Restated Bylaws.  Notwithstanding the preceding sentence, the Corporation shall be required to indemnify a Covered Person in connection with a proceeding (or part thereof) commenced by such Covered Person only if the commencement of such proceeding (or part thereof) by the Covered Person was authorized by the Board of Directors or the proceeding (or part thereof) relates to the enforcement of the Corporation's obligations under this Article XII. It is not intended that the provisions of this article be applicable to, and they are not to be construed as granting indemnity with respect to, matters as to which indemnification would be in contravention of the laws of the State of Delaware or of the United States of America whether as a matter of public policy or pursuant to statutory provision.

2.    *Prepayment of Expenses.*   The Corporation shall to the fullest extent not prohibited by applicable law pay, on an as-incurred basis, all expenses (including, but not limited to, attorneys' fees and expenses) incurred by a Covered Person in defending any proceeding in advance of its final disposition. Such advancement shall be unconditional, unsecured and interest free and shall be made without regard to the Covered Person's ability to repay any expenses advanced; provided, that, to the extent required by law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an unsecured undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article XII or otherwise.

3.    *Claims.*  If a claim for indemnification (following the final disposition of such action, suit or proceeding) or advancement of expenses under this Article XII is not paid in full within 30 days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by law.  In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

16

4. *Insurance*. The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, trustee, employee, member, trustee or agent of the Corporation, or was serving at the request of the Corporation as a director, officer, trustee, employee or agent of an Other Entity, against any liability asserted against the person and incurred by the person in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article XII or the DGCL.

5. *Other Indemnification and Prepayment of Expenses*. The rights of indemnification and prepayment of expenses conferred on any Covered Person by this Article XII shall not be deemed exclusive of any other rights to which a Covered Person indemnified herein may be entitled by the Certificate of Incorporation, or any agreement, vote of stockholders or disinterested directors or otherwise, and shall continue as to a Covered Person who has ceased to be a director, officer, designated officer, employee or agent and shall inure to the benefit of the heirs, executors, administrators and other legal representatives of such Covered Person. This Article XII shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

6. *Amounts Received from an Other Entity*. Subject to Section 7 of this Article XII, the Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at the Corporation's request as a director, officer, employee or agent of an Other Entity shall be reduced by any amount such Covered Person may collect as indemnification or advancement of expenses from such Other Entity.

7. *Indemnification Priority*. As between the Corporation and any other person (other than an entity directly or indirectly controlled by the Corporation) who provides indemnification to the Covered Persons for their service to, or on behalf of, the Corporation (collectively, the "Secondary Indemnitors") (i) the Corporation shall be the full indemnitor of first resort in respect of indemnification or advancement of expenses in connection with any Jointly Indemnifiable Claims (as defined below), pursuant to and in accordance with the terms of this Article XII, irrespective of any right of indemnification, advancement of expenses or other right of recovery any Covered Person may have from any Secondary Indemnitor or any right to insurance coverage that such Covered Person may have under any insurance policy issued to any Secondary Indemnitor (i.e., the Corporation's obligations to such Covered Persons are primary and any obligation of any Secondary Indemnitor, or any insurer of any Secondary Indemnitor, to advance expenses or to provide indemnification or insurance coverage for the same loss or liability incurred by such Indemnitees is secondary to the Corporation's obligations), (ii) the Corporation shall be required to advance the full amount of expenses incurred by any such Covered Person and shall be liable for the full amount of all liability and loss suffered by such Covered Person (including, but not limited to, expenses (including, but not limited to, attorneys' fees and expenses), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Covered Person in connection with such proceeding), without regard to any rights any such Covered Person may have against any Secondary Indemnitor or against any insurance carrier providing insurance coverage to Indemnitee under any insurance policy issued to a Secondary Indemnitor, and (iii) the Corporation irrevocably waives, relinquishes and releases each Secondary Indemnitor from any and all claims against such Secondary Indemnitor

17

for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation shall indemnify each Secondary Indemnitor directly for any amounts that such Secondary Indemnitor pays as indemnification or advancement on behalf of any such Covered Person and for which such Covered Person may be entitled to indemnification from the Corporation in connection with Jointly Indemnifiable Claims. No right of indemnification, advancement of expenses or other right of recovery that a Covered Person may have from any Secondary Indemnitor shall reduce or otherwise alter the rights of the Covered Person or the obligations of the Corporation hereunder. No advancement or payment by any Secondary Indemnitor on behalf of any such Covered Person with respect to any claim for which such Covered Person has sought indemnification from the Corporation shall affect the foregoing and the Secondary Indemnitors shall be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Corporation. Each Covered Person shall execute all papers reasonably required and shall do all things that may be reasonably necessary to secure the rights of such Covered Person's Secondary Indemnitors under this Section 7, including the execution of such documents as may be necessary to enable the Secondary Indemnitors effectively to bring suit to enforce such rights, including in the right of the Corporation. Each of the Secondary Indemnitors shall be third-party beneficiaries with respect to this Section 7, entitled to enforce this Section 7. As used in this Section 7, the term "Jointly Indemnifiable Claims" shall be broadly construed and shall include, without limitation, any action, suit, proceeding or other matter for which a Covered Person shall be entitled to indemnification, reimbursement, advancement of expenses or insurance coverage from both a Secondary Indemnitor (or an insurance carrier providing insurance coverage to any Secondary Indemnitor) and the Corporation, whether pursuant to Delaware law (or other applicable law in the case of any Secondary Indemnitor), any agreement or certificate of incorporation, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or other organizational or governing documents of the Corporation or the Secondary Indemnitors or any insurance policy providing insurance coverage to any Secondary Indemnitor, as applicable.

8.      *Amendment or Repeal*.   Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of this Article XII after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit, proceeding or other matter for which indemnification or advancement of expenses is sought.

9.      *Reliance.* Covered Persons who after the date of the adoption of this Article XII become or remain a Covered Person described in Section 1 of this Article XII will be conclusively presumed to have relied on the rights to indemnity, advancement of expenses and other rights contained in this Article XII in entering into or continuing the service. The rights to indemnification and to the advancement of expenses conferred in this Article XII will apply to claims made against any Covered Person described in Section 1 of this Article XII arising out of acts or omissions or facts or circumstances that occur after the adoption of this Article XII in respect of service as a director or officer of the Corporation or other service described in Section 1 of this Article XII.

10.     *Successful Defense*. In the event that any proceeding to which a Covered Person is a party is resolved in any manner other than by adverse judgment against the Covered Person

NY\1779794.11

(including, without limitation, settlement of such proceeding with or without payment of money or other consideration) it shall be presumed that the Covered Person has been successful on the merits or otherwise in such proceeding for purposes of Section 145(c) of the DGCL. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.


# ARTICLE XIII

## Attorneys' Fees in Stockholder Actions

Notwithstanding anything in the Corporation's Certificate of Incorporation to the contrary, to the fullest extent permitted by law, in the event that (i) any current or prior stockholder or anyone on their behalf (a "Claiming Party") initiates, in their capacity as a current or prior stockholder, any action, suit or proceeding, whether civil, administrative or investigative or asserts any claim or counterclaim in a pending proceeding (each, a "Claim") or joins, offers substantial assistance to or has a direct financial interest in any Claim (including any Claim purportedly filed on behalf of any other stockholder or on behalf of the Corporation) against the Corporation and/or any director, officer, or affiliate thereof (each, a "Company Party"), and (ii) the Claiming Party (or the third party that received substantial assistance from the Claiming Party or in whose Claim the Claiming Party had a direct financial interest) does not obtain a judgment on the merits in favor of the Claiming Party or such third party, then each Claiming Party shall be obligated jointly and severally to reimburse the applicable Company Party for all fees, costs and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses) that the applicable Company Party may incur in connection with such Claim. If any provision (or any part thereof) of this Article XIII shall be held to be invalid, illegal or unenforceable facially or as applied to any circumstance for any reason whatsoever: (1) the validity, legality and enforceability of such provision (or part thereof) in any other circumstance and of the remaining provisions of this Article XIII (including, without limitation, each portion of any subsection of this Article XIII containing any such provision (or part thereof) held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby, and (2) to the fullest extent permitted by law, the provisions of this Article XIII (including, without limitation, each such portion containing any such provision (or part thereof) held to be invalid, illegal or unenforceable) shall be construed for the benefit of the Corporation to the fullest extent permitted by law so as to (a) give effect to the intent manifested by the provision (or part thereof) held invalid, illegal or unenforceable, and (b) permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service. Any person or entity purchasing or otherwise acquiring any interest in the shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XIII.

NY\1779794.11

# ARTICLE XIV

## Amendments

These Bylaws may be altered, amended or repealed, and any new Bylaws may be made, only by the stockholders of the Corporation.

**Attachment 5**

**Identities of the proposed members of the Reorganized Debtor's board and the proposed executive officers of the Reorganized Debtor, under Scenario A**

The Debtor is currently governed by a four member Board of Directors.  The current members of the Debtor's Board of Directors are: (i) David E. Jorden, (ii) Joseph Del Guercio, (iii) Stephen N. Keith, and (iv) C. Eric Winzer.  In the event of a Successful Capital Raise under Scenario A of the Plan, the Reorganized Debtor will be governed by a five member Board of Directors.  It is proposed that Messrs. Jorden, Del Guercio, and Winzer will continue to serve as members of the Board of Directors of the Reorganized Debtor, and that Mr. Scott Pittman will serve as a member of the Board of Directors of the Reorganized Debtor.  The Debtor understands that the Lenders propose that Lawrence S. Atinsky will serve as the fifth member of the Board of Directors of the Reorganized Debtor.  Additional information regarding the proposed members of the Board of Directors of the Reorganized Debtor is set forth below:

**David E. Jorden:**  Mr. Jorden has served on the Nuo Therapeutics board since October 2008. He was Executive Chairman from February 2012 to April 2015, when he assumed the role of Acting CFO.  In January 2016, he was appointed Acting CEO.  Mr. Jorden is also presently serving since June 2013 as CEO in a part time capacity of Nanospectra Biosciences, Inc., a private company developing nanoparticle directed focal thermal ablation technology of solid tumors.  From 2003 to 2008, he was with Morgan Stanley's Private Wealth Management group where he was responsible for equity portfolio management for high net worth individuals.  Prior to Morgan Stanley, Mr. Jorden served as CFO for Genometrix, Inc., a private genomics/life sciences company focused on high-throughput microarray applications.  Mr. Jorden was previously a principal with Fayez Sarofim & Co.  Mr. Jorden has a MBA from Northwestern University's Kellogg School and a B.B.A. from University of Texas at Austin.  He holds both Certified Financial Analyst and Certified Public Accountant designations.  Mr. Jorden previously served on the board of Opexa Therapeutics, Inc. (Nasdaq: OPXA) from August 2008 through November 2013  He is also on the board of a private companies, PLx Pharma, Inc., a late stage specialty pharmaceutical company focusing initially on commercializing a patent-protected aspirin product for over-the-counter distribution  which is FDA approved and is the first ever liquid fill aspirin capsule. He is presently serving as Acting CFO for PLx since June 2015.

**Joseph Del Guercio**:  Joseph Del Guercio has served as a Director of Nuo Therapeutics since February 8, 2012.  He has been Managing Director at CNF Investments (CNF)/Clark Enterprises, an Aldagen investor, since November 2004.  Mr. Del Guercio serves on the boards of directors of Terrago Technologies Inc., an Atlanta-based technology company, KZO Innovations, a Virginia-based technology company, Innovative Biosensors, a Maryland-based diagnostics company, and Ogmento, Inc., a New York-based technology company.  He also serves on the board of directors of Vital Sensors, Inc., a private company based in Richmond, Virginia, Verax Biomedical, Inc., another privately held company based in Worcester, Massachusetts, Overture Technologies, Inc., a Bethesda, MD-based software company, Vision Chain, Inc., a Washington DC based technology company, and DigitalBridge Communications, Inc., an Ashburn, Virginia-

based private company.  Mr. Del Guercio has an M.B.A. degree from Harvard Business School and a B.S. degree from Boston College.

**C. Eric Winzer**:  Mr. C. Eric Winzer has almost 30 years of experience in addressing diverse financial issues including raising capital, financial reporting, investor relations, banking, taxation, mergers and acquisitions, financial planning and analysis, and accounting operations. Currently, Mr. Winzer is the Chief Financial Officer at Immunomic Therapeutics, Inc. Prior to joining Immunomic in May 2015, Mr. Winzer held several executive positions at OpGen Inc. From June 2009 to April 2015 Mr. Winzer served as OpGen Inc.'s Principal Accounting Officer, Senior Vice President of Finance, and Chief Financial Officer. OpGen Inc. went public in May 2015. Before his tenure with OpGen Inc., Mr. Winzer held multiple executive positions at Avalon Pharmaceuticals, Inc., including serving as its Chief Financial Officer and Executive Vice President, Principal Accounting Officer, and Secretary. Before joining Avalon Pharmaceuticals, Mr. Winzer held several positions at Life Technologies Corporation. Most recently, he served as a member of its Executive Team and Senior Vice President of New Enterprise Resource Planning System from 2004 to 2006. As a member of the Executive Team at Life Technologies, he was the Executive Sponsor for Life Technologies' ERP implementation. Previous to this, Mr. Winzer served as the Chief Financial Officer of Life Technologies Corporation from June 2002 to October 2004. From September 2000 to June 2002, Mr. Winzer served as Vice President of Finance of Invitrogen at Life Technologies. Before becoming Vice President of Finance of Invitrogen, Mr. Winzer held several managerial positions with Life Technologies from 1986 to 2000. He served as its Vice President of Finance and Chief Financial Officer, Secretary and Treasurer, and Acting Principal Accounting Officer and Budget Manager from May 1999 to September 2000. Mr. Winzer also served as Controller of Life Technologies in 1991. From 1980 to 1986, Mr. Winzer held various financial positions at Genex Corporation. Mr. Winzer has been an Independent Director at Nuo Therapeutics (f/k/a Cytomedix, Inc.) since January 30, 2009. Mr. Winzer holds a B.A. in Economics and Business Administration from Western Maryland College (now, McDaniel College) and an M.B.A. from Mount Saint Mary's University.

**Scott M. Pittman:**  Scott M. Pittman has 30+ years in Hospital Executive management. He is a Chief Operating & Business Development Officer for Buchanan General Hospital, a Registered Representative with Calton & Associates, and a Principal of Hospital CEO Associates. He has served as CEO Florida Hospital Zephyrhills, Fl., Senior Executive positions with Adventist Health Systems, and various Hospital executive positions in southern West Virginia. Mr. Pittman has developed several multimillion dollar hospital and program service expansions, healthcare entity acquisitions and mergers, and has served on numerous state and regional health planning organizations. He is a Magna cum Laude graduate of Southwestern Adventist University with B.S. & B.A. Degrees in Business and Religion, and a Masters of Hospital Administration from Medical College of Virginia.

**Lawrence S. Atinsky**:  Lawrence Atinsky is a Partner at Deerfield Management Company, a healthcare investment firm focused on advancing healthcare through investment, information and philanthropy.  He primarily focuses on the firm's structured transactions and private equity investments.  Prior to joining Deerfield, Mr. Atinsky was a partner of Ascent Biomedical Ventures, a healthcare focused private equity firm investing in early-stage biomedical and

medical device companies. He has over 18 years of experience investing in healthcare companies and currently serves on the Board of FluoroPharma Medical, Inc.  Mr. Atinsky earned a JD from New York University School of Law and B.A. degrees in Political Science and Philosophy from the University of Wisconsin-Madison, cum laude.

The Debtor's existing senior management team is comprised of David E. Jorden, Acting Chief Executive Officer and Acting Chief Financial Officer, and Peter Clausen, PhD, Chief Scientific Officer.  In the event of a Successful Capital Raise under Scenario A of the Plan, it is intended that the Reorganized Debtor will retain Messrs. Jorden and Clausen in the same positions in which they served the Debtor.

**<u>Peter Clausen, PhD:</u>**  Dr. Clausen joined Nuo Therapeutics in September 2008 and has more than 20 years of experience in the biotechnology industry. Prior to joining Nuo Therapeutics, Dr. Clausen was a founding member and Vice President of Research and Development at Marligen Bioscience, where he developed and commercialized innovative genomic and protein analysis products for the life sciences market. Dr. Clausen was the Manager of New Purification Technologies at Life Technologies and the Invitrogen Corporation. He also has significant experience within the commercial biotechnology industry developing peptide and small molecule therapeutics for application in the areas of inflammatory mediated disease and stem cell transplantation. He completed his post-doctoral training at the Laboratory of Molecular Oncology at the National Cancer Institute where his research efforts focused in the areas of oncology, hematopoiesis, and gene therapy. Dr. Clausen earned his PhD in Biochemistry from Rush University in Chicago and a Bachelor of Science degree in Biochemistry from Beloit College.

**Attachment 6**


**Identities of the proposed members of the Reorganized Debtor's board and the proposed executive officers of the Reorganized Debtor, under Scenario B**

In the event of an Unsuccessful Capital Raise (Scenario B under the Plan), the Reorganized Debtor will be governed by a five-member Board of Directors. It is proposed that Bryan Sendrowski, Steven Hochberg, Kevin Rakin, Kenneth G. Hayes, Jr., and R. Steve Boggan will serve as members of the Board of Directors of the Reorganized Debtor in Scenario B. Additional information regarding the proposed members of the Board of Directors of the Reorganized Debtor is set forth below:

**Bryan Sendrowski**: Mr. Sendrowski has served as a member of the private transactions team at Deerfield Management Company, L.P. since 2012 and has over 10 years of experience in the pharmaceutical industry. In his role at Deerfield, Mr. Sendrowski is responsible for the day-to-day oversight and management of investments in Deerfield's Private Design Funds. Prior to joining Deerfield, Mr. Sendrowski was one of the founding shareholders and Chief Financial Officer of New American Therapeutics, a specialty pharmaceutical company that acquired, marketed and commercialized Denavir, a topical drug for cold sores. Prior to New American Therapeutics, he was Chief Financial Officer at Akrimax Pharmaceuticals and Vice President and Controller of Reliant Pharmaceuticals. He also previously served as a Senior Manager in the financial statement audit practice of KPMG, LLP with responsibility for the management of public and private company audits. Mr. Sendrowski received his B.A. from Pace University and was licensed as a Certified Public Accountant in the state of New Jersey.

**Steven Hochberg**: Mr. Hochberg is a Partner of the Private Transactions team at Deerfield Management Company, L.P. He has been a founder and manager of healthcare companies for more than 20 years. Since 2004, Mr. Hochberg has managed Ascent Biomedical Ventures, a leading venture capital firm he co-founded focused on early stage investment and development of biomedical companies. In his capacity as a developer of new businesses, he has founded or co-founded 15 new enterprises since 1991. Since 2011, Mr. Hochberg has been the Chairman of the Board of Continuum Health Partners until its merger with Mount Sinai in 2013, where he is the Senior Vice Chairman of the Mount Sinai Health System, a non-profit healthcare integrated delivery system in New York City with over $6 billion in annual revenues. Mr. Hochberg graduated from the University of Michigan and earned his M.B.A. from Harvard Business School.

**Kevin Rakin**: Mr. Rakin is co-founder of HighCape Partners, a healthcare focused venture capital firm. He has over 25 years of experience as an executive in the life sciences industry. Mr. Rakin most recently served as President of Shire Regenerative Medicine. Prior to joining Shire, Mr. Rakin was the Chairman and Chief Executive Officer of Advanced BioHealing from 2007 until its acquisition by Shire in 2011. Before that, he served as an executive-in-residence at Canaan Partners. Previously, he was a Co-Founder, President and Chief Executive Officer of Renaissance Pharmaceuticals, Inc., a publicly held pharmacogenomics company, until its merger with Clinical Data, Inc. in 2005. Mr. Rakin currently serves as Chairman of the Board member

of Cheetah Medical, Inc. (Chairman), Histogenics Corp., Collagen Matrix, Inc., and TELA Bio, Inc.  Mr. Rkain is also on the Board of CURE, Connecticut's bioscience cluster, as well as the State of Connecticut's Regenerative Medicine Advisory Committee.  He previously served as a Board member for Ipsogen SA, Vion Pharmaceuticals, Inc., OMRIX Biopharmaceuticals, Inc., and Clinical Data, Inc.  Mr. Rakin received an M.B.A. from Columbia University and B.Com and B.Com (Hons) degrees from the University of Cape Town, South Africa.

**Kenneth G. Hayes, Jr.**:  Since March 2008, Mr. Hayes is the President and CEO of Biomerix Corporation, a synthetic biomaterials company.  He has established and led executive teams through the product development, clinical research, and commercial rollout of a wide range of medical devices.  Mr. Hayes previously served as President and CEO of Radiant Medical, which was acquired by Zoll Medical in 2007.  From 1997 to 1999, Mr. Hayes was President of Surgical Navigation Technologies and on the Management Board of Sofamor Danek which was acquired by Medtronic in 1999.  Prior to that, he served as President of USCI, a division of C.R. Bard, as President/CEO of MDI Instruments which he helped to found, and as President/COO of American Surgical Technologies.  Mr. Hayes began his medical device career with Johnson & Johnson, where he spent 17 years in a range of progressively more senior positions with Ethicon Endo-Surgery, Vistakon and Ethicon, Inc.  Mr. Hayes started his career with Procter & Gamble after graduating with a B.S. in Business Administration & Marketing with honors from Marist College.

**R. Steve Boggan**:  Mr. Boggan is the President and Chief Executive Officer of BioHorizons and a member of its board of directors since 1999.  Mr. Boggan joined BioHorizons in 1995 as a biomedical engineer and was quickly promoted to the position of President in 1997.  Prior to BioHorizons, Mr. Boggan was employed in the R&D department of Dow Corning Wright and Wright Medical Technology from 1989 until 1995. He received a B.S. in Biological Engineering from Mississippi State University, an M.S. in Biomedical Engineering from the University of Alabama at Birmingham, and an M.B.A. from the University of Memphis in 1995.


The Reorganized Debtor's management team in Scenario B will consist of Bryan Sendrowski, as Interim Chief Executive Officer and Interim Chief Financial Officer, and Peter A. Clausen, PhD, Chief Scientific Officer.  In Scenario B, the Reorganized Debtor will engage a consultant to commence a search for a permanent Chief Executive Officer and a permanent Chief Financial Officer.  Additional information about Dr. Clausen follows below:

**Dr. Peter A. Clausen**:  Dr. Clausen joined Nuo Therapeutics in September 2008 and has more than 20 years of experience in the biotechnology industry. Prior to joining Nuo Therapeutics, Dr. Clausen was a founding member and Vice President of Research and Development at Marligen Bioscience, where he developed and commercialized innovative genomic and protein analysis products for the life sciences market.  Dr. Clausen was the Manager of New Purification Technologies at Life Technologies and the Invitrogen Corporation. He also has significant experience within the commercial biotechnology industry developing peptide and small molecule therapeutics for application in the areas of inflammatory mediated disease and stem cell transplantation. He completed his post-doctoral training at the Laboratory of Molecular Oncology at the National Cancer Institute where his research efforts focused in the areas of oncology, hematopoiesis, and gene therapy.  Dr. Clausen earned his PhD in Biochemistry from

Rush University in Chicago and a Bachelor of Science degree in Biochemistry from Beloit College.

**Attachment 7**

**Identity of any insider who will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider, under Scenario A**

The Debtor's existing senior management team is comprised of David E. Jorden, Acting Chief Executive Officer and Acting Chief Financial Officer, and Peter Clausen, PhD, Chief Scientific Officer.  In the event of a Successful Capital Raise under Scenario A of the Plan, it is intended that: (i) the Reorganized Debtor will retain Mr. Jorden in the same position in which he served the Debtor, and that his initial base annual salary will be $275,000, and (ii) the Reorganized Debtor will retain Mr. Clausen in the same position in which he served the Debtor, and that his initial base annual salary will remain $290,000.

**Attachment 8**


**Identity of any insider who will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider, under Scenario B**

The Debtor's existing senior management team includes Peter A. Clausen, PhD, Chief Scientific Officer.  In the event of an Unsuccessful Capital Raise (Scenario B under the Plan), it is intended that the Reorganized Debtor will employ Dr. Clausen as the Reorganized Debtor's Chief Science Officer.  Dr. Clausen will be compensated in Scenario B at a base annual compensation of $300,000 plus an annual performance bonus of up to 50% of his base compensation to be determined by the board of directors of up to 50% of his base compensation.  In addition Mr. Clausen will receive a one-time signing bonus of $87,500 payable within 15 days after the Effective Date of the Plan.

**<u>Attachment 9.A.</u>**

**Scenario A, certain New Common Stock documents:  Registration Rights Agreement, and Securities Purchase Agreement**

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (as amended from time to time, this "**Agreement**") is dated as of April [__] 2016, and is between **NUO THERAPEUTICS, INC.**, a Delaware corporation (the "**Company**"), and the stockholders listed on **Schedule 1** hereto (collectively, the "**Stockholders**" and, each individually, a "**Stockholder**").  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below).

## INTRODUCTION

WHEREAS, on the date hereof, the Company issued shares (the "**Shares**") of common stock, par value $0.0001 per share (the "**Common Stock**"), to the Stockholders pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "**Securities Act**") and Rule 506 of Regulation D promulgated thereunder, and upon the terms set forth in the First Amended Plan of Reorganization of the Company (as amended, modified or supplemented, the "**Plan**") under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101, et seq.), confirmed by order dated April [__], 2016 of the United States Bankruptcy Court for the District of Delaware.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which is hereby acknowledged, the Company and each of the Stockholders agree as follows:

## ARTICLE I
## DEFINITIONS

In this Agreement:

"**Applicable Exchange**" means The New York Stock Exchange, Inc. or the NASDAQ Stock Exchange, including the NASDAQ Global Market.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Prospectus**" means the prospectus included in the Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the Registrable Securities covered by the Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"**Registrable Securities**" shall mean any Shares issued to the Stockholders on the date hereof together with any securities issued or issuable upon any stock split, dividend or other distribution, adjustment, recapitalization or similar event with respect to the foregoing; provided, however, that any such securities shall cease to be Registrable Securities upon the earlier of the date when (i) such Registrable Securities have been registered under the Securities Act and disposed of in accordance with a registration statement filed under the Securities Act, including

the Registration Statement, or such Registrable Securities have been disposed of under Rule 144 promulgated under the Securities Act or (ii) such Registrable Securities may be sold without registration or restriction pursuant to Rule 144(b) under the Securities Act or any successor provision.

"***Registration Statement***" means the registration statement required to be filed under this Agreement, including the Prospectus, amendments and supplements to such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"***SEC***" means the U.S. Securities and Exchange Commission.

## ARTICLE II
## DEMAND AND PIGGYBACK RIGHTS

Section 2.01    **Shelf Registration**.

(a)    The Company shall use its best efforts to cause to prepare and file with the SEC a "Shelf" Registration Statement covering the resale of all Registrable Securities for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act on or prior to the 120th day (the "***Filing Default Date***") following the Closing (such date of actual filing, the "***Filing Date***").  The Registration Statement shall be on Form S 3; provided that if the Company shall determine in good faith that Form S-3 is not then available to it, the Registration Statement shall be on Form S-1.  Each Stockholder will furnish to the Company, within five (5) business days after request by the Company, a completed questionnaire in the form set forth as **Exhibit A** hereto.  Each Stockholder agrees to promptly update such questionnaire in order to make the information previously furnished to the Company by such Stockholder complete and not materially misleading.  The Registration Statement shall register the Registrable Securities for resale by the holders thereof.

(b)    The Company shall use its best efforts to cause the Registration Statement to be declared effective by the SEC on or prior to the 150th day following the Closing (the "***No-Review Effectiveness Default Date***") if there is no SEC review of the Registration Statement or the 210th day following the Closing (the "***SEC-Review Effectiveness Default Date***") in the event of an SEC review of the Registration Statement, and shall use its best efforts to keep the Registration Statement continuously effective under the Securities Act until the earliest of (i) the date when all Registrable Securities covered thereby may be sold without registration or restriction pursuant to Rule 144(b) under the Securities Act or any successor provision or (ii) the date when all Registrable Securities covered by such Registration Statement have been sold (the "***Effectiveness Period***").

(c)    The Company shall request effectiveness of the Registration Statement (and any post-effective amendments thereto) within five (5) business days following the Company's receipt of notice from the SEC that the Registration Statement will not be reviewed by the SEC or that the SEC has completed its review of such Registration Statement and has no further comments.  The Company shall request effectiveness of the Registration Statement (and

any post-effective amendments thereto) at 5:00 p.m., New York City time, on the effective date, and file with the SEC and deliver the Prospectus (or any supplements thereto), which delivery may be made electronically, by 8:00 a.m. New York City time on the business day after such effective date.

Section 2.02    **Registration Procedures**.  In connection with the Company's registration obligations hereunder, the Company shall:

(a)    Use its best efforts to (i) prepare and file with the SEC such amendments, including post-effective amendments, to the Registration Statement as may be necessary to keep the Registration Statement continuously effective as to the Registrable Securities for the Effectiveness Period, (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement, and as so supplemented or amended to be filed pursuant to Rule 424, and (iii) respond promptly to any comments received from the SEC with respect to the Registration Statement or any amendment thereto.

(b)    Notify the Stockholders as promptly as reasonably possible, and (if requested by the Stockholders) confirm such notice in writing of any of the following events: (i) the SEC notifies the Company whether there will be a "review" of the Registration Statement, (ii) the SEC comments in writing on the Registration Statement, (iii) the SEC or any other Federal or state governmental authority in writing requests any amendment or supplement to the Registration Statement or Prospectus or requests additional information related thereto, (iv) if the SEC issues any stop order suspending the effectiveness of the Registration Statement or initiates any action, claim, suit, investigation or proceeding (a "***Proceeding***") for that purpose, (v) the Company receives notice in writing of any suspension of the qualification or exemption from qualification of any Registrable Securities for sale in any jurisdiction, or the initiation or threat of any Proceeding for such purpose; or (vi) the financial statements included in the Registration Statement become ineligible for inclusion therein or any statement made in the Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference is untrue in any material respect or any revision to the Registration Statement, Prospectus or other document is required so that it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  Notwithstanding the foregoing, the Company shall not include any material non-public information in any notice provided to any Stockholder under this **Section 2.02(b)**.

(c)    Use its reasonable best efforts to avoid the issuance of or, if issued, obtain the prompt withdrawal of (i) any order suspending the effectiveness of the Registration Statement or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction.

(d)    Use its reasonable best efforts to deliver to each Stockholder, which delivery may be made electronically, by 8:00 a.m. New York City time on the business day after the date first available, without charge, such reasonable number of copies of the Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Stockholders may reasonably request.  The Company hereby consents (except during the continuance of any event described in **Section 2.02(b)(iii)-(vi)** above) to the use of such

3

Prospectus and each amendment or supplement thereto by each of the selling Stockholders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(e)    In the event the Company's Common Stock is then listed on an Applicable Exchange: (i) in the time and manner required by the Applicable Exchange, prepare and file with Applicable Exchange an additional share listing application covering all of the Registrable Securities, (ii) use its reasonable best efforts to take all steps reasonably necessary to cause such Registrable Securities to be approved for listing on the Applicable Exchange as soon as possible thereafter, (iii) provide to the Stockholders notice of such listing, and (iv) use its reasonable best efforts to maintain the listing of such Registrable Securities on the Applicable Exchange.

(f)    To the extent required by law, prior to any public offering of Registrable Securities, use its reasonable best efforts to register or qualify or cooperate with the selling Stockholders in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or "blue sky" laws of such jurisdictions within the United States as any Stockholder requests in writing, to keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period and to do any and all other acts or things reasonably necessary or advisable to enable the disposition in such jurisdictions of the Registrable Securities covered by a Registration Statement; provided, however, that the Company shall not be required for any such purpose to (i) qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not be otherwise required to qualify but for the requirements of this **Section 2.02(f)**, (ii) file any general consent to service of process in any jurisdiction where it is not as of the date hereof so subject, or (iii) otherwise subject itself to taxation.

(g)    Upon the occurrence of any event described in **Section 2.02(b)(iii)-(vi)** above, as promptly as reasonably possible, prepare a supplement or amendment, including a post-effective amendment, to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, neither the Registration Statement nor such Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that the Company may suspend sales pursuant to the Registration Statement for a period of up to twenty (20) consecutive days or for a total of not more than forty-five (45) days in any twelve-month period if the Company furnishes to the holders of the Registrable Securities a certificate signed by the Company's Chief Executive Officer stating that in the good faith judgment of the Company's Board of Directors, there is some material development relating to the operations and condition (financial or other) of the Company that has not been disclosed to the general public and as to which it is in the Company's best interests not to disclose such development, and the Company shall not disclose such development to the Stockholders.

(h)    In the event that any broker-dealer registered under the Exchange Act shall underwrite any Registrable Securities or participate as a member of an underwriting syndicate or selling group or "assist in the distribution" (within the meaning of the Conduct Rules of the Financial Industry Regulatory Authority, Inc. ("**FINRA**") or any successor thereto,

4

as amended from time to time) thereof, whether as a holder of such Registrable Securities or as an underwriter, a placement or sales agent or a broker or dealer in respect thereof, or otherwise, cooperate with such broker-dealer in connection with any filings required to be made by FINRA.

Section 2.03    **Registration Expenses**.    The Company shall pay (or reimburse the Stockholders for) all fees and expenses incident to the performance of or compliance with this Agreement by the Company, including without limitation (a) all registration and filing fees and expenses, including without limitation those related to filings with the SEC and in connection with applicable state securities or "Blue Sky" laws, (b) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing copies of Prospectuses reasonably requested by the Stockholders), (c) messenger, telephone and delivery expenses, (d) and fees and expenses of all other persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement.    Notwithstanding the foregoing, each Stockholder shall pay any and all costs, fees, discounts or commissions attributable to the sale of its respective Registrable Securities.

Section 2.04    **Indemnification**.

(a)    **Indemnification by the Company**.    In consideration of each Stockholder's execution and delivery of this Agreement and in addition to the Company's other obligations hereunder, the Company shall, notwithstanding any termination of this Agreement, indemnify, defend, protect and hold harmless each Stockholder, its officers and directors, partners, members, agents, brokers and employees of each of them, each person who controls any such Stockholder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, agents and employees of each such controlling person, and each underwriter of Registrable Securities, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, settlement costs and expenses, including without limitation costs of preparation and reasonable attorneys' fees (collectively, "*Losses*"), as incurred, arising out of or relating to (A) any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any Prospectus or form of prospectus or in any amendment or supplement thereto, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (i) such untrue statements or omissions are based upon information regarding such Stockholder furnished in writing to the Company by such Stockholder expressly for use therein, or to the extent that such information related to such Stockholder or such Stockholder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Stockholder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto (which shall, however, be deemed to include disclosure substantially in accordance with the "Plan of Distribution" attached hereto), or (ii) in the case of an occurrence of an event of the type specified in **Section 2.02(b)** above, the use by such Stockholder of an outdated or defective Prospectus after the Company has duly notified such Stockholder in writing that the Prospectus is outdated or defective and prior to the receipt by such Stockholder of the Advice contemplated in **Section 2.05** below, (B) any misrepresentation or material breach of any representation or warranty made by the Company in the Offering

5

Documents; or (C) any material breach of any covenant, agreement or obligation of the Company contained in the Offering Documents. The Company shall notify the Stockholders promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement.

(b)     **Indemnification by Stockholders**. Each Stockholder shall, severally and not jointly, indemnify and hold harmless the Company, its directors, officers, agents and employees, and each person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling persons, to the fullest extent permitted by applicable law, from and against all Losses (as determined by a court of competent jurisdiction in a final judgment not subject to appeal or review) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus or in any amendment or supplement thereto, or arising out of or based upon any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading to the extent, but only to the extent, that such untrue statement or omission is contained in any information furnished in writing by such Stockholder to the Company specifically for inclusion in such Registration Statement or Prospectus or to the extent that (i) such untrue statements or omissions are based upon information regarding such Stockholder furnished in writing to the Company by such Stockholder expressly for use therein, or to the extent that such information related to such Stockholder or such Stockholder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Stockholder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto (which shall, however, be deemed to include disclosure substantially in accordance with the "Plan of Distribution" attached hereto), or (ii) in the case of an occurrence of an event of the type specified in **Section 2.02(b)** above, the use by such Stockholder of an outdated or defective Prospectus after the Company has notified such Stockholder in writing that the Prospectus is outdated or defective and prior to the receipt by such Stockholder of the Advice contemplated in **Section 2.05** below. In no event shall the liability of any selling Stockholder hereunder be greater in amount than the dollar amount of the net proceeds received by such Stockholder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)     **Conduct of Indemnification Proceedings**. If any Proceeding shall be brought or asserted against any person entitled to indemnity hereunder (an "***Indemnified Party***"), such Indemnified Party shall promptly notify the person from whom indemnity is sought (the "Indemnifying Party") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof, provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have prejudiced the Indemnifying Party. An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (i) the Indemnifying Party has agreed in writing to pay such fees and expenses; or (ii) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding;

6

or (iii) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Indemnifying Party; provided, however, that in the event that the Indemnifying Party shall be required to pay the fees and expenses of separate counsel, the Indemnifying Party shall only be required to pay the fees and expenses of one separate counsel for such Indemnified Party or Parties.  The Indemnifying Party shall not be liable for any settlement of any such Proceeding affected without its written consent, which consent shall not be unreasonably withheld.  No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.  All fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten trading days of written notice thereof to the Indemnifying Party (regardless of whether it is ultimately determined that an Indemnified Party is not entitled to indemnification hereunder; provided, that the Indemnifying Party may require such Indemnified Party to undertake to reimburse all such fees and expenses to the extent it is finally judicially determined that such Indemnified Party is not entitled to indemnification hereunder).

(d)      **Contribution**.  If a claim for indemnification under **Section 2.04(a)** or **Section 2.04(b)** is unavailable to an Indemnified Party (by reason of public policy or otherwise), then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations.  The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or related to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.  The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in **Section 2.04(c)**, any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees and expenses if the indemnification provided for in this **Section 2.04(d)** was available to such party in accordance with its terms.  The parties hereto agree that it would not be just and equitable if contribution pursuant to this **Section 2.04(d)** were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding section.  Notwithstanding the provision of this **Section 2.04(d)**, no Stockholder shall be required to contribute, in the aggregate, any amount in excess of the amount of net proceeds actually received by such Stockholder from the sale of the Registrable Securities

subject to the Proceeding. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties and any cause of action or similar right of the Indemnified Parties against the Indemnifying Parties or others.

Section 2.05 **Dispositions**. Each Stockholder agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Registrable Securities pursuant to the Registration Statement. Each Stockholder further agrees that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in **Section 2.02(b)**, such Stockholder will discontinue disposition of such Registrable Securities under the Registration Statement until such Stockholder's receipt of the copies of the supplemented Prospectus and/or amended Registration Statement contemplated by **Section 2.02(g)**, or until it is advised in writing (the "*Advice*") by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement. The Company may provide appropriate stop orders to enforce the provisions of this section.

Section 2.06 **Piggy-Back Registrations**.

(a)     If at any time during the Effectiveness Period, other than any suspension period referred to in **Section 2.02(g)** above, there is not an effective Registration Statement covering all of the Registrable Securities and the Company shall determine to prepare and file with the SEC a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with stock option or other employee benefit plans, then the Company shall send to each Stockholder written notice of such determination and if, within ten (10) days after receipt of such notice, any such Stockholder shall so request in writing, the Company shall use its reasonable best efforts to include in such registration statement all or any part of such Registrable Securities not already covered by an effective Registration Statement such Stockholder requests to be registered; provided, however, that the Company shall have the right to postpone or withdraw any registration effected pursuant to this **Section 2.06(a)**.

(b)     If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so indicate in the notice given pursuant to **Section 2.06(a)**. In such event the right of any Stockholder to registration pursuant to **Section 2.06(a)** shall be conditioned upon Stockholder's agreeing to participate in such underwriting and in the inclusion of such Stockholder's Registrable Securities in the underwriting to the extent provided herein. The Stockholder shall (together with the Company and the other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company or by other holders exercising any demand registration rights. Notwithstanding any other provision of this **Section 2.06**, if the underwriter determines that

8

marketing factors require a limitation of the number of shares to be underwritten, the underwriter may exclude some or all Registrable Securities or other securities from such registration and underwriting (hereinafter an "***Underwriter Cutback***").  In the event of an Underwriter Cutback, the Company shall so advise the Stockholder and the other holders distributing their securities through such underwriting, and the number of Registrable Securities that may be included in the registration and underwriting shall be allocated in proportion, as nearly as practicable, to the respective amounts of Registrable Securities held by the Stockholder and the other holders distributing their securities through such underwriting at the time of filing the registration statement.  If any Stockholder disapproves of the terms of any such underwriting, such Stockholder may elect to withdraw therefrom by written notice to the Company and the underwriter. Any securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

Section 2.07   **Rule 144**.  Until the earlier of (i) one year following the effectiveness of the Registration Statement and (ii) the date when such Registrable Securities may be sold without registration or restriction pursuant to Rule 144(b) under the Securities Act or any successor provision, the Company agrees with each holder of Registrable Securities to:

(a)   use its best efforts to comply with the requirements of Rule 144(c) under the Securities Act with respect to current public information about the Company;

(b)   use its best efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time it is subject to such reporting requirements), and

(c)   furnish to any holder of Registrable Securities upon request (i) a written statement by the Company as to its compliance with the requirements of said Rule 144(c) and the reporting requirements of the Securities Act and the Exchange Act (at any time it is subject to such reporting requirements), (ii) a copy of the most recent annual or quarterly report of the Company, and (iii) such other reports and documents of the Company as such holder may reasonably request to avail itself of any similar rule or regulation of the SEC allowing it to sell any such securities without registration.

Section 2.08   **Exchange Act Registration**.  Promptly following the date hereof, the Company shall cause the Common Stock to be registered under Section 12(g) of the Exchange Act.

## ARTICLE III
## MISCELLANEOUS

Section 3.01   **Notices**.  Any notice or other document required or permitted to be given or delivered to the Stockholders shall be in writing and sent (x) by fax if the sender on the same day sends a confirming copy of such notice by an internationally recognized overnight delivery service (charges prepaid) or (y) by an internationally recognized overnight delivery service (with charges prepaid):

(a)   if to the Company, at

9

Nuo Therapeutics, Inc.
207A Perry Parkway, Suite 1
Gaithersburg, MD 20877
Attention: Chief Executive Officer
Facsimile: (240) 499-2690

or such other address as it shall have specified to the Stockholder in writing, with a copy (which shall not constitute notice) to:

Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Attention:  Jeffrey A. Baumel, Esq.
Facsimile: (973) 912-7199

and

Dentons US LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20006
Attention:  Sam J. Alberts, Esq.
Facsimile: (202) 408-6399

(b)     If to a Stockholder, to the address set forth with respect to such Stockholder on **Schedule 1** or to such other person or address as such Stockholder shall furnish to the Company and the other Stockholders in writing.

Section 3.02    **Section Headings**.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. References in this Agreement to a designated "Article" or "Section" refer to an Article or Section of this Agreement unless otherwise specifically indicated.

Section 3.03    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

Section 3.04    **Consent to Jurisdiction and Service of Process**.  The parties to this Agreement hereby agree to submit to the jurisdiction of the courts of the State of Delaware and the courts of the United States of America located in the District of Delaware, and appellate courts from any thereof in any action or proceeding arising out of or relating to this Agreement.

Section 3.05    **Waiver of Jury Trial**.  Each of the parties to this Agreement hereby unconditionally agrees to waive, to the fullest extent permitted by applicable law, its respective rights to a jury trial of any claim or cause of action (whether based on contract, tort or otherwise) based upon, arising out of or relating to this Agreement or the transactions contemplated hereby. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto: (i)

10

acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings, (ii) acknowledges that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not in the event of any action or proceeding, seek to enforce the foregoing waiver and (iii) warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 3.05 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

Section 3.06    **Amendments**.  This Agreement may be amended only by an instrument in writing executed by the Company and Stockholders holding at least 66 2/3% of the Registrable Securities collectively held by them.  Any such amendment will apply to all Stockholders equally, without distinguishing between them.

Section 3.07    **Entire Agreement**.  This Agreement constitutes the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and thereby. The registration rights granted under this Agreement supersede any registration, qualification or similar rights with respect to any of the shares of Common Stock granted under any other agreement, and any of such preexisting registration rights are hereby terminated.

Section 3.08    **Severability**.  The invalidity or unenforceability of any specific provision of this Agreement shall not invalidate or render unenforceable any of its other provisions.  Any provision of this Agreement held invalid or unenforceable shall be deemed reformed, if practicable, to the extent necessary to render it valid and enforceable and to the extent permitted by law and consistent with the intent of the parties to this Agreement.

Section 3.09    **Arms Length Negotiations**.    The Company acknowledges and each Stockholder confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors.

Section 3.10    **Counterparts**.    This Agreement may be executed in multiple counterparts, including by means of facsimile or electronic mail, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

(Signature Page Follows)

11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**COMPANY**

**NUO THERAPEUTICS, INC.**

By: _____
     Name:
     Title:

**STOCKHOLDERS**

**[STOCKHOLDER]**

By: _____
     Name:
     Title:

Schedule 1

| Stockholder Name | Address |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

**EXHIBIT A**

**SELLING STOCKHOLDER QUESTIONNAIRE**

To:  Nuo Therapeutics, Inc.
c/o Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Attention: Jeffrey A. Baumel, Esq.
Facsimile: (973) 912-7199

Reference is made to the Registration Rights Agreement (the "***Agreement***"), made between Nuo Therapeutics, Inc., a Delaware corporation (the "Company"), and the Stockholders noted therein.

Pursuant to Section 2.01(a) of the Agreement, the undersigned hereby furnishes to the Company the following information for use by the Company in connection with the preparation of the Registration Statement contemplated by Section 2 of the Agreement.

1.    **Name and Contact Information**:

Full legal name of record holder: _____

Address of record holder: _____

Social Security Number or Taxpayer Identification Number: _____

Identity of beneficial owner (if different than record holder): _____

Name of contact person: _____

Telephone number of contact person: _____

Fax number of contact person: _____

E-mail address of contact person: _____

2.    **Beneficial Ownership of Registrable Securities**:

(a) Number of Registrable Securities owned by Selling Stockholder: _____

(b) Number of Registrable Securities requested to be registered: _____

3.    **Beneficial Ownership of Other Securities of the Company Owned by the Selling Stockholder**:

Except as set forth below in this Item (3), the undersigned is not the beneficial or registered owner of any securities of the Company other than the Registrable Securities listed above in Item (2)(a).

Type and amount of other securities beneficially owned by the Selling Stockholder: _____

_____

4.  **Relationships with the Company**:

Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.

State any exceptions here: _____

5.  **Plan of Distribution**:

Except as set forth below, the undersigned intends to distribute pursuant to the Registration Statement the Registrable Securities listed above in Item (2) in accordance with the "Plan of Distribution" section set forth therein:

State any exceptions here: _____

6.  **Selling Stockholder Affiliations**:

(a)    Is the Selling Stockholder a registered broker-dealer? _____

(b)    Is the Selling Stockholder an affiliate of a registered broker-dealers? (For purposes of this response, an "affiliate" of, or person "affiliated" with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.) _____

(c)    If the answer to Item (6)(b) is yes, identify the registered broker-dealers and describe the nature of the affiliations: _____

(d)    If the answer to Item (6)(b) is yes, did the Selling Stockholder acquire the Registrable Securities in the ordinary course of business (if not, please explain)? _
_____

(e)    If the answer to Item (6)(b) is yes, did the Selling Stockholder, at the time of purchase of the Registrable Securities, have any agreements, plans or understandings, directly or indirectly, with any person to distribute the Registrable Securities (if yes, please explain)?

7.  **Voting or Investment Control over the Registrable Securities**:

If the Selling Stockholder is not a natural person, please identify the natural person or persons who have voting or investment control over the Registrable Securities listed in Item (2) above: _____

96108408\V-2

Pursuant to Section 2.02(g) of the Agreement, the undersigned acknowledges that the Company may, by notice to each Stockholder at its last known address, suspend or withdraw the Registration Statement and require that the undersigned immediately cease sales of Registrable Securities pursuant to the Registration Statement under certain circumstances described in the Agreement.  At any time that such notice has been given, the undersigned may not sell Registrable Securities pursuant to the Registration Statement.

The undersigned hereby acknowledges receipt of a draft of the Registration Statement dated ● and confirms that the undersigned has reviewed such draft including, without limitation, the sections captioned "Selling Stockholders" and "Plan of Distribution," and confirms that, to the best of the undersigned's knowledge, the same is true, complete and accurate in every respect except as indicated in this Questionnaire.  The undersigned hereby further acknowledges that pursuant to Section 2.04(b) of the Agreement, the undersigned shall indemnify the Company and each of its directors and officers against, and hold the Company and each of its directors and officers harmless from, any losses, claims, damages, expenses or liabilities (including reasonable attorney's fees) to which the Company or its directors and officers may become subject by reason of any statement or omission in the Registration Statement made in reliance upon, or in conformity with, a written statement by the undersigned, including the information furnished in this Questionnaire by the undersigned.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items (1) through (7) above and the inclusion of such information in the Registration Statement, any amendments thereto and the related prospectus.  The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Registration Statement and the related prospectus.

The undersigned has reviewed the answers to the above questions and affirms that the same are true, complete and accurate.  THE UNDERSIGNED AGREES TO NOTIFY THE COMPANY IMMEDIATELY OF ANY CHANGES IN THE FOREGOING INFORMATION.

Dated: _____

Signature of Record Holder:


_____

(Please sign your name in exactly the same manner as the certificates for the shares being registered)

16

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement, dated on and as of April [__], 2016 (this "***Agreement***"), is made by and among **NUO THERAPEUTICS, INC**., a Delaware corporation and debtor and debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (the "***Company***"), the undersigned purchasers (each a "***Purchaser***" and collectively, the "***Purchasers***") and each assignee of a Purchaser who becomes a party hereto.

**WHEREAS**, the Company is a debtor and debtor-in-possession in Case No. 16-10192 (MFW). (the "***Case***") pending in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") (captioned "In re: Nuo Therapeutics, Inc.") under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101, et seq.) (the "***Bankruptcy Code***");

**WHEREAS**, the Company will be reorganized pursuant to its First Amended Plan of Reorganization (the "***Plan***"), subject to entry of a final order confirming the Plan by the Bankruptcy Court (the "***Confirmation Order***");

**WHEREAS**, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "***Securities Act***") and Rule 506 of Regulation D promulgated thereunder, the Company desires to offer, issue and sell to the Purchasers (the "***Offering***"), and the Purchasers, severally and not jointly, desire to purchase from the Company, shares (the "***Shares***") of the Company's New Common Stock, par value $0.0001 per share (the "***New Common Stock***"). The Shares are sometimes referred to herein as the "***Securities***"; and

**WHEREAS**, the net proceeds of the Offering are intended to be used by the Company to finance in part the distributions to be made under the Plan, to pay the fees and expenses associated therewith, and for working capital and other general corporate purposes of the Company and its subsidiaries.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which is hereby acknowledged, the Company and each of the Purchasers agree as follows:

## 1   SUBSCRIPTION

(a)    Subject to the conditions to closing set forth herein, each Purchaser hereby irrevocably subscribes for and agrees to purchase Securities for the aggregate purchase price set forth on the signature page of such Purchaser hereto (the "***Subscription Amount***"). The Securities to be issued to each Purchaser hereunder shall consist of Shares in an amount equal to the quotient of (x) the Subscription Amount, divided by (y) the Share Purchase Price, rounded down to the nearest whole number.

(b)    For the purposes of this Agreement, the purchase price for each Share shall be [$1.00] (the "***Share Purchase Price***").

(c)     The Company shall use its reasonable best efforts to hold the closing of the Offering (the "***Closing***", and the date of the Closing, the "***Closing Date***") as soon as practicable after entry of the Confirmation Order by the Bankruptcy Court approving the Plan but no later than May [5], 2016.   Prior to the Closing, each Purchaser shall deliver the applicable Subscription Amount, by wire transfer to an escrow account in accordance with the wire transfer instructions set forth on **Schedule A**, and such amount shall be held in the manner described in **Section 1(d)** below.  There is no minimum Subscription Amount required for the Closing.

(d)     All payments for Securities made by the Purchasers will be deposited as soon as practicable but by no later than 5:00 p.m. (New York time) on the date of this Agreement, in a non-interest bearing escrow account.  With respect to each Purchaser, payments for Securities made by such Purchaser will be returned promptly, prior to an applicable Closing, without interest or deduction, if, or to the extent, (i) such Purchaser's subscription is rejected by the Company, (ii) the Offering is terminated for any reason; or (iii) upon request by such Purchaser, if the Closing does not occur within fifteen (15) days after the date of the Confirmation Order; provided, however, that the foregoing clause (iii) shall not relieve any Purchaser of any liability in the event the Closing does not occur within such fifteen (15) day period due to the failure of a Purchaser to deliver such Purchaser's applicable Subscription Amount.

(e)     Upon receipt by the Company of the requisite payment for all Securities to be purchased by the Purchasers whose subscriptions are accepted, the Company shall, at the Closing: (i) issue to each Purchaser stock certificates representing the shares of New Common Stock purchased at such Closing under this Agreement, (ii) deliver to the Purchasers a certificate stating that the representations and warranties made by the Company in **Section 3** of this Agreement are true and correct in all material respects on the date of such Closing relating to the Securities subscribed for pursuant to this Agreement as though made on and as of such Closing Date (provided, however, that representations and warranties that speak as of a specific date shall continue to be true and correct as of the Closing with respect to such date), and (iii) cause to be delivered to the Purchasers an opinion of Dentons US LLP substantially in the form of Exhibit A hereto.  Notwithstanding anything to the contrary herein, the Company and Purchasers agree that no funds may be released to the Company from the escrow account until entry of the Confirmation Order by the Bankruptcy Court approving the Plan, all of the items required to be delivered by the Company pursuant to this **Section 1(e)** have been delivered in accordance with this section and all other conditions to Closing set forth in this Agreement have been satisfied or waived.  Upon satisfaction or waiver of all conditions to the Closing set forth in this Agreement, funds may be released from the escrow account upon the written instructions of the Company.

(f)     Each Purchaser acknowledges and agrees, solely with respect to itself, that (i) the purchase of Shares by such Purchaser pursuant to the Offering is subject to all the terms and conditions set forth in this Agreement, and (ii) this Agreement shall be binding upon such Purchaser upon the execution and delivery to the Company of such Purchaser's signed counterpart signature page to this Agreement unless and until the Company shall promptly reject the subscription being made hereby by such Purchaser.

2

96102661\V-3

## 2    REPRESENTATIONS AND WARRANTIES OF EACH PURCHASER

Each Purchaser, severally and not jointly, hereby represents and warrants only as to itself to the Company, and agrees with the Company as follows:

(a)    Such Purchaser understands and acknowledges and is fully aware that (i) the Company is a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code in Case No. 16-10192 (MFW) pending in the United States Bankruptcy Court for the District of Delaware, (ii) the Company is delinquent in its filings with the Securities and Exchange Commission (the "*SEC*"), including as a result of its failure to file any quarterly or annual periodic report on Form 10-Q or Form 10-K for any quarterly or annual fiscal period ended after December 31, 2015 (including as a result of certain SEC no-action letter relief), (iii) the Securities are currently quoted on the OTC Markets Group OTC Pink marketplace, and (iv) the Securities are not presently quoted or listed for trading on any national securities exchange, and, notwithstanding the circumstances described in the preceding clauses (i), (ii), (iii) and (iv) (and without limiting any of the other representations and warranties or agreements of Purchaser herein), such Purchaser has made its own investment decision to subscribe for and purchase Securities issued in the Offering.

(b)    Such Purchaser has carefully read this Agreement and the Escrow Agreement attached hereto as **Exhibit B** and the Registration Rights Agreement attached hereto as **Exhibit C** (collectively the "*Offering Documents*"), and is familiar with and understands the terms of the Offering.  Such Purchaser has also carefully read and considered the Company's First Amended Disclosure Statement for Debtor's First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated March 28, 2016 (the "*Disclosure Statement*") and the Plan Supplement dated April [__], 2016.  Such Purchaser has relied only on the information contained in the Offering Documents, the Disclosure Statement and the Company's SEC filings through the Closing Date (the "*SEC Filings*"), and has not relied on any representation made by any other person, other than as set forth in **Sections 2(c) and (d)** below.  Such Purchaser fully understands all of the risks related to the purchase of the Securities.   Such Purchaser has carefully considered and has discussed with such Purchaser's professional legal, tax, accounting and financial advisors, to the extent such Purchaser has deemed necessary, the suitability of an investment in the Securities for such Purchaser's particular tax and financial situation and has determined that the Securities being subscribed for by such Purchaser are a suitable investment for such Purchaser.  Such Purchaser recognizes that an investment in the Securities involves substantial risks, including the possible loss of the entire amount of such investment.  Such Purchaser further recognizes that the Company has broad discretion concerning the use and application of the proceeds from the Offering.

(c)    Such Purchaser acknowledges that (i) such Purchaser has had the opportunity to request copies of any documents, records, and books pertaining to this investment and (ii) any such documents, records and books that such Purchaser requested have been made available for inspection by such Purchaser, such Purchaser's attorney, accountant or advisors.

(d)    Such Purchaser and such Purchaser's advisors have had a reasonable opportunity to ask questions of and receive answers from representatives of the Company or persons acting on behalf of the Company concerning the Offering and all such questions have been answered to

the full satisfaction of such Purchaser.  Such Purchaser understands that it is not relying on any representation of any kind made by the Company regarding the Company, the Securities or any other matter other than as set forth herein.

(e)      Such Purchaser is not subscribing for Securities as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar, meeting or conference whose attendees have been invited by any general solicitation or general advertising.

(f)      If such Purchaser is a natural person, such Purchaser has reached the age of majority in the state in which such Purchaser resides.  Such Purchaser has adequate means of providing for such Purchaser's current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the Securities for an indefinite period of time, has no need for liquidity in such investment and can afford a complete loss of such investment.

(g)      Such Purchaser has sufficient knowledge and experience in financial, tax and business matters to enable such Purchaser to utilize the information made available to such Purchaser in connection with the Offering, to evaluate the merits and risks of an investment in the Securities and to make an informed investment decision with respect to an investment in the Securities on the terms described in the Offering Documents.

(h)      Such Purchaser will not sell or otherwise transfer the Securities without registration under the Securities Act and applicable state securities laws or an applicable exemption therefrom.  Such Purchaser acknowledges that neither the offer nor sale of the Securities has been registered under the Securities Act or under the securities laws of any state. Such Purchaser represents and warrants that such Purchaser is acquiring the Securities for such Purchaser's own account and not with a current view toward resale or distribution within the meaning of the Securities Act.  Such Purchaser has not offered or sold the Securities being acquired nor does such Purchaser have any present intention of selling, distributing or otherwise disposing of such Securities either currently or after the passage of a fixed or determinable period of time or upon the occurrence or non-occurrence of any predetermined event or circumstances in violation of the Securities Act.  Such Purchaser is aware that (i) the Securities are not currently eligible for sale in reliance upon Rule 144 promulgated under the Securities Act and (ii) the Company has no obligation to register the Securities subscribed for hereunder, except as provided in the Registration Rights Agreement, dated the date hereof, among the Company and the Purchasers, in the form of **Exhibit C** attached hereto (the "***Registration Rights Agreement***").  By making these representations herein, such Purchaser is not making any representation or agreement to hold the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an available exemption to the registration requirements of the Securities Act.

(i)      Such Purchaser acknowledges that the certificates representing the Shares shall be stamped or otherwise imprinted with a legend substantially in the following form:

The securities represented hereby have not been registered under the Securities Act of 1933, as amended, or any state securities laws and

4

neither the securities nor any interest therein may be offered, sold, transferred, pledged or otherwise disposed of except pursuant to an effective registration under such act or an exemption from registration, which is available under such act.

Certificates evidencing the Shares shall not be required to contain such legend or any other legend (i) following any sale of such Shares pursuant to Rule 144, or (ii) if such Shares are eligible for sale under Rule 144(b) or have been sold pursuant to the Registration Statement (as defined in the Registration Rights Agreement) and in compliance with the obligations set forth in the Registration Rights Agreement, or (iii) such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the Staff of the Securities and Exchange Commission), in each such case (i) through (iii) to the extent reasonably determined by the Company's legal counsel.  Subject to the foregoing, at such time and to the extent a legend is no longer required for the Shares, the Company will use its reasonable best efforts to no later than five (5) trading days following the delivery by a Purchaser to the Company or to the Company and the Company's transfer agent of a legended certificate representing such Shares (together with such accompanying documentation or representations as reasonably required by counsel to the Company), deliver or cause to be delivered a certificate representing such Shares that is free from the foregoing legend.

(j)      If this Agreement is executed and delivered on behalf of a partnership, corporation, limited liability company, trust, estate or other entity: (i) such partnership, corporation, limited liability company, trust, estate or other entity has the full legal right and power and all authority and approval required (a) to execute and deliver this Agreement and all other instruments executed and delivered by or on behalf of such partnership, corporation, limited liability company, trust, estate or other entity in connection with the purchase of its Securities, and (b) to purchase and hold such Securities, (ii) the signature of the party signing on behalf of such partnership, corporation, limited liability company, trust, estate or other entity is binding upon such partnership, corporation, limited liability company, trust, estate or other entity, and (iii) such partnership, corporation, limited liability company, trust or other entity has not been formed for the specific purpose of acquiring such Securities, unless each beneficial owner of such entity is qualified as an accredited investor within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act and has submitted information to the Company substantiating such individual qualification.

(k)      If such Purchaser is a retirement plan or is investing on behalf of a retirement plan, such Purchaser acknowledges that an investment in the Securities poses additional risks, including the inability to use losses generated by an investment in the Securities to offset taxable income.

(l)      The information contained in the purchaser questionnaire in the form of **Exhibit D** attached hereto (the "***Purchaser Questionnaire***") delivered by such Purchaser in connection with this Agreement is complete and accurate in all respects, and such Purchaser is an "accredited investor" as defined in Rule 501 of Regulation D under the Securities Act on the basis indicated therein.

96102661\V-3

(m)    Such Purchaser acknowledges that the Company will have the authority to issue shares of New Common Stock, in excess of those being issued in connection with the Offering, and that the Company may issue additional shares of New Common Stock from time to time. The issuance of additional shares of New Common Stock may cause dilution of the existing shares of New Common Stock and a decrease in the market price of such existing shares.  Such Purchaser acknowledges and agrees that such Purchaser shall have no preemptive rights, right of first refusal, or other rights to subscribe for or purchase any shares of New Common Stock the Company may issue in the future as a result of such Purchaser's purchase of Securities pursuant to this Agreement.

(n)    Such Purchaser agrees that from the Closing Date until the fifth anniversary of the Closing Date, such Purchaser will not enter into any Short Sales of New Common Stock.  For purposes of this Agreement, "Short Sales" are defined as orders by a Purchaser to its broker or agent to sell presently a specified number of shares of New Common Stock held by the broker or agent in return for the Person's promise to replace the New Common Stock sold at a later date. The prohibition on Short Sales contained in this Agreement extends to (i) "naked" shorts sales, which are short sales of New Common Stock which the seller does not presently hold and are completed by covering through a market purchase of the shares due, and (ii) short sales "against the box," which are short sales of New Common Stock shares which the seller does presently hold, which are either covered by a market purchase (as with the "naked short") or by delivering the shares held against the shares due.  Such Purchaser further acknowledges and agrees that in the event of its breach of this Section 2(n), monetary damages shall not constitute a sufficient remedy and that, in addition to other rights and remedies existing in its favor, the Company may apply to the Bankruptcy Court or to any other court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, in each case without the requirement of posting a bond or proving actual damages.  All shares of New Common Stock shall bear a restrictive legend that prohibits for five (5) years from the Closing Date the use of the issued shares by the holder thereof for purposes of covering a short sale by the holder or any other person designated by the holder or who maintains the New Common Stock on behalf of the holder.

3    REPRESENTATIONS AND WARRANTIES OF THE COMPANY

(a)    The Company hereby makes the following representations and warranties to the Purchasers as of immediately prior to Closing after giving effect to the Plan and Confirmation Order:

(b)    **Organization, Good Standing and Qualification**.    The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and, except as disclosed in the Disclosure Statement and the SEC Filings, the Company has full corporate power and authority to conduct its business as currently conducted. The Company is duly qualified to do business as a foreign corporation and is in good standing in all jurisdictions in which the character of the property owned or leased or the nature of the business transacted by it makes qualification necessary, except where the failure to be so qualified would not have a material adverse effect on the business, properties, assets, financial condition or results of operations of the Company and its subsidiaries taken as a whole (a "***Material Adverse Effect***").

6

(c)  **Capitalization**.  Immediately prior to the Closing, (a) the authorized capital stock of the Company will consist of [25,000,000] shares of New Common Stock and [1,000,000] shares of preferred stock, par value $0.0001 per share, (b) [12,000,000] shares of New Common Stock[1] and [29,400] shares of preferred stock will be issued and outstanding, and (c) [1,100,000] shares of Common Stock will be reserved for future issuance to employees, directors, officers and consultants pursuant to the Company's employee stock plans.  Other than as set forth above or as contemplated in this Agreement, there are no other options, warrants, calls, rights, commitments or agreements of any character to which the Company is a party or by which either the Company is bound or obligating the Company to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any shares of the capital stock of the Company or obligating the Company to grant, extend or enter into any such option, warrant, call, right, commitment or agreement.

(d)  **Issuance; Reservation of Shares**.  The issuance of the Shares has been duly and validly authorized by all necessary corporate and stockholder action, and the Shares, when issued and paid for pursuant to this Agreement, will be validly issued, fully paid and non-assessable shares of New Common Stock of the Company.

(e)  **Authorization; Enforceability**.  The Company has all corporate right, power and authority to enter into this Agreement, and to consummate the transactions contemplated hereby and thereby.  All corporate action on the part of the Company, its directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company, the authorization, sale, issuance and delivery of the Securities contemplated herein and the performance of the Company's obligations hereunder and thereunder has been taken. This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms and subject to laws of general application relating to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and rules of law governing specific performance, injunctive relief or other equitable remedies, and to limitations of public policy.  The issuance and sale of the Securities contemplated hereby will not give rise to any preemptive rights or rights of first refusal on behalf of any person, except for those that which have been complied with or waived.

(f)  **No Conflict; Governmental and Other Consents**.

(i)  The execution and delivery by the Company of this Agreement and the consummation of the transactions contemplated hereby will not result in the violation of, (i) any provision of the Certificate of Incorporation or Bylaws of the Company or any of its subsidiaries, or (ii) any law, statute, rule, regulation, order, writ, injunction, judgment or decree of any court or governmental authority to or by which the Company or any of its subsidiaries is bound, and will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute (with due notice or lapse of time or both) a default under, any lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it is bound or to which any of its

---

[1] Assumes that 100% of existing Company common stock is reissued as New Common Stock due to proper return of Release Documents according to the Plan.

properties or assets is subject, nor result in the creation or imposition of any lien upon any of the properties or assets of the Company except to the extent that any such violation, conflict or breach would not be reasonably likely to have a Material Adverse Effect.

(ii)    No consent, approval, authorization or other order of any governmental authority or other third-party is required to be obtained by the Company in connection with the authorization, execution and delivery of this Agreement or with the authorization, issue and sale of the Securities, except (i) such approval as may be required under the Securities Act and applicable state securities laws in respect of the registration of the Shares as contemplated by the Registration Statement, and (ii) such post-Closing filings as may be required to be made with the SEC, the Financial Industry Regulatory Authority, Inc., and with any state or foreign blue sky or securities regulatory authority.

(g)    **Litigation**.   Except for the Case, there are no pending or, to the Company's knowledge, threatened legal or governmental proceedings against the Company or any of its subsidiaries, which, if adversely determined, would be reasonably likely to have a Material Adverse Effect.  Except for the Case, there is no action, suit, proceeding, inquiry or investigation before or by any court, public board or body (including, without limitation, the SEC) pending or, to the knowledge of the Company, threatened against or affecting the Company or any of its subsidiaries wherein an unfavorable decision, ruling or finding could adversely affect the validity or enforceability of, or the authority or ability of the Company to perform its obligations under this Agreement.  Except as disclosed in the Disclosure Statement and the SEC Filings in connection with the Case, neither the Company nor any of its subsidiaries are subject to any order, judgment or decree, which would be reasonably likely to have a Material Adverse Effect.

(h)    **Investment Company**.   The Company is not an "investment company" within the meaning of such term under the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC thereunder.

(i)    **Subsidiaries**.   The Company's subsidiaries are set forth on **Schedule B** hereof (collectively referred to herein as the Company's "**subsidiaries**").   Each of the Company's subsidiaries has been duly formed, is validly existing and is in good standing under the law of the jurisdiction of its formation, has the requisite power and authority to own its property and to conduct its business and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing would not have a Material Adverse Effect.

(j)    **Indebtedness**.   The Disclosure Statement reflects, as of the date thereof, all outstanding secured and unsecured Indebtedness (as defined below) of the Company or any subsidiary, or for which the Company or any subsidiary has commitments.  Neither the Company nor any of its subsidiaries has incurred any material Indebtedness or commitments for Indebtedness since the date of the Disclosure Statement.   For purposes of this Agreement, "Indebtedness" shall mean (a) any liabilities for borrowed money or amounts owed (other than trade accounts payable incurred in the ordinary course of business), (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto),

except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business, and (c) the present value of any lease payments due under leases required to be capitalized in accordance with GAAP.  Except as disclosed in the Disclosure Statement and the SEC Filings, as of the Closing Date, (i) the Company is not in default with respect to any Indebtedness, and (ii) the Company will not be insolvent after giving effect to the transactions contemplated herein.  For purposes of this **Section 3(j)**, "insolvent" shall mean an inability to pay debts when due.

(k)     **Certain Fees**.  Except as is set forth on **Schedule C**, no brokers', finders' or financial advisory fees or commissions will be payable by the Company with respect to the transactions contemplated by this Agreement.

(l)     **Material Agreements**.  Except as disclosed in the Disclosure Statement and the SEC Filings, as of the Closing Date, the Company is not in default under any material agreement then in effect to which the Company is a party, the result of which would be reasonably likely to have a Material Adverse Effect.

(m)     **Transactions with Affiliates**.  Except as disclosed in the Disclosure Statement and the SEC Filings, there are no loans, leases, agreements, contracts, royalty agreements, management contracts or arrangements or other continuing transactions between (a) the Company, its subsidiaries or any of their respective customers or suppliers on the one hand, and (b) on the other hand, any person who would be covered by Item 404(a) of Regulation S-K or any company or other entity controlled by such person.

(n)     **Taxes**.  The Company and its subsidiaries have prepared and filed all federal, state, local, foreign and other tax returns for income, gross receipts, sales, use and other taxes and custom duties ("*Taxes*") required by law to be filed by them, except for tax returns, the failure to file which, individually or in the aggregate, do not and would not have a Material Adverse Effect.  Such filed tax returns are complete and accurate, except for such omissions and inaccuracies, which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The Company and its subsidiaries have paid or made provisions for the payment of all Taxes shown to be due on such tax returns and all additional assessments, and adequate provisions have been and are reflected in the financial statements of the Company and the subsidiaries for all current Taxes to which the Company or any subsidiary is subject and which are not currently due and payable, except for such Taxes which, if unpaid, individually or in the aggregate, do not and would not have a Material Adverse Effect.  None of the federal income tax returns of the Company or any of its subsidiaries for the past five years has been audited by the Internal Revenue Service.  Neither the Company nor any of its subsidiaries has received written notice of any assessments, adjustments or contingent liability (whether federal, state, local or foreign) in respect of any Taxes pending or threatened against the Company or any subsidiary for any period which, if unpaid, would have a Material Adverse Effect.

(o)     **Insurance**.  The Company and its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as the Company believes are prudent and customary in the businesses in which the Company and its subsidiaries are engaged.  The Company has no reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage

9

from similar insurers as may be necessary to continue its and its subsidiaries' businesses without an increase in cost significantly greater than general increases in cost experienced for similar companies in similar industries with respect to similar coverage.

(p)    **Environmental Matters**.  To the Company's knowledge, all real property owned, leased or otherwise operated by the Company and its subsidiaries is free of contamination from any substance, waste or material currently identified to be toxic or hazardous pursuant to, within the definition of a substance which is toxic or hazardous under, or which may result in liability under, any Environmental Law (as defined below), including, without limitation, any asbestos, polychlorinated biphenyls, radioactive substances, methane, volatile hydrocarbons, industrial solvents, oil or petroleum or chemical liquids or solids, liquid or gaseous products, or any other material or substance ("***Hazardous Substance***") which has caused or would reasonably be expected to cause or constitute a threat to human health or safety, or an environmental hazard in violation of Environmental Law or to result in any environmental liabilities that would be reasonably likely to have a Material Adverse Effect.  Neither the Company nor any of its subsidiaries has caused or suffered to occur any release, spill, migration, leakage, discharge, disposal, uncontrolled loss, seepage, or filtration of Hazardous Substances that would reasonably be expected to result in environmental liabilities that would be reasonably likely to have a Material Adverse Effect.  The Company and its subsidiaries have generated, treated, stored and disposed of any Hazardous Substances in compliance with applicable Environmental Laws, except for such non-compliances that would not be reasonably likely to have a Material Adverse Effect.  The Company and its subsidiaries have obtained, or has applied for, and is in compliance with and in good standing under all permits required under Environmental Laws (except for such failures that would not be reasonably likely to have a Material Adverse Effect) and neither the Company nor any of its subsidiaries has knowledge of any proceedings to substantially modify or to revoke any such permit.  There are no investigations, proceedings or litigation pending or, to the Company's knowledge, threatened against the Company, its subsidiaries or any of their respective facilities relating to Environmental Laws or Hazardous Substances.  "Environmental Laws" shall mean all federal, national, state, regional and local laws, statutes, ordinances and regulations, in each case as amended or supplemented from time to time, and any judicial or administrative interpretation thereof, including orders, consent decrees or judgments relating to the regulation and protection of human health, safety, the environment and natural resources.

(q)    **Intellectual Property Rights and Licenses**.  Except as disclosed in the Disclosure Statement and the SEC Filings, (a) the Company and its subsidiaries own or have the right to use any and all information, know-how, trade secrets, patents, copyrights, trademarks, trade names, software, formulae, methods, processes and other intangible properties that are of a such nature and significance to the business that the failure to own or have the right to use such items would have a Material Adverse Effect ("***Intangible Rights***"), (b) neither the Company nor any of its subsidiaries has received any notice that it is in conflict with or infringing upon the asserted intellectual property rights of others in connection with the Intangible Rights, and, to the Company's knowledge, neither the use of the Intangible Rights nor the operation of the Company's and its subsidiaries' businesses is infringing or has infringed upon any intellectual property rights of others in a manner that would be reasonably expected to have a Material Adverse Effect, (c) all payments have been duly made that are necessary to maintain the Intangible Rights in force, (d) no claims have been made, and to the Company's knowledge, no claims are threatened, that challenge the validity or scope of any material Intangible Right of the

Company or any of its subsidiaries, (e) the Company and its subsidiaries have taken reasonable steps to obtain and maintain in force all licenses and other permissions under Intangible Rights of third parties necessary to conduct their businesses as heretofore conducted by them, and now being conducted by them, and as expected to be conducted, and neither the Company nor its subsidiaries is or has been in material breach of any such license or other permission in a manner that would be reasonably expected to have a Material Adverse Effect.

(r)    **Labor, Employment and Benefit Matters**.

(i)    There are no existing, or to the Company's knowledge, threatened strikes or other labor disputes against the Company or any of its subsidiaries that would be reasonably likely to have a Material Adverse Effect.  There is no organizing activity involving employees of the Company or its subsidiaries pending or, to the Company's knowledge, threatened by any labor union or group of employees.  There are no representation proceedings pending or, to the Company's knowledge, threatened with the National Labor Relations Board, and no labor organization or group of employees of the Company or its subsidiaries has made a pending demand for recognition.

(ii)    Neither the Company nor any of its subsidiaries is, or during the five years preceding the date of this Agreement was, a party to any labor or collective bargaining agreement and there are no labor or collective bargaining agreements which pertain to employees of the Company or any of its subsidiaries.

(iii)    Each employee benefit plan is in compliance with all applicable law, except for such noncompliance that would not be reasonably likely to have a Material Adverse Effect.

(iv)    Neither the Company nor any of its subsidiaries have any liabilities, contingent or otherwise, including, without limitation, liabilities for retiree health, retiree life, severance or retirement benefits, which are not fully reflected, to the extent required by GAAP, on the Company's financial statements or fully funded.  The term "liabilities" used in the preceding sentence shall be calculated in accordance with reasonable actuarial assumptions.

(v)    Neither the Company nor any of its subsidiaries has (i) terminated any "employee pension benefit plan" as defined in Section 3(2) of ERISA (as defined below) under circumstances that present a material risk of the Company or any of its subsidiaries incurring any liability or obligation that would be reasonably likely to have a Material Adverse Effect, or (ii) incurred or expects to incur any outstanding liability under Title IV of the Employee Retirement Income Security Act of 1974, as amended and all rules and regulations promulgated thereunder ("***ERISA***").

(s)    **Compliance with Law**.  Except as disclosed in the Disclosure Statement and the SEC Filings, the Company and its subsidiaries are in compliance in all material respects with all applicable laws, including, to the extent applicable, U.S. anti-money laundering laws and U.S. Treasury Department's Office of Foreign Assets Control regulations, except for such noncompliance that would not reasonably be likely to have a Material Adverse Effect.  Neither the Company or its subsidiaries has received any notice of, nor does the Company have any

11

knowledge of, any violation (or of any investigation, inspection, audit or other proceeding by any governmental entity involving allegations of any violation) of any applicable law involving or related to the Company or any of its subsidiaries which has not been dismissed or otherwise disposed of that would be reasonably likely to have a Material Adverse Effect. Neither the Company nor any of its subsidiaries has received notice or otherwise has any knowledge that the Company or any of its subsidiaries is charged with, threatened with or under investigation with respect to, any violation of any applicable law that would reasonably be likely to have a Material Adverse Effect. Neither the Company nor any of its subsidiaries nor, to the Company's knowledge, any employee or agent of the Company or any subsidiary has made any contribution or other payment to any official of, or candidate for, any federal, state or foreign office in violation of any law. The Company, its subsidiaries and, to the Company's knowledge, their respective directors, officers, employees and agents have complied in all material respects with the Foreign Corrupt Practices Act of 1977, as amended, and any related rules and regulations. The Company expects to be in compliance with the applicable requirements of the Sarbanes-Oxley Act of 2002, as amended, and the rules and regulations thereunder within 180 days of the Closing, except where such noncompliance would not reasonably be likely to have a Material Adverse Effect.

(t)    **Ownership of Property**. Except as disclosed in the Disclosure Statement and the SEC Filings, the Company and its subsidiaries has (i) good and marketable fee simple title to its owned real property, if any, free and clear of all liens, except for liens which do not individually or in the aggregate have a Material Adverse Effect, (ii) a valid leasehold interest in all leased real property, and each of such leases is valid and enforceable in accordance with its terms (subject to laws of general application relating to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and rules of law governing specific performance, injunctive relief or other equitable remedies, and to limitations of public policy) and is in full force and effect, and (iii) good title to, or valid leasehold interests in, all of its other properties and assets free and clear of all liens, except for liens which do not individually or in the aggregate have a Material Adverse Effect.

(u)    **No Integrated Offering**. Assuming the accuracy of each Purchaser's representations and warranties set forth in **<u>Section 2</u>** of this Agreement, neither the Company, nor any of its affiliates or other person acting on the Company's behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the Offering of the Securities to be integrated with prior offerings by the Company for purposes of the Securities Act, when integration would cause the Offering not to be exempt from the requirements of Section 5 of the Securities Act.

(v)    **General Solicitation**. Neither the Company nor, to its knowledge, any person acting on behalf of the Company, has offered or sold any of the Securities by any form of "general solicitation" within the meaning of Rule 502 under the Securities Act. To the knowledge of the Company, no person acting on its behalf has offered the Securities for sale other than to the Purchasers and certain other "accredited investors" within the meaning of Rule 501 under the Securities Act.

(w)    **No Manipulation of Stock**. The Company has not taken and will not take, in violation of applicable law, any action designed to or that might reasonably be expected to cause

12

or result in stabilization or manipulation of the price of the New Common Stock to facilitate the sale or resale of the Securities.

(x)     **No Registration**.  Assuming the accuracy of the representations and warranties made by, and compliance with the covenants of, the Purchasers, no registration of the Securities under the Securities Act is required in connection with the offer and sale of the Securities by the Company to the Purchasers as contemplated by this Agreement.

(y)     **Disclosure**.  The Company understands and acknowledges that each of the Purchasers will rely on the foregoing representations in purchasing the Securities of the Company hereunder.   All disclosure provided by the Company to the Purchasers in the Company's SEC Filings and the Disclosure Statement regarding the Company, its business and the transactions contemplated hereby furnished by or on the behalf of the Company are, taken as a whole, true and correct in all material respects and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.  To the Company's knowledge, no material event or circumstance has occurred or information exists with respect to the Company or its business, properties, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed.

## 4   UNDERSTANDINGS

Each of the Purchasers understands, acknowledges and agrees with the Company as follows:

(a)     The execution of this Agreement by the Purchaser or solicitation of the investment contemplated hereby shall create no obligation on the part of the Company to accept any subscription or complete the Offering.  If the Company accepts a subscription for Securities made by a Purchaser, it shall countersign this Agreement.  If this Agreement is not countersigned by the later of (i) five (5) business days following the Company's receipt thereof, and (ii) one (1) business day after entry of the Confirmation Order by the Bankruptcy Court approving the Plan , the Purchaser shall have the option to withdraw its investment by delivering written notice thereof to the Company.  This Agreement, however, shall remain valid unless and until the Company has received such written notice of withdrawal.  Each Purchaser hereby acknowledges and agrees that the subscription hereunder, once accepted by the Company, is irrevocable by such Purchaser, and that, except as required by law, such Purchaser is not entitled to cancel, terminate or revoke this Agreement or any agreements of such Purchaser hereunder, except that the obligations under this Agreement shall not survive the death or disability of such Purchaser.

(b)     No federal or state agency or authority has made any finding or determination as to the accuracy or adequacy of the Offering Documents or as to the fairness of the terms of the Offering nor any recommendation or endorsement of the Securities.  Any representation to the contrary is a criminal offense.  In making an investment decision, Purchasers must rely on their own examination of the Company and the terms of the Offering, including the merits and risks involved.

96102661\V-3

(c)     The Offering is intended to be exempt from registration under the Securities Act by virtue of Section 4(2) of the Securities Act and the provisions of Rule 506 of Regulation D thereunder, which is in part dependent upon the truth, completeness and accuracy of the statements made by the Purchaser herein and in the Purchaser Questionnaire.

(d)     Notwithstanding the registration obligations provided herein, there can be no assurance that the Purchaser will be able to sell or dispose of the Securities.  It is understood that in order not to jeopardize the Offering's exempt status under Section 4(2) of the Securities Act and Regulation D, any transferee may, at a minimum, be required to fulfill the investor suitability requirements thereunder.

(e)     The Purchaser acknowledges that the Offering is confidential and non-public and agrees that all information about the Offering shall be kept in confidence by the Purchaser until the public announcement of the Offering by the Company.  The Purchaser acknowledges that the foregoing restrictions on the Purchaser's use and disclosure of any such confidential, non-public information contained in the above-described documents restricts the Purchaser from trading in the Company's securities to the extent such trading is on the basis of material, non-public information of which the Purchaser is aware.  Except for the terms of the transaction documents and the fact that the Company is considering consummating the transactions contemplated therein (which information the Company has agreed to disclose in accordance with **Section 4(c)** of this Agreement), the Company confirms that neither the Company nor, to its knowledge, any other person acting on its behalf, has provided any of the Purchasers or their agents or counsel with any information that constitutes material, non-public information as of the Closing Date.

## 5   COVENANTS OF THE COMPANY

(a)     The Company shall make a public announcement of the approval of the Plan, the cancellation of the existing common stock and the execution of this Agreement and the terms of the transaction documents by issuing a press release and filing with the SEC a Current Report on Form 8-K not later than 8:30 a.m. New York City time on the business day following the date of this Agreement.   As a result of the forgoing issuance and filing, all material, non-public information previously provided to the Purchasers or their agents or counsel shall have been publicly announced and disclosed.  Notwithstanding anything in this Agreement to the contrary, following the foregoing issuance and filing the Company shall have no obligation to, and will not, disclose or provide any material, non-public information to the Purchasers or their agents or counsel.

(b)     The Company shall make a public announcement of the Closing of the Offering by issuing a press release not later than 8:30 a.m. New York City time on the business day following the Closing, and thereafter the Company shall file with the SEC a Current Report on Form 8-K within the time frame required by law.

(c)     The Company shall use its reasonable best efforts (i) to be in compliance with all of its SEC filing obligations (including having made all filings under the Exchange Act that have not been timely filed as of the date hereof) not later than the [180]th day following the Closing and (ii) thereafter, to file in a timely manner all required reports under the Exchange Act.

(d)    The Company agrees to file one or more Forms D with respect to the Securities on a timely basis as required under Regulation D under the Securities Act to claim the exemption provided by Rule 506 of Regulation D and to provide a copy thereof to the Purchasers and their counsel promptly after such filing.

(e)    The Company will not sell, offer to sell, solicit offers to buy or otherwise negotiate in respect of any "security" (as defined in the Securities Act) that is or could be integrated with the sale of the Securities in a manner that would require the registration of the Securities under the Securities Act.

(f)    The Company intends that the net proceeds from the Offering will be used to finance in part the distributions to be made under the Plan, to pay the fees and expenses associated therewith, and for working capital and other general corporate purposes of the Company.

6    MISCELLANEOUS

(a)    **Notices**.  Any notice or other document required or permitted to be given or delivered to the Purchasers shall be in writing and sent (x) by fax if the sender on the same day sends a confirming copy of such notice by an internationally recognized overnight delivery service (charges prepaid) or (y) by an internationally recognized overnight delivery service (with charges prepaid):

(i)    if to the Company, at

Nuo Therapeutics, Inc.
207A Perry Parkway, Suite 1
Gaithersburg, MD 20877
Attention: Chief Executive Officer
Facsimile: (240) 499-2690

or such other address as it shall have specified to the Purchaser in writing, with a copy (which shall not constitute notice) to:

Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Attention:  Jeffrey A. Baumel, Esq.
Facsimile: (973) 912-7199

and

Dentons US LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20006
Attention:  Sam J. Alberts, Esq.
Facsimile: (202) 408-6399

15

(ii)    if to the Purchaser, at its address set forth on the signature page to this Agreement, or such other address as it shall have specified to the Company in writing.

(b)    **Section Headings**.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. References in this Agreement to a designated "Section" refer to a Section of this Agreement unless otherwise specifically indicated.

(c)    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

(d)    **Consent to Jurisdiction and Service of Process**.  The parties to this Agreement hereby agree to submit to the jurisdiction of the courts of the State of Delaware and the courts of the United States of America located in the District of Delaware, and appellate courts from any thereof in any action or proceeding arising out of or relating to this Agreement.

(e)    **Waiver of Jury Trial**.    Each of the parties to this Agreement hereby unconditionally agrees to waive, to the fullest extent permitted by applicable law, its respective rights to a jury trial of any claim or cause of action (whether based on contract, tort or otherwise) based upon, arising out of or relating to this Agreement or the transactions contemplated hereby. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto: (i) acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings, (ii) acknowledges that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not in the event of any action or proceeding, seek to enforce the foregoing waiver and (iii) warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 6(E) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

(f)    **Amendments**.  This Agreement may be amended only by an instrument in writing executed by the Company and Purchasers holding at least 66 2/3% of the Shares collectively held by them.  Any such amendment will apply to all Purchasers equally, without distinguishing between them.

(g)    **Entire Agreement**.  This Agreement constitutes the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and thereby.

(h)    **Severability**.  The invalidity or unenforceability of any specific provision of this Agreement shall not invalidate or render unenforceable any of its other provisions.  Any

provision of this Agreement held invalid or unenforceable shall be deemed reformed, if practicable, to the extent necessary to render it valid and enforceable and to the extent permitted by law and consistent with the intent of the parties to this Agreement.

(i) **Arms Length Negotiations**. The Company acknowledges and each Purchaser confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors.

(j) **Counterparts**. This Agreement may be executed in multiple counterparts, including by means of facsimile, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

(SIGNATURE PAGE FOLLOWS)

96102661\V-3

The Purchaser hereby subscribes for such number of Shares as shall equal (x) the Subscription Amount as set forth below divided by the Share Purchase Price, rounded down to the nearest whole number, and agrees to be bound by the terms and conditions of this Agreement.

**PURCHASER**

Dated    April [18], 2016

Total Subscription Amount:    $

Signature of Subscriber

Name and Title of Officer (if applicable)

Signature of Joint Subscriber (if any):

Social Security Number:

Taxpayer Identification (if applicable)

Social Security Number of Joint
Subscriber (if any):

Name (please print as name will appear on
stock certificate):

Number and Street:

City, State:

Zip Code:

**ACCEPTED BY:**

**NUO THERAPEUTICS, INC.**

By:_____
Name:
Title:
Dated:

## SCHEDULE A

## ESCROW INSTRUCTIONS

PLEASE SEND WIRE TRANSFERS TO THE ESCROW ACCOUNT AS FOLLOWS:[TO COME]

**SCHEDULE B**

**SUBSIDIARIES**

Cytomedix Acquisition Corp LLC

Aldagen, Inc. (Delaware)

**SCHEDULE C**

**CERTAIN FEES AND COMMISSIONS**

## EXHIBIT A

## LEGAL MATTERS

Dentons US LLP shall deliver an opinion covering the following matters.  The opinion shall be subject to and include customary assumptions, limitations and qualifications.

1.  The Company is a corporation, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority under the laws of the State of Delaware to enter into and perform its obligations under the Securities Purchase Agreement and the Escrow Agreement (collectively, the "Agreements").

2.  The authorized capital stock of the Company consists of ● shares of common stock, par value $0.0001 per share, and ● shares of preferred stock, par value $0.0001 per share.

3.  The Shares have been duly authorized or reserved for issuance by all necessary corporate action on the part of the Company, and the Shares, when issued and delivered against payment therefore in accordance with the provisions of the Securities Purchase Agreement, will be validly issued, fully paid and non-assessable.

4.  The execution and delivery by the Company of the Agreements, and the consummation by the Company of the transactions contemplated thereby, have been duly authorized by all necessary corporate action on the part of the Company.  The Agreements constitute the valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms.

5.  The execution and delivery by the Company of the Agreements, and the consummation by the Company of the transactions contemplated thereby, do not (a) violate the provisions of any federal law of the United States of America or the General Corporation Law of the State of Delaware applicable to the Company, (b) violate the provisions of the Company's Certificate of Incorporation or By-laws; or, (c) to our knowledge, violate any existing obligation of the Company under any judgment, decree, order or award of any court, governmental body or arbitrator specifically naming the Company and of which we are aware, without any inquiry.

6.  Assuming (a) the accuracy of the representations made by each Purchaser in the Securities Purchase Agreement, (b) that neither the Company, any placement agent nor any person acting on behalf of either the Company or the Placement Agent has offered or sold the Securities by any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D (the "Regulation D") promulgated under the Securities Act, (c) that no offerings or sales of securities of the Company after the date hereof in a transaction can be "integrated" with any sales of the Securities, and (d) that each person or entity that purchased securities of the Company directly from the Company or its agents and without registration between the date six months prior to the Closing of the Offering and the date of the Agreement was, as of the date of such purchase, an "accredited investor" as defined in Rule 501 of Regulation D, the sale of the Securities to the Purchasers at the Closing under the circumstances contemplated by the Securities Purchase Agreement are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act.

**EXHIBIT B**

**FORM OF ESCROW AGREEMENT**

[TO COME]

**EXHIBIT C**

**REGISTRATION RIGHTS AGREEMENT**

**EXHIBIT D**

**CONFIDENTIAL PURCHASER QUESTIONNAIRE**

This Questionnaire must be completed and returned to:

NUO THERAPEUTICS, INC.
207A Perry Parkway, Suite 1
Gaithersburg, MD 20877
Attention:
Facsimile:

1.    IF YOU ARE AN INDIVIDUAL PLEASE FILL IN THE IDENTIFICATION QUESTIONS IN (A) IF YOU ARE AN ENTITY PLEASE FILL IN THE IDENTIFICATION QUESTIONS IN (B)

A.    INDIVIDUAL IDENTIFICATION QUESTIONS

Name (Exact name as it should appear on stock certificate) _____

Residence:

Address_____

Home Telephone Number_____

Fax Number_____

Date of Birth_____

Social Security Number_____

B.    IDENTIFICATION QUESTIONS FOR ENTITIES

Name (Exact name as it will appear on stock certificate)_____

Address of Principal Place of Business_____

State (or Country) of Formation or Incorporation_____

Contact Person_____

Telephone Number_____

Type of Entity (corporation, partnership, trust, etc.)_____

Was entity formed for the purpose of this investment? Yes or No_____

2.    DESCRIPTION OF INVESTOR

The following information is required to ascertain whether you would be deemed an "accredited investor" as defined in Rule 501 of Regulation D under the Securities Act.

Please check whether you are any of the following:

_____a corporation or partnership with total assets in excess of $5,000,000, not organized for the purpose of this particular investment;

_____private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, a U.S. venture capital fund which invests primarily through private placements in non-publicly traded securities and makes available (either directly or through co-investors) to the portfolio companies significant guidance concerning management, operations or business objectives or a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958 or an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act;

_____a trust not organized to make this particular investment, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of the Securities Act of 1933 and who completed item 4 below of this questionnaire o a bank as defined in Section 3(a)(2) or a savings and loan association or other institution defined in Section 3(a)(5)(A) of the Securities Act of 1933 acting in either an individual or fiduciary capacity o an insurance company as defined in Section 2(13) of the Securities Act of 1933;

_____ an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 (i) whose investment decision is made by a fiduciary which is either a bank, savings and loan association, insurance company, or registered investment advisor, or (ii) whose total assets exceed $5,000,000, or (iii) if a self-directed plan, whose investment decisions are made solely by a person who is an accredited investor and who completed Part I of this questionnaire;

_____a charitable, religious, educational or other organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the purpose of this investment, with total assets in excess of $5,000,000;

_____an entity not located in the U.S. none of whose equity owners are U.S. citizens or U.S. residents;

_____a broker or dealer registered under Section 15 of the Securities Exchange Act of 1934;

_____a plan having assets exceeding $5,000,000 established and maintained by a government agency for its employees;

26

_____an individual who had individual income from all sources during each of the last two years in excess of $200,000 or the joint income of you and your spouse (if married) from all sources during each of such years in excess of $300,000 and who reasonably excepts that either your own income from all sources during the current year will exceed $200,000 or the joint income of you and your spouse (if married) from all sources during the current year will exceed $300,000;

_____an individual whose net worth as of the date you purchase the securities offered, together with the net worth of your spouse, be in excess of $1,000,000 ;

_____an entity in which all of the equity owners are accredited investors

3.    BUSINESS, INVESTMENT AND EDUCATIONAL EXPERIENCE

Occupation

Number of Years

Present Employer

Position/Title Educational Background

Frequency of prior investment (check one in each column):

|  | Frequently | Occasionally | Never |
|---|---|---|---|
| Stock & Bonds |  |  |  |
| Venture Capital Investments |  |  |  |

4.    SIGNATURE

The above information is true and correct.  The undersigned recognizes that the Company and its counsel are relying on the truth and accuracy of such information in reliance on the exemption contained in Subsection 4(2) of the Securities Act of 1933, as amended, and Regulation D promulgated thereunder.   The undersigned agrees to notify the Company promptly of any changes in the foregoing information, which may occur prior to the investment.

Executed at _____, on , 2016

_____

96102661\V-3

**<u>Attachment 9.B.</u>**

**Scenario B, certain New Common Stock document:  Registration Rights Agreement**

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (as amended from time to time, this "**Agreement**") is dated as of April [18] 2016, and is between **NUO THERAPEUTICS, INC.**, a Delaware corporation (the "***Company***"), and the stockholders listed on **Schedule 1** hereto (collectively, the "***Stockholders***" and, each individually, a "***Stockholder***").  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below).

## INTRODUCTION

WHEREAS, on the date hereof, the Company issued shares (the "***Shares***") of common stock, par value $0.0001 per share (the "***Common Stock***"), to the Stockholders pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "***Securities Act***") and Rule 506 of Regulation D promulgated thereunder, and upon the terms set forth in the First Amended Plan of Reorganization of the Company (as amended, modified or supplemented, the "***Plan***") under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101, et seq.), confirmed by order dated April [  ], 2016 of the United States Bankruptcy Court for the District of Delaware.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which is hereby acknowledged, the Company and each of the Stockholders agree as follows:

## ARTICLE I
## DEFINITIONS

In this Agreement:

"***Applicable Exchange***" means The New York Stock Exchange, Inc. or the NASDAQ Stock Exchange, including the NASDAQ Global Market.

"***Exchange Act***" means the Securities Exchange Act of 1934.

"***Prospectus***" means the prospectus included in the Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the Registrable Securities covered by the Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"***Registrable Securities***" shall mean any Shares issued to the Stockholders on the date hereof together with any securities issued or issuable upon any stock split, dividend or other distribution, adjustment, recapitalization or similar event with respect to the foregoing; provided, however, that any such securities shall cease to be Registrable Securities upon the earlier of the date when (i) such Registrable Securities have been registered under the Securities Act and disposed of in accordance with a registration statement filed under the Securities Act, including

the Registration Statement, or such Registrable Securities have been disposed of under Rule 144 promulgated under the Securities Act or (ii) such Registrable Securities have been sold without registration or restriction pursuant to Rule 144(b) under the Securities Act or any successor provision.

"***Registration Statement***" means the registration statement required to be filed under this Agreement, including the Prospectus, amendments and supplements to such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"***SEC***" means the U.S. Securities and Exchange Commission.

## ARTICLE II
## DEMAND AND PIGGYBACK RIGHTS

Section 2.01    **Shelf Registration**.

(a)    The Company shall use its best efforts to cause to prepare and file with the SEC a "Shelf" Registration Statement covering the resale of all Registrable Securities for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act on or prior to the 120th day (the "***Filing Default Date***") following the Closing (such date of actual filing, the "***Filing Date***").  The Registration Statement shall be on Form S 3; provided that if the Company shall determine in good faith that Form S-3 is not then available to it, the Registration Statement shall be on Form S-1. Each Stockholder will furnish to the Company, within five (5) business days after request by the Company, a completed questionnaire in the form set forth as **Exhibit A** hereto.  Each Stockholder agrees to promptly update such questionnaire in order to make the information previously furnished to the Company by such Stockholder complete and not materially misleading. The Registration Statement shall register the Registrable Securities for resale by the holders thereof.

(b)    The Company shall use its best efforts to cause the Registration Statement to be declared effective by the SEC on or prior to the 150th day following the Closing (the "***No-Review Effectiveness Default Date***") if there is no SEC review of the Registration Statement or the 210th day following the Closing (the "***SEC-Review Effectiveness Default Date***") in the event of an SEC review of the Registration Statement, and shall use its best efforts to keep the Registration Statement continuously effective under the Securities Act until the the date when all Registrable Securities covered by such Registration Statement have been sold (the "***Mandatory Registration Effectiveness Period***").

(c)    The Company shall request effectiveness of the Registration Statement (and any post-effective amendments thereto) within five (5) business days following the Company's receipt of notice from the SEC that the Registration Statement will not be reviewed by the SEC or that the SEC has completed its review of such Registration Statement and has no further comments.  The Company shall request effectiveness of the Registration Statement (and any post-effective amendments thereto) at 5:00 p.m., New York City

2

time, on the effective date, and file with the SEC and deliver the Prospectus (or any supplements thereto), which delivery may be made electronically, by 8:00 a.m. New York City time on the business day after such effective date.

(d) If for any reason the SEC does not permit all of the Registrable Securities to be included in the Registration Statement filed pursuant to Section 2.01(a) above, or for any other reason any Registrable Securities are not then included in a Registration Statement filed under this Agreement, then the Company shall prepare, and, as soon as practicable, file with the SEC an additional Registration Statement covering the resale of all Registrable Securities not already covered by an existing and effective Registration Statement for an offering to be made on a continuous basis pursuant to Rule 415 of the Securities Act.

Section 2.02   **Demand Registration**.

(a) Stockholders holding at least five percent (5%) of the Registrable Securities may, at any time and from time to time, deliver to the Company written notices (each, a "***Demand Notice***") requesting that the Company register all or any portion of the Registrable Securities for resale in an underwritten public offering or otherwise (a "**Demand Registration**"). Any Demand Notice shall specify the number of shares of Registrable Securities proposed to be sold and the intended method(s) of distribution thereof (which may, but need not, include resales in an underwritten public offering with an underwriter(s) selected by the Stockholders requesting registration and reasonably acceptable to the Company). The Company may defer any Demand Registration for up to thirty (30) days if a failure to do so would be materially detrimental to the Company in the reasonable discretion of the Company, provided that the Company will only be entitled to defer a Demand Registration once during any twelve consecutive month period.  The Company will not be obligated to effect any Demand Registration within 180 days after the effective date of a previous Registration Statement in which the holders of Registrable Securities were able to register.

(b) The Company shall use its best efforts to cause to prepare and file with the SEC a Registration Statement covering the resale of all Registrable Securities for an offering to be made in accordance with the plan of distribution or underwriting described in the Demand Notice.   Each Stockholder participating in a Demand Registration will furnish to the Company, within five (5) business days after request by the Company, a completed questionnaire in the form set forth as **Exhibit A** hereto.  Each Stockholder agrees to promptly update such questionnaire in order to make the information previously furnished to the Company by such Stockholder complete and not materially misleading.

(c) The Company shall use its best efforts to cause the Registration Statement to be declared effective by the SEC as soon as practicable following its filing with the SEC and to maintain such effectiveness until all Registrable Securities covered by such Registration Statement have been sold or, if earlier, the offering is terminated (the "***Demand Registration Effectiveness Period***" and, together with the Mandatory Registration Effectiveness Period, the "***Effectiveness Period***").

3

Section 2.03  **Registration Procedures**.    In connection with the Company's registration obligations hereunder, the Company shall:

(a)  Use its best efforts to (i) prepare and file with the SEC such amendments, including post-effective amendments, to the Registration Statement as may be necessary to keep the Registration Statement continuously effective as to the Registrable Securities for the applicable Effectiveness Period, (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement, and as so supplemented or amended to be filed pursuant to Rule 424, and (iii) respond promptly to any comments received from the SEC with respect to the Registration Statement or any amendment thereto.

(b)  Notify the Stockholders as promptly as reasonably possible, and (if requested by the Stockholders) confirm such notice in writing of any of the following events: (i) the SEC notifies the Company whether there will be a "review" of any Registration Statement filed hereunder, (ii) the SEC comments in writing on the Registration Statement, (iii) the SEC or any other Federal or state governmental authority in writing requests any amendment or supplement to the Registration Statement or Prospectus or requests additional information related thereto, (iv) if the SEC issues any stop order suspending the effectiveness of the Registration Statement or initiates any action, claim, suit, investigation or proceeding (a "***Proceeding***") for that purpose, (v) the Company receives notice in writing of any suspension of the qualification or exemption from qualification of any Registrable Securities for sale in any jurisdiction, or the initiation or threat of any Proceeding for such purpose; or (vi) the financial statements included in the Registration Statement become ineligible for inclusion therein or any statement made in the Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference is untrue in any material respect or any revision to the Registration Statement, Prospectus or other document is required so that it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.    Notwithstanding the foregoing, the Company shall not include any material non-public information in any notice provided to any Stockholder under this **Section 2.03(b)**.

(c)  Use its reasonable best efforts to avoid the issuance of or, if issued, obtain the prompt withdrawal of (i) any order suspending the effectiveness of the Registration Statement or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction.

(d)  Use its reasonable best efforts to deliver to each Stockholder, which delivery may be made electronically, by 8:00 a.m. New York City time on the business day after the date first available, without charge, such reasonable number of copies of the Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Stockholders may reasonably request.    The Company hereby consents (except during the continuance of any event described in **Section 2.03(b)(iii)-(vi)** above) to the use of such Prospectus and each amendment or supplement thereto by each of the

selling Stockholders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(e) In the event the Company's Common Stock is then listed on an Applicable Exchange: (i) in the time and manner required by the Applicable Exchange, prepare and file with Applicable Exchange an additional share listing application covering all of the Registrable Securities, (ii) use its reasonable best efforts to take all steps reasonably necessary to cause such Registrable Securities to be approved for listing on the Applicable Exchange as soon as possible thereafter, (iii) provide to the Stockholders notice of such listing, and (iv) use its reasonable best efforts to maintain the listing of such Registrable Securities on the Applicable Exchange.

(f) To the extent required by law, prior to any public offering of Registrable Securities, use its reasonable best efforts to register or qualify or cooperate with the selling Stockholders in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or "blue sky" laws of such jurisdictions within the United States as any Stockholder requests in writing, to keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period and to do any and all other acts or things reasonably necessary or advisable to enable the disposition in such jurisdictions of the Registrable Securities covered by a Registration Statement; provided, however, that the Company shall not be required for any such purpose to (i) qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not be otherwise required to qualify but for the requirements of this **Section 2.03(f)**, (ii) file any general consent to service of process in any jurisdiction where it is not as of the date hereof so subject, or (iii) otherwise subject itself to taxation.

(g) Upon the occurrence of any event described in **Section 2.03(b)(iii)-(vi)** above, as promptly as reasonably possible, prepare a supplement or amendment, including a post-effective amendment, to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, neither the Registration Statement nor such Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that the Company may suspend sales pursuant to the Registration Statement for a period of up to twenty (20) consecutive days or for a total of not more than forty-five (45) days in any twelve-month period if the Company furnishes to the holders of the Registrable Securities a certificate signed by the Company's Chief Executive Officer stating that in the good faith judgment of the Company's Board of Directors, there is some material development relating to the operations or condition (financial or other) of the Company that has not been disclosed to the general public and as to which it is in the Company's best interests not to disclose such development, and the Company shall not disclose such development to the Stockholders.

(h) In the event that any broker-dealer registered under the Exchange Act shall underwrite any Registrable Securities or participate as a member of an underwriting syndicate or

selling group or "assist in the distribution" (within the meaning of the Conduct Rules of the Financial Industry Regulatory Authority, Inc. ("**FINRA**") or any successor thereto, as amended from time to time) thereof, whether as a holder of such Registrable Securities or as an underwriter, a placement or sales agent or a broker or dealer in respect thereof, or otherwise, cooperate with such broker-dealer in connection with any filings required to be made by FINRA.

(i)   The Company shall enter into customary agreements (including, if applicable, an underwriting agreement in customary form) and take such other actions as are reasonably required in order to expedite or facilitate the disposition of such Registrable Securities.

(j)   The Company shall furnish to each holder of Registrable Securities included in any Registration Statement a signed counterpart, addressed to such holder, of (i) any opinion of counsel to the Company delivered to any underwriter and (ii) any comfort letter from the Company's independent public accountants delivered to any underwriter. In the event no legal opinion is delivered to any underwriter, the Company shall furnish to each holder of Registrable Securities included in such Registration Statement, at any time that such holder elects to use a prospectus, an opinion of counsel to the Company to the effect that the Registration Statement containing such prospectus has been declared effective and that no stop order is in effect.

Section 2.04   **Registration Expenses**.  The Company shall pay (or reimburse the Stockholders for) all fees and expenses incident to the performance of or compliance with this Agreement by the Company, including without limitation (a) all registration and filing fees and expenses, including without limitation those related to filings or registration with the SEC, FINRA and in connection with applicable state securities or "Blue Sky" laws, (b) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing copies of Prospectuses reasonably requested by the Stockholders), (c) messenger, telephone and delivery expenses, (d) and fees and expenses of all other persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. Notwithstanding the foregoing, each Stockholder shall pay any and all costs, fees, discounts or commissions attributable to the sale of its respective Registrable Securities.

Section 2.05   **Indemnification**.

(a)   **Indemnification by the Company**.  In consideration of each Stockholder's execution and delivery of this Agreement and in addition to the Company's other obligations hereunder, the Company shall, notwithstanding any termination of this Agreement, indemnify, defend, protect and hold harmless each Stockholder, its officers and directors, partners, members, agents, brokers and employees of each of them, each person who controls any such Stockholder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, agents and employees of each such controlling person, and each underwriter of Registrable Securities, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, settlement costs and expenses, including without limitation costs of preparation and reasonable attorneys' fees (collectively, "**Losses**"), as incurred, arising out of or relating to (A) any untrue or alleged untrue statement of a

material fact contained in the Registration Statement, any Prospectus or form of prospectus or in any amendment or supplement thereto, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (i) such untrue statements or omissions are based upon information regarding such Stockholder furnished in writing to the Company by such Stockholder expressly for use therein, or to the extent that such information related to such Stockholder or such Stockholder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Stockholder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto (which shall, however, be deemed to include disclosure substantially in accordance with the "Plan of Distribution" attached hereto), or (ii) in the case of an occurrence of an event of the type specified in **Section 2.03(b)** above, the use by such Stockholder of an outdated or defective Prospectus after the Company has duly notified such Stockholder in writing that the Prospectus is outdated or defective, (B) any misrepresentation or material breach of any representation or warranty made by the Company in the Offering Documents; or (C) any material breach of any covenant, agreement or obligation of the Company contained in the Offering Documents.  The Company shall notify the Stockholders promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement.

(b)  **Conduct of Indemnification Proceedings**.  If any Proceeding shall be brought or asserted against any person entitled to indemnity hereunder (an "***Indemnified Party***"), such Indemnified Party shall promptly notify the person from whom indemnity is sought (the "Indemnifying Party") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof, provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have prejudiced the Indemnifying Party.  An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (i) the Indemnifying Party has agreed in writing to pay such fees and expenses; or (ii) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (iii) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Indemnifying Party; provided, however, that in the event that the Indemnifying Party shall be required to pay the fees

7

and expenses of separate counsel, the Indemnifying Party shall only be required to pay the fees and expenses of one separate counsel for such Indemnified Party or Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding affected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding. All fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten trading days of written notice thereof to the Indemnifying Party (regardless of whether it is ultimately determined that an Indemnified Party is not entitled to indemnification hereunder; provided, that the Indemnifying Party may require such Indemnified Party to undertake to reimburse all such fees and expenses to the extent it is finally judicially determined that such Indemnified Party is not entitled to indemnification hereunder).

(c) **Contribution**. If a claim for indemnification under **Section 2.05(a)** is unavailable to an Indemnified Party (by reason of public policy or otherwise), then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or related to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in **Section 2.05(b)**, any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this **Section 2.05(c)** was available to such party in accordance with its terms. The parties hereto agree that it would not be just and equitable if contribution pursuant to this **Section 2.05(c)** were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding section. Notwithstanding the provision of this **Section 2.05(c)**, no Stockholder shall be required to contribute, in the aggregate, any amount in excess of the amount of net proceeds actually received by such Stockholder from the sale of the Registrable Securities subject to the Proceeding. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified

Parties and any cause of action or similar right of the Indemnified Parties against the Indemnifying Parties or others.

Section 2.06    **Piggy-Back Registrations**.

(a)    If at any time during the Effectiveness Period, other than any suspension period referred to in **Section 2.03(g)** above, there is not an effective Registration Statement covering all of the Registrable Securities and the Company shall determine to prepare and file with the SEC a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with stock option or other employee benefit plans, then the Company shall send to each Stockholder written notice of such determination and if, within ten (10) days after receipt of such notice, any such Stockholder shall so request in writing, the Company shall use its reasonable best efforts to include in such registration statement all or any part of such Registrable Securities not already covered by an effective Registration Statement such Stockholder requests to be registered; provided, however, that the Company shall have the right to postpone or withdraw any registration effected pursuant to this **Section 2.06(a)**.

(b)    If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so indicate in the notice given pursuant to **Section 2.06(a)**.  In such event the right of any Stockholder to registration pursuant to **Section 2.06(a)** shall be conditioned upon Stockholder's agreeing to participate in such underwriting and in the inclusion of such Stockholder's Registrable Securities in the underwriting to the extent provided herein.  The Stockholder shall (together with the Company and the other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company or by other holders exercising any demand registration rights.  Notwithstanding any other provision of this **Section 2.06**, if the underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may exclude some or all Registrable Securities or other securities from such registration and underwriting (hereinafter an "*Underwriter Cutback*").  In the event of an Underwriter Cutback, the Company shall so advise the Stockholder and the other holders distributing their securities through such underwriting, and the number of Registrable Securities that may be included in the registration and underwriting shall be allocated in proportion, as nearly as practicable, to the respective amounts of Registrable Securities held by the Stockholder and the other holders distributing their securities through such underwriting at the time of filing the registration statement.  If any Stockholder disapproves of the terms of any such underwriting, such Stockholder may elect to withdraw therefrom by written notice to the Company and the underwriter.  Any securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

Section 2.07    **Rule 144**.  Until the earlier of (i) one year following the effectiveness of the Registration Statement and (ii) the date when such Registrable Securities may be sold without

9

registration or restriction pursuant to Rule 144(b) under the Securities Act or any successor provision, the Company agrees with each holder of Registrable Securities to:

(a)  use its best efforts to comply with the requirements of Rule 144(c) under the Securities Act with respect to current public information about the Company;

(b)  use its best efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time it is subject to such reporting requirements), and

(c)  furnish to any holder of Registrable Securities upon request (i) a written statement by the Company as to its compliance with the requirements of said Rule 144(c) and the reporting requirements of the Securities Act and the Exchange Act (at any time it is subject to such reporting requirements), (ii) a copy of the most recent annual or quarterly report of the Company, and (iii) such other reports and documents of the Company as such holder may reasonably request to avail itself of any similar rule or regulation of the SEC allowing it to sell any such securities without registration.

Section 2.08   **Exchange Act Registration**.  Promptly following the date hereof, the Company shall cause the Common Stock to be registered under Section 12(g) of the Exchange Act.

## ARTICLE III
## MISCELLANEOUS

Section 3.01   **Notices**.  Any notice or other document required or permitted to be given or delivered to the Stockholders shall be in writing and sent (x) by fax if the sender on the same day sends a confirming copy of such notice by an internationally recognized overnight delivery service (charges prepaid) or (y) by an internationally recognized overnight delivery service (with charges prepaid):

(a)  if to the Company, at

> Nuo Therapeutics, Inc.
> 207A Perry Parkway, Suite 1
> Gaithersburg, MD 20877
> Attention: Chief Executive Officer
> Facsimile: (240) 499-2690

or such other address as it shall have specified to the Stockholder in writing, with a copy (which shall not constitute notice) to:

> Dentons US LLP
> 1221 Avenue of the Americas
> New York, NY 10020-1089
> Attention:  Jeffrey A. Baumel, Esq.
> Facsimile: (973) 912-7199

> and

US_Active\108324971v1

Dentons US LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20006
Attention:  Sam J. Alberts, Esq.
Facsimile: (202) 408-6399

(b)  If to a Stockholder, to the address set forth with respect to such Stockholder on **Schedule 1** or to such other person or address as such Stockholder shall furnish to the Company and the other Stockholders in writing.

Section 3.02    **Section Headings**.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. References in this Agreement to a designated "Article" or "Section" refer to an Article or Section of this Agreement unless otherwise specifically indicated.

Section 3.03    **Governing Law**.    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

Section 3.04    **Consent to Jurisdiction and Service of Process**.  The parties to this Agreement hereby agree to submit to the jurisdiction of the courts of the State of Delaware and the courts of the United States of America located in the District of Delaware, and appellate courts from any thereof in any action or proceeding arising out of or relating to this Agreement.

Section 3.05    **Waiver of Jury Trial**.    Each of the parties to this Agreement hereby unconditionally agrees to waive, to the fullest extent permitted by applicable law, its respective rights to a jury trial of any claim or cause of action (whether based on contract, tort or otherwise) based upon, arising out of or relating to this Agreement or the transactions contemplated hereby. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto: (i) acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings, (ii) acknowledges that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not in the event of any action or proceeding, seek to enforce the foregoing waiver and (iii) warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 3.05 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

Section 3.06    **Amendments**.  This Agreement may be amended only by an instrument in writing executed by the Company and Stockholders holding at least 66 2/3% of the Registrable

Securities collectively held by them.  Any such amendment will apply to all Stockholders equally, without distinguishing between them.

Section 3.07    **Entire Agreement**.    This Agreement constitutes the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and thereby. The registration rights granted under this Agreement supersede any registration, qualification or similar rights with respect to any of the shares of Common Stock granted under any other agreement, and any of such preexisting registration rights are hereby terminated.

Section 3.08    **Severability**.  The invalidity or unenforceability of any specific provision of this Agreement shall not invalidate or render unenforceable any of its other provisions.    Any provision of this Agreement held invalid or unenforceable shall be deemed reformed, if practicable, to the extent necessary to render it valid and enforceable and to the extent permitted by law and consistent with the intent of the parties to this Agreement.

Section 3.09    **Arms Length Negotiations**.  The Company acknowledges and each Stockholder confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors.

Section 3.10    **Counterparts**.    This Agreement may be executed in multiple counterparts, including by means of facsimile or electronic mail, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

(Signature Page Follows)

12

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**COMPANY**

**NUO THERAPEUTICS, INC.**

By: _____
     Name:
     Title:

**STOCKHOLDERS**

**[STOCKHOLDER]**

By: _____
     Name:
     Title:

Schedule 1

| Stockholder Name | Address |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

## **Attachment 10**

**Scenario B Secured Exit Financing Facility certain documents:  Credit Agreement, and Guaranty and Security Agreement**

# CREDIT AGREEMENT

CREDIT AGREEMENT (this "**Agreement**"), dated as of [_____], 2016, among Nuo Therapeutics, Inc., a Delaware corporation ("**Borrower**"), [Deerfield Mgmt, L.P.], as administrative agent and collateral agent (in such capacities, the "**Agent**") and the lenders set forth on the signature page of this Agreement (such persons and each person which from time to time becomes a party hereto as a lender, the "**Lenders**", and together with the Agent and the Borrower, the "**Parties**").

## W I T N E S S E T H :

WHEREAS, on January 26, 2016 (the "**Petition Date**") the Borrower, as a debtor and debtor in possession, filed a voluntary petition for relief under the Bankruptcy Code (such term and other capitalized terms used herein shall have the meanings set forth in Article I of this Agreement) with the United States Bankruptcy Court for the for the District of Delaware (the "**Bankruptcy Court**") (such proceedings being jointly administered under Case No. 16-10192 (MFW) are hereinafter referred to collectively as the "**Chapter 11 Case**");

WHEREAS, on March 28, 2016, the Borrower filed with the Bankruptcy Court the Reorganization Plan (as defined below);

WHEREAS, on April [____], 2016, the Bankruptcy Court entered the Confirmation Order (as defined below) confirming the Reorganization Plan; and

WHEREAS, in connection with Scenario B (as such term is defined in the Reorganization Plan, the Borrower has requested, and the Lenders have agreed to provide, up to $10,750,000 in term loans from time to time to pay for fees, costs and expenses associated with the Chapter 11 Case and the term loan facility evidenced by this Agreement and for working capital purposes, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1    UCC Defined Terms**.  The following terms are used herein as defined in the UCC: Accounts, Certificated Security, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Inventory, Leases, Letter-of-Credit Rights, Money, Payment Intangibles, Supporting Obligations, and Tangible Chattel Paper.

**Section 1.2    General Definitions**.  Wherever used in this Agreement, including the recitals hereto, the Exhibits or the Schedules attached hereto, unless the context otherwise requires, the following terms have the following meanings:

"**Accountant's Report**" has the meaning given to it in Section 5.1(e)(i).

"**Additional Amounts**" has the meaning given to it in Section 2.5.

"**Affiliate**" means, with respect to any Person, any other Person:

      (a)    that owns, directly or indirectly, in the aggregate more than 10% of the beneficial ownership interest of such Person;

      (b)    that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person; or

      (c)    that directly or indirectly is a general partner, controlling shareholder, or managing member of such Person.

"**Agent**" has the meaning given to it in the introductory paragraph hereto.

"**Agreement**" has the meaning given in the introductory paragraph hereto.

"**Agreement Date**" means the date of this Agreement.

"**Applicable Laws**" means all statutes, rules and regulations of any Governmental Authorities in the United States or elsewhere relating to Borrower or its Subsidiaries or the conduct of their respective businesses.

"**Authorizations**" has the meaning given to it in Section 3.1(o).

"**Bankruptcy Code**" means title 11 of the United States Code, as now and hereafter in effect, or any successor statutes.

"**Bankruptcy Court**" has the meaning given to it in the Recitals hereto.

"**Borrower**" has the meaning given to it in the introductory paragraph hereto.

"**Borrower Indemnified Party**" has the meaning given to it in Section 7.11.

"**Business Day**" means a day on which banks are open for business in the City of New York.

"**Cash and Cash Equivalents**" means, with respect to any date of determination, cash, cash equivalents, and marketable securities as set forth on Borrower's balance sheet as of such date.

"**CFC**" has the meaning given to it in Section 3.1(m).

"**Chapter 11 Case**" has the meaning given to it in the Recitals hereto.

"**Claim**" has the meaning given to it in Section 5.1(d).

"**Code**" has the meaning given to it in Section 3.1(m).

"**Collateral**" has the meaning provided therefor in the Security Agreement.

"**Commitment**" means the commitment of the Lenders to provide Loans in accordance with Section 2.2 in an aggregate principal amount of $10,750,000.

"**Confirmation Order**" means that certain order confirming the Reorganization Plan pursuant to Section 1129 of the Bankruptcy Code entered by the Bankruptcy Court on April [____], 2016.

"**Control Agreement**" has the meaning provided therefor in the Security Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other domestic or foreign liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, arrangement (including under any relevant incorporating statute), rearrangement, receivership, insolvency, reorganization, judicial management, administration or relief of debtors or similar debtor relief laws of the United States or other applicable jurisdiction from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event which, at the giving of notice, lapse of time or fulfillment of any other condition (or any combination of the foregoing), would constitute an Event of Default.

"**Dollars**" and the "**$**" sign mean the lawful currency of the United States of America.

"**Event of Default**" has the meaning given to it in Section 6.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, including the rules and regulations thereunder.

"**FDA**" means the U.S. Food and Drug Administration.

"**GAAP**" means generally accepted accounting principles consistently applied as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession).

"**Government Authority**" means any government, quasi-governmental agency, governmental department, ministry, cabinet, commission, board, bureau, agency, court, tribunal, regulatory authority, instrumentality, judicial, legislative, fiscal, or administrative body or entity, whether domestic or foreign, federal, state, provincial or local, having jurisdiction over the matter or matters and Person or Persons in question.

"**Hedging Obligations**" means all liabilities under take-or-pay or similar arrangements or under any interest rate swaps, caps, floors, collars and other interest hedge or protection agreements, treasury locks, equity forward contracts, currency agreements or commodity purchase or option agreements or other interest or exchange rate or commodity price hedging agreements and any other derivative instruments, in each case, whether the Borrower and its

3

Subsidiaries are liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which liabilities the Borrower or its Subsidiaries otherwise assures a creditor against loss.

"**Indebtedness**" means the following:

  (a)  all indebtedness for borrowed money;

  (b)  the deferred purchase price of assets or services (other than trade payables and other liabilities to employees and officers arising in the ordinary course of business and not related to any financing) which in accordance with GAAP would be shown to be a liability (or on the liability side of a balance sheet);

  (c)  all guarantees of Indebtedness;

  (d)  the maximum amount of all letters of credit issued or acceptance facilities established for the account of Borrower and any of its Subsidiaries, including without duplication, all drafts drawn thereunder (other than letters of credit or acceptance facilities supporting other indebtedness of Borrower and any of its Subsidiaries which are otherwise permitted hereunder);

  (e)  all capitalized lease obligations;

  (f)  all indebtedness of another Person secured by any Lien on any property of Borrower or its Subsidiaries, whether or not such indebtedness has been assumed or is recourse (with the amount thereof, in the case of any such indebtedness that has not been assumed by Borrower or its Subsidiaries, being measured as the lower of (x) the fair market value of such property and (y) the amount of the indebtedness secured);

  (g)  all Hedging Obligations; and

  (h)  indebtedness created or arising under any conditional sale or title retention agreement.

"**Indemnity**" has the meaning given to it in Section 9.11.

"**Initial Lenders**" means the Lenders signatory to this Agreement on the Agreement Date.

"**Initial Loan**" means the initial Loan by Lenders hereunder.

"**Interest Payment Date**" has the meaning given to it in Section 2.7.

"**Interest Rate**" means seven and a half percent (7.5%) simple interest per annum.

"**IP**" and "**Intellectual Property**" have the meanings given to such terms in Section 3.1(k).

"**Lenders**" means the Initial Lenders and any other Person who becomes party to this Agreement from time to time as a Lender.

4

"**Lien**" means any lien, pledge, preferential arrangement, mortgage, security interest, deed of trust, charge, assignment, hypothecation, title retention, privilege or other encumbrance on or with respect to property or interest in property having the practical effect of constituting a security interest, in each case with respect to the payment of any obligation with or from the proceeds of, any asset or revenue of any kind.

"**Loans**" means loans and advances hereunder.

"**Loss**" has the meaning given to it in Section 7.11.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, condition (financial or otherwise) or assets of Borrower or its Subsidiaries, taken as a whole, (b) the validity or enforceability of any provision of any Transaction Document, (c) the ability of the Borrower to fully and timely perform the Obligations or (d) the rights and remedies of the Lenders under any Transaction Document.

"**Maturity Date**" means the earliest of:  (i) the stated maturity date, which shall be December 31, 2022; and (ii) the acceleration of the Loans or termination of the Commitment under this Agreement, including, without limitation, as a result of the occurrence of an Event of Default.

"**Maximum Available Amount**" means (i) with respect to the Initial Loan, $4,000,000 and (ii) with respect to any Loans made after the date the Initial Loan is made, $6,750,000.

"**Necessary Documents**" has the meaning given to it in Section 3.1(i).

"**Notice of Borrowing**" means a notice requesting the borrowing of a Loan duly executed by the chief financial officer or acting chief financial officer of the Borrower and substantially in the form of Exhibit A hereto.

"**Obligations**" means (a) all obligations (monetary or otherwise) of the Borrower arising under or in connection with the Transaction Documents including each of the Loans and all and any obligations related to the foregoing, and (b) in each case to the extent arising pursuant to or in connection with this Agreement or any other Transaction Document, any and all loans (including without limitation, all Loans), advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Agent or any Lender, of any kind or nature, present or future (including any interest or other amounts accruing thereon, any fees accruing under or in connection therewith, any costs and expenses of any Person payable by the Borrower and any indemnification obligations payable by the Borrower, including any such amounts arising or payable after maturity thereof or the Maturity Date, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest, fees or other amounts is allowable or allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether or not for the payment of money, whether arising out of Agent's or any Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with any item of payment, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated,

regardless of how such indebtedness or liabilities arise or whether evidenced by any agreement or instrument.

"**Organizational Documents**" means the articles of incorporation and by-laws, each as amended to date, of the Borrower.

"**Other Taxes**" means any and all present or future stamp or documentary taxes or any other excise or property taxes, duties, other similar charges or similar levies, and all liabilities with respect thereto, together with any interest, fees, additions to tax or penalties applicable thereto (including by reason of any delay in payment), arising from any payment made hereunder or from the execution, delivery, registration or enforcement of, or otherwise with respect to, any Transaction Document (excluding, for greater certainty, any taxes on the general income of the Agent or the Lenders.)

"**Party**" and "**Parties**" have the respective meanings given in the introductory paragraph hereto.

"**Permitted Indebtedness**" means the following Indebtedness:

(a)     the Obligations;

(b)     Indebtedness evidenced by capital leases or secured by purchase money Liens approved in writing by the Required Lenders; and

(c)     Indebtedness existing as of the Agreement Date and set forth on <u>Exhibit B</u> and paid only pursuant to the provisions of the agreements evidencing such Indebtedness set forth on such <u>Exhibit B</u>.

"**Permitted Liens**" means:

(a)     Liens existing on the Agreement Date and set forth on <u>Exhibit C</u> attached hereto, and any renewals or extensions thereof, provided that the property covered thereby is not increased;

(b)     Liens in favor of the Agent under the Security Agreement or the other Transaction Documents;

(c)     statutory Liens created by operation of applicable law;

(d)     Liens arising in the ordinary course of business, consistent with past practice and securing obligations that are not overdue or are being contested in good faith by appropriate proceedings;

(e)     Liens for taxes, assessments or governmental charges or levies not overdue and payable or that are being contested in good faith by appropriate proceedings;

(f)     Liens arising from judgments, decrees or attachments in existence prior to Petition Date;

(g)     Liens in favor of financial institutions arising in connection with accounts maintained in the ordinary course of Borrower's and its Subsidiaries' business and consistent with past practice held at such institutions to secure standard fees for services charged by, but not financing made available by, such institutions;

(h)     Liens securing Indebtedness permitted pursuant to clause (b) of the definition of Permitted Indebtedness;

(i)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(j)     deposits to secure (i) the performance of tenders, bids, trade contracts, licenses and leases, statutory obligations, surety bonds, performance bonds, bank guaranties and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice, or (ii) indemnification obligations relating to any disposition;

(k)     easements, rights of way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially interfere with the conduct of the business of the applicable Person;

(l)     leases, licenses or subleases granted to others in the ordinary course of business and not interfering in any material respect with the business of the Borrower and its Subsidiaries;

(m)     Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or equivalent in foreign jurisdictions) on items in the course of collection; and

(n)     licenses of intellectual property granted by the Borrower or any of its Subsidiaries required in connection with the sale of the Borrower's products in the ordinary course of business and not interfering in any material respect with the conduct of business of the Borrower and its Subsidiaries.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**Petition Date**" has the meaning given to it in the Recitals hereto.

"**PFIC**" has the meaning given to it in Section 3.1(m).

 "**Register**" has the meaning given to it in Section 1.4(b).

"**Reorganization Plan**" means the First Amended Plan of Reorganization for the Borrower, including any exhibits, supplements, appendices and schedules thereto, dated

March 27, 2016 and filed with the Bankruptcy Court on March 28, 2016, as amended, supplemented or otherwise modified from time to time and as confirmed by the Bankruptcy Court pursuant to the Confirmation Order.

"**Required Lenders**" means Lenders that, taken together, hold more than 50% of the aggregate outstanding principal amount of the Commitment and the Loans extended thereunder; provided, that in the event that there is no Commitment then in effect, then more than 50% of the Loans then outstanding.

"**SEC**" means the United States Securities and Exchange Commission.

"**SEC Reports**" means the annual and other reports filed or furnished by the Borrower with or to the SEC under the Exchange Act.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"**Security Agreement**" means the Guaranty and Security Agreement dated as of [_____], 2016, by and among the Agent, the Borrower and all Subsidiaries of the Borrower.

"**Solvent**" means, with respect to the Borrower and its Subsidiaries, on a consolidated basis, taken as a whole, on any date of determination, that on such date (a) the fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, taken as a whole (calculated on a going concern basis), is greater than the total amount of debt, including contingent liabilities, of the Borrower and its Subsidiaries, taken as a whole, (b) the present fair saleable value of the assets of such Person is greater than the total amount that will be required to pay the probable liabilities (including contingent liabilities) of such Person as they become absolute and matured, (c) the capital of the Borrower and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Borrower and its Subsidiaries, taken as a whole, contemplated as of such date; and (d) the Borrower and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purpose hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, representing the amount that can reasonably be expected to become an actual or matured liability.

"**Subsidiary or Subsidiaries**" means, as to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at the time directly or indirectly owned by such Person.

"**Tax Affiliate**" means (a) the Borrower and its Subsidiaries and (b) any Affiliate of the Borrower with which the Borrower files or is required to file consolidated, combined or unitary tax returns.

"**Taxes**" means all present or future taxes, levies, imposts, stamp or other duties, fees, assessments, deductions, withholdings, and other charges imposed by any Government

Authority, and all liabilities with respect thereto, together with any interest, fees, additions to tax or penalties applicable thereto (including by reason of any delay in payment).

"**Tax Returns**" has the meaning given to it in Section 3.1(m).

"**Transaction Documents**" means this Agreement, the Security Agreement and any other order, document or instrument delivered in connection with any of the foregoing and dated the Agreement Date or subsequent thereto, whether or not specifically mentioned herein or therein, in each case as amended, amended and restated, supplemented, waived or otherwise modified at any time and from time to time.

"**Transaction Parties**" has the meaning given to it in Section 7.14.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided that, to the extent that the Uniform Commercial Code is used to define any term herein or in any Transaction Document and such term is defined differently in different Articles of the Uniform Commercial Code, the definition of such term contained in Article 9 shall govern; provided further that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Agent's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**USA Patriot Act**" has the meaning given to it in Section 7.15.

"**U.S. Trustee**" means the office of the United States Trustee for the District of Delaware.

**Section 1.3    Interpretation**.  In this Agreement, unless the context otherwise requires, all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun; the division of this Agreement into Articles and Sections and the use of headings and captions is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions; the words "herein," "hereof," "hereunder," "hereinafter" and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or Section hereof; the words "include," "including," and derivations thereof shall be deemed to have the phrase "without limitation" attached thereto unless otherwise expressly stated; references to a specified Article, Exhibit, Section or Schedule shall be construed as a reference to that specified Article, Exhibit, Section or Schedule of this Agreement; and any reference to any of the Transaction Documents means such document as the same shall be amended, supplemented or modified and from time to time in effect.

**Section 1.4    Business Day Adjustment**.  If the day by which a payment is due to be made is not a Business Day, that payment shall be made by the next succeeding Business Day unless that next succeeding Business Day falls in a different calendar month, in which case that

payment shall be made by the Business Day immediately preceding the day by which such payment is due to be made.

**Section 1.5    Register**.

(a)    The Borrower shall record on its books and records the amount of the Loans, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.

(b)    The Borrower shall establish and maintain at its address referred to in Section 7.1:  (i) a record of ownership (the "**Register**") in which the Borrower agrees to register by book entry the interests (including any rights to receive payment of principal and interest hereunder) of each Lender having a Commitment, and the amount of Loans extended by such Lenders under such Commitment, and any assignment of any such interest; and (ii) accounts in the Register in accordance with its usual practice in which it shall record (A) the names and addresses of the Lenders (and any change thereto pursuant to this Agreement), (B) the amount of any principal or interest due and payable or paid and (C) any other payment received by the Lenders from the Borrower and its application to the Loans.

**Section 1.6    Definition of "Knowledge."**  For purposes of the Transaction Documents, whenever a representation or warranty is made to the Borrower's knowledge or awareness, to the "best of the Borrower's knowledge, or with a similar qualification, knowledge or awareness means such knowledge of such fact or other matter as would have been discovered after a reasonable inquiry of any of the officers, directors, employees and consultants of the Borrower as of the applicable date who would be expected to have knowledge or awareness of such fact or matter under the circumstances.

## ARTICLE 2
## AGREEMENT FOR THE LOAN

**Section 2.1    Use of Proceeds**.

(a)    The proceeds of the Loans shall be used to (i) provide for the ongoing working capital of the Borrower, (ii) pay allowed claims and other obligations due and payable by the Borrower under the Reorganization Plan (including funding as a condition to the occurrence of the Effective Date (as defined in the Reorganization Plan) of the Reorganization Plan of the Class 4 Escrow (as defined in the Reorganization Plan)) and (iii) pay fees, interest and expenses associated with the Loans and the Transaction Documents.

**Section 2.2    Disbursement**.

(a)    Subject to the satisfaction of the conditions set forth in Section 4.1, each Lender severally agrees to make an initial Loan in the total amount of $4,000,000 to be used to pay $2,250,000 of the purposes set forth in Section 2.1(a)(ii) and $1,750,000 of the purposes set forth in Section 2.1(a)(i) on the Agreement Date.

(b)        Subject to satisfaction of each of the conditions set forth in Section 4.2, each Lender severally agrees to make Loans to the Borrower after the initial Loan in amounts not to exceed the Maximum Available Amount for any purpose in accordance with Section 2.1(a), no later than two (2) Business Days after receiving a Notice of Borrowing.  Such Loans may be made no more frequently than once per week and in the aggregate not to exceed the unfunded portion of the Commitment.  Each Lender's share of such Loans shall be determined by its pro rata share of the Commitment as such share is set forth on Schedule 1 hereto.

Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 5 p.m. New York City time, to the account of the Borrower most recently designated by it for such purpose by notice to the Lenders; provided that such account and all sums on deposit shall be subject to a perfected first priority Lien in favor of the Lenders.

**Section 2.3    Payment**.

(a)        The Borrower shall pay to the Agent and the Lenders the outstanding principal amount of the Loans and all accrued and unpaid interest and fees  and all other Obligations in respect of the Loans on the earlier of (i) the Maturity Date and (ii) the date the principal amount of the Loans becomes due and payable following an acceleration under Section 6.1 for an Event of Default.

(b)        Loans that are repaid or prepaid may be reborrowed.

(c)        Within two (2) Business Days after cash receipt of any payments on account of accounts receivable (except for advance deposits remitted by customers, but including such deposits following ordinary course billing for goods or services and recognition by the Borrower that such funds constitute payments on account of such goods or services sold) otherwise due to Borrower, if an Event of Default has occurred and is continuing, the Borrower shall deposit such amount  into a deposit account subject to a blocked account agreement in favor of the Agent on behalf of the Agent and the Lenders and shall not expend such funds.

(d)        Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Lender and reasonably acceptable to the Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(e)        The Borrower shall have the right at any time and from time to time to prepay any Loans in whole or in part, without premium or penalty (other than interest that is accrued and outstanding at the time of such prepayment).

**Section 2.4    Time and Place**.  Payments of any amounts due to the Lenders under this Agreement shall be made in Dollars in immediately available funds prior to 11:00 a.m. New York City time on such date that any such payment is due, at such bank or places as the Lenders shall from time to time designate in writing prior to the date such payment is due.  The Borrower shall pay all and any costs (administrative or otherwise) imposed by banks, clearing houses, or any other financial institution, in connection with making any payments under any of the Transaction Documents, except for any costs imposed by the Lenders' banking institutions.

**Section 2.5    Taxes, Duties and Fees**.

(a)    Any and all payments under any Transaction Document shall be made, in accordance with this Section 2.5, free and clear of and without deduction for any withholding Taxes except as required by applicable law.  If any Taxes are required by law to be withheld from any amounts payable under a Transaction Document, (i) the amount payable shall be increased by as much as shall be necessary so that, after making all required withholdings (including withholdings on the additional amounts), the payee shall receive an amount equal to the sum it would have received had no such withholdings been made (any and all such additional amounts payable shall hereafter be referred to as the "**Additional Amounts**"), (ii) the payor shall make such withholdings, and (iii) the payor shall pay the full amount withheld to the relevant taxing or other authority in accordance with applicable law.  Within thirty (30) days after the date of any payment of such Taxes, the payor shall furnish to the applicable payee the original or a certified copy of a receipt evidencing payment thereof or other evidence of such payment reasonably satisfactory to such payee.

(b)    In addition, the Borrower agrees to pay, and authorizes the applicable payee to pay in its name (but without duplication), all Other Taxes.  Within thirty (30) days after the date of any payment of Other Taxes, the Borrower shall furnish to the applicable payee the original or a certified copy of a receipt evidencing payment thereof or other evidence of such payment reasonably satisfactory to such payee.

(c)    The Borrower shall reimburse and indemnify, within ten (10) days after receipt of demand therefor, each payee for all withholding Taxes and Other Taxes to which this Section 2.5 applies, whether or not such Taxes were correctly or legally imposed or asserted.  A certificate of the applicable payee(s) setting forth the amounts to be paid thereunder and delivered to the Borrower shall be conclusive, binding and final for all purposes, absent manifest error.

(d)    If any Lender determines in good faith that it has received a refund from a Government Authority relating to Taxes in respect of which the Borrower paid Additional Amounts or made a payment pursuant to Section 2.5(c), such Lender shall promptly pay such refund to the Borrower, net of all out-of-pocket expenses (including any Taxes imposed thereon) of such Lender incurred in obtaining such refund, and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that the Borrower, upon the request of such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender if such Lender

12

is required to repay such refund to such Governmental Authority.  Nothing in this Section shall require any Lender to disclose any information it deems confidential (including, without limitation, its tax returns) to any Person, including the Borrower.

**Section 2.6    Costs, Expenses and Losses**.  If, as a result of any failure by the Borrower to pay any sums due under this Agreement on the due date therefor (after the expiration of any applicable grace periods), the Agent and the Lenders shall incur commercially reasonable costs, expenses and/or losses, by reason of the liquidation or redeployment of deposits from third parties or in connection with obtaining funds to maintain any Loans, the Borrower shall pay to the Agent and the Lenders upon request by the Agent or any Lender, the amount of such costs, expenses and/or losses within five (5) Business Days after receipt by the Borrower of a certificate from the Agent or the applicable Lender setting forth in reasonable detail such costs, expenses and/or losses, along with supporting documentation.  For the purposes of the preceding sentence, "costs, expenses and/or losses" shall include, without limitation, any interest paid or payable to carry any unpaid amount and any loss, premium, penalty or expense which may be incurred in obtaining, liquidating or employing deposits of or borrowings from third parties in order to make, maintain or fund the Loans or any portion thereof.

**Section 2.7    Interest**.

(a)    The outstanding principal amount of (a) the Loans shall bear interest from the date of disbursement of such Loan at the Interest Rate (calculated on the basis of the actual number of days elapsed).  Accrued interest shall be paid in cash quarterly, in arrears, on the first Business Day of each fiscal quarter of the Borrower (each, an "**Interest Payment Date**"), commencing [_____], 2016.  Accrued interest will be paid in Dollars.

**Section 2.8    Interest on Late Payments**.  Without limiting the remedies available to the Agent and the Lenders under the Transaction Documents or otherwise, to the maximum extent permitted by applicable law, if an Event of Default has occurred and is continuing, the Borrower shall pay, in respect of principal and interest on the Loans outstanding under this Agreement, at the rate per annum equal to the Interest Rate applicable thereto plus ten percent (10%) for so long as such Event of Default is continuing.  Such interest shall be payable on demand.

**Section 2.9    Fee and Costs**.  From time to time upon demand, the Borrower shall reimburse the Agent and the Lenders for their costs and expenses, including reasonable attorneys' fees in connection with the negotiation, preparation, execution, administration and enforcement of the Transaction Documents.

# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES

**Section 3.1    Representations and Warranties of the Borrower**.  The Borrower represents and warrants as of the Agreement Date and on each day on which the Borrower requests or receives any Loan, that:

13

(a)     The Borrower is conducting its business in compliance with its Organizational Documents, which are in full force and effect with no material defaults outstanding thereunder;

(b)     no Default or Event of Default (or any other material default or event of default, however described) has occurred under any of the Transaction Documents;

(c)     after giving effect to the Reorganization Plan and the Confirmation Order, the Borrower and its Subsidiaries, on a consolidated basis, taken as a whole, are Solvent;

(d)     the obligation of the Borrower to make any payment under this Agreement and the other Transaction Documents (together with all charges in connection therewith) is absolute and unconditional, and there exists no right of setoff or recoupment, counterclaim, cross-claim or defense of any nature whatsoever to any such payment;

(e)     no Indebtedness of the Borrower exists other than Permitted Indebtedness;

(f)     (i) the Borrower validly exists as a corporation, in good standing under the laws of the jurisdiction of its organization and (ii) the Borrower has full power and authority to execute, deliver and perform under the Transaction Documents and to own its properties and conduct its business, and is duly qualified to do business as a foreign entity and is in good standing (or equivalent concept) in each jurisdiction in which the conduct of its business makes such qualification necessary and in which the failure to so qualify would have a Material Adverse Effect;

(g)     (i) there is not pending, or, to the knowledge of the Borrower, threatened, any action, suit or other proceeding before any Government Authority (A) to which the Borrower is a party or (B) which has as the subject thereof any assets owned by the Borrower, and (ii) there are no current, or, to the knowledge of the Borrower, pending, legal, governmental or regulatory enforcement actions, suits or other proceedings to which the Borrower or any of its assets is subject;

(h)     (i) the Transaction Documents have been duly authorized, executed and delivered by the Borrower, as applicable, and constitute the valid, legal and binding obligation of the Borrower enforceable in accordance with their terms, except as such enforceability may be limited by applicable insolvency, bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally and applicable equitable principles (whether considered in a proceeding at law or in equity), and (ii) the execution, delivery and performance of the Transaction Documents by the Borrower and the consummation of the transactions therein contemplated will not (A) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, other than Liens in favor of the Agent (for the benefit of the Agent and the Lenders), upon any assets of the Borrower pursuant to, any agreement to which the Borrower is a party or by which the Borrower is bound or to which any of the assets of the Borrower are subject, (B) result in any violation of or conflict with the provisions of the Borrower's Organizational Documents or (C) result in the violation of any law or any judgment, order, rule, regulation or decree

14

of any Government Authority, and (ii) after giving effect to the Reorganization Plan and the Confirmation Order, no consent, approval, authorization or order of, or registration or filing with any Government Authority is required for the execution, delivery and performance of any of the Transaction Documents or for the consummation by the Borrower of the transactions contemplated hereby except for such registrations and filings in connection with the entry into the Transaction Documents that are necessary to comply with applicable federal, state or provincial securities laws and the Borrower has the power and authority to enter into the Transaction Documents and to consummate the transactions contemplated under the Transaction Documents;

(i)    the Borrower holds, and is operating in compliance in all material respects with, all franchises, grants, authorizations, licenses, permits, easements, consents, certificates and orders of any Government Authority (collectively, "**Necessary Documents**") required for the conduct of its business and all Necessary Documents are valid and in full force and effect; and the Borrower has not received written notice of any revocation or modification of any Necessary Document, and the Borrower has no reason to believe that any Necessary Document will not be renewed in the ordinary course; and the Borrower is in compliance in all material respects with all applicable federal, state, provincial, local and foreign laws, regulations, orders and decrees applicable to the conduct of its business;

(j)    (i) the Borrower has good and marketable title to all of its assets free and clear of all Liens except Permitted Liens, and (ii) the property held under lease by the Borrower is held under valid, subsisting and enforceable leases with only such exceptions with respect to any particular lease as do not interfere in any material respect with the conduct of the business of the Borrower;

(k)    (i) the Borrower owns or has the right to use pursuant to a valid and enforceable written license, implied license or other legally enforceable right, all of the Intellectual Property (as defined below) that is necessary for the conduct of its business as currently conducted (the "**IP**"), (ii) the IP (excluding third-party IP that the Borrower has a right to use pursuant to a valid and enforceable written license, implied license or other legally enforceable right) that is registered with or issued by a Government Authority is valid and enforceable; there is no outstanding, pending, or, to the knowledge of the Borrower, threatened action, suit, other proceeding or claim by any third Person challenging or contesting the validity, scope, use, ownership, enforceability, or other rights of the Borrower in or to any IP (except for any rejections or objections that may have been issued by the applicable patent, trademark or intellectual property office in the ordinary course of prosecution of applications for registrations for IP) and the Borrower has not received any written notice regarding any such action, suit, or other proceeding, (iii) the Borrower has not infringed or misappropriated any material rights of others, (iv) there is no pending or, to the knowledge of the Borrower, threatened action, suit, other proceeding or claim that the Borrower infringes upon, violates or uses the Intellectual Property rights of others without authorization, and the Borrower has not received any written notice regarding any such action, suit, other proceeding or claim, and (v) except for non-exclusive rights granted by the Borrower to its customers, distributors, resellers and technology collaborators in respect to their products and

technologies in the course of licensing, selling and developing such products and technologies, the Borrower is not a party to or bound by any option, license or agreement with respect to IP.  The term "**Intellectual Property**" as used herein means (i) all patents, patent applications, patent disclosures and inventions (whether patentable or unpatentable and whether or not reduced to practice), (ii) all trademarks, service marks, trade dress, trade names, slogans, logos, and corporate names and Internet domain names, together with all of the goodwill associated with each of the foregoing, (iii) copyrights, copyrightable works, and licenses, (iv) registrations and applications for registration for any of the foregoing, (v) computer software (including but not limited to source code and object code), data, databases, and documentation thereof, (vi) trade secrets and other confidential information, (vii) other intellectual property, and (viii) copies and tangible embodiments of the foregoing (in whatever form and medium);

(l)    the Borrower is not in violation of its Organizational Documents.

(m)    (i) all income and other material Tax returns, reports and statements (collectively, the "**Tax Returns**") required to be filed by any Tax Affiliates have been filed with the appropriate Government Authorities, all such Tax Returns are true and correct in all material respects, and all Taxes, assessments and other governmental charges and impositions reflected therein and all other material Taxes, assessments and other governmental charges otherwise due and payable have been paid prior to the date on which any liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP, (ii) as of the Agreement Date, the Borrower has no knowledge of any tax deficiency with respect to its taxes which, if determined adversely, could reasonably be expected to be materially adverse to the Borrower.  Based on its current expectations, the Borrower will not be a "passive foreign investment company" ("**PFIC**") within the meaning of Section 1297 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") for the fiscal year ending December 31, 2014 and does not currently expect to be a PFIC in any subsequent fiscal year, and does not own any direct or indirect equity interest (or option to acquire equity interests) in any entity that is expected to be a PFIC in respect of its current or any subsequent fiscal year, and (iii) the Borrower is not a "controlled foreign corporation" ("**CFC**") within the meaning of Section 957(a) of the Code, and does not own 10% or more of the voting shares of any entity that is a CFC;

(n)    except as set forth in Schedule 2, the Borrower has not granted rights to develop, manufacture, produce, assemble, distribute, license, market or sell its products, services or Intellectual Property to any other Person and is not bound by any agreement that affects the exclusive right of the Borrower to develop, manufacture, produce, assemble, distribute, license, market or sell its products, services or Intellectual Property other than for (i) such distribution agreements entered into by the Borrower in the ordinary course of business for the distribution of its products; and (ii) such research agreements entered into by the Borrower in the ordinary course of business with hospitals, universities and other educational institutions;

16

(o)      (i) the Borrower:  (A) at all times has complied in all material respects with all Applicable Laws, (B) has not received any warning letter or other correspondence or notice from the FDA or from any other Government Authority alleging or asserting noncompliance with Applicable Laws; (C) possesses and complies in all material respects with all licenses, certificates, approvals, clearances, authorizations, permits and supplements or amendments thereto required by any Applicable Laws (together, the "**Authorizations**") which are valid and in full force and effect and has not received any notice from the FDA or any other Government Authority alleging or asserting noncompliance with any Authorizations; (D) has not received written notice that any Government Authority has taken, is taking, or intends to take action to limit, suspend, modify or revoke any Authorization and the Borrower has no knowledge that any Government Authority is considering such action; and (E) has filed, obtained, maintained or submitted all reports, documents, forms, notices, applications, records, claims, submissions and supplements or amendments as required by any Applicable Laws or Authorizations, except as would not have a Material Adverse Effect, (ii) there is no false or misleading information or significant omission in any of the submissions by the Borrower to the FDA or any other Government Authority, and (iii) the Borrower has fulfilled and performed its obligations under all Authorizations, and no event has occurred or condition or state of facts exists which would constitute a breach or default under, or would cause a revocation or termination of, any Authorization;

(p)      [reserved];

(q)      the Borrower maintains a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for material assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

(r)      to the knowledge of the Borrower, (i) no "prohibited transaction" as defined under Section 406 of ERISA or Section 4975 of the Code, or any individual or class exemption issued and not exempt under ERISA Section 408 and the regulations and published interpretations thereunder has occurred with respect to any Employee Benefit Plan, except as for such transactions that would not have a Material Adverse Effect, (ii) at no time within the last seven (7) years has the Borrower or any ERISA Affiliate maintained, sponsored, participated in, contributed to or has or had any liability or obligation in respect of any Employee Benefit Plan subject to Section 302 of ERISA, Title IV of ERISA, or Section 412 of the Code or any "multiemployer plan" as defined in Section 3(37) of ERISA or any multiple employer plan for which the Borrower or any ERISA Affiliate has incurred or could incur liability under Section 4063 or 4064 of ERISA, (iii) no Employee Benefit Plan represents any current or future liability for retiree health, life insurance, or other retiree welfare benefits except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or similar

17

state law, (iv) each Employee Benefit Plan is and has been operated in compliance with its terms and all applicable laws, including but not limited to ERISA and the Code, except for such failures to comply that would not have a Material Adverse Effect, (v) no event has occurred (including a "reportable event" as such term is defined in Section 4043 of ERISA) and no condition exists that would subject the Borrower or any ERISA Affiliate to any tax, fine, lien, penalty or liability imposed by ERISA, the Code or other applicable law, except for any such tax, fine, lien, penalty or liability that would not, individually or in the aggregate, have a Material Adverse Effect, (vi) the Borrower does not maintain any Foreign Benefit Plan, and (vii) the Borrower does not have any obligations under any collective bargaining agreement.  As used in this clause (r), "**Employee Benefit Plan**" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA, including, without limitation, all stock purchase, stock option, stock based severance, employment, change in control, medical, disability, fringe benefit, bonus, incentive, deferred compensation, employee loan and all other employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA, under which (A) any current or former employee, director or independent contractor of the Borrower or any of its Subsidiaries has any present or future right to benefits and which are contributed to, sponsored by or maintained by the Borrower or any of its Subsidiaries or (B) the Borrower or any of its Subsidiaries has had or has any present or future obligation or liability; "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended; "**ERISA Affiliate**" means any member of Borrower's controlled group as defined in Code Section 414 (b), (c), (m) or (o); and "**Foreign Benefit Plan**" means any Employee Benefit Plan established, maintained or contributed to outside of the United States of America or which covers any employee working or residing outside of the United States;

(s)     the Borrower does not, and have not ever, sponsored, administered, participated in or contributed to a retirement or pension arrangement that provides defined benefits to employees or former employees of the Borrower;

(t)     (i) all of the issued and outstanding shares of capital stock of the Borrower are duly authorized and validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state and foreign securities laws, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities that have not been waived in writing, (ii) there are no preemptive rights or other rights to subscribe for or to purchase, or any restriction upon the voting or transfer of any shares of common stock pursuant to the Organizational Documents or any agreement to which the Borrower or any of its Subsidiaries is a party or by which the Borrower or any of its Subsidiaries is bound, and (iii) all of the issued and outstanding shares of capital stock of each of the Borrower's Subsidiaries have been duly and validly authorized and issued and are fully paid and nonassessable, and the Borrower owns of record and beneficially, free and clear of any claims, Liens (other than Permitted Liens) and voting proxies, all of the issued and outstanding shares of such stock;

(u)     all products designed, developed, manufactured, prepared, assembled, packaged, tested, labeled, distributed or marketed by or on behalf of the Borrower that are subject to the jurisdiction of the FDA or a comparable government authority have

18

been and are being designed, developed, tested, manufactured, prepared, assembled, packaged, distributed, labeled and marketed in material compliance with the Federal Food, Drug and Cosmetic Act and the rules and regulations promulgated thereunder and all other Applicable Laws and Authorizations (each a "**Requirement of Law**"), including, without limitation, clinical and non-clinical evaluation, product approval or clearance, good manufacturing practices, labeling, advertising and promotion, record-keeping, establishment registration and device listing, reporting of recalls, and adverse event reporting, and have been and are being tested, investigated, designed, developed, manufactured, prepared, assembled, packaged, labeled, distributed, marketed, and sold in material compliance with each applicable Requirement of Law;

(v)    (i) the Borrower is in compliance with the written procedures, record-keeping and reporting requirements required by the FDA or any comparable government authority pertaining to the reporting of adverse events and recalls involving any of its products, including, as the case may be, Medical Device Reporting set forth in 21 C.F.R. Part 803 and Reports of Corrections and Removals set forth in 21 C.F.R. Part 806, (ii) the Borrower's products are and have been labeled, promoted, and advertised in accordance with their Permit or within the scope of an exemption from obtaining such Permit, and (iii) the Borrower's establishments are registered with the FDA, as applicable, and each product of the Borrower, if any, is listed with the FDA under the applicable FDA registration and listing regulations for medical devices; and

(w)    no statement or information contained in this Agreement and any other Transaction Document, any delivery of financial information or any certificate furnished to the Agent or the Lenders or any of them, by or on behalf of the Borrower for use in connection with the transactions contemplated by this Agreement or the other Transaction Documents when taken as a whole, contained as of the date such statement, information, or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which they were made.

**Section 3.2    Borrower's Acknowledgment**.  The Borrower acknowledges that it has made the representations and warranties referred to in Section 3.1 with the intention of persuading the Agent and the Lenders to enter into the Transaction Documents and fund each of the Loans and that the Agent and the Lenders have entered into the Transaction Documents and the Lenders funded the Loans and on the basis of, and in full reliance on, each of such representations and warranties and the representations and warranties shall survive the execution and delivery of this Agreement and the other Transaction Documents until the Obligations are repaid in full.

**ARTICLE 4**
**CONDITIONS OF DISBURSEMENT**

**Section 4.1    Conditions to Initial Disbursement**.  The obligation of the Initial Lenders to make the Initial Loan, shall be subject to the fulfillment of the following conditions:

19

(a)    The Agent shall have received this Agreement, executed and delivered by the Borrower, the Agent and the Lenders;

(b)    (i) the Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order, (ii) the Confirmation Order shall not have been stayed, modified, or vacated on appeal, and (iii) all conditions precedent to the effectiveness of the Reorganization Plan shall have been satisfied (or waived) or shall be concurrently with the effective date of the Reorganization Plan satisfied (or waived) in accordance with the terms of the Reorganization Plan;

(c)    the Agent shall have received an executed Notice of Borrowing from the Borrower at least one (1) Business Day prior to the date of such requested Initial Loan, which shall include the Closing Fee;

(d)    the Agent shall have received:  (i) executed counterparts of each of the Security Agreement and the other Transaction Documents; (ii) customary officer's and secretary's certificates; (iii) evidence of authority, including without limitation resolutions or consents and incumbency certificates; and (iv) any material third party and governmental consents necessary in connection with the Borrower's entry into this Agreement and the other Transaction Documents, the financing hereunder and thereunder and related transactions;

(e)    all representations and warranties of the Borrower under Section 3.1 hereto shall be true and correct on the date hereof (or to the extent relating to an earlier date, such earlier date) in all material respects; provided that, if a representation and warranty is qualified as to materiality, the materiality qualifier set forth above shall be disregarded with respect to such representation and warranty for purposes of this condition;

(f)    all corporate and judicial proceedings and all instruments and agreements in connection with the transactions contemplated hereunder among the Borrower, the Agent and the Initial Lenders contemplated by this Agreement shall be reasonably satisfactory in form and substance to the Agent and the Initial Lenders, and the Initial Lenders shall have received all information and copies of all documents or papers requested by it;

(g)    the Borrower and its Subsidiaries shall have taken all actions required to perfect Agent's Liens in the Collateral as required by the Security Agreement and the other Transaction Documents;

(h)    the Borrower shall have paid all fees, costs and expenses (including, without limitation, attorneys' costs) of the Agent and the Lenders then payable by the Borrower pursuant to Section 2.9 and any other provision of this Agreement and the other Transaction Documents;

(i)    no Default or Event of Default has occurred or would result from the making of the Initial Loan or the use of the proceeds thereof;

20

(j)     the Agent and each requesting Lender shall have received no later than two Business Days prior to the Agreement Date (or such longer period as may be required by the Agent) all documentation and other information reasonably requested in writing by the Agent or such Lender, as applicable, in order to allow the Agent and such Lender to comply with applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act; and

(k)     the Borrower shall have satisfied such other conditions and delivered such other financial or other information as may be reasonably requested by the Agent and the Initial Lenders.

**Section 4.2     Conditions to Each Subsequent Loan**.  The obligation of the Lenders to make any Loan subsequent to the Initial Loan shall be subject to the fulfillment of the following conditions:

(a)     the Lenders shall have received a fully executed and delivered Notice of Borrowing request at least two (2) Business Days prior to the date of such requested Loan;

(b)     the minimum borrowing request shall be Five Hundred Thousand Dollars ($500,000);

(c)     as of the date of the proposed Loan, the representations and warranties contained herein and in each other Transaction Document, certificate or other writing delivered to the Agent or any Lender pursuant hereto or thereto on or prior to the date of the proposed borrowing, shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof; which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of the proposed borrowing, to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date;

(d)     as of the date of such borrowing, no event shall have occurred and be continuing or would result from the funding of such Loan or the use of the proceeds thereof that would constitute an Event of Default or a Default;

(e)     the Borrower shall have paid all fees, costs and expenses (including, without limitation, any attorneys' costs) then payable by the Borrower pursuant to this Agreement and the other Transaction Documents;

(f)     the making of such Loan shall not contravene any law, rule or regulation applicable to the Agent or any Lender;

21

(g)    the amount of the Loan requested and its intended use is permitted by Section 2.1; and

(h)    no action shall be pending or threatened (to the knowledge of the Borrower) against the Borrower.

The Agent or the Lenders shall be entitled, but not obligated, to reasonably request and receive, prior to the making of any Loans, additional conditions or information if, in the good faith judgment of the Agent or the Required Lenders, such request is warranted under the circumstances.

## ARTICLE 5
## AFFIRMATIVE COVENANTS AND EVENTS OF DEFAULT

**Section 5.1    Affirmative Covenants**.

(a)    The Borrower and its Subsidiaries shall maintain its existence and qualify and remain qualified to do its business as currently conducted, except where the failure to maintain such qualification would not reasonably be expected to have a Material Adverse Effect;

(b)    the Borrower and its Subsidiaries shall comply in all material respects with all Applicable Laws, except where the necessity of compliance therewith is contested in good faith by appropriate proceedings;

(c)    the Borrower shall obtain and its Subsidiaries shall make and keep in full force and effect all material Authorizations required to conduct their businesses;

(d)    the Borrower shall promptly notify the Agent of the occurrence of (i) any Default or Event of Default, (ii) any claims, litigation, arbitration, mediation or administrative or regulatory proceedings (individually, a "**Claim**") that are instituted or threatened against the Borrower or its Subsidiaries; (iii) any reporting of device recalls, device failures or serious adverse events or deaths in connection with any of the products of the Borrower or any of its Subsidiaries, (iv) an event that has had, or reasonably could be expected to have, a Material Adverse Effect on the value of any Intellectual Property; and (v) each event which, at the giving of notice, lapse of time, determination of materiality or fulfillment of any other applicable condition (or any combination of the foregoing), would constitute a default or event of default (however described) under any Transaction Document;

(e)    (i) if the Borrower is not required to file reports pursuant to Sections 13 or 15(d) of the Exchange Act, Borrower will provide to the Agent quarterly financial statements for itself and its Subsidiaries within forty-five (45) days after the end of each quarter, and audited annual financial statements within one hundred twenty (120) days after the end of each year prepared in accordance with GAAP in the United States with a report thereon by Borrower's independent certified public accountants (an "**Accountant's Report**"); (ii) the Borrower will timely file with the SEC (subject to appropriate extensions made under Rule 12b-25 under the Exchange Act) any annual

22

reports, quarterly reports and other periodic reports required to be filed pursuant to Section 13 or 15(d) of the Exchange Act; and (iii) the Borrower will provide to the Agent copies of all documents, reports, financial data and other information not available on the SEC EDGAR system or the SEDAR system and not containing any material non-public information that the Agent or any Lender may reasonably request including amendments to Organizational Documents promptly after their effectiveness, and cause the Agent and the Lenders to be permitted to visit and inspect any of the properties of the Borrower and its Subsidiaries, and to discuss its affairs, finances with its officers during regular business hours and upon reasonable notice;

(f)     [reserved];

(g)     [reserved];

(h)     not later than fifteen (15) days after the last day of each month, the Borrower shall deliver to the Agent non-GAAP basis monthly financial statements including an unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such preceding monthly period and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a financial officer of the Borrower as presenting fairly in all material respects the financial condition as of the end of and for such monthly period and such portion of the fiscal year and results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis, subject to normal year-end adjustments;

(i)     [reserved];

(j)     the Borrower will maintain general and professional liability insurance, including products/completed operations liability coverage, and such other insurance coverage in such amounts and with respect to such risks as the Agent and the Lenders may reasonably request from time to time;

(k)     the Borrower shall use the proceeds of the Loans in accordance with Section 2.1;

(l)     [reserved];

(m)     [reserved];

(n)     [reserved];

(o)     the Borrower will provide any additional reporting requirements requested by the Agent or any Lender, including, without limitation, with respect to litigation, contingent liabilities, and ERISA and environmental events; and

(p)     the Borrower will provide periodic access by the Agent, the Lenders and their advisors to information and senior personnel, senior management and other

23

company advisors, including conference calls with such Persons upon any request by the Agent or any Lender.

The Borrower shall cause each of its Subsidiaries to comply with each of the agreements set forth in Section 5.1.

**Section 5.2    Negative Covenants**.

(a)    The Borrower shall not, nor shall the Borrower permit any Subsidiary to, (i) liquidate or dissolve (unless, prior to such liquidation or dissolution, such Subsidiary ceases to own any operating assets or conduct business), or (ii) directly or indirectly, by operation of law or otherwise amalgamate or merge with, consolidate with, acquire all or substantially all of the assets or stock of, or otherwise combine with or acquire, any Person.  The Borrower shall not establish any Subsidiary without consent of the Required Lenders and unless such Subsidiary executes and delivers to the Agent and the Lenders a guaranty of the Obligations and security agreement providing for all of its assets to be collateral for the Obligations in form and substance satisfactory to the Agent and the Lenders;

(b)    the Borrower shall not, nor shall the Borrower permit any Subsidiary to (i) enter into any partnership, joint venture, syndicate, pool, profit-sharing or royalty agreement or other combination, or engage in any transaction, whereby its income or profits are, or might be, shared with another Person other than a wholly owned United States of America Subsidiary, (ii) enter into any management contract or similar arrangement whereby a substantial part of its business is managed by another Person, or (iii) distribute, or permit the distribution of, any of its assets, including its intangibles, to any shareholder of any Subsidiary or to any Affiliate, including by way of loans or advances or purchase or redemption of equity interests in a Person;

(c)    the Borrower shall not, nor shall the Borrower permit any Subsidiary to, create, incur or suffer any Lien upon any of its assets, other than Permitted Liens;

(d)    the Borrower shall not, nor shall the Borrower permit any Subsidiary to, create, incur, assume, guarantee or remain liable with respect to any Indebtedness, other than Permitted Indebtedness;

(e)    the Borrower shall not, nor shall the Borrower permit any Subsidiary to, acquire any assets (other than assets acquired in the ordinary course of business consistent with past practices), directly or indirectly, in one or more related transactions;

(f)    the Borrower shall not, nor shall the Borrower permit any Subsidiary to (i) engage in any business other than the businesses in which it is currently engaged or (ii) modify or alter its organizational documents;

(g)    the Borrower shall not, nor shall the Borrower permit any Subsidiary to, directly or indirectly, enter into any transaction with any of its Affiliates, except in the ordinary course of business and upon terms that are no less favorable than would be obtained in a comparable arm's length transaction with a Person not an Affiliate;

(h)     the Borrower shall not declare or pay any dividend or other distribution on its common shares without the prior written consent from the Required Lenders;

(i)     [reserved];

(j)     [reserved];

(k)     [reserved];

(l)     the Borrower shall not, nor shall the Borrower permit any Subsidiary to, (i) establish or commence contributing to or otherwise participate in any retirement or pension arrangement that provides defined benefits; or (ii) acquire an interest in any Person if such Person sponsors, administers, participates in, or has any liability in respect of, any retirement or pension arrangement that provides defined benefits;

(m)     the Borrower shall not, nor shall the Borrower permit any Subsidiary to, use the proceeds of the Loans other than in accordance with Section 2.1; and

(n)     the Borrower shall not, nor shall the Borrower permit any Subsidiary to, dispose any of its assets (including, without limitation, any sale and leaseback transaction) other than in the ordinary course of business.

## ARTICLE 6
## EVENTS OF DEFAULT

**Section 6.1     General Acceleration Provision upon Events of Default**.

(a)     If any event specified in Section 6.1(b) shall have occurred and be continuing beyond the applicable cure period or which has not been waived by the Required Lenders (each, an "**Event of Default**"), the Agent may (or at the request of the Required Lenders, shall) (i) declare the principal of, and accrued and unpaid interest on, the Loans, the other Obligations or any part of any of them (together with any other amounts accrued or payable under the Transaction Documents) to be, and the same shall thereupon become, immediately due and payable, (ii) terminate the Commitment, in each case, without any further notice and without any presentment, demand, or protest of any kind, all of which are hereby expressly waived by the Borrower, and (iii) take any further action available at law or in equity, including, without limitation, the sale of the Loans and all other rights acquired in connection with the Loans; provided, however, that upon the occurrence of any event specified in Section 6.1(b)(v) or Section 6.1(b)(vi) below, the Commitment shall automatically and immediately terminate and the Loans and all other Obligations shall automatically become due and payable without further act of the Agent or any Lender.

(b)     Each of the following shall constitute an Event of Default:

(i)     the Borrower shall have failed to make payment of (A) principal when due on the Loans, or (B) interest and any other amounts under the

25

Transaction Documents or other Obligations due within five (5) Business Days of their due date;

(ii)    any representation or warranty made by the Borrower in any Transaction Document shall have been incorrect, false or misleading as of the date it was made;

(iii)    the Borrower shall have failed to comply with the due observance or performance of Sections 5.1 and 5.2;

(iv)    the Borrower shall have failed to comply with the due observance or performance of any other covenant, condition or agreement contained in any Transaction Document (other than as described in clauses (i), (ii) and (iii) above), and such failure shall not have been cured by the Borrower within five (5) Business Days;

(v)    (i) a petition shall be filed or an action or proceeding otherwise commenced in respect of the Borrower or any of its Subsidiaries seeking relief under any Debtor Relief Law or seeking any reorganization, arrangement, consolidation or readjustment of the debt of the Borrower or any of its Subsidiaries seeking relief under any Debtor Relief Law or seeking any reorganization, arrangement, consolidation or readjustment of the debts of the Borrower or any of its Subsidiaries under any other bankruptcy or insolvency law and, in respect of any such United States of America law, and (ii) an involuntary petition shall be filed or an action or proceeding otherwise commenced in respect of the Borrower or any of its Subsidiaries seeking relief under any Debtor Relief Law or seeking any reorganization, arrangement, consolidation or readjustment of the debts of the Borrower or any of its Subsidiaries under any other bankruptcy or insolvency law and, in respect of any such action under United States of America law, any of the following events occur:   (A) the Borrower or any of its Subsidiaries consents or acquiesces to the institution of such petition or proceeding, (B) the petition commencing such proceeding is not timely controverted, (C) with respect to this clause (ii) only, the petition commencing such proceeding is not dismissed within thirty (30) days of the filing date thereof; (D) an interim trustee is appointed to take possession of all or any substantial portion of the property or assets of, or to operate all or any substantial portion of the business of, the Borrower or any of its Subsidiaries, or (E) an order for relief shall have been issued or entered therein; provided that, the Lenders shall have no obligation to provide any extension of credit to the Borrower or any of its Subsidiaries during such thirty (30) day calendar period specified in (C) above;

(vi)    a receiver, interim receiver, receiver-manager, assignee, liquidator, sequestrator, custodian, trustee or similar officer shall be appointed for the Borrower or any of its Subsidiaries or for all or any part of its property or a warrant of attachment, execution or similar process shall be issued against any part of the property of the Borrower or any of its Subsidiaries;

26

(vii)    the Borrower or any of its Subsidiaries shall file a certificate of dissolution or shall be liquidated, dissolved or wound-up or shall commence or have commenced against it any action or proceeding for dissolution, winding-up or liquidation, or shall take any action in furtherance thereof;

(viii)    one or more judgments against the Borrower or any of its Subsidiaries or attachments against any of its property remain(s) unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days from the date of entry of such judgment;

(ix)    any authorization necessary for the execution, delivery or performance of any Transaction Document or for the validity or enforceability of any of the Obligations is not given or is withdrawn or ceases to remain in full force or effect, including, without limitation, the Liens granted with respect to the Transaction Documents shall not be valid, perfected and enforceable in all respects, or shall be asserted by or on behalf of Borrower or any of its Subsidiaries not to be valid, perfected and enforceable in all respects;

(x)    the validity of any Transaction Documents shall be contested by the Borrower or any of its Subsidiaries, or any treaty, law, regulation, communiqué, decree, ordinance or policy of any jurisdiction shall purport to render any material provision of any Transaction Document invalid or unenforceable or shall purport to prevent or materially delay the performance or observance by the Borrower of the Obligations;

(xi)    there is a failure to perform in any agreement to which the Borrower or any of its Subsidiaries is a party with a third party or parties resulting in a right by such third party or parties to accelerate the maturity of any indebtedness for borrowed money in an aggregate amount in excess of $50,000;

(xii)    any material suspension by the Borrower or any of its Subsidiaries of operation of any its businesses;

(xiii)    the Confirmation Order fails to be in full force and effect or fails to be final, valid, subsisting and continuing, or has been modified, reversed, stayed, vacated or subject to any appeal, in each case, in any material respects that are materially adverse to the Agent and the Lenders; or

(xiv)    the occurrence of a Material Adverse Effect.

**Section 6.2    Rights Not Exclusive**.  The rights provided for in this Agreement and the other Transactions Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

**Section 6.3    Recovery of Amounts Due**.  If any amount payable hereunder or the other Transaction Documents or the other Obligations is not paid as and when due, the Borrower hereby authorizes the Agent and the Lenders to proceed, to the fullest extent permitted by

applicable law, without prior notice, by right of setoff, banker's Lien or counterclaim, against any moneys or other assets of the Borrower to the full extent of all amounts and other Obligations payable to the Agent and the Lenders.

**ARTICLE 7**
**MISCELLANEOUS**

**Section 7.1    Notices**.    Any notice to be given under this Agreement or the other Transaction Documents shall be sent by certified or registered mail (return receipt requested) or delivered personally or by courier (including a recognized overnight delivery service) or by facsimile or by electronic mail and shall be effective five (5) days after being placed in the mail, if mailed by regular United States mail, or upon receipt, if delivered personally, by courier, by facsimile or electronic mail in each case addressed to a Party.    A notice to be given to the Borrower under this Agreement shall not be effective unless and until it is given by either the Agent or the Required Lenders.    Any notice given to the Borrower under this Agreement by the Agent or the Required Lenders shall be binding upon all of the Lenders.    The addresses for such communications shall be:

If to the Borrower:

> Nuo Therapeutics, Inc.
> 207A Perry Parkway, Suite 1
> Gaithersburg, MD 20877
> Fax:  _____
> Email:  _____
> Attention:  Chief Executive Officer

With copy to:

> Katten Muchin Rosenman LLP
> 525 West Monroe Street
> Chicago, Illinois 60661
> Fax:  (312) 577-4676
> Email:  jeff.elegant @kattenlaw.com
> Attention:  Jeffrey L. Elegant

If to the Agent or the Lenders:

> Deerfield Mgmt, L.P.
> c/o Deerfield Management Company, L.P.
> 780 Third Avenue, 37th Floor
> New York, NY 10017
> Fax:  212-599-3075
> Email:  dclark@deerfield.com
> Attn:  David J. Clark

28

With a copy to:

> Katten Muchin Rosenman LLP
> 525 West Monroe Street
> Chicago, Illinois 60661
> Fax: (312) 577-4676
> Email: jeff.elegant @kattenlaw.com
> Attention: Jeffrey L. Elegant

**Section 7.2    Waiver of Notice**.  Whenever any notice is required to be given to the Agent, any Lender or the Borrower under any Transaction Document, a waiver thereof in writing signed by the Person or Persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 7.3    Reimbursement of Legal and Other Expenses**.  If any amount owing to the Agent and the Lenders under any Transaction Document shall be collected through enforcement of this Agreement, any Transaction Document or restructuring of the Loans, the other Obligations or Commitment, in the nature of a workout, settlement, negotiation, or any process of law, or shall be placed in the hands of third Persons for collection, the Borrower shall pay (in addition to all monies then due in respect of the Loan, the other Obligations or otherwise payable under any Transaction Document) attorneys' and other fees, costs and expenses incurred in respect of such collection.

**Section 7.4    Governing Law**.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement and the other Transaction Documents shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed in such State.  Each Party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such Party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  The Parties hereby waive all rights to a trial by jury.

**Section 7.5    Successors and Assigns**.  This Agreement and the other Transaction Documents shall bind and inure to the respective successors and assigns of the Parties, except that the Borrower may not assign or otherwise transfer all or any part of its rights under the Transaction Documents without the prior written consent of all of the Lenders and any prohibitive assignment by the Borrower is absolutely void *ab initio*.  Each Lender may sell or otherwise transfer the Loans, the other Obligations and related Commitments, provided that such Lender shall have provided notice of the transfer to the Agent and the Borrower for recordation by the Borrower in the Register pursuant to Section 1.4.  Upon receipt of a notice of a transfer of an interest in a Loan, other Obligations or Commitments, the Borrower shall record the identity of the transferee and other relevant information in the Register and the transferee shall (to the extent of the interests transferred to such transferee) have all the rights and obligations of, and shall be deemed, a Lender hereunder.

**Section 7.6    Entire Agreement**.  The Transaction Documents contain the entire understanding of the Parties with respect to the matters covered thereby and supersede any and all other written and oral communications, negotiations, commitments and writings with respect thereto.  The provisions of this Agreement may be waived, modified, supplemented or amended only by an instrument in writing signed by the authorized officer of each Party.

**Section 7.7    Severability**.  If any provision of this Agreement shall be invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  The Parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

**Section 7.8    Counterparts**.  This Agreement may be executed by each Party on separate counterparts, each of which and any facsimile or other electronic copies thereof shall be deemed an original, but all of which together shall constitute one and the same agreement.  The representations and warranties of the Borrower herein and in each other Transaction Document are effective immediately after the consummation of the Closing (as defined in the Reorganization Plan) occurring on the Effective Date (as defined in the Reorganization Plan).

**Section 7.9    Survival**.  The obligations of Borrower under Section 1.4 and the obligations of the Borrower, the Agent and the Lenders under this Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and the other Obligations, or the termination of the Commitment or this Agreement or the other Transaction Documents or any provision hereof or thereof.

**Section 7.10    Waiver**.  Neither the failure of, nor any delay on the part of, any Party in exercising any right, power or privilege hereunder, or under any agreement, document or instrument mentioned herein, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder, or under any agreement, document or instrument mentioned herein, preclude other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver of any right, power, privilege or default hereunder, or under any agreement, document or instrument mentioned herein, constitute a waiver of any other right, power, privilege or default or constitute a waiver of any default of the same or of any other term or provision.  No course of dealing and no delay in exercising, or omission to exercise, any right, power or remedy accruing to the Agent or the Lenders upon any default under this Agreement, the other Transaction Documents or any other agreement, instrument or document shall impair any such right, power or remedy or be construed to be a waiver thereof or an acquiescence therein; nor shall the action of the Agent or any Lender in respect of any such default, or any acquiescence by it therein, affect or impair any right, power or remedy of the Agent and the Lenders in respect of any other default.  All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.

US_118306100v3_333285-00104 4/15/2016 2:30 PM

**Section 7.11   Indemnity**.

(a)     The Borrower shall, at all times, indemnify and hold harmless (the "**Indemnity**") the Agent, each of the Lenders and each Agent's and Lender's directors, partners, officers, employees, agents, counsel and advisors (each, an "**Indemnified Person**") from any losses, claims (including the cost of defending against such claims), damages, liabilities, penalties, or other expenses (each a "**Loss**") which an Indemnified Person may incur or to which an Indemnified Person may become subject to the extent such Loss arises out of a breach of any representation, warranty or covenant of the Borrower in any of the Transaction Documents, or the extension of credit hereunder or thereunder or the Loan or the other Obligations or the use or intended use of the Loan. The Indemnity shall not apply with respect to any Indemnified Person to the extent that a court or arbitral tribunal with jurisdiction over the subject matter of the Loss, such Indemnified Person and over the Borrower determines (after such Indemnified Person that had an adequate opportunity to defend its interests), that such Loss resulted from the willful misconduct of such Indemnified Person, which determination results in a final, non-appealable judgment or decision of a court or tribunal of competent jurisdiction. The Indemnity is independent of and in addition to any other agreement of any Party under any Transaction Document to pay any amount to the Agent, the Lenders or the Borrower, as applicable, and any exclusion of any obligation to pay any amount under this subsection shall not affect the requirement to pay such amount under any other section hereof or under any other agreement.

(b)     Promptly after receipt by an Indemnified Person under this Section 7.11 of notice of the commencement of any action (including any governmental action), such Indemnified Person shall deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person.

(c)     An Indemnified Person shall have the right to retain its own counsel with the reasonable fees and expenses to be paid by the indemnifying party, if, in the reasonable opinion of counsel for the indemnifying party, the representation by such counsel of the Indemnified Person and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person and any other party represented by such counsel in such proceeding. The indemnifying party shall pay for only one separate legal counsel for the Indemnified Persons, and such legal counsel shall be approved by the indemnifying party. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such legal action shall not relieve the indemnifying party of any liability to the Indemnified Person under this Section 7.11, except to the extent that the indemnifying party is actually prejudiced in its ability to defend such action. The indemnification required by this Section 7.11 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as such expense, loss, damage or liability is incurred and is due and payable.

31

(d)     Without prejudice to the survival of any other agreement, instrument or document of any of the Parties hereunder, the agreements and the obligations of the Borrower contained in this Section 7.11 shall survive the termination of each other provision hereof and the payment of all amounts and Obligations payable to the Agent and the Lenders hereunder and under the other Transaction Documents.

**Section 7.12   Interest Limitations**.  The Transaction Documents are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the amount paid or agreed to be paid to the Agent and the Lenders for the Loan and other Obligations exceed the maximum amount permissible under applicable law.  If from any circumstance whatsoever fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance the Agent and the Lenders shall ever receive anything which might be deemed interest under applicable law, that would exceed the highest lawful rate, such amount that would be deemed excessive interest shall be applied to the reduction of the principal amount owing on account of the Loan or other Obligations, or if such deemed excessive interest exceeds the unpaid balance of principal of the Loan or other Obligations, such deemed excess shall be refunded to the Borrower.  All sums paid or agreed to be paid to the Agent or the Lenders for the Loan or other Obligations shall, to the extent permitted by applicable law, be deemed to be amortized, prorated, allocated and spread throughout the full term of the Loan and other Obligations until payment in full so that the deemed rate of interest on account of the Loan and the other Obligations is uniform throughout the term thereof.  The terms and provisions of this Section shall control and supersede every other provision of this Agreement.

**Section 7.13   Further Assurances**.  Froth time to time, the Borrower shall perform any and all acts and execute and deliver to the Agent such additional documents as may be necessary or as requested by the Agent or any Lender to carry out the purposes of any Transaction Document or any or to preserve and protect the Agent's and the Lenders' rights as contemplated therein.

**Section 7.14   Independent Transaction Documents**.  Each Transaction Document constitutes an independent agreement between the parties thereto (the "**Transaction Parties**") and no Transaction Document shall be construed so as to affect the rights of the Transaction Parties to their rights and remedies under another Transaction Document.

**Section 7.15   USA Patriot Act**.  The Agent and each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**USA Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Agent or such Lender to identify the Borrower in accordance with the USA Patriot Act.

**Section 7.16   Agency Appointment**.  Each Lender hereby appoints the Agent as administrative agent and collateral agent for the Lenders and authorizes the Agent (i) to enter into this Agreement and the other Transaction Documents and accept delivery thereof on its behalf from the Borrower and its Subsidiaries, (ii) to take such action on its behalf and to

exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Agent under such Transactions Documents, (iii) to take all actions as the Agent on its behalf and to exercise such powers under the this Agreement and the other Transaction Documents on behalf of the Lenders, together with all such powers as are reasonably incidental thereto, for purposes of any and all matters associated with administrative matters, receiving and delivering notices, the perfection of security interests in the Collateral granted hereunder or under the other Transaction Documents, including, but not limited to, entering into Control Agreements on behalf of, and for the benefit of, the Agent and the Lenders, and (iv) to exercise such powers as are reasonably incidental to the foregoing.  In performing its functions and duties under this Agreement, the Agent shall act solely as administrative agent and collateral agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Lender.

**[SIGNATURE PAGE FOLLOWS]**

33

IN WITNESS WHEREOF, the Agent, the Lenders and the Borrower have caused this Agreement to be duly executed.

**BORROWER:**

**NUO THERAPEUTICS, INC.**

By: _____
Name:
Title:

**AGENT:**

**DEERFIELD MGMT, L.P.**

By: J.E. Flynn Capital, LLC, its General Partner

By: _____
Name: _____
Title:_____

**LENDERS:**

**DEERFIELD PRIVATE DESIGN FUND II, L.P.**

By:    Deerfield Mgmt, L.P., its General Partner
By:    J.E. Flynn Capital, LLC, its General Partner

By: _____
Name: _____
Title: _____

**DEERFIELD PRIVATE DESIGN INTERNATIONAL II, L.P.**

By:   Deerfield Mgmt, L.P., its General Partner
By:   J.E. Flynn Capital, LLC, its General Partner


By: _____
Name: _____
Title: _____




**DEERFIELD SPECIAL SITUATIONS FUND, L.P.**

By:   Deerfield Mgmt, L.P., its General Partner
By:   J.E. Flynn Capital, LLC, its General Partner


By: _____
Name: _____
Title: _____

**EXHIBIT A**

**Form of Notice of Borrowing**

NOTICE OF BORROWING

DATE: [_____]

Deerfield Mgmt, L.P., as Agent
780 Third Avenue, 37th Floor
New York NY 10017
Fax: 212-599-3075
Email: dclark@deerfield.com
Attn: David J. Clark

RE:  Request for disbursement of Loan

Ladies and Gentlemen:

1.  We refer to the Credit Agreement, dated as of [_____], 2016, by and among Nuo Therapeutics, Inc. ("Borrower"), Deerfield Mgmt, L.P., as the Agent (as defined therein), and the Lenders (as defined therein) from time to time party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

2.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Credit Agreement.

3.  The Borrower hereby requests that the Lenders advance a Loan on [_____] in the principal amount of $[_____] in accordance with Section 2.2 of the Credit Agreement.  The Lenders are requested to disburse the proceeds of such Loan to the parties listed on Annex 1 attached hereto by wire transfer in the corresponding amounts set forth in such Annex 1.

4.  The Borrower hereby certifies that (a) the representations and warranties in Article 3 of the Credit Agreement are true in all material respects on the date hereof with the same effect as though such representations and warranties had been made on today's date, (b) no Event of Default or Default has occurred and is continuing, and (c) the relevant conditions to the making of such Loan set forth in Article 4 of the Credit Agreement have been fulfilled and satisfied in all respects.

Very truly yours,

NUO THERAPEUTICS, INC.


By: _____
Name:
Title:

ANNEX 1 to NOTICE OF BORROWING

**Wire Transfer Instructions for Disbursement of Loan:**

**<u>EXHIBIT B</u>**
**Permitted Indebtedness**

None

## **EXHIBIT C**
**Permitted Liens**

None

## SCHEDULE 1
## Pro Rata Shares[1]


Deerfield Private Design Fund II, L.P.                    [30.7560]%

Deerfield Private Design International II, L.P.           [35.2440]%

Deerfield Special Situations Fund, L.P.                   [34.00]%

---

[1] NTD:  Lender percentages to be confirmed.

US_118306100v3_333285-00104 4/15/2016 2:30 PM

**SCHEDULE 2**

None.

**GUARANTY AND SECURITY AGREEMENT**

**among**

**NUO THERAPEUTICS, INC.,**
**as Grantor,**

**and**

**THE OTHER PARTIES HERETO,**
**as Grantors and Guarantors,**

**and**

**DEERFIELD PRIVATE DESIGN FUND II, L.P.,**
**DEERFIELD PRIVATE DESIGN INTERNATIONAL II, L.P.,**
**DEERFIELD SPECIAL SITUATIONS FUND, L.P.,**
**as Lenders**

**and**

**DEERFIELD MGMT, L.P.,**
**as Agent for the Lenders**

**_____, 2016**

## GUARANTY AND SECURITY AGREEMENT

THIS GUARANTY AND SECURITY AGREEMENT dated as of _____, 2016 (this "Agreement") is entered into among NUO THERAPEUTICS, INC., a Delaware corporation ("Borrower"), ALDAGEN, INC., a Delaware corporation ("AI"), CYTOMEDIX ACQUISITION COMPANY, LLC ("CAC") and any other Person who becomes a party hereto pursuant to Section 7.16 (the "Grantors" and each, a "Grantor"), each other Person signatory hereto as a "Guarantor" (as defined below), and DEERFIELD MGMT, L.P., as Agent, DEERFIELD PRIVATE DESIGN FUND II, L.P., DEERFIELD PRIVATE DESIGN INTERNATIONAL II, L.P. and DEERFIELD SPECIAL SITUATIONS FUND, L.P. (the "Lenders").

## RECITALS

A.      Lenders have agreed to extend credit to Borrower pursuant to the Facility Agreement (defined below).  Borrower is affiliated with each other Grantor and Guarantor.

B.      Borrower, the other Grantors and the Guarantors are engaged in interrelated businesses, and each Grantor and each Guarantor will derive substantial direct and indirect benefit from extensions of credit under the Facility Agreement.

C.      It is a condition precedent to Lenders' obligation to extend credit under the Facility Agreement that the Grantors and the Guarantors shall have executed and delivered this Agreement to Lenders.

In consideration of the premises and to induce Lenders to enter into the Facility Agreement and to induce Lenders to extend credit thereunder, each Grantor and each Guarantor hereby agrees with Lenders as follows:

SECTION 1      DEFINITIONS.

1.1      Unless otherwise defined herein, terms defined in the Facility Agreement and used herein shall have the meanings given to them in the Facility Agreement, and the following terms are used herein as defined in the UCC: Accounts, Certificated Security, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Inventory, Leases, Letter-of-Credit Rights, Money, Payment Intangibles, Supporting Obligations, and Tangible Chattel Paper.

1.2      When used herein the following terms shall have the following meanings:

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Agent" has the meaning set forth in Section 3.4.

"Borrower Obligations" means all Obligations of Borrower.

"Collateral" means all of Grantors' assets, including without limitation, all of Grantors' right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising:

(a)      all Goods, Accounts (including Health Care Insurance Receivables), Equipment, Inventory, contract rights or rights to payment of money, Leases, license agreements, franchise agreements, General Intangibles, Commercial Tort Claims, Documents,

Instruments (including any promissory notes), Chattel Paper (whether Tangible Chattel Paper or electronic), Cash, Deposit Accounts, Intellectual Property, securities accounts, fixtures, Letter-of-Credit Rights (whether or not the letter of credit is evidenced by a writing), securities, and all other Investment Property, Supporting Obligations, and financial assets, whether now owned or hereafter acquired, wherever located;

(b)       all of Grantors' books and records relating to any of the foregoing;

(c)       all of Grantors' Pledged Notes; and

(d)       any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof. Notwithstanding the foregoing, "Collateral" shall not include Excluded Property.

"Control Agreement" means an agreement among a Grantor and Lenders (or an agent thereof) and (i) the issuer of uncertificated securities with respect to uncertificated securities in the name of such Grantor, (ii) a securities intermediary with respect to securities, whether certificated or uncertificated, securities entitlements and other financial assets held in a securities account in the name of such Grantor, (iii) a futures commission merchant or clearing house, as applicable, with respect to commodity accounts and commodity contracts held by such Grantor, or (iv) a bank with respect to a Deposit Account; whereby, among other things, the issuer, securities intermediary or futures commission merchant, or bank limits any Lien that it may have in the applicable financial assets or Deposit Account in a manner reasonably satisfactory to Lenders (or an agent thereof), acknowledges the Lien of Lenders (or a representative thereof) on such financial assets or Deposit Account, and agrees to follow the instructions or entitlement orders of Lenders (or an agent thereof) without further consent by such Grantor.

"Dollars" and "$" each mean lawful money of the United States of America.

"Equity Interest" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a 11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"Excluded Property" means, collectively, (a) any permit, license or agreement entered into by any Grantor (i) to the extent that any such permit, license or agreement or any requirement of law applicable thereto prohibits the creation of a Lien thereon, but only to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other requirement of law, (ii) which would be abandoned, invalidated or unenforceable as a result of the creation of a Lien in favor of Lenders or (iii) to the extent that the creation of a Lien in favor of Lenders would result in a breach or termination pursuant to the terms of or a default under any such permit, license or agreement (other than to the extent that any such term would be rendered ineffective pursuant to the Sections 9-406, 9-407, 9-408 or 9-409 of the UCC or any other applicable law (including the Bankruptcy Code) or principles of equity), (b) property owned by any Grantor that is subject to a purchase money Lien or a capital lease permitted under the Facility Agreement if the agreement pursuant to which such Lien is granted (or in the document providing for such capital lease) prohibits or requires the consent of

2

any Person other than a Grantor and its Affiliates which has not been obtained as a condition to the creation of any other Lien on such property, and (c) any "intent to use" trademark applications for which a statement of use has not been filed (but only until such statement is filed); provided, however, "Excluded Property" shall not include any proceeds, products, substitutions or replacements of Excluded Property (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Property).

"Facility Agreement" means the Credit Agreement of even date herewith among Borrower, Agent and Lenders, as amended, supplemented, restated or otherwise modified from time to time.

"Grantor" has the meaning set forth in the preamble of this Agreement.

"Guarantor Obligations" means, collectively, with respect to each Guarantor, all obligations and liabilities of each Guarantor to Agent and Lenders under this Agreement.

"Guarantors" means AI, CAC and any other Person who becomes a signatory to this Agreement pursuant to Section 7.16.

"Identified Claims" means the Commercial Tort Claims described on Schedule 7 as such schedule shall be supplemented from time to time in accordance with the terms and conditions of this Agreement.

"Investment Property" means the collective reference to (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC, (b) all "financial assets" as such term is defined in Section 8-102(a)(9) of the UCC, and (b) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Equity.

"Issuers" means the collective reference to each issuer of Investment Property.

"Lien" means any pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement.

"Paid in Full" means (a) all Secured Obligations (other than contingent claims for indemnification or reimbursement not then asserted) have been repaid in full in cash and have been fully performed, (b) all other Obligations (other than contingent claims for indemnification or reimbursement not then asserted) under the Facility Agreement and the other Transaction Documents have been completely discharged, and (c) all commitments of Lenders, if any, to extend credit that would constitute Borrower Obligations have been terminated or have expired.

"Pledged Equity" means collectively, all Pledged Interests and Pledged Stock.

"Pledged Interests" shall mean, with respect to each limited liability company, partnership or other organization listed on Schedule 1, the Equity Interests in such limited liability company, partnership or other organization owned by a Grantor and listed on Schedule 1, and the certificates, if any, representing such interests and any interest of such Grantor, as applicable, on the books and records of such limited liability company, partnership or other organization or on the books and records of any securities intermediary pertaining to such interests and the Equity Interests of any other Person whose Equity Interests are at any time hereafter issued or granted to, or held by any Grantor, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from

3

time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such interests.

"Pledged Notes" means all promissory notes listed on Schedule 1A, all intercompany notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor (other than promissory notes issued in connection with extensions of trade credit by any Grantor in the ordinary course of business).

"Pledged Stock" shall mean, with respect to each corporation listed on Schedule 1, the Equity Interests of such corporation owned by a Grantor and listed on Schedule 1, and the certificates, if any, representing such shares and any interest of such Grantor, as applicable, in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares and the Equity Interests of any other Person whose Equity Interests are at any time hereafter issued to or granted to or held by any Grantor, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Receivable" means any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including any Accounts).

"Secured Obligations" means, collectively, the Borrower Obligations and Guarantor Obligations.

"Securities Act" means the Securities Act of 1933, as amended.

"UCC" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided that, to the extent that the Uniform Commercial Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Uniform Commercial Code, the definition of such term contained in Article or Division 9 shall govern; provided further that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

SECTION 2     GUARANTY.

2.1     Guaranty.

(a)     Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, as a primary obligor and not only a surety, guarantees to Agent and Lenders and their successors and permitted assigns, the prompt and complete payment and performance by Borrower of the Borrower Obligations when due (whether at the stated maturity, by acceleration or otherwise).

(b)     The guaranty contained in this Section 2 is a guaranty of payment and shall remain in full force and effect until all of the Secured Obligations shall have been Paid in Full.

(c)    No payment made by Borrower, any of the Guarantors, any other guarantor or any other Person, or received or collected by Agent or Lenders from Borrower, any of the Guarantors, any other guarantor or any other Person, by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Secured Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which Guarantor shall, notwithstanding any such payment (other than any payment received or collected from such Guarantor in respect of the Secured Obligations), remain liable for the Secured Obligations until the Secured Obligations are Paid in Full.

2.2    <u>No Subrogation</u>.    Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by Agent or Lenders, no Guarantor shall be entitled to be subrogated to any of the rights of Agent or Lenders against Borrower or any Guarantor or any collateral security or guaranty or right of offset held by Agent or Lenders for the payment of the Secured Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from Borrower or any Guarantor in respect of payments made by such Guarantor hereunder, until all of the Secured Obligations are Paid in Full.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Secured Obligations shall not have been Paid in Full, such amount shall be held by such Guarantor in trust for Agent and Lenders, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to Agent, if required by Agent), to be applied against the Secured Obligations, whether matured or unmatured, in a manner consistent with the provisions of the Facility Agreement.

2.3    <u>Amendments, etc. with respect to the Secured Obligations</u>.    Each Guarantor shall remain obligated hereunder, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, notwithstanding the fact that: (a) any demand for payment of any of the Secured Obligations made by Agent or Lenders may be rescinded by Agent or Lenders and any of the Secured Obligations continued, (b) the Secured Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by Agent or Lenders, or (c) the Facility Agreement and the other Transaction Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as Agent or Lenders may deem advisable from time to time.  Agent and Lenders shall have no obligation to protect, secure, perfect or insure any Lien at any time held by them as security for the Secured Obligations or for the guaranty contained in this <u>Section 2</u> or any property subject thereto.

Agent or Lenders may, from time to time, in their reasonable discretion and without notice to the Guarantors (or any of them), take any or all of the following actions:  (a) retain or obtain a security interest in any personal property of the Grantors constituting Collateral to secure any of the Secured Obligations or any obligation hereunder, (b) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the undersigned, with respect to any of the Secured Obligations, (c) extend or renew any of the Secured Obligations for one or more periods (whether or not longer than the original period), alter or exchange any of the Secured Obligations, or release or compromise any obligation of any of the undersigned hereunder or any obligation of any nature of any other obligor with respect to any of the Secured Obligations, (d) release any guaranty or right of offset or their security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any personal property securing any of the Secured Obligations or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such personal property, and (e) resort to the undersigned (or any of them) for payment of any of the Secured Obligations when due, whether or not

Agent or Lenders shall have resorted to any personal property securing any of the Secured Obligations or any obligation hereunder or shall have proceeded against any other of the undersigned or any other obligor primarily or secondarily obligated with respect to any of the Secured Obligations.

2.4     Waivers.  To the extent permitted by applicable law, each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Secured Obligations and notice of or proof of reliance by Agent or Lenders upon the guaranty contained in this Section 2 or acceptance of the guaranty contained in this Section 2. The Secured Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guaranty contained in this Section 2, and all dealings between Borrower and any of the Guarantors, on the one hand, and Agent and Lenders, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guaranty contained in this Section 2.  To the extent permitted by applicable law, each Guarantor waives (a) diligence, presentment, protest, demand for payment and notice of default, dishonor or nonpayment and all other notices whatsoever to or upon Borrower or any of the Guarantors with respect to the Secured Obligations, (b) notice of the existence or creation or non-payment of all or any of the Secured Obligations and (c) all diligence in collection or protection of or realization upon any Secured Obligations or any security for or guaranty of any Secured Obligations.

2.5     Payments.  Each Guarantor hereby guaranties that payments hereunder will be paid to Agent and Lenders without set-off or counterclaim in Dollars at the office of Lenders specified in the Facility Agreement.

SECTION 3     GRANT OF SECURITY INTEREST.

3.1     Grant.  Each Grantor hereby assigns and transfers to Agent, for the benefit of Lenders, and hereby grants to Agent, for the benefit of Lenders, a continuing security interest in all of its Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Obligations. Notwithstanding the foregoing, no Lien or security interest is hereby granted on any Excluded Property.

3.2     Each Lender hereby appoints and authorizes Agent to enter into this Agreement and to take all actions as Agent on its behalf and to exercise such powers under the this Agreement on behalf of Lenders, together with all such powers as are reasonably incidental thereto, for purposes of any and all matters associated with the perfection of security interests in the Collateral granted hereunder or under the other Transaction Documents, including, but not limited to, entering into Control Agreements on behalf of, and for the benefit of, the Lenders.  In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Lender.

SECTION 4     REPRESENTATIONS AND WARRANTIES.

To induce Agent and Lenders to enter into the Facility Agreement and to induce Lenders to make extensions of credit to Borrower thereunder, each Grantor jointly and severally hereby represents and warrants to Lenders that:

4.1     Title; No Other Liens.  Except for Permitted Liens, the Grantors own each item of the Collateral free and clear of any and all Liens of others.  As of the Closing Date, no effective financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Permitted Liens.

6

4.2     <u>Perfected Liens</u>.  The security interests granted in the Collateral pursuant to this Agreement (a) upon completion of the filings and other actions specified on <u>Schedule 2</u> (which filings and other documents referred to on <u>Schedule 2</u>, have been delivered to Agent in completed form) will constitute valid perfected security interests in all of the Grantors' rights in the Collateral in favor of Agent as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof and in accordance with the terms of the Facility Agreement, to the extent such security interests can be perfected by the filing of UCC financing statements (and, with respect to Commercial Tort Claims, to the extent any Commercial Tort Claims are sufficiently identified herein),  and (b) shall be prior to all other Liens on the Grantors' rights in the Collateral (other than (x) motor vehicles and (y) any Intellectual Property arising under laws other than those of the United States) except for Permitted Liens having priority over Lenders' Lien by operation of law or permitted pursuant to the Facility Agreement, upon (i) in the case of all Pledged Notes, Pledged Equity and other pledged Investment Property, the delivery thereof to Agent of such Pledged Notes, Pledged Equity and other pledged Investment Property consisting of instruments and certificates, in each case properly endorsed for transfer to Agent or in blank, (ii) in the case of all pledged Investment Property not in certificated form and Deposit Accounts, the execution of Control Agreements with respect to such Investment Property and Deposit Accounts, (iii) in the case of all other Instruments and Tangible Chattel Paper that are not Pledged Notes, Pledged Equity and other pledged Investment Property, the delivery thereof to Agent of such Instruments and Tangible Chattel Paper, (iv) in the case of Letter-of-Credit Rights, the consent of the issuer of such Letter-of-Credit Rights, (v) in the case of Intellectual Property, to the extent not subject to Article 9 of the UCC, recordation of the security interests granted hereunder in such Intellectual Property in the applicable intellectual property registries, including but not limited to, the United States Patent and Trademark Office and the United States Copyright Office; and (vi) in the case of Money, upon Agent or Lenders taking possession of such Money.  As of the date hereof and except as set forth in this Section 4.2 or as otherwise not required hereunder, all actions by each Grantor necessary to perfect the Liens granted hereunder on the Collateral have been duly taken.

4.3     <u>Grantor Information</u>.  On the date hereof, <u>Schedule 3</u> sets forth (a) each Grantor's and each Guarantor's jurisdiction of organization, (b) the location of each Grantor's and each Guarantor's chief executive office, (c) each Grantor's and each Guarantor's exact legal name as it appears on its organizational documents and (d) each Grantor's organizational identification number (to the extent a Grantor or Guarantor is organized in a jurisdiction which assigns such numbers) and federal employer identification number.

4.4     <u>Collateral Locations</u>.  On the date hereof, <u>Schedule 4</u> sets forth (a) each place of business of each Grantor and each Guarantor (including its chief executive office), (b) all locations where all Inventory and Equipment with a book value in excess of $25,000 owned by each Grantor is kept (other than Inventory or Equipment that is otherwise in transit or out for repair, refurbishment or processing in the ordinary course of business or otherwise disposed of in a transaction permitted by the Facility Agreement) and (c) whether each such Collateral location and place of business (including each Grantor's chief executive office) is owned or leased (and if leased, specifies the complete name and notice address of each lessor).  On the Agreement Date, no Collateral (other than Inventory or Equipment that is otherwise in transit or out for repair, refurbishment or processing in the ordinary course of business or otherwise disposed of in a transaction permitted by the Facility Agreement) with a book value greater than $25,000 is located outside the United States or in the possession of any lessor, bailee, warehouseman or consignee, except as indicated on <u>Schedule 4</u>.

4.5     <u>Certain Property</u>.  None of the Collateral constitutes, or is the Proceeds of, (a) Farm Products, (b) Health Care Insurance Receivables or (c) vessels, aircraft or any other personal property subject to any certificate of title or other registration statute of the United States, any State or

118308469_3

other jurisdiction, except for motor vehicles owned by the Grantors and used by employees of the Grantors in the ordinary course of business.

        4.6    <u>Investment Property</u>.

        (a)    The Pledged Equity pledged by each Grantor hereunder constitutes all the issued and outstanding equity interests of each Issuer owned by such Grantor.

        (b)    All of the Pledged Equity has been duly and validly issued and, in the case of shares of capital stock and membership interests, is fully paid and nonassessable.

        (c)    Each of the Pledged Notes constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms.

        (d)    <u>Schedules 1</u> and <u>1A</u> list all Investment Property owned by each Grantor with a value greater than $25,000.  Each Grantor is the record and beneficial owner of, and has good and valid title to, the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except Permitted Liens.

        4.7    <u>Receivables</u>.

        (a)    No material amount payable to a Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which, to the extent required hereunder, has not been delivered to Agent.

        (b)    No obligor on any Receivable is a Governmental Authority.

        4.8    <u>Intellectual Property</u>.   As of the date hereof: (a) <u>Schedule 5</u> lists all Intellectual Property that is registered or is the subject of an application to register and owned by each Grantor in its own name on the date hereof; and (b) except as set forth in <u>Schedule 5</u> and except for non-exclusive licenses of software and other Intellectual Property licensed in the ordinary course of business, none of the Intellectual Property of any Grantor is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

        4.9    <u>Depository and Other Accounts</u>.  <u>Schedule 6</u> lists all banks and other financial institutions at which any Grantor maintains deposit or other accounts as of the Closing Date and such <u>Schedule 6</u> correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

        4.10    <u>Facility Agreement</u>.  Each Grantor and each Guarantor makes each of the representations and warranties made by Borrower in <u>Section 3.1</u> of the Facility Agreement to the extent applicable to it on the date such Grantor or Guarantor becomes a party hereto (which representations and warranties shall be deemed to be renewed upon each borrowing under the Facility Agreement).  Such representations and warranties shall be incorporated herein by this reference as if fully set forth herein.

SECTION 5    <u>COVENANTS.</u>

        Each Grantor covenants and agrees with Agent and Lenders that, from and after the date of this Agreement until the Secured Obligations shall have been Paid in Full:

5.1     <u>Delivery of Instruments, Certificated Securities and Chattel Paper</u>.  In the event that an Event of Default shall have occurred and be continuing, upon the request of Agent, any Instrument, certificated security or Chattel Paper not theretofore delivered to Agent and at such time being held by any Grantor shall be promptly (and, in any event, within five (5) Business Days) delivered to Agent, duly indorsed in a manner satisfactory to Agent, to be held as Collateral pursuant to this Agreement and in the case of Electronic Chattel Paper, the applicable Grantor shall cause Agent to have control thereof within the meaning set forth in Section 9-105 of the UCC.

5.2     <u>Maintenance of Perfected Security Interest; Further Documentation</u>.

(a)     The Grantors shall maintain the security interests created by this Agreement as perfected security interests (to the extent such security interests can be perfected by the filing of UCC financing statements (and, with respect to Commercial Tort Claims, to the extent any Commercial Tort Claims are sufficiently identified herein)) having at least the priority described in <u>Section 4.2</u>, and shall defend such security interests against the claims and demands of all Persons whomsoever.

(b)     Each Grantor will furnish to Agent from time to time statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as Agent may reasonably request, all in reasonable detail.

(c)     At any time and from time to time, upon the written request of Agent, and at its sole expense, each Grantor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby, (ii) in the case of Investment Property and any other relevant Collateral, taking any such requested actions necessary to enable Lenders to obtain "control" (within the meaning of the applicable UCC) with respect to such Investment Property or other Collateral to the extent required to be pledged hereunder; and (iii) if requested by Agent, delivering, to the extent permitted by law, any original motor vehicle certificates of title received by such Grantor from the applicable secretary of state or other Governmental Authority after information reflecting Agent's security interest has been recorded in such motor vehicles to the extent required to be pledged thereunder.

5.3     <u>Changes in Locations, Name, etc</u>.  Such Grantor shall not, except upon 10 Business Days' prior written notice to Agent (or such lesser notice as Agent may agree to in its sole discretion) and delivery to Agent of (a) all additional financing statements and other documents reasonably requested by Agent as to the validity, perfection and priority of the security interests provided for herein and (b) if applicable, a written supplement to <u>Schedule 4</u> showing any additional location at which Inventory or Equipment with a book value in excess of $25,000 shall be kept (other than Inventory or Equipment that is otherwise in transit or out for repair, refurbishment or processing in the ordinary course of business or otherwise disposed of in a transaction permitted by the Facility Agreement):

(i)     permit any of the Inventory or Equipment with a book value greater than $25,000 in the aggregate to be kept at a location subject to the possession or control of any warehouse, consignee, bailee, or any of the Grantors' agents or processors other than those listed on <u>Schedule 4</u>, other than the Inventory or Equipment that is otherwise in transit or out for repair, refurbishment or processing in the ordinary course of business or otherwise disposed of in a transaction permitted by the Facility Agreement;

9

(ii)     change its jurisdiction of organization or the location of its chief executive office from that specified on <u>Schedule 3</u> or in any subsequent notice delivered pursuant to this <u>Section 5.3</u>; or

(iii)    change its name, identity or corporate structure.

5.4     <u>Notices</u>.  The Grantors will advise Agent promptly, in reasonable detail, of:

(a)     any Lien (other than Permitted Liens) on any of the Collateral; and

(b)     the occurrence of any other event which would reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or on the Liens created hereby.

5.5     <u>Investment Property</u>.

(a)     If a Grantor shall become entitled to receive or shall receive any certificate, option or rights in respect of the Equity Interests of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any of the Pledged Equity, or otherwise in respect thereof, such Equity Interests shall be Pledged Equity (to the extent consistent with the percentage of the Grantor's Equity Interests in such Issuer pledged hereunder, as set forth on <u>Schedule 1</u>) and Grantor shall accept the same as the agent of Agent, hold the same in trust for Agent and deliver the same forthwith to Agent in the exact form received, duly indorsed by such Grantor to Agent, if required by Agent, together with an undated instrument of transfer covering such certificate duly executed in blank by such Grantor and with, if Lenders so request, signature guarantied, to be held by Agent, subject to the terms hereof, as additional Collateral for the Secured Obligations.

(b)     Upon the occurrence and during the continuance of an Event of Default and the request of Agent, (i) any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any Issuer shall be paid over to Agent to be held by it hereunder as additional Collateral for the Secured Obligations, and (ii) in case any distribution of capital shall be made on or in respect of the Investment Property, or any property shall be distributed upon or with respect to the Investment Property, pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected Lien in favor of Agent, be delivered to Agent to be held by it hereunder as additional Collateral for the Secured Obligations.  Upon the occurrence and during the continuance of an Event of Default, if any sums of money or property so paid or distributed in respect of the Investment Property shall be received by a Grantor, such Grantor shall, at the request of Agent and until such money or property is paid or delivered to Lenders, hold such money or property in trust for Agent, segregated from other funds of such Grantor, as additional Collateral for the Secured Obligations.

(c)     Without the prior written consent of Agent, each Grantor will not (i) vote to enable, or take any other action, to permit any Issuer to issue any Equity Interests of any nature or to issue any other securities or interests convertible into or granting the right to purchase or exchange for any Equity Interests of any nature of any Issuer, except, in each case, as permitted by the Facility Agreement, (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property or Proceeds thereof (except pursuant to a transaction permitted by the Facility Agreement) other than, with respect to Investment Property not constituting Pledged Equity or Pledged Notes, any such action which is not prohibited by the Facility Agreement, (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for Permitted Liens, or (iv) enter into any agreement or undertaking restricting the right or ability of such Grantor or Agent to sell, assign or transfer

118308469_3

any of the Investment Property or Proceeds thereof, except with respect to Permitted Liens and any such action which is not prohibited by the Facility Agreement.

(d)    In the case of each Grantor which is an Issuer, such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Pledged Equity issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify Agent promptly in writing of the occurrence of any of the events described in Sections 5.5(a) and 5.5(b) of this Agreement with respect to the Pledged Equity issued by it and (iii) the terms of Sections 6.3(c) and 6.7 of this Agreement shall apply to such Grantor with respect to all actions that may be required of it pursuant to Section 6.3(c) or 6.7 of this Agreement regarding the Pledged Equity issued by it.

5.6    Receivables.  Other than in the ordinary course of business consistent with its past practice or with respect to amounts which are not material to such Grantor, each Grantor will not (a) grant any extension of the time of payment of any Receivable, (b) compromise or settle any Receivable for less than the full amount thereof, (c) release, wholly or partially, any Person liable for the payment of any Receivable, (d) allow any credit or discount whatsoever on any Receivable or (e) amend, supplement or modify any Receivable in any manner that would reasonably be expected to adversely affect the value thereof in any material respect.

5.7    Intellectual Property.  Except as expressly permitted by the Facility Agreement,

(a)    Each Grantor (either itself or through licensees) will (i) continue to use each trademark (owned by such Grantor) material to its business, in order to maintain such material trademark in full force free from any claim of abandonment for non-use, (ii) maintain as in the past the quality of products and services offered under such trademark, (iii) use such material trademark with the appropriate notice of registration and all other notices and legends required by applicable law, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such material trademark unless Agent shall obtain a perfected security interest in such mark pursuant to this Agreement and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such material trademark becomes invalidated or impaired in any way.

(b)    Each Grantor (either itself or through licensees) will not do any act, or omit to do any act, whereby any patent owned by such Grantor material to its business may become forfeited, abandoned or dedicated to the public.

(c)    Each Grantor (either itself or through licensees) (i) will employ each copyright owned by such Grantor material to its business and (ii) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any material portion of such copyrights may become invalidated or otherwise impaired, and (iii) will not (either itself or through licensees) do any act whereby any material portion of such copyrights may fall into the public domain.

(d)    Each Grantor (either itself or through licensees) will not knowingly do any act that uses any Intellectual Property material to its business to infringe the intellectual property rights of any other Person.

(e)    Each Grantor will notify Agent promptly if it knows, or has reason to know, that any application or registration relating to any material Intellectual Property may become forfeited, abandoned or dedicated to the public, or of any determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding, such Grantor's ownership of, or the validity of, any material Intellectual Property or such Grantor's right

11

to register the same or to own and maintain the same, that would reasonably be expected to have a Material Adverse Effect.

(f)     Whenever a Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall promptly report such filing to Agent. Upon the request of Agent, such Grantor shall execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers as Agent may request to evidence Agent's security interest in any copyright, patent or trademark and the goodwill and general intangibles of such Grantor relating thereto or represented thereby.

(g)     Such Grantor will take all reasonable and necessary steps to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of all material Intellectual Property owned by it.

(h)     In the event that any material Intellectual Property is infringed upon or misappropriated or diluted by a third party, such Grantor shall (i) take such actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Intellectual Property and (ii) if such Intellectual Property is of material economic value, promptly notify Agent after it learns thereof and sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution.

5.8     <u>Deposit Accounts / Securities Accounts</u>.  On and after the date hereof, no Grantor shall open any Deposit Account or Securities Account unless such Grantor shall have given to Agent 10 calendar days' prior written notice (or such lesser notice as the Agent may agree to in their sole discretion) of its intention to open any such new Deposit Account or Securities Account.  With respect to each Deposit Account or Securities Account located in the United States, upon request of the Agent, such Grantor shall, and shall cause the bank, financial institution or securities intermediary at which such account is to be opened to, enter into a Control Agreement.  The provisions of this <u>Section 5.8</u> requiring Control Agreements shall not apply to Deposit Accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Grantors' employees and identified to Lenders by Grantors as such; <u>provided</u>, <u>however</u>, that at all times that any Secured Obligations remain outstanding, Grantors shall maintain one or more separate Deposit Accounts to hold any and all amounts to be used for payroll, payroll taxes and other employee wage and benefit payments, and shall not commingle any monies allocated for such purposes with funds in any other Deposit Account.

5.9     <u>Other Matters</u>.

(a)     Each Grantor authorizes Agent to, at any time and from time to time, file financing statements, continuation statements, and amendments thereto that describe the Collateral as "all assets" of each Grantor, or words of similar effect, and which contain any other information required pursuant to the UCC for the sufficiency of filing office acceptance of any financing statement, continuation statement or amendment, and each Grantor agrees to furnish any such information to Lenders promptly upon request.  Any such financing statement, continuation statement or amendment may be signed by Agent on behalf of any Grantor and may be filed at any time in any jurisdiction.

(b)     Each Grantor shall, at any time and from time to time, take such steps as the Agent or Lenders may reasonably request for Agent to insure the continued perfection and priority of Agent's security interest in any of the Collateral and of the preservation of its rights therein.

(c)    If any Grantor shall at any time, acquire a Commercial Tort Claim in excess of $25,000, such Grantor shall promptly notify Agent thereof in writing and supplement Schedule 7, therein providing a reasonable description and summary thereof, and upon delivery thereof to Agent, such Grantor shall be deemed to thereby grant to Agent (and such Grantor hereby grants to Agent) a Lien in and to such Commercial Tort Claim and all proceeds thereof, all upon the terms of and governed by this Agreement.

5.10    Facility Agreement.    Each of the Grantors covenants that it will, and, if necessary, will cause or enable Borrower to, fully comply with each of the covenants and other agreements set forth in the Facility Agreement.

5.11    Insurance.  Each Grantor shall:

(a)    Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of such Grantor, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be reasonably satisfactory to Agent.  Original (or certified) copies of certificates of insurance have been delivered to Agent, together with evidence of payment of all premiums therefor, and each such policy shall contain an endorsement, in form and substance reasonably acceptable to Agent, showing loss under such insurance policies payable to Agent.

(b)    Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of such Grantor with such companies and in such amounts, with such deductibles and under policies in such form as shall be reasonably satisfactory to Agent and original (or certified) copies of  certificates of insurance have been delivered to Lenders, together with evidence of payment of all premiums therefor and; each such policy shall include an endorsement, reasonably satisfactory to Agent, showing Agent as additional insured thereunder.

5.12    Lenders May Purchase Insurance.    If a Grantor at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above under Section 5.11 (and provide evidence thereof to Agent promptly following receipt of written request therefor from Agent) or to pay any premium relating thereto, then Agent or Lenders, without waiving or releasing any obligation or default by such Grantor hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Agent or Lenders deems advisable upon notice to such Grantor.  Such insurance, if obtained by Agent or Lenders, may, but need not, protect such Grantor's interests or pay any claim made by or against such Grantor with respect to the Collateral.  Such insurance may be more expensive than the cost of insurance such Grantor may be able to obtain on its own and may be cancelled only upon such Grantor providing evidence that it has obtained the insurance as required above.  All sums disbursed by Agent or Lenders in connection with any such actions, shall constitute Secured Obligations payable upon demand.

SECTION 6    REMEDIAL PROVISIONS.

6.1    Certain Matters Relating to Receivables.

(a)    At any time and from time to time after the occurrence and during the continuance of an Event of Default, Agent shall have the right to make test verifications of the Receivables in any manner and through any medium that they reasonably considers advisable, and each Grantor shall furnish all such assistance and information as Agent may reasonably require in connection

13

with such test verifications. At any time and from time to time after the occurrence and during the continuance of an Event of Default, upon request of the Agent or Required Lenders and at the expense of the relevant Grantor, such Grantor shall cause independent public accountants or others satisfactory to Lenders to furnish to Agent reports showing reconciliations, agings and test verifications of, and trial balances for, the Receivables.

(b)     Agent hereby authorize each Grantor to collect such Grantor's Receivables, and Agent may curtail or terminate such authority at any time after the occurrence and during the continuance of an Event of Default. If required by Agent at any time after the occurrence and during the continuance of an Event of Default, provided that a release pursuant to <u>Section 7.17</u> shall not have occurred, any payments of Receivables, when collected by any Grantor, (i) shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to Agent (if required by Agent) and upon notice to such Grantor, in a collateral account maintained under the sole dominion and control of Agent, subject to withdrawal by Agent only as provided in <u>Section 6.4</u>, and (ii) until so turned over after such request by Agent, shall be held by such Grantor in trust for Agent, segregated from other funds of such Grantor. Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)     At any time and from time to time after the occurrence and during the continuance of an Event of Default, at the request of Agent, each Grantor shall deliver to Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including all original orders, invoices and shipping receipts.

(d)     Each Grantor hereby irrevocably authorizes and empowers Agent, in Agent's sole discretion, at any time after the occurrence and during the continuance of an Event of Default, following Agent's concurrent notice to such Grantor, to assert, either directly or on behalf of such Grantor, any claim such Grantor may from time to time have against the sellers under or with respect to any agreements assigned or collaterally assigned to Agent and to receive and collect any and all damages, awards and other monies resulting therefrom and to apply the same to the Secured Obligations in such order as Lenders may determine in their discretion. After the occurrence and during the continuance of an Event of Default, each Grantor hereby irrevocably makes, constitutes and appoints Agent as its true and lawful attorneys in fact for the purpose of enabling Agent to assert and collect such claims and to apply such monies in the manner set forth above, which appointment, being coupled with an interest, is irrevocable.

6.2     <u>Communications with Obligors; Grantors Remain Liable</u>.

(a)     Agent in its own name or in the name of others may at any time after the occurrence and during the continuance of an Event of Default communicate with obligors under the Receivables to verify with them to Agent's satisfaction the existence, amount and terms of any Receivables.

(b)     Upon the written request of Agent at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Receivables that the Receivables have been assigned to Agent's and that payments in respect thereof shall be made directly to Agent.

(c)     Anything herein to the contrary notwithstanding, each Grantor shall remain liable in respect of each of the Receivables to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise

14

thereto. Agent shall have no obligation or liability under any Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by Agent of any payment relating thereto, nor shall Agent be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(d)     After the occurrence and during the continuance of an Event of Default, for the purpose of enabling Agent or Lenders to exercise rights and remedies under this Agreement, each Grantor hereby grants to Agent and Lenders an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, license or sublicense any Intellectual Property now owned or hereafter acquired by such Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

6.3     Investment Property.

(a)     Unless an Event of Default shall have occurred and be continuing and Agent shall have given written notice to the relevant Grantor of Agent's intent to exercise their corresponding rights pursuant to Section 6.3(b), such Grantor shall be permitted to receive all cash dividends and distributions paid in respect of the Pledged Equity and all payments made in respect of the Pledged Notes, to the extent permitted in the Facility Agreement, and to exercise all voting and other rights with respect to the Investment Property; provided, that no vote shall be cast or other right exercised or action taken which would reasonably be expected to materially impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Facility Agreement, this Agreement or any other Transaction Document.

(b)     If an Event of Default shall occur and be continuing and Agent shall give notice of Agent's intent to exercise such rights to the relevant Grantor, (i) Agent shall have the right to receive any and all cash dividends and distributions, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Secured Obligations in such order as Agent may determine in their discretion, (ii) Agent shall have the right to cause any or all of the Investment Property to be registered in the name of Agent or its nominee and (iii) Agent or its nominee may exercise (x) all voting and other rights pertaining to such Investment Property at any meeting of holders of the Equity Interests of the relevant Issuer or Issuers or otherwise (or by written consent) and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if they were the absolute owner thereof (including the right to exchange at their discretion any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate or other structure of any Issuer, or upon the exercise by any Grantor or Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as Agent may determine), all without liability except to account for property actually received by them, but Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)     After the occurrence and during the continuance of an Event of Default, each Grantor, upon notice from Agent, hereby authorizes and instructs each Issuer of the Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from Agent in

15

writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and (ii) unless otherwise expressly permitted hereby, pay any dividends, distributions or other payments with respect to the Investment Property directly to Agent.

6.4    <u>Proceeds to be Turned Over to Lenders</u>.  In addition to the rights of Agent specified in <u>Section 6.1</u> with respect to payments of Receivables, if an Event of Default shall occur and be continuing, all Proceeds received by any Grantor consisting of cash, checks and other cash equivalent items shall be held by such Grantor in trust for Agent, segregated from other funds of such Grantor, and shall, upon written request of Agent, forthwith upon receipt by such Grantor, be turned over to Agent in the exact form received by such Grantor (duly indorsed by such Grantor to Lenders, if required).  All Proceeds received by Agent hereunder shall be held by Agent in a collateral account maintained under its sole dominion and control.  All Proceeds, while held by Agent in any collateral account (or by such Grantor in trust for Agent) established pursuant hereto, shall continue to be held as collateral security for the Secured Obligations and shall not constitute payment thereof until applied as provided in <u>Section 6.5</u>.

6.5    <u>Application of Proceeds</u>.  Agent may apply all or any part of Proceeds from the sale of, or other realization upon, all or any part of the Collateral in payment of the Secured Obligations in such order as the Agent shall determine in their discretion.  Any part of such funds which Agent elect not so to apply and deem not required as collateral security for the Secured Obligations shall be paid over from time to time by Agent to the applicable Grantor or to whomsoever may be lawfully entitled to receive the same.  Any balance of such Proceeds remaining after the Secured Obligations shall have been Paid in Full shall be paid over to the applicable Grantor or to whomsoever may be lawfully entitled to receive the same.

6.6    <u>Code and Other Remedies</u>.  If an Event of Default shall occur and be continuing, Agent may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the UCC or any other applicable law.  Without limiting the generality of the foregoing, Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses (other than defense of payment), advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of Agent or elsewhere upon such terms and conditions as they may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery with assumption of any credit risk.  Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released. Each Grantor further agrees, at Agent's request, to assemble the Collateral and make it available to Agent at places which Agent shall reasonably select, whether at such Grantor's premises or elsewhere in connection with the exercise of Agent's remedies hereunder.  Agent shall apply the net proceeds of any action taken by it pursuant to this <u>Section 6.6</u>, after deducting all reasonable documented out-of-pocket costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Agent hereunder, to the payment in whole or in part of the Secured Obligations, in such order as the Agent may elect in its discretion, and, only after such application and after the payment by Agent of any other amount required by any provision of law, need Agent account for the surplus, if any, to any Grantor.

16

To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against Agent arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such sale or other disposition.

6.7     Private Sale. Each Grantor recognizes that Agent may be unable to effect a public sale of any or all the Pledged Equity, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. Agent shall be under no obligation to delay a sale of any of the Pledged Equity for the period of time necessary to permit the Issuer thereof to register such securities or other interests for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

Each Grantor agrees to use its commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Pledged Equity pursuant to this Section 6.7 valid and binding and in compliance with applicable law. Each Grantor further agrees that a breach of any of the covenants contained in this Section 6.7 will cause irreparable injury to Agent, that Agent has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 6.7 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Facility Agreement.

6.8     Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Secured Obligations in full and the fees and disbursements of any attorneys employed by Agent to collect such deficiency.

SECTION 7     MISCELLANEOUS.

7.1     Amendments in Writing. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 9.1 of the Facility Agreement.

7.2     Notices. All notices, requests and demands to or upon Agent, Lenders or any Grantor hereunder shall be addressed to such party and effected in the manner provided for in Section 9.1 of the Facility Agreement and each Grantor hereby appoints the Borrower as its agent to receive notices hereunder.

7.3     Indemnification by Grantors. Each Grantor and each Guarantor agrees to jointly and severally indemnify, pay, and hold Agent, Lenders and their Affiliates, officers, directors, employees, agents, and attorneys (the "Indemnitees") harmless against losses and liabilities to the extent set forth in Section 9.1 of the Facility Agreement, the terms of which are incorporated herein by reference as though set forth fully herein. The provisions in this Section 7.3 shall survive repayment of all Secured Obligations (and all commitments of Lenders, if any, to extend credit that would constitute Borrower Obligations have been terminated or have expired), any foreclosure under, or any modification, release or discharge of, any or all of the Collateral, and termination of this Agreement.

7.4     Enforcement Expenses.

(a)     Each Grantor and each Guarantor agrees, on a joint and several basis, to pay or reimburse on demand Agent and Lenders for all reasonable out-of-pocket documented costs and expenses incurred in collecting against any Guarantor under the guaranty contained in Section 2 or otherwise enforcing or preserving any rights under this Agreement and the other Transaction Documents.

(b)     Each Grantor and each Guarantor agrees to pay, and to save Agent and Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)     The agreements in this Section 7.4 shall survive repayment of all Secured Obligations (and all commitments of Lenders, if any, to extend credit that would constitute Borrower Obligations have been terminated or have expired), any foreclosure under, or any modification, release or discharge of, any or all of the Collateral, and termination of this Agreement.

7.5     Captions.  Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

7.6     Nature of Remedies.  All Secured Obligations of each Grantor and rights of Agent and Lenders expressed herein or in any other Transaction Document shall be in addition to and not in limitation of those provided by applicable law.  No failure to exercise and no delay in exercising, on the part of Lenders, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

7.7     Counterparts; Effectiveness.  This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but one in the same instrument.  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto; provided, that the representations and warranties of the Grantors herein are effective immediately after the consummation of the Closing (as defined in the Reorganization Plan) occurring on the Effective Date (as defined in the Reorganization Plan).

7.8     Severability.  The invalidity, illegality or unenforceability in any jurisdiction of any provision under this Agreement or any of the other Transaction Documents shall not affect or impair the remaining provisions in this Agreement or any of the other Transaction Documents.

7.9     Entire Agreement.  This Agreement and the other Transaction Documents to which the parties hereto are parties embody the entire agreement among the parties hereto and supersede all prior commitments, agreements, representations and understandings, whether oral or written, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.  All Exhibits, Schedules and Annexes referred to herein are incorporated in this Agreement by reference and constitute a part of this Agreement.  If any provision contained in this Agreement conflicts with any provision of the Facility Agreement, then with regard to such conflicting provisions, the Facility Agreement shall govern and control.

7.10    <u>Successors; Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns except that Grantors and Guarantors may not assign their rights or obligations hereunder without the written consent of Agent and any such purported assignment without such written consent shall be void.

7.11    <u>Applicable Law</u>.    THIS AGREEMENT AND EACH OF THE OTHER TRANSACTION DOCUMENTS TO WHICH THE GRANTORS AND GUARANTORS ARE A PARTY WHICH DOES NOT EXPRESSLY SET FORTH APPLICABLE LAW SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

7.12    <u>Consent to Jurisdiction</u>.    GRANTORS AND GUARANTORS HEREBY CONSENT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK COUNTY, STATE OF NEW YORK AND IRREVOCABLY AGREE THAT, SUBJECT TO LENDERS' ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS TO WHICH THE GRANTORS ARE A PARTY SHALL BE LITIGATED IN SUCH COURTS.  GRANTORS AND GUARANTORS EXPRESSLY SUBMIT AND CONSENT TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVE ANY DEFENSE OF FORUM NON CONVENIENS. GRANTORS AND GUARANTORS HEREBY WAIVE PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREE THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON GRANTORS AND GUARANTORS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER, AT THE ADDRESS SET FORTH IN THE FACILITY AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

7.13    <u>Waiver of Jury Trial</u>.    GRANTORS, GUARANTORS, AGENTS AND LENDERS HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS.    GRANTORS, GUARANTORS AND LENDERS ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. GRANTORS, GUARANTORS, AGENT AND LENDERS WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

7.14    <u>Set-off</u>.  Each Grantor agrees that Agent and Lenders have all rights of set-off and bankers' lien provided by applicable law, and in addition thereto, each Grantor agrees that at any time any Event of Default exists, Agent and Lenders may apply to the payment of any Secured Obligations in such order as Agent or Lenders may determine in their reasonable discretion, whether or not then due, any and all balances, credits, deposits, accounts or moneys of such Grantor then or thereafter with Lenders. Agent and Lenders hereby agree that they shall endeavor to notify each Grantor of any such set-off or any such application, but failure to notify shall have no adverse determination or effect hereunder.

7.15    <u>Acknowledgements</u>.  Each Grantor and each Guarantor hereby acknowledges that:

19

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Transaction Documents to which it is a party;

(b)      Neither Agent nor Lenders have no fiduciary relationship with or duty to any Grantor or Guarantor arising out of or in connection with this Agreement or any of the other Transaction Documents, and the relationship between the Grantors and Guarantors, on the one hand, and Agent and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)      no joint venture is created hereby or by the other Transaction Documents or otherwise exists by virtue of the transactions contemplated hereby among the Grantors, Guarantors and Lenders.

7.16    <u>Additional Grantors/Guarantors</u>.  The Grantors shall cause each Person, upon becoming a Subsidiary of a Grantor, to guaranty Borrower's performance of the Borrower Obligations and grant to Agent, on behalf of Lenders a security interest in the personal property of such Person (to the extent such personal property would constitute Collateral) to secure its performance under the Facility Agreement (to the extent a party thereto) and Borrower's performance of the Borrower Obligations by becoming a party to this Agreement.  Upon execution and delivery by such Person of a joinder agreement in the form of <u>Annex I</u> hereto, such Person shall become a Grantor and Guarantor for all purposes of this Agreement.

7.17    <u>Releases</u>.

(a)      At such time as the Secured Obligations have been Paid in Full, the Collateral shall be automatically released from the Liens created hereby, and this Agreement and all guarantees and obligations (other than those expressly stated to survive such termination) of Lenders and each Grantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Grantors.  At the request and sole expense (to the extent reasonable, documented and out-of-pocket) of any Grantor following any such termination, Agent shall promptly deliver to the Grantors any Collateral held by Agent hereunder, and execute and deliver to the Grantors such documents (including authorization to file UCC termination statements) as the Grantors shall reasonably request to evidence such termination.

(b)      If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Facility Agreement, then Agent, at the request and sole expense (to the extent reasonable, documented and out-of-pocket) of such Grantor, shall execute and deliver to such Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral.  At the request and sole expense (to the extent reasonable, documented and out-of-pocket) of Borrower, a Grantor shall be released from its obligations hereunder in the event that all the equity interests of such Grantor shall be sold, transferred or otherwise disposed of in a transaction permitted by the Facility Agreement; <u>provided</u> that Borrower shall have delivered to Agent, with reasonable notice prior to the date of the proposed release, a written request for release identifying the relevant Grantor and the terms of the sale or other disposition in reasonable detail, including the price thereof and estimated expenses in connection therewith, together with a certification by Borrower stating that such transaction is in compliance with the Facility Agreement and the other Transaction Documents.

7.18    <u>Obligations and Liens Absolute and Unconditional</u>.  Each Grantor and each Guarantor understands and agrees that the obligations of each Grantor under this Agreement shall be construed as continuing, absolute and unconditional without regard to (a) the validity or enforceability of any Transaction Document, any of the Secured Obligations or any other collateral security therefor or

guaranty or right of offset with respect thereto at any time or from time to time held by Agent of Lenders, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Grantor, Guarantor or any other Person against Agent or Lenders, or (c) any other circumstance whatsoever (with or without notice to or knowledge of any Grantor or Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of any Grantor or Guarantor for the Secured Obligations, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Grantor or Guarantor, Agent and Lenders may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as they may have against any other Grantor or Guarantor or any other Person or against any collateral security or guaranty for the Secured Obligations or any right of offset with respect thereto, and any failure by Agent or Lenders to make any such demand, to pursue such other rights or remedies or to collect any payments from any other Grantor or Guarantor or any other Person or to realize upon any such collateral security or guaranty or to exercise any such right of offset, or any release of any other Grantor or Guarantor or any other Person or any such collateral security, guaranty or right of offset, shall not relieve any Grantor or Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of Lenders against any Grantor or Guarantor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

       7.19    <u>Reinstatement</u>.    In the event that any payment in respect of the Secured Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

*[Signatures Immediately Follow]*

21

IN WITNESS WHEREOF, each of the undersigned has caused this Guaranty and Security Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS AND GUARANTORS:**

**NUO THERAPEUTICS, INC.,**
**as Grantor**

By: _____

Name: _____

Title: _____

**ALDAGEN, INC., as Grantor and Guarantor**

By: _____

Name: _____

Title: _____

**CYTOMEDIX ACQUISITION COMPANY, LLC, as Grantor and Guarantor**

By: _____

Name: _____

Title: _____

**LENDERS:**

**DEERFIELD PRIVATE DESIGN INTERNATIONAL II, L.P.**

By: Deerfield Mgmt., L.P., General Partner
By: J.E. Flynn Capital LLC, General Partner

By: _____

Name: _____

Title: _____

**DEERFIELD PRIVATE DESIGN FUND II, L.P.**

By: Deerfield Mgmt., L.P., General Partner
By: J.E. Flynn Capital LLC, General Partner

By: _____

Name: _____

Title: _____

**DEERFIELD    SPECIAL    SITUATIONS FUND, L.P.**

By:  Deerfield Mgmt., L.P., General Partner
By:  J.E. Flynn Capital LLC, General Partner


By: _____
Name: _____
Title: _____

2

**AGENT:**                                    **DEERFIELD MGMT., L.P.**

By:  J.E. Flynn Capital LLC, General Partner


By: _____
Name: _____
Title: _____

**SCHEDULE 1**

**PLEDGED EQUITY**

| Grantor (owner of Record of such Pledged Equity) | Issuer | Pledged Equity Description | Certificate (Indicate No.) |
|---|---|---|---|
| Nuo Therapeutics, Inc. | Cytomedix Acquisition Company, LLC | LLC Membership Interest | n/a |
| Nuo Therapeutics, Inc. | Aldagen, Inc. | 1000 shares of common stock | C-1002 |
| | | | |
| | | | |
| | | | |

**SCHEDULE 1A**

**<u>PLEDGED NOTES AND OTHER INVESTMENT PROPERTY</u>**

**A.**     **<u>PLEDGED NOTES</u>**

**B.**     **<u>OTHER INVESTMENT PROPERTY</u>**

**SCHEDULE 2**

**FILINGS AND PERFECTION**

See UCC financing statements attached.

UCC-1 Financing Statement of Nuo Therapeutics, Inc. to be filed with the Delaware Secretary of State.

UCC-1 Financing Statement of Aldagen Inc. to be filed with the Delaware Secretary of State.

UCC-1 Financing Statement of Cytomedix Acquisition Company, LLC to be filed with the Delaware Secretary of State.

**SCHEDULE 3**

**GRANTOR INFORMATION**

| GRANTOR (exact legal name) | STATE/COUNTRY OF ORGANIZATION | FEDERAL EMPLOYER IDENTIFICATION NUMBER | CHIEF EXECUTIVE OFFICE | ORGANIZATIONAL IDENTIFICATION NUMBER |
|---|---|---|---|---|
| Nuo Therapeutics, Inc. | Delaware | 23-3011702 | | 981164777-2890868 |
| Aldagen, Inc. | Delaware | 56-2185054 | | 001111025-3188005 |
| Cytomedix Acquisition Company, LLC | Delaware | n/a | | 100334974-4806133 |

**SCHEDULE 4**

**PLACES OF BUSINESS / LOCATION OF COLLATERAL**

| Grantor | Location | Interest | Lessor |
|---------|----------|----------|--------|
| Nuo Therapeutics, Inc. | | Leasehold | |
| Aldagen, Inc. | | Leasehold | |

**SCHEDULE 5**

**<u>INTELLECTUAL PROPERTY</u>**

See attached.

**SCHEDULE 6**

**<u>DEPOSIT ACCOUNTS</u>**

**SCHEDULE 7**

**COMMERCIAL TORT CLAIMS**

## ANNEX I

## FORM OF JOINDER TO GUARANTY AND SECURITY AGREEMENT

This JOINDER AGREEMENT (this "Agreement") dated as of [_____], 20[__] is executed by the undersigned for the benefit of _____, as lenders (the "Lenders") in connection with that certain Guaranty and Security Agreement dated as of _____, 2016 among the Grantors party thereto, Agent and Lenders (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty and Security Agreement"). Capitalized terms not otherwise defined herein are being used herein as defined in the Guaranty and Security Agreement.

Each Person signatory hereto is required to execute this Agreement pursuant to Section 7.16 of the Guaranty and Security Agreement.

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each such Person hereby agrees as follows:

1.     Each such Person assumes all the obligations of a Grantor and a Guarantor under the Guaranty and Security Agreement and agrees that such person or entity is a Grantor and a Guarantor and bound as a Grantor and a Guarantor under the terms of the Guaranty and Security Agreement, as if it had been an original signatory to such agreement. In furtherance of the foregoing, such Person hereby assigns, pledges and grants to Agent and (to the extent provided therein) its Affiliates, a security interest in all of its right, title and interest in and to the Collateral (other than Excluded Property) owned thereby to secure the Secured Obligations.

2.     Schedules 1, 2, 3, 4, 5, 6 and 7 of the Guaranty and Security Agreement are hereby amended to add the information relating to each such Person set out on Schedules 1, 2, 3, 4, 5, 6 and 7 respectively, hereof. Each such Person hereby makes to Agent and Lenders the representations and warranties set forth in the Guaranty and Security Agreement applicable to such Person and the applicable Collateral and confirms that such representations and warranties are true and correct in all material respects (without duplication of any materiality qualifier) as of the date hereof after giving effect to such amendment to such Schedules (except to the extent stated to relate to a specific earlier date).

3.     In furtherance of its obligations under Section 5.2 of the Guaranty and Security Agreement, each such Person agrees to deliver to Agent appropriately complete UCC financing statements naming such person or entity as debtor and Lenders as secured party, and describing its Collateral and such other documentation as Agent (or its successors or assigns) may require to evidence, protect and perfect the Liens created by the Guaranty and Security Agreement, as modified hereby. Each such Person acknowledges the authorizations given to Lenders under the Section 5.9 of the Guaranty and Security Agreement and otherwise.

4.     Each such Person's address for notices under the Guaranty and Security Agreement shall be the address of the Borrower set forth in the Facility Agreement and each such Person hereby appoints the Borrower as its agent to receive notices hereunder.

5.     Agent acknowledges that upon the effectiveness of this Agreement, the undersigned shall have the rights of a Grantor and Guarantor under the Guaranty and Security Agreement.

6.     This Agreement shall be deemed to be part of, and a modification to, the Guaranty and Security Agreement and shall be governed by all the terms and provisions of the Guaranty and Security Agreement, with respect to the modifications intended to be made to such agreement, which terms are

incorporated herein by reference, are ratified and confirmed and shall continue in full force and effect as valid and binding agreements of each such person or entity enforceable against such person or entity. Each such Person hereby waives notice of Lenders' acceptance of this Agreement.  Each such Person will deliver an executed original of this Agreement to Agent.

[add signature block for each new Grantor]

**Acknowledged and agreed to as of the year and date first written above:**

**<u>AGENT</u>:**

_____

By:      _____
Name:  _____
Title:   _____

2

**Attachment 11**


**Percentage of the Scenario A Allocated New Common Stock allocated from the New Investors to existing holders of Common Stock Equity Interests in the Debtor as of the Record Date who execute and timely deliver a Release Document, in the event of a Successful Capital Raise.**

The percentage of the Scenario A Allocated New Common Stock allocated from the New Investors to existing holders of Common Stock Equity Interests in the Debtor as of the Record Date who execute and timely deliver a Release Document, in the event of a Successful Capital Raise, shall be between 10-30%.

**Attachment 12**


**Form of the Arthrex TSA (transition services agreement)**

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement is dated as of April ____, 2016 (this "Agreement"), by and between _____ ("Deerfield") and Nuo Therapeutics, Inc. ("Nuo", and collectively with Deerfield, the "Parties", and each individually a "Party").

R E C I T A L S:

WHEREAS, Nuo is a debtor and debtor-in-possession in a Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware (the "Court") in Case No. 16-10192 (MFW);

WHEREAS, Nuo proposed and the Court has confirmed a Plan of Reorganization (the "Plan");

WHEREAS, pursuant to the Plan, Nuo's existing Amended and Restated License Agreement dated as of October 16, 2015 ("License Agreement") between Nuo and Arthrex, Inc. ("Arthrex") is being assigned to Deerfield;

WHEREAS, the Plan provides that concurrently with the consummation of the transactions contemplated thereby, the Parties will enter into this Agreement whereby Nuo will provide Deerfield the Services (as defined herein) during the Transition Period (as defined herein);

WHEREAS, pursuant to the License Agreement, the assumption by Arthrex of all rights related to manufacture and supply of the Product Line (as such terms is defined in the License Agreement) was to occur no later than March 31, 2016 but is now targeted to occur on or around September 30, 2016 and Nuo's continued manufacture and supply of the Product Line until such assumption by Arthrex is part of the consideration to Deerfield's assumption of the License Agreement and support of the Plan;

A G R E E M E N T:

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

SECTION 1
DEFINITIONS

For the purposes of this Agreement, the following terms will have the definitions hereinafter specified:

1.1     "Action" means any suit, charge, legal proceeding, investigation, audit, grievance, administrative enforcement proceeding or arbitration proceeding by or before any Governmental Authority or arbitrator.

1.2     "Affiliate" means with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with such Person, where "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.3     "Business Day" means any day other than a Saturday, a Sunday or any other day on which the Federal Reserve Bank of New York is closed.

1.4     "Force Majeure" means any event beyond the reasonable control of a Party or its Affiliates that delays or interrupts the performance of the obligations or covenants of such Party (or, if applicable, such Affiliate) hereunder, including (a) an intervening act of God or public enemy, war, invasion, armed conflict, act of foreign enemy, blockade, revolution, terrorist attack, sabotage, civil commotions, interference by civil or military authorities; (b) mechanical breakdowns (that could not have been prevented by industry standard maintenance), obstruction, strikes or other similar events; or (c) natural disasters, riot or other public disorder, epidemic, quarantine restriction, strike, or labor protest.

1.5     "Governmental Authority" means any government or political subdivision, whether federal, state, local or foreign, or any agency of any such government or political subdivision, or any federal, state, local or foreign court.

1.6     "Law" means any law, statute, code, ordinance, regulation, Order or rule of any Governmental Authority.

1.7     "Order" means any order, judgment, ruling, injunction, assessment, award, decree or writ issued, promulgated or entered by or with any Governmental Authority.

1.8     "Original License" means the Distributor Agreement and License dated August 7, 2013 between Nuo and Arthrex.

1.9     "Person" means any natural person, sole proprietorship, partnership, corporation, limited liability company, joint venture, unincorporated society or association, trust or other legal entity or Governmental Authority.

1.10     "Products" has the meaning provided therefor in the License Agreement.

1.11     "Service" or "Services" shall mean those services listed and described on Schedule A attached hereto to be provided pursuant to the terms and in the manner described herein.

1.12     "Transition Period" shall mean, with respect to each Service, the period beginning on the date of this Agreement and continuing until such time as Arthrex has fully assumed responsibility for the Service, and such period shall not exceed beyond October 15, 2016, unless extended by mutual agreement of the Parties.

SECTION 2
SERVICES

2.1    Transition Services.

(a)    During the Transition Period, Nuo agrees to provide to Deerfield or its Affiliate, which may be the holder of the License Agreement, all of the Services set forth on Schedule A to this Agreement.  In every case, all of the Services will be provided in accordance with the terms, limitations and conditions set forth herein and on Schedule A.

(b)    Nuo acknowledges that during the Transition Period, Deerfield will be transitioning the Services being performed by Nuo hereunder to Arthrex or one or more vendors. During the Transition Period, Nuo agrees to provide reasonable assistance to Deerfield, Arthrex, and any third party vendors selected by Deerfield or Arthrex to effect such transfer in a manner designed (to the extent reasonably possible) to minimize disruptions to the business operations of Arthrex, provided that Nuo shall be reimbursed by Deerfield or Arthrex for the reasonable out-of-pocket expenses incurred by Nuo thereof in connection with the performance of its obligations under this Section 2.1(b), such reimbursement to be made promptly after receipt of a written request therefor accompanied by such reasonable documentation as Deerfield or Arthrex may request in connection therewith; provided, however, Deerfield shall not be obligated to reimburse any expense totaling more than Five Thousand Dollars ($5,000) unless Nuo obtained the prior consent of Deerfield to incur such expenses.

2.2    Quality of Services.  Nuo represents and warrants that the Services provided to Deerfield by Nuo and its Affiliates hereunder will be provided in good faith, in accordance with practices and standards historically exercised by Nuo for the provision of such Services and in material compliance with applicable Laws and the terms of the License Agreement and Original License, if applicable.  Except as set forth in the immediately preceding sentence, Nuo makes no representations or warranties of any kind, express or implied, with respect to the Services, including without limitation any warranties of merchantability or fitness for a particular purpose, which are specifically disclaimed.

SECTION 3
PAYMENT

3.1    Payment of Services.

(a)    In consideration for providing the Services, Deerfield will pay to Nuo, for each full calendar month during which any Service is performed hereunder: (i) the fee set forth for such Services on Schedule A and reimbursement for the actual cost of any Product purchased by Nuo for Arthrex as required by the License Agreement; and (ii) all reasonable and documented out-of-pocket expenses incurred by Nuo in providing such Services it being understood and agreed that if any Services shall be provided for less than a full calendar month (including in respect of the calendar month in which this Agreement shall be executed), the fees payable in respect thereof shall be prorated based on the number of days in such calendar month in which such Services were provided in relation to the total number of days in such calendar month; provided, however, Deerfield shall not be obligated to pay any expense totaling more

than Five Thousand Dollars ($5,000) unless Nuo obtained the prior consent of Deerfield to incur such expenses.

(b)    A single written statement will be rendered each calendar month by Nuo to Deerfield for Services delivered during the preceding calendar month, which statement will include the applicable Product cost, fee or fees set forth for such Services on Schedule A and all reasonable and documented out-of-pocket expenses incurred by Nuo in providing such Services during such preceding calendar month (the "Monthly Statement").  Monthly Statements will be substantiated by supporting written information and will itemize in reasonable detail the basis for such Monthly Statement.  Each Monthly Statement will be delivered promptly on the invoice date and payable to Nuo in immediately available funds within ten (10) days after the receipt by Deerfield of payment by Arthrex to Deerfield for such Product and Services, but in no event later than ninety (90) days after the invoice date of such Monthly Statement.  The Monthly Statement shall be sent to the recipient at the address for Deerfield and in the manner set forth in Section 6.2.  If any payment is not paid when due, Nuo shall send a notice of such overdue payment to Deerfield (a "Payment Notice").  If Deerfield does not make such overdue payment within ten (10) Business Days after receiving a Payment Notice, Nuo shall have the right to cease providing any or all of the Services it provides and terminate those Services upon delivery of ten (10) days' prior written notice to Deerfield; provided, however, Nuo shall not cease providing any Service or terminate this Agreement if such lack of payment is due to a good faith dispute regarding such payment and any amounts not in dispute have been duly paid by Deerfield.

SECTION 4
TERM

4.1    General.  Each Service will commence on the Effective Date and will continue until the end of the Transition Period.  This Agreement will commence as of the Effective Date hereof and shall remain in force until the earlier of (a) expiration of the Transition Period, (b) termination of this Agreement by Nuo or Deerfield in accordance with Section 3.1(b), or 4.4(a), as applicable.

4.2    Amounts Due.

In the event of a termination or expiration of this Agreement, all outstanding amounts due from Deerfield under Sections 2.1(b) and 3.1, up through and including the date of termination or expiration, will become due and payable to Nuo and Nuo shall send or cause to be sent a final invoice in respect thereof, which shall thereafter be paid in accordance with the terms set forth in Section 3.1(b) hereof.  The fee for any terminated or expired Service will be prorated on the terms set forth in Section 3.1(a) hereof.

4.3    Survival.  The provisions in Sections 3.1, 4.2, 4.3, 5, and 6.2 through 6.14 hereof shall survive the expiration or other termination of this Agreement.

4.4    Termination of Agreement or Services.

(a)    At any time on written notice to the other Party, Nuo or Deerfield, as applicable, shall have the right to terminate this Agreement or all or any of the Services: (i) if the other Party commits a material breach of any of the terms or conditions of this Agreement (other

than non-payment by the other Party of any invoice in respect of a Service, which shall be governed by Section 3.1(b)) and, if such breach may be cured, the other Party fails to remedy the breach within thirty (30) days of receiving such notice; or (ii) pursuant to Section 5.3.

(b)    Deerfield may terminate the use of all or any of the Services upon at least thirty (30) days' prior notice thereof in accordance with Section 6.2.  Notwithstanding anything contained in this Agreement to the contrary, if Nuo, prior to the end of the Transition Period for such Service, breaches its obligation to provide such Service, Nuo shall be liable to Deerfield for any costs incurred by Deerfield for such Services obtained from any third party provided that Deerfield shall be required to deliver to Nuo reasonable evidence of the amount of costs so incurred by Deerfield.

SECTION 5
LIABILITIES; INDEMNIFICATION

5.1    [RESERVED]

5.2    [RESERVED]

5.3    <u>Performance Remedy; Specific Performance</u>.

(a)    In the event that Nuo fails to provide a Service hereunder, or the quality of a Service is not in accordance with Section 2.2 (a "Failure"), Deerfield may give Nuo prompt written notice thereof.  Following receipt of any such notice, Nuo will use commercially reasonable efforts to promptly remedy any such Failure.  If, within fifteen (15) days following the delivery of such written notice, Nuo has not provided such Service or improved the quality thereof to be in compliance with the terms set forth in this Agreement, and if as a result of any such Failure, it becomes reasonably necessary for Deerfield to obtain any applicable Service from another provider, then Deerfield may terminate the applicable Service and Nuo shall be required to pay to Deerfield  the amount of any reasonable cost (in excess of the cost of the Service to be provided by Nuo hereunder) that is actually paid by Deerfield to a third party service provider, provided that Deerfield shall be required to deliver to Nuo reasonable evidence of the amount of costs so incurred by Deerfield.

(b)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Subject to <u>Section 6.5</u>, the Parties agree that, without the necessity of posting bond or other undertaking, the parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Agreement, this being in addition to any other remedy to which such party is entitled at law or in equity.

5.4    <u>Indemnification</u>.

(a)    Nuo will indemnify and hold harmless each of Deerfield and its Affiliates for any Actions, assessments, losses, damages, deficiencies, costs, expenses, liabilities, judgments, awards, fines, interest, sanctions, penalties and charges (including any amounts paid in settlement in accordance with this Agreement), including reasonable costs, fees and expenses

of attorneys, accountants, consultants, experts and other third party representatives required to investigate, mitigate or avoid the same, arising from a claim by a third party ("Losses") that are incurred by Deerfield or its Affiliates, as the case may be, if and to the extent that any such Loss arises out of or relates to (i) any material breach of this Agreement by Nuo or any of its Affiliates providing Services hereunder or (ii) the gross negligence, bad faith or fraud of Nuo or any of its Affiliates providing services hereunder in connection with the performance of the Services hereunder.

SECTION 6
GENERAL PROVISIONS

6.1    Access.

During the Transition Period, Deerfield will have reasonable access upon prior written notice to information or records kept by Nuo for the purposes of the delivery of Services under this Agreement.

6.2    Notices.    Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and (a) sent by facsimile transmission, (b) sent by electronic mail, (c) delivered in person, (d) mailed by first class registered or certified mail, postage prepaid, or (e) sent by Federal Express or other overnight courier of national reputation, addressed as follows:

To Nuo:

Nuo Therapeutics, Inc.
_____
_____
Attention: _____
Fax: _____
Email: _____

If to Deerfield to:

Deerfield
_____
_____
Attention: _____
Fax: _____
Email: _____

6.3    Relationship between Parties.    Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, trust or other association of any kind, each Party being individually responsible only for its obligations as set forth in this Agreement. Nuo shall provide the Services hereunder in the capacity of an independent contractor and not as an employee or agent of Deerfield.

6.4     Assignment; Binding Effect.  This Agreement and the rights hereunder and all the provisions hereof shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  The Parties acknowledge and agree that a Party may assign its rights and delegate its duties under this Agreement to one or more of its Affiliates that normally performs the contemplated Services; provided, however, that the assigning Party will remain fully responsible for compliance with the terms of this Agreement the same as if such delegation or designation were not effected.

6.5     Governing Law; Jurisdiction.  All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the Schedules hereto, and all claims and disputes arising hereunder or thereunder or in connection herewith or therewith, whether purporting to be sound in contract or tort, or at law or in equity, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware. The Parties hereto hereby agree and consent to be subject to the exclusive jurisdiction of the federal and state courts  in Wilmington, Delaware, and hereby waive the right to assert the lack of personal or subject matter jurisdiction or improper venue in connection with any such suit, action or other proceeding.  In furtherance of the foregoing, each of the Parties hereto (a) waives the defense of inconvenient forum, (b) agrees not to commence any suit, action or other proceeding arising out of this Agreement or any transactions contemplated hereby other than in any such court, and (c) agrees that a final judgment in any such suit, action or other proceeding shall be conclusive and may be enforced in other jurisdictions by suit or judgment or in any other manner provided by Law.  EACH PARTY HERETO HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY AND WITH AND UPON THE ADVICE OF COMPETENT COUNSEL IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (i) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (ii) THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

6.6     Counterparts; Electronic Transmission.  This Agreement may be executed in two or more counterparts (any of which may be delivered by facsimile or email transmission followed promptly by an executed original), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

6.7     Captions.  The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.

6.8     Complete Agreement.  This Agreement and the Schedules attached hereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings between the Parties with respect to such subject matter.

6.9    <u>Interpretation.</u>

(a)    When a reference is made in this Agreement to a Section or Schedule, such reference shall be to a Section or Schedule of or to this Agreement unless otherwise indicated.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(c)    Unless the context requires otherwise, the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words in this Agreement refer to this entire Agreement.

(d)    Unless the context requires otherwise, words in this Agreement using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders.

(e)    References in this Agreement to "dollars" or "$" are to U.S. dollars.

(f)    This Agreement was prepared jointly by the Parties and no rule that it be construed against the drafter will have any application in its construction or interpretation.

6.10    <u>Waiver and Amendment.</u>  This Agreement may be amended or modified only by an instrument in writing duly executed by each Party.  Except as otherwise provided in this Agreement, any failure of any Party to comply with any obligation, covenant, agreement or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligations, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

6.11    <u>Third Party Beneficiaries.</u>  Each Party intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any Person other than the Parties hereto, and no such right shall be created.

6.12    <u>Force Majeure.</u>  If a Party or any of its Affiliates or any other Person (including any vendor or supplier to such Party or any Affiliate thereof) is affected by an event of Force Majeure such that such Party or any Affiliate thereof is unable to fulfill all or part of its obligations under this Agreement (including providing such Party's Services), such Party must give written notice thereof to the other Party, and thereafter and so long as such Force Majeure circumstances shall remain in effect, the affected Party and its Affiliates will be relieved of their obligations hereunder and shall not be in default or breach hereunder as a result thereof.

6.13    <u>Severability.</u>  Any term of provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rending invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so

broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

*[The remainder of this page is intentionally left blank]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**NUO THERAPEUTICS, INC.**

By: _____

Name: _____

Title: _____

**[DEERFIELD]**

By: _____

Name: _____

Title: _____

*[Signature Page to the Transition Services Agreement]*

## SCHEDULE A

| **SERVICES** | **COST** |
|---|---|
| During the Transition Period, Nuo will continue to provide for the manufacture and supply to Arthrex of the Products in accordance with the terms of License Agreement and Original License, as applicable, and provide its full cooperation, as commercially reasonable, to assist Arthrex with the manufacture and supply of the Products, notwithstanding any argument that Nuo could assert that it is not obligated to perform under the terms of License Agreement following March 31, 2016.<br><br>Nuo will provide consultation, as commercially reasonable to Arthrex concerning technical aspects, regulatory clearances and approvals and use of the Products from time to time as reasonably requested by Arthrex.<br><br>Nuo will, so far as it is reasonably able, provide Arthrex all scientific and technical information available to Nuo and required in connection with the licenses granted under the License Agreement, or to respond to inquiries from customers or governmental or regulatory authorities.<br><br>Nuo will provide the services required by Section 5(a) and 5(c) the License Agreement and such other services, as reasonably necessary to fulfill the obligations to Nuo under the License Agreement and Original License, as applicable, including but not limited to transition of the manufacture and supply of Product to Arthrex, as Deerfield or Arthrex may reasonably request. | USD 10,000 per month |
| Nuo will permit Arthrex and its contractors, subcontractors and other agents to duplicate, translate, decompile, reverse engineer and adapt any Products or component parts thereof. | **None** |
| Nuo will complete the "cable refit" on any defective Products identified in Schedule B exhibiting a "white screen" failure or potential for "white screen" failure. | **None** |
| Nuo will be responsible for all Products that it has manufactured and supplied to Arthrex, or shall supply to Arthrex in accordance with Section 2(b) of the License Agreement.. | |

*[Signature Page to the Transition Services Agreement]*

**SCHEDULE B**

| SERIAL NUMBER | |
|---|---|
| GB | 928 |
| GB | 929 |
| GB | 930 |
| GB | 931 |
| GB | 932 |
| GB | 933 |
| GB | 934 |
| GB | 935 |
| GB | 936 |
| GB | 937 |
| GB | 938 |
| GB | 939 |
| GB | 940 |
| GB | 941 |
| GB | 942 |
| GB | 943 |
| GB | 944 |
| GB | 945 |
| GB | 946 |
| GB | 947 |
| GB | 948 |
| GB | 950 |
| GB | 951 |
| GB | 952 |
| GB | 953 |
| GB | 954 |
| GB | 955 |
| GB | 956 |
| GB | 958 |
| GB | 959 |
| GB | 961 |
| GB | 962 |
| GB | 963 |
| GB | 964 |
| GB | 965 |
| GB | 966 |
| GB | 967 |

*[Signature Page to the Transition Services Agreement]*

118142112_2

| GB | 968 |
| GB | 969 |
| GB | 970 |
| GB | 971 |
| GB | 972 |
| GB | 973 |
| GB | 974 |
| GB | 976 |
| GB | 977 |
| GB | 978 |
| GB | 979 |
| GB | 981 |
| GB | 985 |
| GB | 987 |
| GB | 992 |
| GB | 993 |
| GB | 998 |
| GB | 1003 |
| GB | 1004 |
| GB | 1006 |
| GB | 1011 |
| GB | 1012 |
| GB | 1015 |
| GB | 1018 |
| GB | 1021 |
| GB | 1023 |
| GB | 1024 |
| GB | 1026 |
| GB | 1027 |
| GB | 1031 |
| GB | 1032 |
| GB | 1033 |
| GB | 1034 |
| GB | 1038 |
| GB | 1040 |
| GB | 1041 |
| GB | 1043 |
| GB | 1045 |
| GB | 1047 |
| GB | 1048 |

*[Signature Page to the Transition Services Agreement]*

| GB | 1049 |
|----|------|
| GB | 1050 |
| GB | 1051 |
| GB | 1053 |
| GB | 1057 |
| GB | 1059 |
| GB | 1064 |
| GB | 1066 |
| GB | 1069 |
| GB | 1070 |
| GB | 1071 |
| GB | 1072 |
| GB | 1074 |
| GB | 1075 |
| GB | 1076 |
| GB | 1077 |
| GB | 1079 |
| GB | 1080 |
| GB | 1082 |
| GB | 1083 |
| GB | 1084 |
| GB | 1085 |
| GB | 1086 |
| GB | 1088 |
| GB | 1089 |
| GB | 1090 |
| GB | 1091 |
| GB | 1092 |
| GB | 1093 |
| GB | 1094 |
| GB | 1096 |
| GB | 1097 |
| GB | 1098 |
| GB | 1099 |
| GB | 1100 |
| GB | 1102 |
| GB | 1104 |
| GB | 1105 |
| GB | 1107 |
| GB | 1108 |

*[Signature Page to the Transition Services Agreement]*

118142112_2

| GB | 1109 |
|----|------|
| GB | 1110 |
| GB | 1111 |
| GB | 1112 |
| GB | 1114 |
| GB | 1115 |
| GB | 1116 |
| GB | 1119 |
| GB | 1121 |
| GB | 1123 |
| GB | 1128 |
| GB | 1129 |
| GB | 1132 |
| GB | 1134 |
| GB | 1135 |
| GB | 1136 |
| GB | 1137 |
| GB | 1138 |
| GB | 1143 |
| GB | 1146 |
| GB | 1148 |
| GB | 1150 |
| GB | 1151 |
| GB | 1153 |
| GB | 1154 |
| GB | 1155 |
| GB | 1156 |
| GB | 1157 |
| GB | 1158 |
| GB | 1160 |
| GB | 1161 |
| GB | 1162 |
| GB | 1163 |
| GB | 1166 |
| GB | 1167 |
| GB | 1168 |
| GB | 1169 |
| GB | 1170 |
| GB | 1171 |
| GB | 1174 |

*[Signature Page to the Transition Services Agreement]*

| GB | 1175 |
|----|------|
| GB | 1176 |
| GB | 1177 |
| GB | 1179 |
| GB | 1180 |
| GB | 1183 |
| GB | 1184 |
| GB | 1188 |
| GB | 1191 |
| GB | 1192 |
| GB | 1193 |
| GB | 1194 |
| GB | 1195 |
| GB | 1196 |
| GB | 1197 |
| GB | 1200 |
| GB | 1201 |
| GB | 1202 |
| GB | 1203 |
| GB | 1205 |
| GB | 1206 |
| GB | 1207 |
| GB | 1208 |
| GB | 1209 |
| GB | 1210 |
| GB | 1212 |
| GB | 1213 |
| GB | 1214 |
| GB | 1216 |
| GB | 1217 |
| GB | 1218 |
| GB | 1219 |
| GB | 1220 |
| GB | 1222 |
| GB | 1223 |
| GB | 1224 |
| GB | 1225 |
| GB | 1226 |
| GB | 1227 |
| GB | 1228 |

*[Signature Page to the Transition Services Agreement]*

| | |
|---|---|
| GB | 1230 |
| GB | 1231 |
| GB | 1232 |
| GB | 1234 |
| GB | 1235 |
| GB | 1236 |
| GB | 1238 |
| GB | 1239 |
| GB | 1240 |
| GB | 1241 |
| GB | 1242 |
| GB | 1243 |
| GB | 1244 |
| GB | 1245 |
| GB | 1246 |
| GB | 1247 |
| GB | 1248 |
| GB | 1249 |
| GB | 1251 |
| GB | 1252 |
| GB | 1253 |
| GB | 1254 |
| GB | 1255 |
| GB | 1256 |
| GB | 1257 |
| GB | 1258 |
| GB | 1259 |
| GB | 1260 |
| GB | 1261 |
| GB | 1265 |
| GB | 1268 |
| GB | 1269 |
| GB | 1270 |
| GB | 1271 |
| GB | 1272 |
| GB | 1274 |
| GB | 1275 |
| GB | 1276 |
| GB | 1277 |
| GB | 1278 |

*[Signature Page to the Transition Services Agreement]*

| | |
|----|------|
| GB | 1279 |
| GB | 1280 |
| GB | 1282 |
| GB | 1283 |
| GB | 1284 |
| GB | 1286 |
| GB | 1287 |
| GB | 1288 |
| GB | 1289 |
| GB | 1290 |
| GB | 1292 |
| GB | 1293 |
| GB | 1294 |
| GB | 1296 |
| GB | 1297 |
| GB | 1298 |
| GB | 1299 |
| GB | 1300 |
| GB | 1301 |
| GB | 1302 |
| GB | 1303 |
| GB | 1304 |
| GB | 1305 |
| GB | 1306 |
| GB | 1307 |
| GB | 1308 |
| GB | 1309 |
| GB | 1311 |
| GB | 1313 |
| GB | 1314 |
| GB | 1315 |
| GB | 1316 |
| GB | 1317 |
| GB | 1319 |
| GB | 1320 |
| GB | 1321 |
| GB | 1322 |
| GB | 1324 |
| GB | 1325 |
| GB | 1326 |

*[Signature Page to the Transition Services Agreement]*

| GB | 1327 |
|----|------|
| GB | 1328 |
| GB | 1329 |
| GB | 1330 |
| GB | 1332 |
| GB | 1333 |
| GB | 1334 |
| GB | 1335 |
| GB | 1337 |
| GB | 1338 |
| GB | 1339 |
| GB | 1340 |
| GB | 1341 |
| GB | 1343 |

*[Signature Page to the Transition Services Agreement]*

## **Attachment 13**

### **"Class 4 Escrow" Information**

In accordance with the terms of the Plan, the Debtor is presently taking necessary steps to open a segregated bank account for purposes of the "Class 4 Escrow", which account will be administered by the Reorganized Debtor.